CASE 0:24-md-03108-DWF-DJF   Doc. 57-1   Filed 09/05/24   Page 1 of 15

E-FILED
6/21/2024 2:43 PM
CLERK & MASTER
DAVIDSON CO. CHANCERY CT.

IN THE CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE
AT NASHVILLE

| | |
|---|---|
| MID-SOUTH IMAGING & THERAPEUTICS, P.A. <br><br> Plaintiffs, <br><br> v. <br><br> UNITEDHEALTH GROUP INCORPORATED, OPTUM, INC., CHANGE HEALTHCARE INC., and CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, <br><br> Defendants. | Case No._____ <br><br> **COMPLAINT** <br><br> **Jury Trial Demanded** |

Plaintiff, MID-SOUTH IMAGING & THERAPEUTICS, P.A. ("MidSouth" or "Plaintiff") brings this Complaint against Defendants, UNITEDHEALTH GROUP INCORPORATED ("United"), OPTUM, INC. ("Optum"), CHANGE HEALTHCARE INC. ("Change") and CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC ("CHC") (collectively "Defendants") based upon its personal knowledge, investigation by counsel, and review of public documents, and states as follows:

**NATURE OF THE ACTION**

1. From its headquarters in Tennessee, for more than 50 years, MidSouth has offered world-class diagnostic imaging interpretation and interventional radiology services to patients, hospitals, and clinics across the mid-south, as well as trained and mentored numerous residents through its long-standing radiology residency program. Patients, referring physicians, advanced

1

practice professionals, and healthcare administrators rely on MidSouth for accurate diagnoses and superb patient care. MidSouth is widely recognized as a leading provider of its services.

2. In order to obtain payment for these important services, MidSouth relied solely on Defendants for all of MidSouth's medical coding, billing, collections and revenue cycle management.

3. Under the contract, Defendants are obligated to seek reimbursement for all of MidSouth's clinical procedures by billing patients and third-party payors, such as insurance companies. Defendants are also solely responsible for managing MidSouth's accounts receivable once they have been billed. Without Defendants' performance of these essential obligations, MidSouth has no way to bill or collect any money for the medical services that it provides to patients and other medical providers.

4. Since February of 2024, Defendants have failed to perform *any* of their obligations owed to MidSouth, which has left MidSouth without *any* coding, billing, collections, or revenue cycle management—the lifeblood of its business.

5. As a direct result of Defendants' failures, MidSouth's business operations have been significantly harmed.

## PARTIES

6. Plaintiff is a professional association organized in the State of Tennessee, with a principal place of business located in Tennessee.

7. Defendant United is incorporated under the laws of the State of Delaware and maintains its principal place of business in Minnetonka, Minnesota.

8. Defendant Optum is incorporated under the laws of the State of Delaware and maintains its principal place of business in Eden Prairie, Minnesota.

9. Defendant Change is incorporated under the laws of the State of Delaware and maintains its principal place of business in Nashville, Tennessee.

10. Defendant CHC is a Georgia limited liability company that is a subsidiary of Change and is a citizen of Tennessee.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction under Tenn. Code Ann. § 16-10-113.

12. This Court has personal jurisdiction over Defendants because they maintain sufficient minimum contacts with the State of Tennessee, including by being citizens of Tennessee and by purposefully availing themselves of the privilege of conducting business with Plaintiff in Tennessee.

13. Venue is proper in this Court pursuant to Tenn. Code Ann. § 20-4-104.

## FACTUAL ALLEGATIONS

14. MidSouth offers world-class teaching and diagnostic imaging interpretation and interventional radiology services to patients, hospitals, and clinics in Tennessee and other locations in the mid-south. MidSouth's board-certified, fellowship-trained physicians and advanced practice professionals focus on nine sub-specialty areas: body imaging, vascular interventional, neurointerventional, mammography, neuroradiology, nuclear medicine, pediatric radiology, musculoskeletal imaging, and cardiopulmonary imaging.

15. Change is a healthcare technology company that supplies critical services "to make clinical, administrative and financial processes simpler and more efficient for payers, providers and consumers." Among these services, its platform facilitates patient insurance verifications, clinical information exchanges, provider claim transmittals and payment disbursements, pharmacy claims transactions, and prior authorizations and medical necessity reviews. Change stores highly

sensitive information for millions of people, including MidSouth's patients, on its servers. Such information includes Personal Identifiable Information (e.g., phone numbers, addresses, Social Security numbers, etc.) ("PII") and Personal Health Information (e.g., medical, dental, and insurance records, claims information, etc.) ("PHI").[1]

16. Optum is a subsidiary of United that provides pharmacy management and medical administrative services to physicians, providers, hospitals, government entities, health plans, and various related companies, reaching over 100 million consumers every year.

17. In October 2022, United acquired Change. As part of the acquisition, Optum merged with Change.

18. Change represents to providers that its "advanced technology and services help . . . enhance patient engagement and access, improve outcomes, drive revenue performance, and improve operational efficiency." Change also promises patients that its "solutions streamline the engagement, care, and payment experience to improve the patient journey." Change has established itself as a vital link between providers and insurers, acknowledging that the "healthcare system, and how payers and providers interact and transact, would not work without Change Healthcare."[2]

19. Effective on or about October 1, 2019, a subsidiary of Change, CHC, assumed all rights and responsibilities of the Service Provider, as successor in interest to PST Services, Inc., under a Services Agreement with MidSouth (the "Agreement"). Pursuant to Section 1 of the Agreement, CHC agreed to provide Services, including medical coding and seeking

---

[1] *MMRG Notifies Patients of Cybersecurity Incident*, BUSINESS WIRE (Feb. 6, 2024, 5:30 PM), https://www.businesswire.com/news/home/20240206060527/en/.

[2] Complaint at 12, *United States v. UnitedHealth Group Incorporated*, Case No. 1:22-cv-00481, 2022 WL 576918 (D.D.C. Feb. 24, 2022).

4

reimbursement for MidSouth's charges for clinical procedures through billing patients and third-party payors. CHC also agreed to manage MidSouth's accounts receivable.

20. Under the Agreement, CHC provided all of MidSouth's coding, billing, and collection services. Without CHC's performance of its contractual obligations, MidSouth has no way to bill or collect amounts due. In short, without CHC, MidSouth cannot bring any money into its business.

21. Considering Defendants' critical infrastructure that providers and payors depend on, their representations as to its vast involvement in the healthcare industry, and their creation, collection, and maintenance of highly sensitive data, Defendants must maintain the utmost security of their systems.

22. On February 21, 2024, in an SEC filing, United announced that "a suspected nation-state associated cyber security threat actor had gained access to some of the Change Healthcare information technology systems" (the "Change Healthcare Data Breach").[3] United disclosed that the "network interruption [was] specific to Change Healthcare . . ."[4]

23. Following the Change Healthcare Data Breach, Defendants unilaterally disconnected more than 100 services, including the Change Healthcare platform ("Change Platform"), which provided *all* of MidSouth's coding, billing and collection services pursuant to the Agreement.

24. The unavailability of Defendants' mission-critical services to MidSouth resulted in unpaid claims, overdue payments, interest accumulation, inability to perform eligibility

---

[3] *UnitedHealth Group Incorporation Form 8-K*, SEC (Feb. 21, 2024), https://www.sec.gov/Archives/edgar/data/731766/000073176624000045/unh-20240221.htm.

[4] *Id.*

5

verifications leading to loss of services, increased administrative costs caused by manual processes, negative credit impact, and other harms to MidSouth.

25. Initially, Defendants informed MidSouth that the Change Platform was projected to be restored in mid-March 2024. But Defendants' systems were *not* restored by that time.

26. On or about April 13, 2024, Defendants notified MidSouth that Defendants were waiting on completion of one test and that system restoration was slated for the week of April 22, 2024. But Defendants' systems were *not* restored by that time.

27. On or about April 29, 2024, Defendants promised MidSouth that Defendants' system restoration would occur later that week. But Defendants' systems were not restored by that time either.

28. Continuing Defendants' pattern, on or about May 1, 2024, Defendants informed MidSouth that restoration would occur the week of May 13, 2024. But Defendants' systems were not restored by that time either.

29. Once again, on or about May 17, 2024, Defendants notified MidSouth that the system would be restored and the Change Platform would finally "go live" the week of May 20, 2024. Defendants also stated that medical claims submission could begin the week of May 27, 2024. But Defendants' systems did not become operable and claims were not submitted by those dates.

30. On or about May 28, 2024, Defendants told MidSouth that the Change Platform should be operational within "a day or two." But the Change Platform was not operational at that time.

31. On or about June 20, 2024, Defendants told MidSouth that they were still unable to submit claims, but that their billing systems should be "online" and operational by the next week.

32. As of the date of the filing of this complaint, the Change Platform is *still* not operational and MidSouth has not received billing and collection services from Defendants.

33. On information and belief, Defendants had reason to believe that at least one of the statements regarding the timeline for the restoration of the Change Platform was false.

34. Defendants made these statements to induce MidSouth to maintain its Services Agreement relationship with CHC, despite its ongoing default, and otherwise guide MidSouth's decisions.

35. MidSouth justifiably relied upon the above-referenced false information and timelines that Defendants supplied to it. In reliance on Defendants' misrepresentations, MidSouth delayed seeking an alternate provider for its billing and collections, among other things.

36. Defendants did not make any effort to implement work-arounds or alternate solutions that MidSouth suggested while the Change Platform was inoperable, including deploying alternative billing and revenue cycle recovery solutions.

37. Moreover, Defendants failed to implement reasonable security measures and failed to disclose material facts regarding their deficient security protocols. Because MidSouth relies entirely on CHC for its billing and accounts receivable services under the Agreement, MidSouth's payments were completely stopped as a direct result of Defendants' failure to adequately protect their systems and their decision to disconnect services.

38. In addition to losing its only way to collect revenue, MidSouth has been unable to provide any billing statements in response to medical records requests it has received from patients or to law firms in response to subpoenas.

39. MidSouth has already suffered more than $30 million in lost revenue as a result of Defendants' failure to provide Services under the Agreement and its damages continue to increase.

MidSouth has also incurred additional damages including business interruption costs, legal expenses, and other continuing costs associated with the fallout created by Defendants.

40. Due to their critical position within the healthcare system, Defendants are prime targets of cyberattacks.

41. Defendants must have observed frequent public announcements of data breaches affecting healthcare providers and must have known that information of the type they collect, maintain, and store is highly coveted and a frequent target of hackers and ransomware attacks.

42. Accordingly, Defendants were, or certainly should have been, aware of the high risk of cyberattacks given the massive repositories of sensitive information they manage, and therefore, should have taken all reasonable precautions to prevent such incidents. Defendants were also aware of the risks created by their substandard data security practices, their insecure computer networks, and their inadequate incident response and system restoration processes. Their failure to heed warning, adequately secure their networks, and adhere to recommended best practices caused the disruption and damages suffered by MidSouth.

## CAUSES OF ACTION

### COUNT ONE
### BREACH OF CONTRACT

43. MidSouth expressly realleges and incorporates the allegations in ¶¶ 1-42 of this Complaint.

44. Through the Agreement, MidSouth and CHC were parties to a valid and enforceable contract, supported by adequate consideration, under Tennessee law.

45. CHC breached the Agreement by failing to provide services in a manner expressly and/or impliedly required by the Agreement.

46. Specifically, CHC agreed to obtain reimbursement for MidSouth's charges for clinical procedures through the billing of patients and third-party payors and the management of MidSouth's accounts receivable. But since on or about February 21, 2024, CHC has failed to obtain any reimbursement on behalf of MidSouth for its charges for clinical procedures or work to collect MidSouth's accounts receivable balances.

47. As a result of CHC's breaches of the Agreement, MidSouth has suffered more than $30 million in lost revenue and continues to suffer damages to be proven at trial.

## COUNT TWO
## BREACH OF FIDUCIARY DUTIES

48. MidSouth expressly realleges and incorporates the allegations in ¶¶ 1-47 of this Complaint.

49. MidSouth and CHC were in a principal-agent relationship given that CHC acted on behalf of and for the benefit of MidSouth in the performance of the Agreement.

50. As a result of this agency relationship, CHC owed fiduciary duties to MidSouth.

51. CHC breached these fiduciary duties to MidSouth, including but not limited to by failing to make any effort to provide MidSouth with a backup plan or a workaround while Change Platform was not operational.

52. As a result of CHC's breach of its fiduciary duties, MidSouth has suffered damages, financial and otherwise, to be proven at trial.

## COUNT THREE
## NEGLIGENCE

53. MidSouth expressly realleges and incorporates the allegations in ¶¶ 1-52 of this Complaint.

54. By agreeing to serve as a claims clearinghouse and payment processor, Defendants undertook to render revenue and claims processing services that benefited MidSouth.

55. In undertaking to provide such services, Defendants knew or should have known of the necessity to heed credible security warnings, maintain adequate cybersecurity policies and procedures, detect alerts in regard to vulnerabilities affecting their systems, and implement appropriate procedures to keep security current and address vulnerabilities.

56. Defendants owed a duty of care to MidSouth to provide adequate data security, consistent with industry standards, to ensure that Change's systems and networks were adequately protected and could remain open and operational for Change's clients, such as MidSouth.

57. Defendants breached their duty to MidSouth in numerous ways, as described herein, including by:

   a. Failing to comply with industry standard data security measures for the healthcare industry leading up to the Data Breach;

   b. Failing to comply with their own privacy policies; and

   c. Failing to adequately monitor, evaluate, and ensure the security of Change's network and systems.

58. Defendants' failure to exercise reasonable care by taking proper security measures to protect their systems and the information they possessed resulted in their decision to disconnect the Change Platform following the Change Data Breach.

59. Furthermore, Defendants failed to have an adequate response/backup plan to ensure continuity of service to their clients such as MidSouth, which would have allowed MidSouth's claims, billing and accounts receivable processes to continue without interruption in the event of a cybersecurity event.

60. Defendants' failure to abide by their duties has placed MidSouth in a worse position than it would have been had Defendants not undertaken such duties because it would have utilized other, more secure means to process insurance claims and payments, which would have avoided the current disruption and lack of funds flowing to MidSouth.

61. As a direct and proximate result of Defendants' negligence, MidSouth has suffered damages, including, but not limited to missed payments, business disruption, lost time, and other out-of-pocket costs and expenses.

**COUNT FOUR**
**NEGLIGENT FAILURE TO WARN**

62. MidSouth expressly realleges and incorporates the allegations in ¶¶ 1-61 of this Complaint.

63. Upon information and belief, Defendants had been aware for a substantial period of time that their cybersecurity systems and networks were inadequate and prone to attack.

64. Defendants knew or should have known of their cybersecurity failures including, but not limited to, failing to heed credible security warnings; failing to maintain adequate patch management policies and procedures; failing to detect alerts in regard to vulnerabilities affecting their systems; failing to properly update and patch third-party software, update software regularly, implement third-party patches when issued, and prioritize patches by the severity of the threat; failing to properly use automated tools to track which versions of software were running and whether updates were available; and failing to implement appropriate procedures to keep security current and address vulnerabilities, including to monitor expert websites and software vendors' websites regularly for alerts about new vulnerabilities.

65. Furthermore, Defendants failed to have an adequate response/backup plan to ensure continuity of service to their clients such as MidSouth, which would have allowed MidSouth's

claims, billing and accounts receivable processes to continue without interruption in the event of a cybersecurity event.

66. As MidSouth's only contracted billing and accounts receivable processor, Defendants had a duty to warn MidSouth of the known cybersecurity vulnerabilities, of the likely risks caused by Defendants' failure to remedy such cybersecurity flaws, and that if there was a cybersecurity event that it was reasonably foreseeable that Defendants' entire system would be shuttered for months and months.

67. Defendants failed to provide such warnings to MidSouth.

68. Defendants also failed to effectively remedy the cybersecurity flaws and problems in their systems and networks and failed to provide prompt notice to MidSouth that the promised secure information systems had been breached by unauthorized persons during the Change Data Breach.

69. As a direct and proximate result of Defendants' negligent failure to warn, MidSouth has suffered and will continue to suffer injury to be proven at trial.

## COUNT FIVE
## NEGLIGENT MISREPRESENTATION

70. MidSouth expressly realleges and incorporates the allegations in ¶¶ 1-69 of this Complaint.

71. Defendants were acting within the course and scope of their business, professional, and/or contractual relationship with MidSouth during the relevant time alleged herein.

72. Defendants negligently supplied false information regarding the restoration of their systems and processes and the resumption of their Services to MidSouth following the Change Data Breach.

73. Specifically, over several months, Defendants repeatedly and falsely assured MidSouth that the Change Platform would be restored and MidSouth's billing and collections processes would resume soon.

74. Defendants did not exercise reasonable care to obtain and/or communicate accurate information concerning the timeline for the restoration of the Change Platform.

75. Defendants intended for this information to induce MidSouth to maintain its Services Agreement relationship with CHC, despite its ongoing default, and otherwise guide MidSouth's decisions.

76. MidSouth justifiably relied upon the above-referenced false information that Defendants supplied to it.

77. As a result, MidSouth has suffered and will suffer financial losses to be proven at trial.

## COUNT SIX
## INTENTIONAL MISREPRESENTATION / FRAUD

78. MidSouth expressly realleges and incorporates the allegations in ¶¶ 1-77 of this Complaint.

79. Defendants repeatedly and intentionally misrepresented to MidSouth the status and timeline for restoring the Change Healthcare Platform.

80. Defendants knew that these representations were incorrect, or made them recklessly without knowing whether they were true or false, and misled MidSouth in an attempt to keep MidSouth from rescinding its contract and pursuing an alternative to Defendants' services.

81. MidSouth reasonably relied on Defendants' misrepresentations and delayed finding an alternative service provider.

82. As a result, MidSouth has suffered and will continue to suffer financial damages to be determined at trial.

### COUNT SEVEN
### VIOLATION OF THE TENNESSEE CONSUMER PROTECTION ACT, T.C.A. § 47-18-104(b)(5)

83. MidSouth expressly realleges and incorporates the allegations in ¶¶ 1-82 of this Complaint.

84. Defendants repeatedly and deceptively represented to MidSouth that the Change Healthcare Platform was nearly restored when that was not true.

85. Defendants knew of this deception and purposefully misled MidSouth in an attempt to keep MidSouth from rescinding its contract and pursuing an alternative to Defendants' services.

86. MidSouth relied on Defendants' misrepresentations and delayed finding an alternative service provider.

87. As a result, MidSouth has suffered and will continue to suffer financial damages to be determined at trial.

### REQUEST FOR RELIEF

WHEREFORE, MidSouth respectfully requests the following relief:

    a. An award of damages, including actual, nominal, punitive and consequential damages, as allowed by law in an amount to be determined;

    b. An award of three (3) times the actual damages sustained by MidSouth and any other relief as the Court considers necessary and proper pursuant to T.C.A. § 47-18-109;

c. Equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein and from refusing to issue prompt, complete, and accurate disclosures to MidSouth;

d. Injunctive relief requested by MidSouth, including but not limited to injunctive and other equitable relief as is necessary to protect MidSouth's interests;

e. Prejudgment interest on all amounts awarded, at the prevailing legal rate;

f. An award of attorneys' fees, costs, and litigation expense, as allowed by law, including T.C.A. § 47-18-109; and

g. Any other Orders, findings, and determinations identified and sought in this Complaint.

## JURY DEMAND

Plaintiff hereby demands a trial by jury for all issues triable by jury.

Respectfully submitted,

*/s/ Kathryn Hannen Walker*
Kathryn Hannen Walker (BPR# 020794)
Briana T. Sprick Schuster (BPR# 038305)
Taylor M. Sample (BPR# 034430)
BASS BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Phone: (615) 742-6200
Facsimile: (615) 742-2844
kwalker@bassberry.com
briana.sprick.schuster@bassberry.com
taylor.sample@bassberry.com

*Attorneys for Plaintiff MidSouth Imaging & Therapeutics, P.A.*