# UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: CHANGE HEALTHCARE, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates to:<br>ALL ACTIONS | MDL No. 24-3108 (DWF/DJF)<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS DILLMAN CLINIC'S AND ODOM HEALTH'S MOTION FOR  PRELIMINARY INJUNCTION** |
| Total Care Dental and Orthodontics, et al.,<br><br>          Plaintiffs,<br>v.<br><br>UnitedHealth Group Incorporated, UnitedHealthCare Services, Inc., Optum Insight, Change Healthcare Inc., Change Healthcare Operations, LLC, Change Healthcare Solutions, LLC, Change Healthcare Holdings, Inc., Change Healthcare Technologies, LLC, and Change Healthcare Pharmacy Solutions, Inc., Optum, Inc., Optum Financial, Inc., Optum Bank, and Optum Pay,<br><br>          Defendants. | Case No. 0:25-cv-00179-DWF-DJF |
| Odom Sports Medicine P.A. d/b/a Odom Health & Wellness, on behalf of itself and all others similarly situated,<br><br>          Plaintiff,<br>v.<br><br>UnitedHealth Group Incorporated, UnitedHealthCare Services, Inc., Optum Insight, Change Healthcare Inc., Change Healthcare Operations, LLC, Change Healthcare Solutions, LLC, Change Healthcare Holdings, Inc., Change | Case No. 0:25-cv-00949-DWF-DJF |

Healthcare Technologies, LLC, and
Change Healthcare Pharmacy Solutions,
Inc., Optum, Inc., Optum Financial, Inc.,
Optum Bank, and Optum Pay,

Defendants.

## I.    INTRODUCTION

After failing to employ rudimentary cybersecurity precautions to authenticate user sessions, Change Health Defendants' systems were breached by outside parties. This gross failure led to the data of hundreds of millions of U.S. patients being exposed and compromised. In response, Change Health Defendants deliberately disconnected the claims processing system—their main corporate purpose ("Change Platform"), leaving healthcare providers and pharmacies ("Providers") without repayment for their services provided to patients ("Service Shutdown").

The Change Platform is the largest healthcare payment processing service in the country. More than 44% of all the dollars flowing through the U.S. healthcare system are processed on the Change Platform. The Service Shutdown paralyzed the healthcare industry and disrupted Providers' practices. Billions of dollars of payments from legitimate claims were not processed or paid and, despite Change Health Defendants reconnecting the claims processing system, the effects of the Service Shutdown continued. Even today, claims and payments impacted by the Service Shutdown are still not resolved, causing continuing damage to Providers.

Amid the Service Shutdown—faced by growing pressure from government agencies and cash-strapped Providers—Change Health Defendants hastily introduced a loan program called the Temporary Funding Assistance Program ("TFAP") to provide what they promoted as "interest-free and fee-free loans" to Providers in crisis due to the complete shutdown of its claims processing and payment systems. The loans were made on "take-it-or-leave-it" terms ("TFAP contract") and Providers were left with little choice but to accept the loans to stay afloat.

The plain language of the TFAP contract provides that that repayment is due only once claims processing services have resumed *and* all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid). And, if there was any ambiguity regarding the language, United HealthGroup Inc.'s ("UHG") CEO Andrew Witty confirmed under oath at a May 1, 2024, Congressional Hearing that  UHG had "no intention of asking for repayment until providers determine their business is back to normal."[1]

The Change Health Defendants are now violating the plain terms of the TFAP contract by prematurely trying to collect repayment. Even though many Providers, including Plaintiffs Dillman Clinic and Labs' ("Dillman Clinic") and Odom Sports Medicine P.A.'s ("Odom"), have not received all payments for services provided months ago and are far from "back to normal," Defendants are demanding that Providers repay the

---

[1] *Responses to Questions for the Record for Andrew Witty*, U.S. Senate Committee on Finance, Full Committee Hearing, at 34 (May 1, 2024), available at https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_to_andrew_witty.pdf (last accessed April 1, 2025).

loans, in full and on a short timeline.[2] Providers' businesses are not back to normal because, in addition to being subject to increased costs because of the shutdown, Providers have not received all the valid claims payments that accrued during the shutdown. Incredibly, insurance companies, including UHG's UnitedHealthcare Insurance, Co. ("UHIC") and its giant web of subsidiary insurers, have refused to pay substantial amounts to Providers stating the claims are "untimely"—of course, the reason they are untimely is Defendants' own conduct.

Defendants have now started making frequent and increasingly threatening demands for repayment of TFAP loans. Even after receiving communications from Providers that they are unable to pay and business is not "back to normal," Defendants are threatening to unilaterally take money from the Providers to repay the loans, by offsetting money from unrelated current claims payments owed to Providers. Defendants are making these threats despite payments impacted during the Service Shutdown still not having been processed and despite Providers still not having received the claim payments owed to them.

To prevent further irreparable harm, Plaintiffs Dillman Clinic and Odom now move for a preliminary injunction to stop Defendants from taking any action against Dillman Clinic and Odom to recoup the TFAP loans or otherwise penalize Dillman Clinic or Odom for not paying back the loans until the Court has had an opportunity to consider and

---

[2] Odom filed suit on March 14, 2025. *See Odom Sports Medicine P.A. d/b/a Odom Health & Wellness v. UnitedHealthGroup Inc.* (Case No. 0:25-cv-00949-DWF-DJF).

determine Providers' claims for Defendants' breach of the TFAP contracts and declaratory relief on the merits.

## II.    RELEVANT FACTS

### A.    Defendants' Temporary Funding Assistance Program (TFAP)

In February 2024, UHG and its subsidiaries, including Change Healthcare Inc. ("Change Healthcare"), controlled the largest healthcare payment platform in United States (the "Change Platform"), which processed 15 billion transactions annually, or approximately $2 trillion in health care payments each year. (Consolidated Provider Complaint ("CC") ¶ 1.) Despite the reliance of the U.S. healthcare system on the Change Platform, and the incredible volume of sensitive information it contained, the Change Health Defendants[3] failed to employ even rudimentary cybersecurity precautions to authenticate people logging in to their networks, among other failures. (CC ¶ 3.) The result was that the Change Platform and related systems were subject to the largest data breach and Service Shutdown in history, which decimated the operations of the Change Platform and any backups. (CC ¶¶ 3-4.) Upon belatedly discovering the exposure of its system, on February 21, 2024, the Change Health Defendants took the Change Platform offline, leaving Providers without a way to submit claims and get paid for their services to patients. The Service Shutdown lasted for months and still has not been fully rectified.

---

[3] The "Change Health Defendants" include UHG, UnitedHealthCare Services, Inc. ("UHCS"), Optum Insight, Change Healthcare, Change Healthcare Operations, LLC ("CHO"), Change Healthcare Solutions, LLC ("CHS"), Change Healthcare Holdings, Inc. ("CHH"), Change Healthcare Technologies, LLC ("CHT"), and Change Healthcare Pharmacy Solutions, Inc. ("CHPS").

Following Congressional hearings and widespread criticism of Change Health Defendants' response to the complete failure of its systems, on March 1, 2024, Defendants established the TFAP, administered by the Optum Financial Defendants[4] (also UHG subsidiaries), to provide interest-free and fee-free loans to eligible Providers. In contractual terms, the loans were provided "***to provide [Providers] with funds that you may have otherwise received but for the disruption*** in processing of electronic healthcare transactions, claims processing, and administrative services and payments operations of Change Healthcare." (Declaration of Dillman Clinic ("Dillman Decl.") Ex. A,; Declaration of Odom ("Odom Decl.") Ex. A) (emphasis added). To participate in the TFAP, Providers could submit an inquiry form through an online portal, and, if deemed eligible, they could then log into their Optum Pay account to view their organization's funding amount and request and accept the funds that would be deposited to the bank account on file in Optum Pay. The Provider would then receive TFAP funds in weekly allotments, if so requested.

The TFAP contract is one of adhesion that was offered to Providers on a take-it-or-leave-it basis at a time when their businesses were in crisis because of the Change Health Defendants' failure to safeguard its systems and protect the integrity of the Change Platform. Because of the Service Shutdown, Providers, including Plaintiffs Dillman Clinic and Odom, needed an immediate influx of funds in order to keep their doors open and took the funds under duress the Defendants caused in the first place.

---

[4] The "Optum Financial Defendants" include Optum, Inc., Optum Financial, Inc. ("Optum Financial"), Optum Bank, and Optum Pay.

The parties to the TFAP contracts include Defendant CHO, its affiliates, and the Provider accepting the loan. The TFAP contract calls for jurisdiction and venue in Minnesota and for the application of Minnesota law. (Dillman Decl. Ex. A, at ¶ 10; Odom Decl. Ex. A, at ¶ 10). As updated on March 15, 2024, under section 5(a) ("Repayment Clause"), the Agreement states:

> Recipient agrees to pay the total Funding Amount disbursed to Recipient in full within forty-five (45) business days of receiving notice that the Funding Amount is due ("Repayment Date"). CHC will send notice to the Recipient that the Funding Amount is due ***after claims processing and or/payment processing services have resumed <u>and</u> payments impacted during the service disruption period are being processed***. (Dillman Decl. Ex. A, at ¶ 5(a); Odom Decl. Ex. A, at ¶ 5(a)) (emphasis added).

Defendants touted the TFAP in describing their response to the failure of the Change System at a May 1, 2024 Congressional Hearing. At that hearing, UHG CEO Andrew Witty discussed the TFAP, explaining that UHG had "no intention of asking for repayment until providers determine their business is back to normal."[5] In his written responses to questions from Congress in May 2024, Mr. Witty responded the same way in questions concerning the TFAP program:

> We have taken a personalized approach to determining providers' funding requests and restoration efforts. In those one-on-one verbal conversations with providers we are communicating that we will work with them on a case-by-case basis so they can determine when their business is back to normal. ***We have no intention of asking for repayment until providers determine their business is back to normal. Once providers determine***

---

[5] *Responses to Questions for the Record for Andrew Witty*, U.S. Senate Committee on Finance, Full Committee Hearing, at 34 (May 1, 2024), available at https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_to_andrew_witty.pdf (last accessed April 1, 2025).

> *their business is back to normal we will work with each provider to determine when the 45 business days will start with no fees or interest.*[6]

Defendants disbursed approximately $9 billion to Providers on a weekly basis for months, continuing to provide funds through at least the end of September 2024. Yet in October 2024, contrary to the terms of the TFAP contract and to UHG's representations to Congress, Defendants abruptly began demanding that Providers repay the entire balance loaned in one lump sum within 45 business days. When Providers were predictably unable to repay the full amounts, Defendants' frequent demands became increasingly threatening—stating that Defendants would begin offsetting amounts due by unilaterally taking Providers' other claims payments and that such offsetting was imminent. None of Defendants' communications seeking repayment of the loans mentioned the existence of the MDL and Provider Plaintiffs' claims, disclosed the existence of Interim Overall Lead Counsel or the Lead Counsel representing Providers, or that Provider Plaintiffs in the MDL dispute Defendants' rights to repayment of the TFAP loans.

### B.    Plaintiffs' Financial Position

#### 1.    Dillman Clinic and Lab

Plaintiff Dillman Clinic is a small internal medicine and pediatric practice located and registered in Lakeville, Minnesota. (CC ¶ 355). Dillman Clinic used the Change Platform as its clearinghouse for submitting and processing medical claims. (CC ¶ 356). When Defendants commenced the Service Shutdown in February 2024, Dillman Clinic was unable to submit any claims to insurers, receive an electronic remittance advice

---

[6] *Id.* at 34 (emphasis added).

("ERA"), receive payment for medical care provided to insured patients, take on new patients, or hire additional personnel. (CC ¶ 357). As a result, Dillman Clinic had very little income coming in for several months and experienced decreased revenue streams even after claims processing started to come back online. (CC ¶¶ 357-58). Even now, Dillman Clinic has experienced challenges in accessing ERAs on the Change Platform. (Dillman Decl., at ¶ 12). The lack of organized information makes it difficult or impossible to quantify the precise amount that Dillman Clinic has yet to be reimbursed for claims submitted during the Service Shutdown, but it has had nearly $5,000 in claims denied by insurers—including United Healthcare—as untimely. (Dillman Decl., at ¶ 14).

Because of the Service Shutdown, Dillman Clinic was forced to participate in the TFAP. Dillman Clinic received a total loan of $157,600 between April and September 2024 through the program. (CC ¶ 359; Dillman Decl., at ¶ 9). On November 4, without any advance communication from Defendants and prior to Dillman receiving payments impacted by the Service Shutdown, Defendants sent Dillman Clinic a demand to repay the entire $157,600 balance by January 10, 2025. (Dillman Decl., at ¶¶ 10-13, Ex. B). As Dillman Clinic had no way of paying such a large lump sum, it requested a payment plan. Defendants responded with a plan that required Dillman Clinic to repay the entire loan by May 5, 2025, which Dillman Clinic is unable to do given the financial strain it is still experiencing. (Dillman Decl., at ¶¶ 16, 17).

On January 15, 2025, Defendants sent Dillman Clinic an email demanding that Dillman Clinic "***immediately repay the balance due within 5 business days*** of the date of this email." (Dillman Decl., at ¶ 19, Ex. C) (emphasis added) The email further threatened

that "[s]hould your organization fail to repay as requested, *we reserve the right to begin offsetting claims payable to [the] organization until the balance due has been repaid by [the] organization*." (Dillman Decl., at ¶ 19, Ex. C) (emphasis added). On January 24, 2025, Dillman Clinic received another email from Defendants stating "[a]fter multiple attempts to contact you at the email addresses and phone numbers provided and with the repayment past due, please be advised *Change Healthcare will start withholding payment on UnitedHealthcare claims next week*." (Dillman Decl., at ¶ 21, Ex. D) (emphasis added). None of the communications from Defendants ever mentioned the MDL, that Dillman Clinic is a putative class member, the Court's appointment of the various Lead Counsel or that Provider Plaintiffs were challenging Defendants' right to collect the loans in Court. (Dillman Decl., at ¶ 22, Exs. B-D.)

If Defendants force the entire repayment or start withholding claims, Dillman Clinic will face a substantial threat of bankruptcy or closing its doors. (Dillman Decl., at ¶ 33). Dillman Clinic is already seriously considering closing its primary care practice as a result of the business interruption caused by the breach. (Dillman Decl., at ¶ 30). UHG insurers make up approximately 25 percent of its total income, and if those payments are unilaterally withheld in the name of offsetting the loan, it will likely result in bankruptcy. (Dillman Decl., at ¶ 24). Furthermore, if Defendants force repayment, it will impact Dillman Clinic's ability to serve its patients.

For example, Dillman Clinic would have to forgo or delay offering critical pediatric vaccines until they could financially afford them. (Dillman Decl., at ¶ 28). This includes Rotovirus, Tenivac, Menveo, Pediarix, Prevnar, Infanrix, Boostrix, Gardisil 9, MMR, and

the Varicella vaccines. (Dillman Decl., at ¶ 28). Additionally, to save money, Dillman Clinic would have to shut down its in-house lab because of the monthly cost. (Dillman Decl., at ¶ 29). Closing the lab, however, would mean that Dillman Clinic could not offer the efficient care that it advertises to its patients, including providing lab results and a doctor visit in a single appointment. (Dillman Decl., at ¶ 29). Delaying vaccine treatments and referring patients out for lab work would result in a loss of consumer goodwill and patients would likely switch to another provider who could offer the higher level of service. (Dillman Decl., at ¶¶ 28-29). Finally, forcing Dillman Clinic to repay the loan balance means that Dillman Clinic must divert resources from providing essential medical care to patients. Dillman Clinic has already had to begin offering elective procedures through a qualified subsidiary to maximize immediate cash-flow. (Dillman Decl., at ¶ 32). It would have to expand these cash-paying procedures, diverting staff time and resources for its patients with medical needs. (*Id.*)

### 2. Odom Sports Medicine P.A. d/b/a Odom Health & Wellness

Plaintiff Odom Sports Medicine P.A. ("Odom") is a sports medicine, physical therapy, and wellness practice located and registered in Eden Prairie, Minnesota. (Odom Compl. ¶ 266). Odom used the Change Platform as its clearinghouse for submitting and processing medical claims. (Odom Compl. ¶ 267). When Defendants disconnected the Change Platform in February 2024, Odom was unable to submit claims, receive ERAs, and receive payment for medical care provided to insured patients. (Odom Compl. ¶ 268). As a result, Odom had very little income coming in for several months, and it experienced decreased revenue streams even after claims processing started. (Odom Compl. ¶¶ 268-69).

Odom estimates that it has experienced a revenue shortfall of at least $485,000 as a result of the shutdown, in part due to increased and outsized adjustments due to the heavy workload, potentially lost claims during the transition between clearinghouses, and lost revenue due to providers spending time managing the crisis instead of seeing patients and launching the new business location. (Odom Decl., at ¶ 10). It further estimates that it experienced a net deficit of at least $700,000 because the billing team was forced to work overtime, and it had to consult with attorneys. (*Id.*).

There are claims that Odom submitted during the shutdown, and related payments, that have yet to be processed. It estimates that it still has approximately $235,000 in outstanding claims that accrued from approximately February through August 2024, that it is trying to get processed through insurance. (Odom Decl., at ¶ 18). UHIC has denied approximately 39 claims totaling approximately $18,095 that were delayed due to the shutdown as "untimely." (Odom Decl., at ¶ 19). At least 20 of these claims accrued in February 2024. (*Id.*) Even though Odom specifically informed UHIC that the claims were late due to the Change Defendants' complete system failure and shutdown caused by its corporate partner, United Healthcare Insurance still denied the claims as untimely. (*Id.*).

Due to the business disruption, Odom was forced to participate in the TFAP. Odom received a total loan of $569,680 throughout the spring and summer of 2024. (Odom Compl. ¶ 270; Odom Decl., at ¶ 11). On October 28, 2024, Defendants sent Odom a demand for the entire $569,680 balance, due by January 2, 2025. (Odom Decl., at ¶ 20, Ex. C). On November 7, 2024, Odom spoke with Optum and requested a delayed repayment schedule as its business was not yet back to normal. (Odom Decl., at ¶ 21). Defendants

proposed a six-month repayment plan, with a 25% initial payment starting January 31, 2025, and the entire balance paid by June 20, 2025. (Odom Decl., at ¶ 21). Odom expressed that it could not withstand these payments. (*Id.*). Despite these representations that Odom would be unable to pay this amount, TFAP Repayment sent Odom an email that same day, setting forth the repayment plan. (Odom Decl., at ¶ 22, Ex. D). Odom had its legal counsel request that Defendants withdraw their request for repayment indefinitely and that further communications be directed to counsel. (Odom Decl., at ¶ 24). Despite counsel's outreach, Defendants continued to send Odom demands for repayment, with increasingly urgent threats to begin offsetting the loan amounts with claims payments, on January 7, January 13, January 14, and January 15. (*Id.*, Exs. F-I). And on February 26, Defendants' litigation counsel in the MDL wrote to Odom's legal counsel demanding documentation of Odom's damages in a claimed Rule 408 communication. (Odom Decl., at ¶ 28, Ex. J). None of the communications from Defendants ever mentioned the MDL, that Odom is a putative class member, the Court's appointment of various Lead Counsel or that Provider Plaintiffs were challenging Defendants' right to collect the loans in Court. (Odom Decl., at ¶ 29, Exs. B-D, F-J).

If Defendants force the entire repayment or start withholding claims payments, Odom will face a substantial threat of bankruptcy or risk closing its doors. (Odom Decl., at ¶ 33). Odom's providers are its most valuable resource, and if Defendants force repayment, Odom will have to fire at least 22 providers, and possibly all of them. (Odom Decl., at ¶ 32). This drastic measure would strain the remaining providers and dramatically reduce the number of patients it could see, including vulnerable seniors that rely on

outpatient care to maintain their mobility. (*Id.*). Additionally, a majority of these providers provide essential therapy services to seniors residing in assisted and independent living communities in the Greater Minnesota area. (*Id.*). Losing these providers would severely impact Odom's ability to serve patients in multiple facilities, and if they lose access to one building, they would likely lose access to others as operators generally prefer a single provider for all senior community buildings. (*Id.*). And given the uncertainty in Odom's financial accounts due to the shutdown, there is no guarantee that it could re-hire providers. (*Id.*). Moreover, Odom would be unlikely to secure another loan to cover the TFAP payment or garnished claims payments. (Odom Decl., at ¶ 31).

## C.    Defendants' Financial Position

Unlike Plaintiffs, Defendants are not in a precarious financial situation. UHG has a market capitalization of roughly $500 billion, and $29.1 billion in cash on hand as of January 2025.[7] Despite its failure to protect the integrity of the Change Platform, UGH reported its revenue in 2024 alone to be $400.3 billion, an 8% growth year-over-year from 2023.[8] Beyond that, while Providers suffered and continue to suffer financial hardship, UHG made hundreds of millions of dollars as a direct result of the shutdown. At 2024 year-

---

[7] *Unitedhealth Group Inc.*, CNBC (Jan. 28, 2025), https://www.cnbc.com/quotes/UNH. As of January 28, 2025, UGH's market capitalization is $500.193 billion (last accessed April 1, 2025).

[8] *UnitedHealth Group Reports 2024 Results*, UnitedHealth Group (Jan. 16, 2025), https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2024/2025-16-01-uhg-reports-fourth-quarter-results.pdf at 1 (last accessed April 1, 2025).

end, UHG reported that the total tax effect of its own failures and the shutdown was a positive $672 million.[9]

Much of the positive financial impact of the shutdown for UHG is attributable to UHIC, UHG's health insurance company. (CC ¶¶ 18, 134.) During the shutdown, UHIC, like many other insurers, did not experience a dip in income because its members were still paying premiums. (*Id.*) UHIC and other insurers, however, were not paying Providers for the medical services members received during the shutdown while Providers were unable to submit claims. (*Id.*) Instead of paying out that money owed to Providers, UHIC and other insurers held those millions (if not billions) of dollars in their cash reserves, earning interest at a time when interest rates were at recent highs. (*Id.*) Incredibly, UHIC has aggressively enforced Timely Filing Deadlines for claims that could not be submitted because of the shutdown, permanently denying payment to struggling Providers while enriching UHG. (CC ¶ 135.)

Defendants made millions from their own misconduct while placing Providers on the brink of financial ruin. Despite this, and despite Defendants' very promise to Congress and the public not to collect on TFAP contracts until after Providers were made whole, Defendants are now demanding full repayment, often in a single lump sum. While UHG has disclosed that, as of October 15, recipients of TFAP funding have repaid $3.2 billion, it has not publicly disclosed how much has been repaid in the last six months since Defendants began demanding repayment and sending misleading and threatening

---

[9] *Id.* at 8.

communications.[10] Furthermore, the fact that some Providers responded to Defendants threatening intimidation tactics does not change the fact that those Providers were not yet obligated to pay back these funds if their payment impacted during the Service Shutdown had not yet been fully processed (i.e., all payments are in the process of being paid). If Providers Dillman Clinic and Odom are forced to repay in full the TFAP loans before they are made whole, their ability to deliver healthcare to their patients, and even their very existence as businesses, will suffer irreparable harm.

## III. LEGAL STANDARD

Courts in the Eighth Circuit consider the four *Dataphase* factors when evaluating whether a preliminary injunction is warranted: "(1) the threat of irreparable harm to the movant, (2) the balance between this harm and the injury that the injunction will inflict on other parties, (3) the probability that the movant will succeed on the merits and (4) the public interest." *Erickson v. Hutchinson Tech. Inc.*, 158 F. Supp. 3d 751, 756 (D. Minn. 2016) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)); *see also Jackson v. Macalester Coll.*, 169 F. Supp. 3d 918, at 921 n.1 (D. Minn. 2016) (recognizing "[t]he same legal standard applies to both a request for a temporary restraining order and a request for a preliminary injunction."). No one factor is determinative, rather, "the court considers the particular circumstances of each case, remembering that the primary question is whether the 'balance of equities so favors the

---

[10] UHG, Information on the Change Healthcare Cyber Response, https://www.unitedhealthgroup.com/ns/changehealthcare.html#:~:text=If%20you%20are%20ready%20to,the%20statement%20to%20remit%20payment (last accessed April 1, 2025).

movant that justice requires the court to intervene to preserve the status quo until the merits are determined.'" *Erickson*, 158 F. Supp. 3d at 756 (quoting *Dataphase*, 640 F.2d at 113).

## IV.    THE COURT SHOULD GRANT PLAINTIFFS DILLMAN CLINIC AND ODOM A PRELIMINARY INJUNCTION

### A.    Plaintiffs Dillman Clinic and Odom Have Established a Threat of Irreparable Harm

"Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Erickson*, 158 F. Supp. 3d at 760 (quotation omitted). For example, the threat of unrecoverable economic loss due to bankruptcy or insolvency can constitute irreparable harm. *See Slidell, Inc. v. Millennium Inorganic Chems., Inc.*, No. CIV A. 02-213, 2002 WL 649086, at *4 (D. Minn. Apr. 17, 2002) (citing *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n*, 109 F.3d 418, 425-26 (8th Cir. 1996), and *Airlines Reporting Corp. v. Barry*, 825 F.2d 1220, 1227 (8th Cir. 1987) (upholding district court's issuance of a preliminary injunction where movant "demonstrated a clear probability that defendants will not be able to satisfy an award of adequate damages")). Nonetheless,

> the mere fact that an action for damages is available to the movant does not, necessarily, preclude issuance of a preliminary injunction . . . . Simply put, some intangible injuries, such as the movant's loss of good will, cannot be adequately compensated owing to the difficulty in computing the loss and, when properly evidenced, will constitute an adequate showing of irreparable harm.

*Coll. Craft Cos., Ltd. v. Perry*, No. 3-95-583, 1995 WL 783612, at *7 (D. Minn. Aug. 9, 1995).

Plaintiffs Dillman Clinic and Odom have demonstrated that Defendants' impending collection of TFAP loans threatens them with irreparable harm in several forms.

First, repayment of the loans threatens Dillman Clinic and Odom with insolvency and having to shutter their practices. (Dillman Decl., at ¶¶ 24, 33; Odom Decl., at ¶ 33). Plaintiffs are still suffering from increased costs due to the shutdown (Odom Decl., at ¶¶ 9, 17), have been unable to expand their businesses (Dillman Decl., at ¶ 30; Odom Decl., at ¶ 10), and are owed money for claims that accrued during the shutdown and that insurers have denied as "untimely." (Dillman Decl., at ¶¶ 13-14; Odom Decl., at ¶ 18). Plaintiffs are also unable to obtain loans to cover the substantial sums Defendants are demanding be repaid. (Dillman Decl., at ¶ 26; Odom Decl., at ¶ 31). Monetary harm may constitute irreparable harm "where the loss threatens the very existence of the [plaintiff]'s business." *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986); *see also Slidell*, 2002 WL 649086, at *4 (citing *Iowa Utils. Bd.*, 109 F.3d at 425-26 ("The Eighth Circuit has held that the threat of unrecoverable economic loss due to a company's bankruptcy or insolvency can constitute irreparable harm."). Here, the monetary harm Defendants will impose on Dillman Clinic and Odom threatens "unrecoverable economic harm"—insolvency. *See Doran v. Salem Inn, Inc*., 422 U.S. 922, 932 (1975) (substantial loss of business and perhaps bankruptcy supports irreparable harm finding).

Second, Defendants' premature recoupment of TFAP loans threatens Dillman Clinic and Odom with a permanent loss of patients and loss of goodwill. (Dillman Decl., at ¶¶ 29, 32; Odom Decl., at ¶¶ 15, 32). These harms also constitute irreparable harm. *See Iowa Utils. Bd.*, 109 F.3d at 426 (loss of consumer goodwill can be irreparable harm); *Med.*

*Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (loss of intangible assets such as reputation and goodwill constitute irreparable injury even though they are difficult to quantify); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.").

Third, the forced repayment of the TFAP loans will divert Plaintiffs' resources and threatens a reduction in quality of services to patients. Dillman Clinic would have to reduce the number and quantity of vaccines it stocks and "may have to stop offering crucial and high-demand pediatric vaccines, including Rotovirus, Tenivac, Menveo, Pediarix, Prevnar, Infanrix, Boostrix, Gardisil 9, MMR, and the Varicella vaccines." (Dillman Decl., at ¶ 28). That is in addition to shutting down its on-site lab and diverting resources to cash-paying elective procedures. (Dillman Decl., at ¶¶ 29, 32). Odom would have lay off providers and staff, decreasing its ability to timely schedule and see patients, and its ability to treat vulnerable geriatric patients in senior housing and assisted living centers. (Odom Decl., at ¶ 32). Courts have found that "a reduction of the quality of services to patients or an inability of the health care providers to continue to furnish the nature of services" they have offered to patients, presents a "genuine" threat of irreparable harm. *See e.g., Nebraska Health Care Ass'n, Inc. v. Dunning,* 578 F. Supp. 543, 545 (D. Neb. 1983).

The Court should grant Plaintiffs' Motion to stop Defendants from inflicting these harms on Providers and the patients they serve.

**B.     The Balance of Harms Weighs in Favor of Granting a Preliminary Injunction**

Under the second *Dataphase* factor, the Court should consider "the balance between the harm [to the movant] and the injury that the injunction's issuance would inflict on other interested parties." *Cenveo Corp. v. S. Graphic Sys., Inc.*, No. 08-5221 (JRT/AJB), 2009 WL 161210, at *4 (D. Minn. Jan. 22, 2009) (citation and quotation omitted). The Court must weigh "the threat to each of the parties' rights and economic interests that would result from either granting or denying the . . . injunction." *Id.* A preliminary injunction is appropriate where the non-movant "will suffer comparatively slight harm" when compared "to the irreparable harm that [the movant] will suffer if injunctive relief is not granted." *Copeland LP v. Thurston*, 732 F. Supp. 3d 1003, 1013 (E.D. Mo. 2024). Indeed, the preliminary injunction analysis "was designed to determine whether the Court should intervene to preserve the status quo until it decides the merits of the case." *Id.* at 1009.

Defendants "will suffer comparatively slight harm" in comparison to the harm that Dillman Clinic and Odom will experience if injunctive relief is not granted. *See id.* at 1012. As described above, Dillman Clinic's and Odom's very existence is threatened by repayment of the loans. In contrast, if Defendants are delayed in recouping the relatively small amounts loaned to the Providers—moneys that ultimately is owed to the Providers for the claims submitted and which is dwarfed by UHG's $29.1 billion in cash on hand[11]— until after their claims are resolved on the merits, the harm Defendants suffer will be

---

[11] *Unitedhealth Group Inc.*, CNBC (Jan. 28, 2025), https://www.cnbc.com/quotes/UNH (last accessed April 1, 2025).

nonexistent or slight. Defendants will not suffer any real impact on business operations if the preliminary injunction is granted.[12] Moreover, this outcome comports with the purpose of the balancing analysis, which is to preserve the status quo. *See id.* at 1013. If this Court grants Dillman Clinic and Odom their requested relief, the status quo is preserved.

### C.    Plaintiffs Dillman Clinic and Odom Are Likely to Succeed on the Merits of Their Claims

The third *Dataphase* factor asks the Court to evaluate the probability that the movants will succeed on the merits. Under this factor, the movant need only "demonstrate that it has a fair chance of prevailing on its claims." *Marvin Lumber & Cedar Co. v. Severson*, No. 15-1869, 2015 WL 5719502, at *7 (D. Minn. Sept. 28, 2015) (quotation omitted); *see also Planned Parenthood Minnesota, N. Dakota, S. Dakota v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (explaining that where an injunction is sought to enjoin something other than a duly enacted state statute, movant need only show a "fair chance" of prevailing on the merits). The Court does not decide whether the movant will ultimately win. *Marvin Lumber*, 2015 WL 5719502, at *7; *see also PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007) ("[T]he Eighth Circuit has rejected a requirement as to a 'party seeking preliminary relief prove a greater than fifty per cent likelihood that he will prevail on the merits.'" (quoting *Dataphase*, 640 F.2d at 113)); *D. U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016) (determining whether the movant has a likelihood of success on the merits is simply a "threshold" issue, and it requires only that the movant

---

[12] *UnitedHealth Group Reports 2024 Results*, UnitedHealth Group (Jan. 16, 2025), https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2024/2025-16-01-uhg-reports-fourth-quarter-results.pdf at 1 (last accessed April 1, 2025).

have a "better than negligible" chance of prevailing). The question before the Court as to the third *Dataphase* factor is whether Plaintiffs have a fair chance of prevailing on the relevant breach of contract claim by proving Defendants' actions in prematurely seeking repayment are a breach by Defendants of the TFAP contracts.[13]

Dillman Clinic and Odom readily demonstrate they have a fair chance of prevailing on the merits. *See Marvin Lumber*, 2015 WL 5719502, at *7. Under Minnesota law,[14] the elements of a breach of contract claim are "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Ill. Paper and Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (quotation omitted).

### 1. The plain language of the agreement shows no payments are owed now.

The TFAP contract states, in relevant part, that Defendants "will send notice . . . that the Funding Amount is due *after claims processing and/or payment processing services have resumed and payments impacted during the service disruption period are being processed*." (Dillman Decl. Ex. A, at ¶ 5(a); Odom Decl. Ex. A, at ¶ 5(a)) (emphasis added). The plain language of the contract contains two preconditions to the 45-day period after which loans are due. First, "claims processing and payment processes services" must "have resumed." This language refers to the "*processing services*" aspect of Defendant's business and imposes a requirement that the services Defendants offer must be back to normal.

---

[13] Count IV (CC ¶¶ 501, 509-14).

[14] The TFAP contracts are governed by Minnesota law. (Dillman Decl. Ex. A; Odom Decl. Ex. A).

Second, precondition to the inception of the 45-day period is that "payments impacted during the Service Shutdown period are being processed." This phrase requires more than that the service is up and running; it requires that all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid). This is the only reasonable interpretation of Defendants' form contract.

Notwithstanding the plain language, Defendants apparently contend that repayment is due once Defendants' system is useable again and *some* of the *claims* backlog is being processed. *See, e.g.,* Doc. 253-1, at 20 ("Now that Defendants' services are restored, the TFAP contracts' purpose has been satisfied"). But this disregards the second condition to repayment, which tethers Providers' obligations to when *payments* are being made. This interpretation also frustrates the purpose of the contract: "***to provide [Providers] with funds that you may have otherwise received but for the disruption*** in processing of electronic healthcare transactions, claims processing, and administrative services and payments operations of Change Healthcare." (Dillman Decl. Ex. A; Odom Decl. Ex. A) (emphasis added). If the TFAP loan is meant to temporarily substitute the "funds that [Providers] may have otherwise received but for the disruption," then to satisfy the purpose of the contract, repayment is not required until those payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid).  . (Dillman Decl. Ex. A, at ¶ 5(a); Odom Decl. Ex. A, at ¶ 5(a)).

Defendants' interpretations also read the second condition right out of the agreement. Defendants' apparent position rests on the view that the condition of "payments . . . being processed" is satisfied when *claims* are once again flowing through the Change

Platform. But that is inconsistent with the plain language of the agreement Defendants drafted, which differentiates between claims and payments processing *services*, and "payments . . . being processed." This tortured reading is particularly far-fetched considering the circumstances that compelled the TFAP in the first place—i.e., that Providers needed loans because *payments* were not being processed (and still have not been processed entirely) because of the Service Shutdown. But this oppressive interpretation is apparently what Defendants now interpret these contracts of adhesion to mean, namely that even though the Change Defendants' sister company—United Health Insurance Company—is denying claims on the basis that they are untimely, the *payments* Providers are owed in connection with those claims are somehow now being "processed."

If the trigger for repayment is resumption of any claims processing services for any Provider, and processing (but not necessarily payment) of any affected claim for any Provider, then Defendants would arguably have had the contractual right to recoup all TFAP loans as soon as *any claim* processing occurred in the Change system, without regard to whether any *payments* were made. But at least some claims were being processed in the Change system occurred *before* many of the loans were even *made*. (*Compare* CC ¶ 119 (Change Health Defendants claimed on April 22, 2024, that payment processing was at "86% of pre-incident levels") *with* Dillman Decl., at ¶ 9 (Defendants funding loans as late as September 27, 2024).) Even more troubling is that whether the impacted *payments* are being processed is within Defendants' parent company's exclusive *control*. The remedy Defendant threatens to impose is that UHIC, the same insurer whose claim denials are preventing the processing of payments which are owed (and which, if paid, might trigger

24

the 45-day repayment window), is now threatening to withhold the loan amounts from *future* payments for Providers' services.

As such, Defendants' purported contract "interpretation" defies the plain language of the agreement and is nonsensical. A court will "not consider the terms of a contract to be ambiguous simply because the parties dispute their proper interpretation." *Bettin v. Bettin*, No. A05-954, 2006 WL 541033, at *2 (Minn. Ct. App. Mar. 7, 2006). No loan payments are due until "payments impacted during the Service Shutdown period are being processed." That language means just what it says: Providers do not have to pay back the loans until all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid).   .

By seeking to collect on TFAP contract now, when many payments have not been processed, Defendants are in breach of the TFAP contracts with respect to all providers whose payments have not been processed because of the complete system failure and Service Shutdown. The provider declarations describe testimony that proves Defendants are in breach. *See, e.g.*, Dillman Decl., at ¶ 13 ("All of the claims submitted by the Dillman Clinic during the shutdown and related payments have not yet been processed."); Odom Decl., at ¶ 18 ("There are claims that Odom submitted during the shutdown, and related payments, that have yet to be processed.").

Because the conditions precedent necessary for Defendants to demand repayment have not been satisfied—payments owed to Dillman Clinic and Odom that were impacted by the Service Shutdown still have not been fully processed (i.e., all payments are in the process of being paid)—in part because Defendants' sister company denied claims as

untimely—Defendants' attempts to prematurely collect on the TFAP loans is a breach of the TFAP contract. On this basis, Plaintiffs have shown a likelihood of success on the merits.

### 2. To the extent the TFAP is ambiguous, both parol evidence and the rule of *contra preferentum* support Plaintiffs' interpretation.

Plaintiffs strongly contend that the plain language of the TFAP contract is a sufficient basis on which to decide they have shown the requisite likelihood of success on the merits. However, to the extent Defendants contend that the phrase "after claims processing and/or payment processing services have resumed and payments impacted during the Service Shutdown period are being processed" really just means "after Defendants are processing at least some claims," the language is, at a minimum, ambiguous. In particular, Defendants' apparent interpretation would require the Court to determine the meaning of the phrase "payments impacted during the Service Shutdown period are being processed" and to adjudicate the question of whether "processing" a "payment" is consistent with denial of the payment. The question of whether this language is ambiguous is a question of law for the court to decide. *See Loftness Specialized Farm Equip. v. Twiestmeyer*, 818 F.3d 356, 361 (8th Cir. 2016) ("Whether the terms of a contract are ambiguous is a question of law to be determined by the court. A contract is ambiguous if it is *reasonably* susceptible to more than one construction." (quotation omitted)).

If the Court determines that a contract is ambiguous, it may admit parol, or extrinsic, evidence of the parties' intent. *Flynn v. Sawyer*, 272 N.W.2d 904, 908 (Minn. 1978). When extrinsic evidence has been admitted, the interpretation of ambiguous terms becomes a

question of fact unless the extrinsic evidence is conclusive. *Thomsen v. Famous Dave's of Am., Inc.*, 606 F.3d 905, 911 (8th Cir. 2010) (quoting *Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 751 (Minn.2000)); *see also Cherne Contracting Corp. v. Marathon Petroleum Co., LLC,* 578 F.3d 735, 740 (8th Cir.2009) ("[A]mbiguities in written contracts" do not "necessarily preclude summary judgment. Rather, ... where no reasonable jury could find the facts necessary to entitle a plaintiff to relief, summary judgment remains appropriate.").

The Court should resolve the issue because there is no genuine factual dispute as to what the extrinsic evidence shows. The extrinsic evidence here is a *testimonial admission* by UHG about the contracts' meaning. This undisputed extrinsic evidence clearly supports Plaintiffs' reading. In UHG CEO Witty's Congressional testimony in May 2024, Witty claimed the TFAP contracts would not require repayment until "after the provider attests or it is otherwise clear that its claims processing or payment processing services have resumed to normal levels" and that UHG had "no intention of asking for repayment until *providers* determine their business is back to normal."[15] This testimony under oath confirms that the Providers' interpretation of the Repayment Clause is correct. The terms of the TFAP contract itself, the circumstances and purpose of its making—i.e., a bridge to mitigate nonpayment of claims for provider services caused by the complete failure and

---

[15] *Responses to Questions for the Record for Andrew Witty*, U.S. Senate Committee on Finance, Full Committee Hearing, at 34 (May 1, 2024), available at https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_to_andrew_witty.pdf (last accessed April 1, 2025).

Service Shutdown, which nonpayment is ongoing to this day—and Mr. Witty's own congressional testimony, support Plaintiffs' reading of the Repayment Clause.

Plaintiffs have a high likelihood of proving Defendants' loan collection efforts are premature and thus not authorized by the contract. If any doubt remains as to the contracts' meaning and the parties' intent, the rule of *contra preferentum* demands that any such doubt be construed against Defendants as drafters of the TFAP contract, which is itself a contract of adhesion. *See, e.g.*, *Lowry v. Kneeland*, 117 N.W.2d 207, 210 (Minn. 1962) ("It is elementary that if there is doubt as to [a contract's] meaning it must be construed most strongly against the one who chose the language in drafting the instrument."); *Staffing Specifix, Inc.*, 913 N.W.2d 687, 691 (Minn. 2018) (disparity in bargaining power is a relevant consideration in applying the rule of *contra proferentem*); *see also Hauenstein & Bermeister, Inc. v. Met-Fab Indus., Inc.*, 320 N.W.2d 886, 891 (Minn. 1982) ("[C]ontracts which are termed adhesion—'take-it-or-leave-it'—contracts . . . are the product of unequal bargaining power between the parties [and] are unreasonable."); *Fields v. Maslon Edelman Borman & Brand, LLP,* No. C1-02-940, 2003 WL 115449, at *2 (Minn. Ct. App. Jan. 14, 2003) (referencing contracts of adhesion and noting "the use of boilerplate language contained in a printed form is common in such agreements").

As discussed more fully above, Providers entered the TFAP contracts under dire circumstances. Because of Defendants' gross failures, Change Defendants implemented the Service Shutdown. As a result, Providers went without repayment for their services provided to patients for months. Without payment, Providers needed an immediate influx of funds to keep their doors open, and Defendants offered the TFAP. The combination of

the Provider Plaintiffs' desperate situation, the disparate bargaining power, and the boilerplate language of the TFAP contract renders the contract a quintessential "contract of adhesion."

Because Plaintiffs have more than "a fair chance of prevailing" on their Count IV contract claim, *Marvin Lumber*, 2015 WL 5719502, at *7, the third *Dataphase* factor strongly favors Providers.

### D.    Halting Defendants' Conduct Is Heavily in the Public's Interest

The fourth *Dataphase* factor requires the Court to consider whether granting injunctive relief would be in the public's interest. *Erickson*, 158 F. Supp. 3d at 756. "The 'public interest' factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious." *Prudential Ins. Co. Of Am. v. Inlay*, 728 F. Supp. 2d 1022, 1032 (N.D. Iowa 2010). "However, there are more concrete considerations, such as reference to the purposes and interests any underlying legislation was intended to serve, a preference for enjoining inequitable conduct, and the public's interest in minimizing unnecessary costs to be met from public coffers." *Id.*; *see also Mercy Health Services-Inc. v. Efstratiadis*, 579 F. Supp. 3d 1096, 1117 (N.D. Iowa 2022) (finding "that it is in the public interest that area residents have access to quality medical services"). As discussed above, because the conditions precedent necessary for Defendants to demand repayment have not been satisfied, the public interest in enforcing contract terms would not be served by allowing loan repayment effort to continue at this time.

Dillman Clinic and Odom are small practices that remain in a financially precarious situation after surviving the crisis of Defendants' making, so much so that they face a risk

of insolvency or at least cutting back on critical patient services if they are forced to repay the loans. *See* Section B *supra*. Requiring them to repay the loans at this time will thus have a negative effect on the public. Dillman Clinic would have to reduce the number and quantity of vaccines it stocks and "may have to stop offering crucial and high-demand pediatric vaccines, including Rotovirus, Tenivac, Menveo, Pediarix, Prevnar, Infanrix, Boostrix, Gardisil 9, MMR, and the Varicella vaccines." (Dillman Decl., at ¶ 28). The specter of reducing pediatric access to the MMR (Measles, Mumps, and Rubella) vaccine as the nation faces new measles outbreaks is especially alarming. Similarly, should the vulnerable senior communities that Odom serves lose access to treatment, their mobility and quality of life will suffer. (Odom Decl., at ¶ 32). The full set of ramifications for the Minnesotans that Dillman Clinic and Odom would experience if these Plaintiffs are forced to repay the TFAP loans now are hard to quantify. Public policy warrants staying the status quo while Provider Plaintiffs' claims relating to the loans are determined.

The public interest factor therefore weighs heavily in favor of Plaintiffs.

## V.    CONCLUSION

Plaintiffs Dillman Clinic and Odom have met their burden to prove the need for a preliminary injunction. Accordingly, Plaintiffs' motion for a preliminary injunction should be granted.

Dated: April 2, 2025

        *s/Daniel E. Gustafson*

Daniel E. Gustafson (#202241)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com

*Plaintiffs' Overall Lead Counsel*

Shawn M. Raiter
**LARSON-KING LLP**
30 East Seventh Street, Suite 2800
St. Paul, MN 55101
Telephone: (651) 312-6500
sraiter@larsonking.com

*MDL Liaison Counsel*

E. Michelle Drake (#387366)
**BERGER MONTAGUE**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5933
emdrake@bm.net

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com

Warren Burns
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 458-9890
wburns@burnscharest.com

*Provider Track Co-Lead Counsel*