## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: CHANGE HEALTHCARE, INC. CUSTOMER DATA SECURITY BREACH LITIGATION<br><br>This Document Relates to:<br>ALL ACTIONS | MDL No. 24-3108 (DWF/DJF)<br><br>**MEMORANDUM IN SUPPORT OF PROVIDER PLAINTIFFS' MOTION FOR DECLARATORY JUDGMENT** |
| Total Care Dental and Orthodontics, et al.,<br><br>        Plaintiffs,<br>v.<br><br>UnitedHealth Group Incorporated, UnitedHealthCare Services, Inc., Optum Insight, Change Healthcare Inc., Change Healthcare Operations, LLC, Change Healthcare Solutions, LLC, Change Healthcare Holdings, Inc., Change Healthcare Technologies, LLC, and Change Healthcare Pharmacy Solutions, Inc., Optum, Inc., Optum Financial, Inc., Optum Bank, and Optum Pay,<br><br>        Defendants. | Case No. 0:25-cv-00179-DWF-DJF |

### INTRODUCTION

After failing to employ rudimentary cybersecurity precautions to authenticate user sessions, Change Health Defendants' systems were breached by outside parties. This gross failure led to the data of hundreds of millions of U.S. patients being exposed and compromised. In response, Change Health Defendants deliberately disconnected the claims processing system—their main corporate purpose ("Change Platform"), leaving

healthcare providers and pharmacies ("Providers") without repayment for their services provided to patients ("Service Shutdown").

The Change Platform is the largest healthcare payment processing service in the country. More than 44% of all the dollars flowing through the U.S. healthcare system are processed on the Change Platform. The Service Shutdown paralyzed the healthcare industry and disrupted Providers' practices. Billions of dollars in payments from legitimate claims were not processed or paid and, despite Change Health Defendants reconnecting the claims processing system, the effects of the Service Shutdown continued. Even today, claims and payments impacted by the Service Shutdown are still not resolved, causing continuing damage to Providers.

Amid the Service Shutdown—faced by growing pressure from government agencies and cash-strapped Providers—Change Health Defendants hastily introduced a loan program called the Temporary Funding Assistance Program ("TFAP") to provide what it promoted as "interest-free and fee-free" loans to Providers in crisis due to the complete shutdown of its claims processing and payment systems. The loans were made on "take it or leave it" terms and Providers were left with little choice but to accept the loans to stay afloat.

The plain language of the loans provides that repayment is due only once claims processing services have resumed *and* all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid). And, if there was any ambiguity regarding the language, United HealthGroup Inc.'s ("UHG") CEO Andrew Witty confirmed under oath at a May 1, 2024, Congressional Hearing that UHG had "no

intention of asking for repayment until providers determine their business is back to normal."[1]

The Change Health Defendants are now violating the plain terms of the loan agreements ("TFAP contract") by prematurely trying to collect repayment. Even though many Providers have not received all payments for services provided months ago and are far from "back to normal," Defendants are demanding that Providers repay the loans in full on an expedited timeline. Providers' businesses are not back to normal because, in addition to being subject to increased costs as a result of the Service Shutdown, Providers have not received all valid claims payments that accrued during the Service Shutdown. Insurance companies, including UHG's UnitedHealthcare Insurance, Co. ("UHIC") and its giant web of subsidiary insurers, have refused to pay substantial amounts stating the claims are "untimely"—of course, the reason they are untimely is Defendants' own conduct.

Defendants have now started making frequent and increasingly threatening demands for repayment of the TFAP contract. Even after receiving communication from Providers that they are unable to pay and business is not "back to normal," Defendants are threatening to unilaterally take money from the Providers to repay the loans, by offsetting money from unrelated current claims payments owed to Providers.[2] Defendants are making

---

[1] *Responses to Questions for the Record for Andrew Witty*, U.S. Senate Committee on Finance, Full Committee Hearing, at 34 (May 1, 2024), available at https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_to_andrew_witty.pdf (last accessed April 1, 2025).

[2] None of the communications from Defendants demanding repayment of these loans mentioned the existence of the MDL and Provider Plaintiffs' claims, disclosed the existence of the Court-appointed Lead Counsel, or that Provider Plaintiffs in the MDL dispute

these threats despite the fact that payments impacted during the Service Shutdown still have not been processed and Providers still not have not received the claim payments owed to them.

The timing of repayments pursuant to TFAP contract must be decided now to clarify the rights of the Parties under the TFAP contract and provide immediate relief from uncertainty. Provider Plaintiffs move for a declaratory judgment that, under the plain reading of the TFAP contract (or applying construction principles if the contract is deemed ambiguous), repayment is due only once claims processing services have resumed *and* all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid). The Court should then declare that Defendants cannot attempt to collect repayment from Providers who entered into a TFAP contract until that time.

Finally, while this motion is pending, Provider Plaintiffs move the Court to pause Defendants efforts to recoup TFAP loans or otherwise penalize Provider Plaintiffs for failing to pay back the loan amounts until the issue of the proper interpretation of the contract can be decided.

## I.    FACTS

In February 2024, UHG and its subsidiaries, including Change Healthcare Inc. ("Change Healthcare"), controlled the largest healthcare payment platform in United States

---

Defendants' rights to demand repayment of the TFAP loans. Moreover, Defendants appear to be using the misleading and incomplete communications sent to putative Class Members to obtain releases, including as to claims in this litigation. Defendants have refused to disclose to Court-appointed Lead Counsel the number or scope of the releases they have entered into with putative Class Members. Provider Plaintiffs request oversight of these communications in a separate motion.

(the "Change Platform"), which processed 15 billion transactions annually, or approximately $2 trillion in health care payments each year. (Consolidated Provider Complaint ("CC") ¶ 1.) Despite the reliance of the U.S. healthcare system on the Change Platform, and the incredible volume of sensitive information it contained, the Change Health Defendants[3] failed to employ even rudimentary cybersecurity precautions to authenticate users logging in to their networks, among other failures. (CC ¶ 3.) The result was that the Change Platform and related systems were subject to the largest data breach and Service Shutdown in history, which decimated the operations of the Change Platform and any backups. (CC ¶¶ 3-4.) Upon belatedly discovering the exposure of its systems on February 21, 2024, the Change Health Defendants took the Change Platform offline, leaving Providers without a way to submit claims and get paid for their services to patients. The Service Shutdown lasted for months and still has not been fully rectified.

Following Congressional hearings and widespread criticism of Change Health Defendants' response to the complete failure of its systems, on March 1, 2024, Defendants established the TFAP, administered by the Optum Financial Defendants[4] (also UHG subsidiaries), to provide interest-free and fee-free loans to eligible Providers. In contractual terms, the loans were provided "*to provide [Providers] with funds that you may have*

---

[3] The "Change Health Defendants" include UHG, UnitedHealthCare Services, Inc. ("UHCS"), Optum Insight, Change Healthcare, Change Healthcare Operations, LLC ("CHO"), Change Healthcare Solutions, LLC ("CHS"), Change Healthcare Holdings, Inc. ("CHH"), Change Healthcare Technologies, LLC ("CHT"), and Change Healthcare Pharmacy Solutions, Inc. ("CHPS").

[4] The "Optum Financial Defendants" include Optum, Inc., Optum Financial, Inc. ("Optum Financial"), Optum Bank, and Optum Pay.

***otherwise received but for the disruption*** in processing of electronic healthcare transactions, claims processing, and administrative services and payments operations of Change Healthcare." (Declaration of Daniel E. Gustafson (Gustafson Decl.), Ex. A (TFAP contract)) (emphasis added). To participate in the TFAP, Providers could submit an inquiry form through an online portal, and, if deemed eligible, could then log into their Optum Pay account to view their organization's funding amount and request and accept the funds that would be deposited to the bank account on file in Optum Pay. The Provider would then receive TFAP funds in weekly allotments, if so requested.

The TFAP contract is one of adhesion, offered to Providers on a take-it-or-leave-it basis at a time when their businesses were in crisis because of the Change Health Defendants' failure to safeguard its systems and protect the integrity of the Change Platform. Because of the Service Shutdown, Providers needed an immediate influx of funds to keep their doors open and took the funds under duress the Defendants caused in the first place.

The parties to the TFAP contracts include Defendant CHO, its affiliates, and the Provider accepting the loan. The TFAP contracts calls for jurisdiction and venue in Minnesota and for the application of Minnesota law. (Gustafson Decl., Ex. A, at ¶ 10).  As updated on March 15, 2024, the provision at issue (the "Repayment Clause")[5] is as follows:

> Recipient agrees to pay the total Funding Amount disbursed to Recipient in full within forty-five (45) business days of receiving notice that the Funding

---

[5] It is the Provider Plaintiffs'  understanding that essentially all Providers who needed funding under the TFAP were given the same form contract. (*See, e.g.*, Gustafson Decl., Ex. A) This Agreement was drafted by Defendants and not subject to negotiations by the Providers. This motion relates to only TFAP contracts that contain this language.

Amount is due ("Repayment Date"). CHC will send notice to the Recipient that the Funding Amount is due *after claims processing and or/payment processing services have resumed <u>and</u> payments impacted during the service disruption period are being processed*.

(Gustafson Decl., Ex. A, at ¶ 5(a)) (emphasis added).

Defendants touted the TFAP in describing their response to the failure of the Change System at a May 1, 2024, Congressional Hearing. At that hearing, UHG CEO Andrew Witty discussed the TFAP contract, explaining that UHG had "no intention of asking for repayment until providers determine their business is back to normal."[6] In his written responses to questions from Congress in May 2024, Mr. Witty responded the same way in questions about the TFAP program:

> We have taken a personalized approach to determining providers' funding requests and restoration efforts. In those one-on-one verbal conversations with providers we are communicating that we will work with them on a case-by-case basis so they can determine when their business is back to normal. *We have no intention of asking for repayment until providers determine their business is back to normal. Once providers determine their business is back to normal we will work with each provider to determine when the 45 business days will start with no fees or interest*.[7]

Defendants disbursed approximately $9 billion to Providers on a weekly basis for months, continuing to provide funds through at least the end of September 2024. Yet in October 2024, contrary to the terms of the TFAP contract and to UHG's representations to Congress, Defendants abruptly began demanding that Providers repay the entire balance

---

[6] *Responses to Questions for the Record for Andrew Witty*, U.S. Senate Committee on Finance, Full Committee Hearing, at 34 (May 1, 2024), available at https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_to_andrew_witty.pdf (last accessed April 1, 2025).

[7] *Id.* at 34 (emphasis added).

loaned in one lump sum within 45 business days. When Providers were predictably unable to repay the full amounts, Defendants' demands became increasingly threatening—stating that Defendants would begin offsetting amounts due by unilaterally taking Providers' other claims payments and that such offsetting was imminent.

Unlike Plaintiffs, Defendants are not in a precarious financial situation. UHG has a market capitalization of roughly $500 billion, and $29.1 billion in cash on hand as of January, 2025.[8] Despite its failure to protect the integrity of the Change Platform, UHG reported its revenue in 2024 alone to be $400.3 billion, an 8% growth year-over-year from 2023.[9] Beyond that, while Providers suffered and continue to suffer financial hardship, UHG made hundreds of millions of dollars as a direct result of the Service Shutdown. At 2024 year-end, UHG reported that the total tax effect of its own failures related to the Service Shutdown was a *positive* $672 million.[10]

Much of the positive financial impact of the Service Shutdown for UHG is attributable to UHIC, UHG's health insurance company. (CC ¶¶ 18, 134.) During the Service Shutdown, UHIC, like many other insurers, did not experience a dip in income because its members were still paying premiums. (*Id.*) UHIC and other insurers, however, were not paying Providers for the medical services members received during the Service

---

[8] *Unitedhealth Group Inc.*, CNBC (Jan. 28, 2025), https://www.cnbc.com/quotes/UNH. As of January 28, 2025, UGH's market capitalization is $500.193 billion. (Last accessed April 1, 2025).

[9] *UnitedHealth Group Reports 2024 Results*, UnitedHealth Group (Jan. 16, 2025), https://www.unitedhealthgroup.com/content/dam/UHG/PDF/investors/2024/2025-16-01-uhg-reports-fourth-quarter-results.pdf at 1 (last accessed April 1, 2025).

[10] *Id.* at 8.

Shutdown while Providers were unable to submit claims. (*Id.*) Instead of paying out that money owed to Providers, UHIC and other insurers held those millions (if not billions) of dollars in their cash reserves, earning interest at a time when interest rates were at recent highs. (*Id.*) Incredibly, UHIC has aggressively enforced Timely Filing Deadlines for claims that could not be submitted because of the Service Shutdown, permanently denying payment to struggling Providers while enriching UHG. (CC ¶ 135.)

Defendants made millions from their own misconduct while placing Providers on the brink of financial ruin. Despite this, and despite Defendants' very promise to Congress and the public not to collect on TFAP contract until after Providers were made whole, Defendants are now demanding full repayment. While UHG has disclosed that, as of October 15, recipients of TFAP funding have repaid $3.2 billion, it has not publicly disclosed how much has been repaid in the last six months since Defendants began demanding repayment and sending misleading and threatening communications.[11] That some Providers responded to Defendants threatening communications does not change the fact that those Providers were not yet obligated to pay back these funds if their payments impacted during the Service Shutdown had not yet been fully processed (i.e., all payments are in the process of being paid).

Given the continued chaos surrounding Defendants' collection efforts, the Court should provide clarity to the Parties and declare that, given the plain language of the

---

[11] UHG, Information on the Change Healthcare Cyber Response, https://www.unitedhealthgroup.com/ns/changehealthcare.html#:~:text=If%20you%20are%20ready%20to,the%20statement%20to%20remit%20payment (last accessed April 1, 2025).

Repayment Clause, repayment is due only once claims processing services have resumed *and* all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid). Alternatively, the Court should reach the same conclusion if the contract is deemed ambiguous.

## II.    ARGUMENT

Provider Plaintiffs seek a declaratory judgment interpreting the Repayment Clause of the TFAP contract, as it will efficiently determine the rights of Provider Plaintiffs and their repayment obligations.

### A.    Declaratory judgment is the proper mechanism for resolving the interpretation of the repayment provision in the TFAP contracts.

"In a case of actual controversy within its jurisdiction," a court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. "District courts are afforded broad discretion over these claims." *Fairview Health Servs. v. Armed Forces Off. of Royal Embassy of Saudi Arabia*, 705 F. Supp. 3d 898, 912 (D. Minn. 2023) (citation omitted). The party seeking a declaratory judgment must show that there is an actual controversy between the parties. *Nat'l Hockey League v. Nat'l Hockey League Players Ass'n*, 789 F. Supp. 288, 292 (D. Minn. 1992). In other words, "the question in each case is whether the facts alleged ... show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Nat'l Hockey League*, 789 F. Supp. at 294 (citing *Maryland Cas. Co. v. Pacific*

*Coal & Oil Co*., 312 U.S. 270 (1941)). The dispute must be "definite and concrete, not hypothetical or abstract." *Nat'l Hockey League*, 789 F. Supp. at 294.

There can be no doubt that there is an actual controversy between the Parties here. Provider Plaintiffs have pleaded these issues in their Consolidated Complaint and Defendants have moved to dismiss these claims in their Motion to Dismiss. But while those motions are pending, the Defendants continue to attempt prematurely to enforce the Repayment Clause in their TFAP contracts. It is this immediacy that requires the relief that would be afforded by the declaratory judgment the Provider Plaintiffs request now.

When considering whether to render a declaratory judgment, courts consider "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceedings." *Alsager v. Dist. Ct. of Polk Cnty., Iowa (Juv. Div.)*, 518 F.2d 1160, 1163–64 (8th Cir. 1975).

Interpretation of the Repayment Clause would clarify and settle the legal relations in this matter. Because of the demands for repayment and related threats, the Provider Plaintiffs are now unclear as to what their obligations are under TFAP contract. Although they do not believe repayment is yet due because all payments impacted during the Service Shutdown have not been fully processed (i.e., all payments are in the process of being paid), Defendants' continued efforts to recoup the loans are at odds with the Provider Plaintiffs' understanding of their duties under the TFAP contract. "A dispute about . . . one party's contractual obligations to another is a dispute that either party has the requisite

interest to ask a federal court to resolve by a declaration." *J.B. Hunt Transp., Inc. v. BNSF Ry. Co.*, 9 F.4th 663, 668 (8th Cir. 2021).

A declaration regarding the Repayment Clause terms now would allow all Parties to have clarity as to rights and obligations under the TFAP contracts  If Providers Plaintiffs are correct in their interpretation of the contract, they will be relieved from the substantial additional financial strain of repaying their loans prematurely. *See St. Jude Packaging & Specialties, Inc. v. World Color, Inc.*, No. 4:06CV01717-WRW, 2007 WL 473687, at *1 (E.D. Ark. Feb. 8, 2007) (granting declaratory judgment even where the "breach of contract action and [the] action for declaratory judgment are similar in that they both seek a determination of what is owed" because a declaratory judgment "may clarify and settle legal relations in the issue").[12]

Because a declaratory judgment would clarify the legal rights and obligations of the Parties under the TFAP contract and provide immediate relief, it is a proper mechanism to resolve this issue.

**B.    Minnesota law governs the interpretation of the TFAP contract.**

---

[12] Additionally, although not a factor for determining whether declaratory judgment is appropriate, it is clear that in cases in which the claims and payments that were impacted by the Service Shutdown have still not been processed, many Provider Plaintiffs do not have the means to repay these loans while those payments are outstanding. *See, e.g.* Plaintiffs Dillman Clinic and Odom Health's Motion for Preliminary Injunction. These contracts were entered under dire circumstances and were offered as a "take it or leave it" contract. Now Defendants are attempting to enforce the Repayment Clause despite the fact that the terms of Repayment Clause have not been satisfied and in contradiction of Defendants own prior statements about when Repayment would be due.

"[T]he interpretation of private contracts is ordinarily a question of state law." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989). In Minnesota, courts "traditionally enforces parties' contractual choice of law provisions" *Hagstrom v. Am. Cir. Breaker Corp.*, 518 N.W.2d 46, 48 (Minn. Ct. App. 1994); *see also Combined Ins. Co. of Am. v. Bode,* 247 Minn. 458, 464, 77 N.W.2d 533, 536 (1956) (Minnesota courts are "committed to the rule that the parties, acting in good faith and without an intent to evade the law, may agree that the law of either state shall govern."). The TFAP contract at issue contains a "Governing Law" provision, which is as follows:

> **Governing Law.** The laws of the State of Minnesota shall govern this Agreement and all disputes arising hereunder or thereunder. You agree that jurisdiction and venue are proper in the State of Minnesota for the resolution of any dispute arising under this Agreement.

(*See* Gustafson Decl, Ex. A, at ¶ 10).

There should therefore be no dispute that Minnesota law should govern the interpretation of the contract at issue.

### C.   The Court should issue declaratory judgement as to the clear meaning of the repayment clause.

Under Minnesota law, "[t]he primary goal of contract interpretation is to ascertain and enforce the intent of the parties." *Valspar Refinish, Inc. v. Gaylord's, Inc.,* 764 N.W.2d 359, 364 (Minn. 2009); *Ascente Business Consulting, LLC v. DR myCommerce,* 9 F.4th 839, 848 (8th Cir. 2021). Contract language is given its plain and ordinary meaning, read in the context of the instrument as a whole. *Brookfield Trade Ctr. v. Cnty. of Ramsey,* 584 N.W.2d 390, 394 (Minn. 1998). "A contract must be interpreted in a way that gives all of

its provisions meaning." *Current Tech. Concepts, Inc. v. Irie Enters.,* 530 N.W.2d 539, 543 (Minn.1995); *Hampton v. Kohler*, 989 F.3d 619, 623 (8th Cir. 2021) ("That intent 'is ascertained, not by a process of dissection in which words or phrases are isolated from their context, but from a process of synthesis in which the words and phrases are given a meaning in accordance with the obvious purpose of the contract as a whole.'") (quoting *Motorsports Racing Plus, Inc. v. Arctic cat Sales, Inc.*, 666 N.W.2d 320, 324) (cleaned up). The plain language of the Repayment Clause is clear: repayment is due only once claims processing services have resumed *and* all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid). As such, this interpretation is a question of law for this Court to decide. *Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018).

To the extent the Court finds another reasonable interpretation, then the Repayment Clause is, at a minimum, ambiguous. *See Loftness Specialized Farm Equip. v. Twiestmeyer*, 818 F.3d 356, 361 (8th Cir. 2016) ("Whether the terms of a contract are ambiguous is a question of law to be determined by the court. A contract is ambiguous if it is *reasonably* susceptible to more than one construction." (quotation omitted)). Accordingly, the Court may admit extrinsic evidence of the parties' intent. *Flynn v. Sawyer*, 272 N.W.2d 904, 908 (Minn. 1978). When extrinsic evidence has been admitted, the interpretation of ambiguous terms becomes a question of fact, unless the extrinsic evidence is conclusive. *Thomsen v. Famous Dave's of Am., Inc.*, 606 F.3d 905, 911 (8th Cir. 2010) (quoting *Martens v. Minn. Mining & Mfg. Co.,* 616 N.W.2d 732, 751 (Minn.2000)); *see also Cherne Contracting Corp. v. Marathon Petroleum Co., LLC,* 578 F.3d 735, 740 (8th Cir.2009) ("[A]mbiguities

14

in written contracts" do not "necessarily preclude summary judgment. Rather, ... where no reasonable jury could find the facts necessary to entitle a plaintiff to relief, summary judgment remains appropriate."). Even under this standard, considering CEO Witty's congressional testimony under oath, the most reasonable understanding of the contract terms is that put forth by Provider Plaintiffs here.

> **1.    The only reasonable interpretation based on the plain language of the contract is that no repayment is owed until all payments impacted by the Service Shutdown are fully processed (i.e., all payments are in the process of being paid).**

The Repayment Clause states, in relevant part, that Defendants "will send notice . . . that the Funding Amount is due *after claims processing and/or payment processing services have resumed <u>and</u> payments impacted during the service disruption period are being processed.*" (Gustafson Decl., Ex. A, at ¶ 5(a)) (emphasis added). The plain language of the contract contains two preconditions to the 45-day period after which loans are due. First, "claims processing and payment processes services" must "have resumed." This language refers to the "processing services" aspect of Defendants' business and imposes a requirement that the services Defendants offer must be back to normal. Second, "payments impacted during the service disruption period are being processed" requires that the payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid). This is the only reasonable interpretation of the Defendants' form contract.

Notwithstanding the plain language of the contract, Defendants apparently contend that repayment is due once Defendants' system is useable again and *some* of the *claims*

backlog is being processed. *See, e.g.,* Doc. 253-1, at 20 ("Now that Defendants' services are restored, the TFAP contracts' purpose has been satisfied"). But this disregards the second condition to repayment, which tethers Providers' obligations to when *payments* are being made. This interpretation also frustrates the purpose of the contract: "***to provide [Providers] with funds that you may have otherwise received but for the disruption*** in processing of electronic healthcare transactions, claims processing, and administrative services and payments operations of Change Healthcare." (Gustafson Decl., Ex. A,) (emphasis added). If the TFAP loan is meant to temporarily substitute the "funds that [Providers] may have otherwise received but or the disruption," then to satisfy the purpose of the contract, repayment is not required until all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid).

Defendants' interpretation also reads the second condition precedent right out of the agreement. Defendants' apparent position rests on the view that the condition of "payments …being processed" is satisfied when *claims* are once again flowing through the Change Platform. But that is inconsistent with the plain language of the contract Defendants drafted, which differentiates between claims and payment processing *services*, and "payments…being processed." This reading is particularly far-fetched considering the circumstances that compelled the TFAP in the first place—i.e., that Providers needed loans because *payments* were not being processed (and still have not been processed entirely) because of the Service Shutdown. But this oppressive interpretation is apparently what Defendants now interpret these contracts of adhesion to mean, namely that, even though the Change Defendants' sister company—United Health Insurance Company—is denying

claims on the basis that they are untimely, the *payments* providers are owed in connection with those claims are somehow now being "processed."

If the trigger for repayment is resumption of any claims processing services for any Provider, and processing (but not necessarily payment) of any affected claim for any Provider, then Defendants would arguably have had the contractual right to recoup all TFAP loans as soon as *any claim* processing occurred in the Change system, without regard to whether any *payments* were made. Even more troubling is that whether the impacted *payments* are being processed is within Defendants' sister company's exclusive *control*. The remedy Defendants threaten to impose is that UHIC, the same insurer whose claim denials are preventing the processing of payments which are owed (and which, if paid, might trigger the 45-day repayment window), is now threatening to withhold the loan amounts from *future* payments for Providers' services.

As such, Defendants' purported contract "interpretation" defies the plain language of the agreement and logic. A court will "not consider the terms of a contract to be ambiguous simply because the parties dispute their proper interpretation." *Bettin v. Bettin*, No. A05-954, 2006 WL 541033, at *2 (Minn. Ct. App. Mar. 7, 2006). No loan payments are due until "payments impacted during the service disruption period are being processed." That language means just what it says: Providers do not have to pay back the loans until all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid).

Because the language of the contract is clear, Provider Plaintiffs respectfully request that this Court declare the Repayment Clause to mean that repayment does not become due

until *all* payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid).

>    **2.    To the extent the Repayment Clause is ambiguous, the parol evidence rule and extrinsic evidence support Plaintiffs' interpretation.**

While Plaintiffs strongly contend that their interpretation is the only reasonable one, if the Court nonetheless finds the relevant language ambiguous, then Plaintiffs still prevail based on conclusive extrinsic evidence. *See Thomsen v. Famous Dave's of Am., Inc.*, at 911 (8th Cir. 2010) (quoting *Martens v. Minn. Mining & Mfg. Co.,* at 751 (Minn.2000)); *see also Cherne Contracting Corp. v. Marathon Petroleum Co., LLC,* at 740 (8th Cir.2009) ("[A]mbiguities in written contracts" do not "necessarily preclude summary judgment. Rather, ... where no reasonable jury could find the facts necessary to entitle a plaintiff to relief, summary judgment remains appropriate."). The extrinsic evidence here confirms Plaintiffs' interpretation and is conclusive.

There is no genuine factual dispute as to what the extrinsic evidence shows. The extrinsic evidence here is a *testimonial admission* by UHG about the contract's meaning. In UHG CEO Witty's Congressional testimony in May, 2024, Witty claimed that the TFAP contracts would not require repayment until "after the provider attests or it is otherwise clear that its claims processing or payment processing services have resumed to normal levels" and that UHG had "no intention of asking for repayment until *providers* determine

18

their business is back to normal."[13] This testimony under oath confirms that the Providers'

interpretation of the Repayment Clause is correct.

The terms of the TFAP contract itself, the circumstances and purpose of its making—

i.e., a bridge to mitigate nonpayment of claims for provider services caused by the complete

failure and Service Shutdown, which nonpayment is ongoing to this day—and Mr. Witty's

own congressional testimony support Plaintiffs' reading of the Repayment Clause.

**3.      Under well-established Minnesota law, the TFAP contract should be construed against Defendants as the drafter.**

If there is any remaining doubt as to the intent of the agreement, the rule of *contra*

*preferentum* demands that any such doubt be construed against Defendants, who drafted

the TFAP contract from a disparate position of bargaining power. *See Lowry v. Kneeland*,

263 Minn. 537, 541, 117 N.W.2d 207, 210 (1962) ("It is elementary that if there is doubt

as to [a contract's] meaning it must be construed most strongly against the one who chose

the language in drafting the instrument."); *Staffing Specifix, Inc.*, at 691 (disparity in

bargaining power is a relevant consideration in applying the rule of *contra proferentem*);

*see also Hauenstein & Bermeister, Inc. v. Met-Fab Indus., Inc.*, 320 N.W.2d 886, 891

(Minn. 1982) ("[C]ontracts which are termed adhesion—'take-it-or-leave-it'—

contracts…are the product of unequal bargaining power between the parties [and] are

unreasonable."); *Fields v. Maslon Edelman Borman & Brand, LLP,* No. C1-02-940, 2003

---

[13] *Responses to Questions for the Record for Andrew Witty*, U.S. Senate Committee on Finance, Full Committee Hearing, at 34 (May 1, 2024), available at https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_to_andrew_witty.pdf (last accessed April 1, 2025) (emphasis added).

WL 115449, at *2 (Minn. Ct. App. Jan. 14, 2003) (referencing contracts of adhesion and noting "the use of boilerplate language contained in a printed form is common in such agreements").

As discussed more fully above, Providers entered the TFAP contracts under dire circumstances. Because of Defendants' gross failures, Change Defendants implemented the Service Shutdown. As a result, Providers went without repayment for their services provided to patients for months. Without payment, Providers needed an immediate influx of funds to keep their doors open, and Defendants offered the TFAP. The combination of the Provider Plaintiffs' desperate situation, the disparate bargaining power, and the boilerplate language of the TFAP contract renders the contract a quintessential "contract of adhesion."

Although Providers may be considered sophisticated parties in normal circumstances, at the time of the TFAP loans, they were not on equal footing with Defendants—some of which are the largest companies in the world. This desperate situation borne of Defendants' Service Shutdown created a substantial power imbalance between the Provider Plaintiffs and Defendants. Provider Plaintiffs needed immediate financial assistance to continue operating their businesses—and all the while remained dependent on Defendants who made assurances that the Service Shutdown was a temporary measure. And while navigating the Service Shutdown, Providers simultaneously were dealing with UHG's subsidiary UHIC who steadily denied claims as untimely. Again, Providers were at the "mercy" of Defendants.

***

In sum, the plain language of the contract is clear: repayment is not due until "payments impacted during the service disruption period are being processed." This means Providers do not have to pay back the loans until all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid). This is the only reasonable interpretation. To the extent the Court finds this provision is susceptible to another reasonable interpretation, CEO Witty's congressional testimony that Defendants will not seek repayment until Providers are "back to normal" is conclusive and confirms Plaintiffs' reading of the Repayment Clause. And if there is any remaining doubt as to the Parties' intent, that doubt should be construed against Defendants as the drafter of the TFAP contract.

### D.  Defendants' collection efforts should be paused until the issue of the repayment trigger is resolved on the merits.

While the Parties litigate this contract interpretation issue, the Court should pause Defendants' collection efforts. Particularly, if after analyzing the plain language of the Agreement, considering CEO Witty's congressional testimony that Providers must be "back to normal," and construing any doubts against Defendants, the Court finds there is a factual issue as to the parties' intention, then the Repayment Clause's interpretation is a question for the jury. *See Noreen*, 96 N.W.2d, at 34. It would be unfair and inefficient for Defendants to continue to collect repayment of the TFAP loans only for a future jury to decide Defendants have no right to do so. Accordingly, this Court should order that Defendants' pause their collection efforts until the interpretation of the Repayment Clause is resolved on the merits.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order declaring that under the TFAP contract repayment is due 45 days after claims processing services have resumed *and* all payments impacted during the Service Shutdown are being processed—in other words, 45 days after all payments impacted during the Service Shutdown are fully processed (i.e., all payments are in the process of being paid). Plaintiffs also request that the Court pause Defendants' efforts to collect repayment on the TFAP loans or otherwise penalize Provider Plaintiffs for failing to repay the loans until the issue of interpretation is resolved on its merits.

Dated: April 2, 2025

 *s/Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com

*Plaintiffs' Overall Lead Counsel*

Shawn M. Raiter
**LARSON-KING LLP**
30 East Seventh Street, Suite 2800
St. Paul, MN 55101
Telephone: (651) 312-6500
sraiter@larsonking.com

*MDL Liaison Counsel*

E. Michelle Drake (#387366)
**BERGER MONTAGUE**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5933
emdrake@bm.net

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com

Warren Burns
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 458-9890
wburns@burnscharest.com

*Provider Track Co-Lead Counsel*