# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

---

IN RE: CHANGE HEALTHCARE, INC.
CUSTOMER DATA SECURITY BREACH
LITIGATION

This Document Relates To:

All Provider Actions &
*Total Care Dental and Orthodontics, et al.*
*v. UnitedHealth Group Incorporated, et al.*
No. 0:25-cv-00179

MDL No. 24-3108 (DWF/DJF)

**PROVIDER PLAINTIFFS'
MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO
DISMISS CONSOLIDATED CLASS
ACTION COMPLAINT**

---

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................................. 1

II.  BACKGROUND AND FACTS ....................................................................... 3

     A.   The Change Platform's Critical Role in the Healthcare Industry ......................... 3

     B.   Change Health Defendants Failed to Prevent a Foreseeable Ransomware
          Attack, Detect a Breach, and Restore Their Systems ............................. 4

          1.   Change Health Defendants Did Next to Nothing to Prevent a Breach .......... 5

          2.   Change Health Defendants Had No Plans in Place to Restore Operations
               After a Breach ............................................................................. 7

     C.   The Ransomware Attack's Aftermath Devastated Providers ............................... 8

III. LEGAL STANDARD .................................................................................... 9

IV.  ARGUMENT ................................................................................................ 10

     A.   Defendants' Negligence Arguments Misconstrue Plaintiffs' Claims ................. 10

          1.   Plaintiffs' Claims Are Not Barred by the Economic Loss Rule ................... 11

          2.   Defendants Owed Providers a Duty ................................................... 13

          3.   Plaintiffs Sufficiently Plead Negligence Per Se .............................. 24

     B.   Plaintiffs Adequately Allege Two Breaches of Contract .................................... 26

          1.   Direct Contract Plaintiffs Allege Breach of Service Contracts .................. 26

          2.   Defendants Breached the TFAP Contracts of Adhesion ........................... 31

     C.   Plaintiffs Plausibly State Their Claim of Unjust Enrichment ............................ 35

          1.   The Claim for Unjust Enrichment Is Permitted Under Minnesota Law ....... 35

          2.   Plaintiffs Are Permitted to Assert Unjust Enrichment Claims in the
               Alternative
               at the Pleading Stage .................................................................... 37

          3.   The Complaint Identifies Benefits Unjustly Conferred on Defendants ....... 39

     D.   Plaintiffs Adequately Plead Their Interference Claims ..................................... 42

          1.   California Plaintiffs Adequately Allege Negligent Interference ................. 42

          2.   Plaintiffs State a Claim for Interference with Prospective Economic
               Advantage .................................................................................. 44

     E.   Plaintiffs Adequately Allege Public Nuisance .................................................. 47

          1.   Plaintiffs Allege Ample Facts to Sustain a Claim for Public Nuisance ....... 47

2. Plaintiffs' Public Nuisance Claims Cannot Be Dismissed As "Duplicative" of Their Negligence Claims ...................................................................... 52

F. Plaintiffs Adequately State Their Claims Arising From Defendants' Misstatements and Omissions ...................................................................... 53

   1. Plaintiffs State a Claim for Fraudulent Inducement .................................... 53

   2. Plaintiffs State a Claim for Negligent Omission and Negligent Misrepresentation. ...................................................................................... 58

   3. Plaintiffs' Claims Are Not Precluded ......................................................... 65

G. Plaintiffs Adequately Plead Claims Under Their Respective Consumer Protection Statutes ...................................................................................... 66

   1. Rule 9(b) Does Not Bar These Claims ........................................................ 67

   2. State Claims for Unlawful Conduct ............................................................ 68

   3. State Claims for Fraud ................................................................................ 69

   4. State Law Claims for Unfair Conduct ........................................................ 74

H. The Plaintiffs' Declaratory Judgment Claim Is Appropriate, and The Plaintiffs Have Standing to Pursue Such Relief ............................................................ 77

I. NCPA Alleges Facts to Support Associational Standing ................................... 80

V. CONCLUSION ...................................................................................................... 83

# TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Allen Freight Lines, Inc. v. Consol. Rail Corp.*,
595 N.E.2d 855 (Ohio 1992) ...................................................................... 53

*Alotech, Ltd. v. North Star Imaging, Inc.*,
No. CV 14-3414, 2016 WL 1122024 (D. Minn. 2016) ................................ 53

*AlterG, Inc. v. Boost Treadmills LLC*,
388 F. Supp. 3d 1133 (N.D. Cal. 2019) ...................................................... 46

*Amaro v. Lincoln Gen.*,
361 Fed. Appx. 338 (3d Cir. 2010) .............................................................. 40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................................. 10, 80

*Banco Industrial de Venezuela, C.A. v. CDW Direct, L.L.C.*,
888 F. Supp. 2d 508 (S.D.N.Y. 2012) ......................................................... 19

*Baptiste v. Bethehem Landfill Co.*,
965 F.3d 214 (3d Cir. 2020) ........................................................................ 52

*Bass v. Facebook, Inc.*,
394 F. Supp. 3d 1024 (N.D. Cal. 2019) ...................................................... 22

*Battle v. Taylor James, LLC*,
607 F. Supp. 3d 1025 (C.D. Cal. 2022) ...................................................... 67

*BC Gen. Contractors, Inc.*,
600 N.W.2d 348 (Mich. Ct. App. 1999) ...................................................... 26

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................ 9, 10, 36

*Benson v. Fannie May Confections Brands, Inc.*,
944 F.3d 639 (7th Cir. 2019) ....................................................................... 77

*BJC Health Sys. v. Columbia Cas. Co.*,
478 F.3d 908 (8th Cir. 2007) ....................................................................... 63

*Bjerke v. Johnson*,
    742 N.W.2d 660 (Minn. 2007) ................................................................................. 16

*Bortell v. White Mountains Ins. Grp., Ltd.*,
    2 So. 3d 1041 (Fla. Dist. Ct. App. 2009) ................................................................ 45

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) .................................................................................. 10

*Bradshaw v. Daniel*,
    854 S.W.2d 865 (Tenn. 1993) ........................................................................... 16, 21

*Brand & Co. v. Williams*,
    13 N.W. 42 (1882) ................................................................................................... 41

*Brush v. Miami Beach Healthcare Grp. Ltd.*,
    238 F. Supp. 3d 1359 (S.D. Fla. 2017) ............................................................. 22, 27

*Caldas v. Affordable Granite & Stone, Inc.*,
    820 N.W.2d 826 (Minn. 2012) ............................................................................... 40

*Cardiovascular Sys., Inc. v. Cardio Flow, Inc.*,
    37 F.4th 1357 (8th Cir. 2022) ................................................................................. 35

*Carpenter v. Amazon.com, Inc.*,
    No. 17-CV-03221, 2017 WL 4071383 (N.D. Cal. 2017) ........................................ 52

*Champion Labs. v. Metex Corp.*,
    2009 WL 2496888 (D.N.J. 2009) ............................................................................ 53

*Chey v. Metro. Airports Comm'n*,
    No. 22-CV-1429, 2023 WL 2308272 (D. Minn. Mar. 1, 2023) ............................... 35

*Cisco Sys., Inc. v. STMicroelectronics, Inc.*,
    77 F. Supp. 3d 887 (N.D. Cal. 2014) ...................................................................... 65

*Cleveland v. Whirlpool Corp.*,
    550 F. Supp. 3d 660 (D. Minn. 2021) ..................................................................... 72

*Cmty. Stabilization Project v. Cuomo*,
    199 F.R.D. 327 (D. Minn. 2001) ............................................................................. 82

*Cole–Haddon, Ltd. v. Drew Philips Corp.*,
    454 F. Supp. 2d 772 (N.D. Ill. 2006) ................................................................ 38

*Coleman v. CubeSmart*,
    328 F. Supp. 3d 1349 (S.D. Fla. 2018) ............................................................. 73

*Collins v. eMachines, Inc.*,
    202 Cal. App. 4th 249 (2011) ........................................................................... 73

*Columbia Cas. Co. v. 3M Co.*,
    814 N.W.2d 33 (Minn. Ct. App. 2012) ............................................................. 65

*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*,
    636 N.E.2d 503 (Ill. 1994) ................................................................................ 12

*Connick v. Suzuki Motor Co., Ltd.*,
    675 N.E.2d 584 (Ill. 1996) ................................................................................ 72

*Cox v. Mortg. Elec. Registration Sys., Inc.*,
    685 F.3d 663 (8th Cir. 2012) ...................................................................... 62, 63

*Crisp Hum. Cap. Ltd. v. Authoria Inc.*,
    613 F. Supp. 2d 136 (D. Mass. 2009) .............................................................. 67

*Cummins L. Off., P.A. v. Norman Graphic Printing Co.*,
    826 F. Supp. 2d 1127 (D. Minn. 2011) ............................................................ 39

*Curran v. Wells Fargo Bank, N.A.*,
    No. 20-CV-492, 2021 WL 6753480 (D.D.C. Mar. 11, 2021) .......................... 69

*D.S.A., Inc. v. Hillsboro*,
    973 S.W.2d 662 (Tex. 1998) ............................................................................ 66

*Damabeh v. 7-Eleven, Inc.*,
    No. 5:12-CV-1739, 2013 WL 1915867 (N.D. Cal. May 8, 2013) .................... 43

*Data Sec. Breach Litig.*,
    64 F. Supp. 3d 1304 (D. Minn. 2014) ...................................................... *passim*

*Debbie Elliot, Inc. v. Hancock*,
    No. CIV.A.CV-05-280, 2005 WL 3340067 (Me. Super. Oct. 27, 2005) .......... 13

*Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*,
  810 F.3d 861 (2d Cir. 2015) ........................................................................ 66

*Dickerson v. Colonial Pipeline Co.*,
  No. 1:21-CV-2098, 2022 WL 18717801 (N.D. Ga. June 17, 2022) ..................... 23, 48

*Disability Support All. v. Monali, Inc.*,
  No. 15-CV-1522, 2016 WL 859442 (D. Minn. Feb. 12, 2016) ................................... 83

*Disability Support All. v. Monali, Inc.*,
  No. 15-CV-1522, 2016 WL 868174 (D. Minn. Mar. 4, 2016) .................................... 83

*Donaldson v. YWCA of Duluth*,
  539 N.W.2d 789 (Minn. 1995) ..................................................................... 19

*Drake v. Village of Lima*,
  200 N.Y.S.3d 600 (2023) ............................................................................ 52

*Drobnak v. Andersen Corp.*,
  561 F.3d 778 (8th Cir. 2009) .................................................................... 56, 68

*Fairview Health Servs. v. Armed Forces Off. of Royal Embassy of Saudi Arabia*,
  705 F. Supp. 3d 898 (D. Minn. 2023) ............................................................. 35

*F.T.C. v. IFC Credit Corp.*,
  543 F. Supp. 2d 925 (N.D. Ill. 2008) ............................................................. 25

*F.T.C. v. Peoples Credit First, LLC*,
  244 F. App'x 942 (11th Cir. 2007) ............................................................... 73

*Fero v. Excellus Health Plan, Inc.*,
  502 F. Supp. 3d 724 (W.D.N.Y. 2020) ............................................................ 72

*First Choice Fed. Credit Union v. Wendy's Co.*,
  No. CV 16-506, 2017 WL 9487086 (W.D. Pa. Feb. 13, 2017) .............................. 14, 25

*First Choice Fed. Credit Union v. Wendy's Co.*,
  2017 WL 1190500 (W.D. Pa. Mar. 31, 2017) .................................................. 15

*Fla. Emergency Phys. Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*,
  526 F. Supp. 3d 1282 (S.D. Fla. 2021) .......................................................... 71

*Fleet Farm LLC*,
    679 F. Supp. 3d 825 (D. Minn. 2023)................................................................24

*Flores v. OneWest Bank*,
    172 F. Supp. 3d 391 (D. Mass. 2016)...............................................................37

*Flores-Mendez v. Zoosk, Inc.*,
    No. C 20-04929, 2021 WL 308543 (N.D. Cal. Jan. 30, 2021)......................28

*Fox Sports Net N., L.L.C. v. Minn. Twins P'ship*,
    319 F.3d 329 (8th Cir. 2003) ...........................................................................46

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*,
    844 N.W.2d 210 (Minn. 2014) .........................................................................46

*Glass v. Northwest Airlines, Inc.*,
    761 F. Supp. 2d 734 (W.D. Tenn. Jan. 4, 2011) ............................................18

*Gooch v. Life Invs. Ins. Co. Of Am.*,
    672 F.3d 402 (6th Cir. 2012) ...........................................................................80

*Gorog v. Best Buy Co.*,
    760 F.3d 787 (8th Cir. 2014) ...................................................................10, 75

*Graham v. Bank of Am., N.A.*,
    226 Cal. App. 4th 594 (2014) ..........................................................................70

*Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp.*,
    850 N.W.2d 682 (Minn. 2014) ..................................................................71, 73

*Hadley v. Kellogg Sales Co.*,
    243 F. Supp. 3d 1074 (N.D. Cal. 2017) ..........................................................75

*Hageman v. Accenture LLP*,
    No. Civ. 10-1759, 2010 WL 3749246 (D. Minn. Sept. 21, 2010)................33

*Hameed-Bolden v. Forever 21 Retail, Inc.*,
    2018 WL 6802818 (C.D. Cal. Oct. 1, 2018)...................................................79

*Haney v. Charter Foods North, LLC*,
    747 F. Supp. 3d 1093 (E.D. Tenn. 2024)..............................................16, 17, 19, 22

*Harris v. Nationwide Mut. Fire Ins. Co.*,
   367 F. Supp. 3d 768 (M.D. Tenn. 2019).................................................................21

*Heartland Acad. Cmty. Church v. Waddle*,
   427 F.3d 525 (8th Cir. 2005) .................................................................................82

*Herlache v. Ruchs*,
   990 N.W.2d 443 (Minn. 2023) ...............................................................................41

*Hirsch v. Bank of Am.*,
   107 Cal. App. 4th 708 (Cal. Ct. App. 2003) ..........................................................37

*Hodsdon v. Mars, Inc.*,
   162 F. Supp. 3d 1016 (N.D. Cal. 2016) .................................................................76

*Hoyt Props., Inc. v. Prod. Res. Grp., LLC*,
   736 N.W.2d 313 (Minn. 2007) ...............................................................................53

*In re Accellion, Inc. Data Breach Litig.*,
   713 F. Supp. 3d 623 (N.D. Cal. 2024) ...................................................................22

*In re Adobe Sys. Privacy Litig.*,
   66 F. Supp. 3d 1197 (N.D. Cal. 2014) ...................................................................79

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
   No. CV 19-MD-2904, 2021 WL 5937742 (D.N.J. Dec. 16, 2021) ........................67

*In re Anthem, Inc. Data Breach Litig.*,
   No. 15-MD-02617, 2016 WL 3029783 (N.D. Cal. May 27, 2016)..........................29

*In re Arby's Rest. Grp. Inc. Litig.*,
   No. 1:17-CV-0514-AT, 2018 WL 2128441 (N.D. Ga. Mar. 5, 2018) ................14, 25

*In re Cap. One Consumer Data Sec. Breach Litig.*,
   488 F. Supp. 3d 374 (E.D. Va. 2020) ................................................................22, 25

*In re Equifax, Inc. Customer Data Sec. Breach Litig.*,
   362 F. Supp. 3d 1295 (N.D. Ga. 2019)..............................................................22, 25

*In re Fyre Festival Litig.*,
   399 F. Supp. 3d 203 (S.D.N.Y. 2019) ...................................................................23

*In re HCA Healthcare, Inc. Data Sec. Litig.*,
No. 3:23 CV 684, 2024 WL 3857330 (M.D. Tenn. Aug. 15, 2024) ...................... 15, 17

*In re Hennepin Cnty. 1986 Recycling Bond Litig.*,
540 N.W.2d 494 (Minn. 1995) ................................................................................ 30

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020) .................................................................... 49

*In re LastPass Data Sec. Incident Litig.*,
742 F. Supp. 3d 109 (D. Mass. 2024) ..................................................................... 29

*In re Levaquin*,
752 F. Supp. 2d 1071 (D. Minn. 2010) ................................................................... 38

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
No. 19-MD-2879, 2020 WL 6290670 (D. Md. Oct. 27, 2020) .................................. 22

*In re National Prescription Opiate Litig.*,
452 F. Supp. 3d 745 (N.D. Ohio 2020) ............................................................. 49, 51

*In re Netgain Tech., LLC*,
2022 WL 1810606 (D. Minn. June 2, 2022)..................................................*passim*

*In re Pawn Am. Consumer Data Breach Litig.*, No. 21-CV-2554,
2022 WL 3159874 (D. Minn. Aug. 8, 2022) ............................................................ 80

*In re Pork Antitrust Litig.*,
No. CV 18-1776, 2025 WL 964545 (D. Minn. March 31, 2025).................................. 38

*In re Riddell Concussion Reduction Litig.*,
121 F. Supp. 3d 402 (D.N.J. 2015) .......................................................................... 37

*In re Rutter's Data Sec. Breach Litig.*,
511 F. Supp. 3d 514 (M.D. Pa. 2021)....................................................................... 41

*In re StarLink Corn Prod. Liab. Litig.*,
212 F. Supp. 2d 828 (N.D. Ill. 2002) ....................................................................... 51

*In re Target Corp. Cust. Data Sec. Breach Litig.*,
64 F. Supp. 3d 1304 (D. Minn. 2014)....................................................................... 14

*In re Target Corp. Cust. Data Sec. Breach Litig.*,
    66 F. Supp. 3d 1154 (D. Minn. 2014) .................................................... 22, 36, 37, 41

*In re: The Home Depot, Inc., Cust. Data Sec. Breach Litig.*,
    2016 WL 2897520 (N.D. Ga. May 18, 2016) .................................... 14, 25, 79

*In re USAA Data Sec. Litig.*,
    621 F. Supp. 3d 454 (S.D.N.Y. 2022) ................................................. 22

*In re VTech Data Breach Litig.*,
    2018 WL 1863953 (N.D. Ill. Apr. 18, 2018) ...................................... 77

*InCompass IT, Inc. v. Dell, Inc.*,
    No. 11-CV-0629, 2012 WL 383960 (D. Minn. Feb. 6, 2012) ..................... 56

*Inj. Prods. Liab. Litig.*,
    754 F. Supp. 3d 946 (N.D. Cal. 2024) ................................................ 13

*Inline Packag'g, LLC v. Graphic Packag'g Int'l, Inc.*,
    164 F. Supp. 3d 1117 (D. Minn. 2016) ........................................ 45, 46, 47

*Int'l Bhd. of Teamsters v. Sun Country, Inc.*,
    753 F. Supp. 3d. 764 (D. Minn. Oct. 15, 2024) .................................... 82

*Jack v. Pearson*,
    No. 1:17-CV-0520, 2018 WL 1567796 (E.D. Cal. Mar. 30, 2018) ............... 25

*J'Aire Corp. v. Gregory*,
    24 Cal. 3d 799 (1979) ...................................................................... 43

*James v. Arms Tech., Inc.*,
    820 A.2d 27 (N.J. App. Div. 2003) ..................................................... 51

*Jensen v. Duluth Area YMCA*,
    688 N.W.2d 574 (Minn. Ct. App. 2004) .............................................. 33

*Johnson v. Hondo, Inc.*,
    125 F.3d 408 (7th Cir. 1997) ............................................................ 38

*Juliano v. Simpson*,
    962 N.E.2d 175 (Mass. 2012) ........................................................... 26

*Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*,
    527 F.3d 412 (5th Cir. 2008) ....................................................................... 59

*Kae v. Cumberland Univ.*,
    194 F. Supp. 3d 676 (M.D. Tenn. July 7, 2016) ......................................... 18

*Kjesbo v. Ricks*,
    517 N.W.2d 585 (Minn. 1994) ................................................................... 47

*Kohl v. Kohl*,
    149 So. 3d 127 (Fla. Dist. Ct. App. 2014) ................................................. 26

*Krichman v. J.P. Morgan Chase & Co.*,
    No. 06 CV 15305, 2008 WL 5148769 (S.D.N.Y. Dec. 8, 2008)................... 27

*Langbehn v. Pub. Health Tr. of Miami-Dade Cnty.*,
    661 F. Supp. 2d 1326 (S.D. Fla. 2009) ...................................................... 25

*Lesmeister v. Dilly*,
    330 N.W.2d 95 (Minn. 1983) ..................................................................... 34

*Lexington Ins. Co. v. Integrity Land Title Co., Inc.*,
    721 F.3d 958 (8th Cir. 2013) ...................................................................... 78

*Liberty Mut. Fire Ins. Co. v. Acute Care Chiropractic Clinic P.A.*,
    88 F. Supp. 3d 985 (D. Minn. 2015).......................................................... 59

*Logistick, Inc. v. AB Airbags, Inc.*,
    543 F. Supp. 3d 881 (S.D. Cal. 2021).......................................................... 42

*Luckey v. Alside*,
    245 F. Supp. 3d 1080 (D. Minn. 2017)......................................................... 40

*Lyon Fin. Servs., Inc. v. MBS Mgmt. Servs., Inc.*,
    No. CIV. 06-4562, 2007 WL 2893612 & n.6 (D. Minn. Sept. 27, 2007) ..... 39

*M.H. v. Caritas Family Servs.*,
    488 N.W.2d 282 (Minn. 1992) ................................................................... 58

*MacDonald v. Cashcall, Inc.*,
    333 F.R.D. 331 (D.N.J. 2019)...................................................................... 69

*Manderson as Tr. of I.B.E.W. 292 Health Care Plan v. Fairview Health Servs.*,
No. CV 21-1797, 2022 WL 2442233 n.6 (D. Minn. July 5, 2022) .............................. 35

*Maritz Holdings Inc. v. Cognizant Tech. Sols. U.S. Corp.*,
No. 4:18-CV-826, 2019 WL 6910051 (E.D. Mo. Dec. 19, 2019) ................................. 29

*Markarian v. Connecticut Mut. Life Ins. Co.*,
202 F.R.D. 60 (D. Mass. 2001) .................................................................................. 72

*MASTR Asset Backed Sec. Tr. 2006-HE3 v. WMC Mortg., LLC*,
983 F. Supp. 2d 1104 (D. Minn. 2013) ....................................................................... 79

*McClung v. Delta Square Ltd. P'ship*,
937 S.W.2d 891 (Tenn. 1996) .............................................................................. 16, 21

*Miller v. William Chevrolet/GEO, Inc.*,
762 N.E.2d 1 (Ill. Ct. App. 2001) .............................................................................. 76

*Minnesota. R-80 Med. Transportation. Coal. v. Comm'r. of the Minnesota. Dep't. of
Hum. Servs.*,
No. CV 1704539, 2018 WL 4120075 (D. Minn. Aug. 29, 2018)................................. 81

*Monogram Credit Card Bank of Georgia v. Tennesen*,
390 N.J. Super. 123 (App. Div. 2007) ........................................................................ 71

*Morgan v. AT&T Wireless Servs., Inc.*,
177 Cal. App. 4th 1235 (2009) .................................................................................. 73

*Nebraska Beef Producers Comm. v. Nebraska Brand Comm.*,
287 F. Supp. 3d 740 (D. Neb. 2018)........................................................................... 82

*Newton v. Tinley*,
970 S.W.2d 490 (Tenn. Ct. App. 1997)...................................................................... 19

*Nicollet Restoration, Inc. v. City of St. Paul*,
533 N.W.2d 845 (Minn. 1995) .................................................................................. 58

*Northland Parent Ass'n v. Excelsior Springs Sch. Dist. # 40*,
571 F. Supp. 3d 1104 (W.D. Mo. 2021) ................................................................ 81, 82

*Office of Attorney Gen. v. Bilotti*,
267 So.3d 1 (Fla. 4th DCA 2019) ............................................................................... 71

*Olympus Ins. Co. v. AON Benfield, Inc.*,
   711 F.3d 894 (8th Cir. 2013) ...................................................................... 33

*Ott v. Alfa-Laval Agri, Inc.*,
   31 Cal. App. 4th 1439 (1995) ...................................................................... 43

*Paisley Park Enter's, Inc. v. Boxill*,
   361 F. Supp. 3d 869 (D. Minn. 2019)..................................................... 44, 46

*Pastor v. Lafayette Bldg. Ass'n*,
   567 So.2d 793 (La. Ct. App. 1990).............................................................. 59

*Patenaude v. Orgain, LLC*,
   594 F. Supp. 3d 108 (D. Mass. 2022).......................................................... 71

*People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*,
   104 Cal. App. 4th 508 (2002) ...................................................................... 68

*Perry v. Bay & Bay Transp. Servs., Inc.*,
   650 F. Supp. 3d 743 (D. Minn. 2023).......................................................... 24

*Petrosino v. Stearn's Products, Inc.*,
   95 U.C.C. Rep. Serv. 2d 679, No. 16-CV-7735, 2018 WL 1614349 (S.D.N.Y. 2018) 71

*Portier v. Neo Tech.*,
   *Sols.*, 2019 WL 7946103 (D. Mass. Dec. 31, 2019) ................................. 12, 79

*PPD Enterprises, LLC v. Stryker Corp.*,
   No. 4:16-CV-0507, 2017 WL 4950064 (S.D. Tex. Nov. 1, 2017) ............................... 46

*Prudential v. Clark Consulting*,
   548 F. Supp. 2d 619 (N.D. Ill. 2008) ............................................................ 38

*Radisson Hotels Int'l, Inc. v. Westin Hotel Co.*,
   931 F. Supp. 638 (D. Minn. 1996)............................................................... 38

*Randall v. Michigan High Sch. Athletic Ass'n*,
   965 N.W.2d 690 (Mich. Ct. App. 2020) ...................................................... 25

*Rapoport v. Caliber Home Loans, Inc.*,
   617 F. Supp. 3d 241 (D.N.J. 2022) .............................................................. 76

*Resnick v. AvMed, Inc.*,
  693 F.3d 1317 (11th Cir. 2012) .................................................... 41

*Richfield Bank & Trust Co. v. Sjogren*,
  309 Minn. 362, 244 N.W.2d 648 (1976) ...................................... 59

*River City Mortg. Corp. v. Baldus*,
  695 N.W.2d 375 (Minn. Ct. App. 2005) ....................................... 30

*Rubenstein v. Neiman Marcus Grp. LLC*,
  687 F. App'x 564 (9th Cir. 2017)................................................... 69

*Russell Barnett Ford of Tullahoma, Inc. v. H & S Bakery, Inc.*,
  398 F. Supp. 3d 287 (E.D. Tenn. 2019) ....................................... 30

*San Diego Gas & Elec, Co. v. Super. Ct. Orange Cnty.*,
  920 P.2d 669 (Cal. 1996) ............................................................ 50

*Schmitt v. SN Servicing Corp.*,
  No. 21-CV-03355, 2021 WL 5279822 (N.D. Cal. Nov. 12, 2021) ............................. 74

*Schneider v. Colgate-Palmolive Co.*,
  677 F. Supp. 3d 91 (N.D.N.Y. 2023)............................................. 68

*Sebago, Inc. v. Beazer E., Inc.*,
  18 F. Supp. 2d 70 (D. Mass. 1998) .............................................. 72

*ServiceMaster of St. Cloud v. GAB Bus. Servs. Inc.*,
  544 N.W.2d 302 (Minn. 1996) .................................................... 36

*Seutter v. Mead Johnson Nutrition Co.*,
  No. CV 24-2179, 2025 WL 220315 (D. Minn. Jan. 16, 2025)...................................... 38

*Sheldon v. Kettering Health Network*,
  40 N.E.3d 661 (Ohio Ct. App. 2015)............................................ 27

*Sherwood Med. Indus., Inc. v. Deknatel, Inc.*,
  512 F.2d 724 (8th Cir. 1975) ...................................................... 78

*Show Services, LLC v. Amber Trading Co.*,
  No. 3:09-CV-2385, 2010 WL 4392544 (N.D. Tex. Oct. 29, 2010) ............................. 37

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   645 F.3d 978 (8th Cir. 2011) ................................................................. 81

*Silva v. Metro. Life Ins. Co.*,
   762 F.3d 711 (8th Cir. 2014) ................................................................. 38

*Slimm v. Bank of Amer. Corp.*,
   No. 12-5846, 2013 WL 1867035 (D.N.J. May 2, 2013) ............................ 69

*Smith v. Cent. Maine Power Co.*,
   988 A.2d 968 (Me. 2010) ....................................................................... 26

*Smith v. Citimortgage, Inc.*,
   No. CV 15-7629, 2015 WL 12734793 (D.N.J. Dec. 22, 2015) .................. 69

*State v. Purdue Pharma L.P.*,
   No. 3AN-17-09966CI, 2018 WL 4468439 (Alaska Super. July 12, 2018) ......... 51

*Szalla v. Locke*,
   421 Mass. 448, (1995) ........................................................................... 66

*Tate v. EyeMed Vision Care, LLC*,
   No. 1:21-CV-36, 2023 WL 6383467 (S.D. Ohio Sept. 29, 2023) ............... 12

*Taxpayers Allied for Constitutional Taxation v. Wayne Cnty.*,
   537 N.W.2d 596 (Mich. 1995) ................................................................ 79

*Thawar v. 7-Eleven, Inc.*,
   165 F. Supp. 3d 524 (N.D. Tex. 2016) ................................................... 12

*Tomasella v. Nestle USA, Inc.*,
   962 F.3d 60 (1st Cir. 2020) ............................................................. 71, 76

*Toyota Motor Sales, U.S.A., Inc. v. Allen Interchange LLC*,
   No. 22-CV-1681, 2023 WL 5206884 (D. Minn. Aug. 14, 2023) ........... 44, 46

*Trone Health Servs., Inc. v. Express Scripts Holding Co.*,
   974 F.3d 845 (8th Cir. 2020) ................................................................. 29

*Trooien v. Mansour*,
   No. CIV. 06-3197, 2012 WL 3030784 (D. Minn. July 25, 2012) ............... 58

*UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*,
    117 F. Supp. 3d 1092 ........................................................................................ 44

*Unite Eurotherapy, Inc. v. Walgreen Co.*,
    No. 16-CV-01706, 2017 WL 513008 (S.D. Cal. Feb. 7, 2017) ....................................... 43

*Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc.*,
    28 F. Supp. 2d 947 (E.D. Pa. 1998) .............................................................. 12

*Varsity News Network, Inc. v. Carty Web Strategies, Inc.*,
    No. CV 17-2574, 2017 WL 7201873 (C.D. Cal. Aug. 30, 2017) ................................. 44

*Warth v. Seldin*,
    422 U.S. 490 (1975) ........................................................................................ 82

*Weavewood, Inc. v. S & P Home Invs., LLC*,
    821 N.W.2d 576 (Minn. 2012) ......................................................................... 79

*Webb v. Smart Document Sols., LLC*,
    499 F.3d 1078 (9th Cir. 2007) ........................................................................ 69

*Williams v. Smith*,
    820 N.W.2d 807 (Minn. 2012) ......................................................................... 62

*Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*,
    536 F.3d 663 (7th Cir. 2008) ........................................................................... 67

*Z.J. v. Vanderbilt Univ.*,
    355 F. Supp. 3d 646 (M.D. Tenn. 2018) .......................................................... 30

*Zlotnick v. Premier Sales Grp., Inc.*,
    480 F.3d 1281 (11th Cir. 2007) ....................................................................... 76

<u>Statutes</u>

15 U.S.C. § 45 ................................................................................................. 24, 68

815 ILCS 505/2 .............................................................................................. 76

Minn. Stat. § 604.101(2) .................................................................................. 12

Minn. Stat. § 609.74(1) .................................................................................... 47

Rules

Fed. R. Civ. P. 8(d)(3) ......................................................................... 37

Fed. R. Civ. P. 9(b) ................................................................. 56, 57, 61

Minn. R. Civ. P. 8.05(b) ....................................................................... 65

Regulations

45 C.F.R. § 164 .................................................................................... 68

Other Authorities

29 Fed. Reg. 8324 (July 2, 1964) ........................................................ 25

Restatement (Second) of Torts § 821B (1979) ............................... 47, 50

## I.    INTRODUCTION

In February 2024, the Change Health Defendants[1] became victims of their own shockingly substandard data security policies when Change's systems were compromised in the largest health care ransomware attack in history (the "Ransomware Attack"). The Change Health Defendants were responsible for securing the Change Platform, the largest healthcare payment platform in the United States that processes 15 billion transactions and $2 trillion in healthcare payments annually, each containing sensitive patient information. Healthcare providers and pharmacies ("Providers") entrust the Change Health Defendants with patient information because they rely on the Change Platform to get reimbursed by insurance companies for services provided to patients.

Despite assuming this enormous responsibility and representing that it had adequate security policies in place to protect the systems and sensitive health information of patients, the Change Health Defendants failed to implement even the most basic data security measures—multifactor authentication—a common requirement for social media profiles, email inboxes, and personal bank accounts, that has been around for decades. This inexcusable failure, along with multiple other failures identified by Plaintiffs, allowed a well-known ransomware gang, ALPHV, to access and essentially destroy Change's systems—all without the Change Health Defendants detecting the intrusion for ***nine days***.

---

[1] Change Health Defendants include UnitedHealth Group Incorporated ("UHG"), UnitedHealthCare Services, Inc. ("UHCS"), Optum Insight, Change Healthcare Inc. ("Change Healthcare"), Change Healthcare Operations, LLC ("CHO"), Change Healthcare Solutions, LLC ("CHS"), Change Healthcare Holdings, Inc. ("CHH"), Change Healthcare Technologies, LLC ("CHT"), and Change Healthcare Pharmacy Solutions, Inc. ("CHPS") (Change Healthcare, CHO, CHS, CHH, CHT, and CHPS together, "Change").

It was not until ALPHV *chose* to reveal itself that the Change Health Defendants became aware of the intrusion. Then, in a belated and blunt attempt to stop the attack, Change Health Defendants intentionally took the Change Platform offline, severing the connection between Providers and payers with no viable back-up plan in place.

The IT infrastructure underlying the Change Platform was so damaged by the Ransomware Attack that the Change Health Defendants still, more than a year after the attack, have not restored its full functionality. For months following the Ransomware Attack, the Change Platform was nearly entirely shut down. During that time, Providers were unable to verify insurance, determine copays, submit claims, or receive payment. As a result, Providers did not timely receive billions of dollars in reimbursements—and they may never receive a substantial portion of these sums due to insurance companies denying as "untimely" claims that could not be submitted because of the shutdown. Without reimbursement, many Providers were not able to afford employee payroll, make rent and mortgage payments, and secure medical supplies. At the same time, Providers incurred increased costs dealing with the crisis and many took out high-interest loans to survive.

In an effort to stem the devastating tide of financial harm caused by their failures, Defendants[2] offered the Temporary Funding Assistance Program ("TFAP") to Providers, promising that Providers would not be required to repay loans until they were made whole. Now, Defendants are calling in those loans and recouping payments directly from claims

---

[2] Defendants include the Change Health Defendants and the "Optum Financial Defendants," including Optum, Inc., Optum Financial, Inc. ("Optum Financial"), Optum Bank, and Optum Pay.

payments from Providers that are still struggling, without making good on that promise.

As a result of Defendants' conduct, Providers have suffered and will continue to suffer substantial harm. With its Motion to Dismiss (Doc. 261), Defendants ignore the plain allegations in the Provider Plaintiffs' Class Action Complaint ("CAC") listing and describing the numerous unexplainable failures that left critical infrastructure underlying the U.S. healthcare system exposed and vulnerable to a known cyber gang using known tactics. Plaintiffs have adequately pleaded that Defendants are liable for their failures, and the following misrepresentations, under the common law and several statutes. The Motion to Dismiss should be denied.

## II.    BACKGROUND AND FACTS

### A.    THE CHANGE PLATFORM'S CRITICAL ROLE IN THE HEALTHCARE INDUSTRY

Change Health Defendants control the Change Platform, the largest healthcare payment platform in the U.S. CAC ¶ 1. This platform offers Providers, among other things, a claims processing service to submit claims to insurance companies so that they can receive payment for the medical services that they provide to patients ("Services"). *Id.* In other words, the Change Platform is a "middleman" between Providers and insurance companies to facilitate the claims submission and payment process. To that end, the Change Platform processes 15 billion transactions, or about $2 trillion in healthcare payments, each year. *Id.* Through these transactions, the Change Health Defendants are responsible for nearly half of all dollars flowing through the U.S. healthcare system. *Id.*

Along with handling trillions of dollars, the Change Health Defendants also handle

massive volumes of confidential patient data. *Id.* ¶ 2. Operating the Change Platform requires Defendants to transmit and store highly sensitive patient information, like contact, claims, payment, and health insurance information, Social Security numbers, medical records, Medicaid-Medicare-government payer ID numbers, and so on ("Private Information"). *Id.* Given the scope of Defendants' operations and the sensitivity of the data it handles, the Change Platform is critical to the healthcare industry—enabling the routine and efficient submission, routing, and payment of medical claims.

Normally, the Change Platform is supposed to streamline claims processing. After confirming insurance coverage and providing treatment, a given Provider submits a claim to the insurance company so that it can receive payment for its Services. *Id.* ¶¶ 37-38. Once the insurance company receives the claim, it evaluates the claim to determine how much, if any, the Provider should be paid. *Id.* ¶ 39. The insurance company then sends the Provider an electronic remittance advice ("ERA"), outlining the allowable amounts paid or denied, and pays the Provider accordingly. *Id.* ¶ 40. The Provider then uses the ERA to bill the patient for any outstanding amounts owed or appeals the insurance company's determination. *Id.* ¶ 41. Clearinghouses, like the Change Platform, enable this process by facilitating the communications and payments between Providers and insurers. *Id.* ¶ 42. Thus, Providers depend on a functioning Change Platform for timely and accurate payment for services to run their businesses and treat their patients.

## B. CHANGE HEALTH DEFENDANTS FAILED TO PREVENT A FORESEEABLE RANSOMWARE ATTACK, DETECT A BREACH, AND RESTORE THEIR SYSTEMS

Despite the reliance of the U.S. healthcare system on the Change Platform, and the

incredible volume of sensitive information it contains, Change Health Defendants failed to employ even rudimentary cybersecurity precautions. As a result, on February 12, 2024, with nothing but the username and password for a low-level, customer support employee's access to Change's employee portal, ALPHV was able to "navigate[] through Change's systems and servers at will, installing multiple malware tools and applications, as well as multiple 'backdoors' that would allow the cybercriminals to return to those environments." *Id.* ¶¶ 57-61. ALPHV also copied and exfiltrated terabytes of Private Information for tens of millions of individuals. *Id.* ¶ 62. ALPHV chose to reveal itself when it began to encrypt Change's systems on February 21, 2024. *Id.* ¶ 63.

ALPHV's movements—and Change Health Defendants' failure to prevent, detect, or stop them—illustrate the many shortcomings with the Change Health Defendants' cybersecurity (or lack thereof). Moreover, the Change Platform has still not been fully restored, demonstrating that the Change Health Defendants had no meaningful plans in place to restore their systems following a cyber-attack.

### 1. Change Health Defendants Did Next to Nothing to Prevent a Breach

As one U.S. Senator explained, the Ransomware Attack "could have been stopped with 'Cybersecurity 101.'" *Id.* ¶ 176. But, despite knowing that they were a likely target of a cyber attack (*id.* ¶¶ 146-53) Change Health Defendants failed to take even basic precautions to prevent such an attack.

First, the Change Health Defendants failed to utilize multifactor authentication ("MFA") for remote access to Change's servers. *Id.* ¶¶ 58, 183-99. MFA—which has been

widely used since the early 2010s—is "an identity verification method in which a user must supply at least 2 pieces of evidence [] to prove their identity." *Id.* ¶¶ 188; 192 (internal citation omitted). When MFA is in place, even if a hacker obtains login credentials, that will not be enough for them to gain unauthorized access. *Id.* ¶ 188. It is no surprise, then, that "using MFA blocks more than 99% of automated hacks, including most ransomware attacks that occur because of unauthorized account access." *Id.* ¶ 193. Change Health Defendants chose not to use MFA to protect Change's internal networks. *Id.* ¶¶ 78, 183-99. This meant that any third-party who obtained a Change employee's log-in credentials could access Change's internal networks. *Id.* ¶ 197. Quite simply, had Change Health Defendants used MFA at the time of the Ransomware Attack, that alone would have been enough to prevent the attack and shutdown. *Id.* ¶ 198.

Second, Change Health Defendants failed to apply the cybersecurity principle known as the Minimum Necessary Rule. *Id.* ¶¶ 200-02. This rule states that "a user or entity should only be granted the minimum access level needed to perform their required tasks." *Id.* ¶ 200. As a result, ALPHV was able to use a low-level employee's login credentials to "conduct administrator actions and move laterally throughout Change's networks and backup systems." *Id.* ¶ 204. Yet again, had the Change Health Defendants employed the Minimum Necessary Rule, ALPHV would have been stopped in its tracks. *Id.* ¶ 208.

Third, the Change Health Defendants failed to properly silo, or "segment," their systems, thereby allowing one bad actor to further move easily through Change's systems. *Id.* ¶¶ 209-10. This failure allowed the cybercriminals to travel freely among Change's systems and access patients' Private Information, Change software, backup systems, and

more. *Id.* ¶¶ 212-13. Once again, had Change Health Defendants adequately used segmentation, the Ransomware Attack would have been much smaller, if not altogether prevented. *Id.* ¶ 214.

Fourth, although they knew that their systems needed modernizing (*id.* ¶ 77), Change Health Defendants did not protect their backup technology and data. *Id.* ¶¶ 215-19. This failure allowed ALPHV to disable both the primary *and* backup systems for the Change Platform, preventing timely restoration. *Id.* ¶¶ 217-18. Fifth, Change Health Defendants failed to implement cybersecurity monitoring systems to detect unauthorized access to the Change networks. *Id.* ¶¶ 220-30. Sixth, they also turned a blind eye to ALPHV, a known cyber gang that was using well-documented tactics to carry out attacks in the healthcare industry. *Id.* ¶¶ 231-55. Finally, Change Health Defendants did not follow basic recommendations to protect Private Information with sufficient masking, encrypting, or hashing. *Id.* ¶¶ 256-62. Again, had the Change Health Defendants taken any or all of the above steps, the Ransomware Attack would have been significantly mitigated, if not entirely prevented.

## 2. Change Health Defendants Had No Plans in Place to Restore Operations After a Breach

Change Health Defendants' failures do not stop there. Once the Ransomware Attack was revealed, the missteps continued. First and foremost, with no backups or contingency plans in place in the event of a breach, and without warning Providers, Change Health Defendants simply severed the connection between Providers and payers, thereby making the Change Platform completely inoperable. *Id.* ¶¶ 65, 88. This left Providers without a

way to submit claims and get paid for their Services to patients. The shutdown lasted for months and still has not been fully rectified. *Id.* ¶¶ 4-5; 88. Not only that, but Change Health Defendants tried to cover up their inability to restore the Change Platform, which has only caused further damage. *Id.* ¶¶ 108-29.

### C.    THE RANSOMWARE ATTACK'S AFTERMATH DEVASTATED PROVIDERS

As a result of Change Health Defendants' actions—or, in many instances, inaction—the Change Platform and related systems were subject to the largest data breach and service shut down in history. *Id.* ¶¶ 3-4. Change Health Defendants' decisions decimated Providers around the country, who were unable to process claims for months. *Id.* ¶¶ 95-6. Without claims processing, Providers did not receive payment for their Services. *Id.* ¶ 96. Without payment, many Providers lost—and still are losing—revenue, including the accrual of daily interest. While losing revenue, Providers declined new patients that they could not afford to care for or for whom they could not determine insurance coverage (*id.* ¶ 105), absorbed losses for being unable to bill patients because the Change Platform did not produce ERAs (*id.* ¶ 101), and were stripped of their ability to appeal denials of claims (*id.* ¶ 6). Providers also incurred additional expenses, such as costs associated with increased labor for submitting paper claims (*id.* ¶ 97), switching clearinghouses to submit claims through an alternative service (*id.* ¶¶ 98-9), and securing loans and opening lines of credit to keep their practices afloat. *Id.* ¶¶ 6, 106-07. Still, amidst these struggles, Providers' financial obligations like employee payroll, rent, and other related expenses, continued. *Id.* ¶ 106.

Defendants' post-breach actions exacerbated Providers' injuries. Following

Congressional hearings and in response to widespread criticism of Change Health Defendants' response to the complete failure of its systems, on March 1, 2024, Defendants established TFAP, administered by the Optum Financial Defendants, to provide interest-free and fee-free loans. *Id.* ¶¶ 136-7. The TFAP contract states:

> Recipient agrees to pay the total Funding Amount disbursed to Recipient in full within forty-five (45) business days of receiving notice that the Funding Amount is due ("Repayment Date"). CHC will send notice to the Recipient that the Funding Amount is due ***after claims processing and or/payment processing services have resumed*** <u>***and***</u> ***payments impacted during the service disruption period are being processed***.

*Id.* ¶ 143 (emphasis added).

Defendants touted the TFAP in describing their response to the failure of the Change Platform at a May 1, 2024, Congressional Hearing. In his written response to questions from Congress, UHG CEO Andrew Witty explained that Defendants had "no intention of asking for repayment until providers determine their business is back to normal." *Id.* ¶ 142. Defendants reneged on their promise. Now, in violation of the TFAP contract, Defendants are demanding repayment before all payments impacted during the shutdown have been processed and while many Providers are still struggling. *Id.* ¶ 144.

As a result of Defendants' gross failures and breaches, Providers bring various claims under common law and state consumer protection laws to hold Defendants accountable for Providers' significant and foreseeable damages.

## III.    LEGAL STANDARD

Defendants bear the burden of demonstrating that the complaint lacks "enough facts to state a claim to relief that is *plausible* on its face." *Bell Atlantic Corp. v. Twombly*, 550

9

U.S. 544, 547 (2007) (emphasis added). "The plausibility standard is not akin to a 'probability requirement,' [but instead] asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *id.* at 556). The Eighth Circuit has reinforced that "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Twombly*, 550 U.S. at 556) (internal quotation marks omitted). While the complaint must "raise a right to relief above the speculative level," detailed allegations are not required at this stage. *Twombly*, 550 U.S. at 555. Rather, a claim is plausible when the facts allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. In making this determination, courts must accept all factual allegations in the complaint as true and draw all the reasonable inferences in the plaintiffs' favor. *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).

## IV. ARGUMENT

### A. DEFENDANTS' NEGLIGENCE ARGUMENTS MISCONSTRUE PLAINTIFFS' CLAIMS

Plaintiffs' negligence claim pleads two general tenets related to Defendants' duty of care: (1) Defendants had "a duty to exercise reasonable care in setting up, providing, managing, maintaining, operating, supervising, and controlling the System, including a duty to secure the System against reasonably foreseeable breaches" (CAC ¶ 449); and (2) Defendants had a "duty to exercise reasonable care to avoid harm to Plaintiffs, Class

10

members, and NCPA members because they were reasonably foreseeable and probable victims of substandard cybersecurity practices[.]" *Id.* ¶ 450. Plaintiffs further assert that Defendants' duties also arose from "the parties' relationship, as well as common law and federal law, and . . . Defendants' own policies and promises regarding privacy and data security." *Id.* ¶ 452. Defendants miscast Plaintiffs' allegations as resting only on a duty to protect private information and provide uninterrupted services, and raise several challenges to these duties. Defendants are wrong on all fronts.

### 1.    Plaintiffs' Claims Are Not Barred by the Economic Loss Rule

Defendants argue that the economic loss rule ("ELR") precludes Plaintiffs' negligence-based claims in California, Illinois, Louisiana, Maine, Massachusetts, Ohio, Pennsylvania, and Texas. Defendants attempt to circumvent the page limits ordered by the Court by making this argument in a single paragraph, and attaching an appendix with a compendium of related state law, which the Court should disregard.[3] Defendants' analysis is insufficient to carry their burden in any jurisdiction, and is certainly insufficient to carry their burden in every jurisdiction. Indeed, Defendants concede that the ELR does not bar Plaintiffs' claims under Florida, Michigan, New Jersey, New York, or, critically, Minnesota law, which the Court should apply at this stage of the case. As determining the applicability of the ELR necessarily requires a premature choice of law analysis, the Court should deny the Motion on that basis alone. Under Minnesota's ELR, Defendants lose. Minnesota's ELR does not apply to services and is therefore inapplicable in data breach

---

[3] Defendants' Appendices A through F comprise 125 pages and hundreds of legal citations.

cases. *See In re Netgain Tech., LLC*, 2022 WL 1810606, at *8 (D. Minn. June 2, 2022); *see also* Minn. Stat. § 604.101(2) ("This section applies to any claim by a buyer against a seller for harm caused by a defect in *the goods sold or leased*, or for a misrepresentation relating to *the goods sold or leased*.") (emphasis added).

Moreover, even if the Court were to apply the law of Plaintiffs' home states, Defendants fare no better. The ELR has exceptions that vary by jurisdiction, including the "special relationship" exception (California, Pennsylvania, and Massachusetts) and the "independent duty" exception (Ohio, Texas, and Illinois). *See, e.g.*, *Valley Forge Convention & Visitors Bureau v. Visitor's Servs., Inc*., 28 F. Supp. 2d 947, 952 (E.D. Pa. 1998) (recognizing exception to Pennsylvania's ELR where parties' relationship involves "confidentiality, the repose of special trust or fiduciary responsibilities"); *Portier v. Neo Tech. Sols.*, 2019 WL 7946103, at *16-22 (D. Mass. Dec. 31, 2019) (noting Pennsylvania's ELR "mirrors" Massachusetts's, with an emphasis on the defendant's ability to foresee harm to the plaintiff as a result of their failure to take affirmative action); *Tate v. EyeMed Vision Care, LLC*, No. 1:21-CV-36, 2023 WL 6383467, at *7 (S.D. Ohio Sept. 29, 2023) (finding Ohio's ELR did not bar negligence claim in data breach case where plaintiffs alleged the defendant owed "a common law duty of reasonable care to protect their PII from misappropriation"); *Thawar v. 7-Eleven, Inc.*, 165 F. Supp. 3d 524, 532 (N.D. Tex. 2016) ("Texas courts will not apply the economic loss doctrine to bar a tort suit when the defendant is alleged to have breached 'an independent legal duty, separate from the existence of the contract itself.'"); *Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 636 N.E.2d 503, 514-15 (Ill. 1994) (finding Illinois' ELR does not bar

tort claims in service industry if performing party had duty that "arises outside of the contract").

Both exceptions apply here. As the largest healthcare payment platform in the U.S., Defendants have a special relationship with Providers, who depended on the Change Platform to receive payment for their Services and treat patients. And Defendants' duties to Providers to implement and maintain reasonable data security procedures and practices arise under common law, as set forth below.

Defendants' argument also fails under Louisiana and Maine law. Louisiana only extends the ELR to cases where plaintiffs suffer economic loss resulting from physical property in which they lack a proprietary interest. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 754 F. Supp. 3d 946, 982 (N.D. Cal. 2024) (declining to apply Louisiana's ELR because "[p]laintiffs [did] not seek recovery for 'economic loss' resulting from physical property damage in which they lack a proprietary interest."). And the Maine Supreme Court has only extended the ELR to product liability cases. *See Debbie Elliot, Inc. v. Hancock*, No. CIV.A.CV-05-280, 2005 WL 3340067 at *2 (Me. Super. Oct. 27, 2005) (noting limitation of ELR's application to the product liability context and rejecting a broad interpretation supporting its use to preclude recovery of economic damages where a contract exists).

For the same reasons, Plaintiffs' public nuisance and negligent omission and negligent misrepresentation claims are not barred by the ELR under Minnesota law or the law of any other jurisdiction identified by Defendants.

**2.    Defendants Owed Providers a Duty**

13

Ignoring Plaintiffs' well-pled allegations, Defendants attack a strawman, arguing that Defendants do not owe Plaintiffs any duty to protect patients' Private Information. While this is factually and legally wrong, it also fails to address Plaintiffs' actual allegations. Plaintiffs' assertions of duty stem not from Defendants' duty to patients, but from the foreseeable harm to Providers themselves in the event of a data breach of Change's systems. CAC ¶¶ 449-50.

"The duty to exercise reasonable care arises from the probability or foreseeability of injury to the plaintiff." *In re Target Corp. Cust. Data Sec. Breach Litig.*, 64 F. Supp. 3d 1304, 1309 (D. Minn. 2014). Defendants' attempt to draw a distinction between *whose* Private Information was affected is thus not legally relevant. Courts regularly hold, for example, that financial institutions whose customers' data was stolen in data breaches can pursue negligence claims for the harm suffered as a result of the breach. *See, e.g.*, *id.* at 1310 (finding defendant retailer owed financial institution plaintiffs a duty to protect consumer data where plaintiffs alleged actions and inactions "caused foreseeable harm to" plaintiffs); *In re Arby's Rest. Grp. Inc. Litig.*, No. 1:17-CV-0514-AT, 2018 WL 2128441, at *5 (N.D. Ga. Mar. 5, 2018) ("allegations that a company knew of a foreseeable risk to its data security systems are sufficient to establish the existence of a plausible legal duty" owed to financial institutions to safeguard consumer data); *In re: The Home Depot, Inc., Cust. Data Sec. Breach Litig.*, 2016 WL 2897520, at *4 (N.D. Ga. May 18, 2016) (finding defendant retailer owed plaintiff financial institutions and credit unions a duty to safeguard consumer data); *First Choice Fed. Credit Union v. Wendy's Co.*, No. CV 16-506, 2017 WL 9487086, at *4 (W.D. Pa. Feb. 13, 2017) (finding financial institution plaintiffs' negligence

claim plausible based on allegations that retailer failed to take reasonable steps to guard against known risks to consumer data), *R. & R. adopted*, 2017 WL 1190500 (W.D. Pa. Mar. 31, 2017).

As explained below, Plaintiffs have alleged that Defendants owed them a duty to exercise reasonable care to protect and secure their data from unauthorized disclosure.

### a. Applicable State Law Recognizes the Duty to Safeguard Private Information

Defendants had common-law duties to Providers to protect the Private Information in their custody because Defendants affirmatively collected and stored that highly sensitive data, and the risk of a data breach and the attendant consequences suffered by Providers were reasonably foreseeable to Defendants. *See, e.g.*, *Netgain*, 2022 WL 1810606, at *10 (finding negligence duty applied because it was "foreseeable that these alleged harms would result when a cybersecurity provider fails to properly protect data from its clients in the healthcare and accounting industries"); *In re HCA Healthcare, Inc. Data Sec. Litig.*, No. 3:23 CV 684, 2024 WL 3857330, at *4 (M.D. Tenn. Aug. 15, 2024) ("Plaintiffs plead the [data breach] was foreseeable, and that [d]efendant affirmatively created, collected, and stored [p]laintiffs' PII/PHI. This is sufficient to establish duty for [p]laintiffs' negligence claims.") (internal citations omitted).

Under Minnesota law, Defendants owed Plaintiffs a duty "to act with reasonable care for the protection of others" in two situations applicable here: "First, . . . general negligence law imposes a general duty of reasonable care *when the defendant's own conduct creates a foreseeable risk of injury to a foreseeable plaintiff*." *See Target*, 64 F.

Supp. at 1308 (internal citation omitted) (emphasis added). "Second, a defendant owes a duty to protect a plaintiff when action by someone other than the defendant creates a foreseeable risk of harm to the plaintiff and the defendant and plaintiff stand in a special relationship." *Id.* (citing *Bjerke v. Johnson*, 742 N.W.2d 660, 665 (Minn. 2007)).

Although the Court should not apply Tennessee law at this stage of the case, the outcome under Tennessee law is the same. The Tennessee Supreme Court has held that "all persons have a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to others," *Bradshaw v. Daniel*, 854 S.W.2d 865, 870 (Tenn. 1993), and businesses have a duty to take reasonable measures to protect their customers from foreseeable criminal acts. *See McClung v. Delta Square Ltd. P'ship*, 937 S.W.2d 891, 902 (Tenn. 1996) ("[A] duty to take reasonable steps to protect customers arises if the business knows, or has reason to know, either from what has been or should have been observed or from past experience, that criminal acts against its customers on its premises are reasonably foreseeable, either generally or at some particular time."); *see also Haney v. Charter Foods North, LLC*, 747 F. Supp. 3d 1093, 1111 (E.D. Tenn. 2024) (finding "[employer] owed [its employees] a duty to take reasonable steps to protect them from a data breach and to timely inform [them] of the breach").

Here, Plaintiffs plausibly allege that the risk of a data breach was foreseeable and apparent to Defendants. CAC ¶¶ 147-50 (detailing public announcements concerning ransomware attacks and numerous other high profile data breach incidents involving healthcare providers and partners); *see also Haney*, 747 F. Supp. 3d at 1111 ("The risk of a data breach is a risk of great harm, and companies are aware—or at least should be

aware—of the scale and harm a data breach can cause. Data breaches have affected many large businesses for years and are only increasing in frequency."). Given Defendants' relationship with Plaintiffs, and Plaintiffs' readily apparent dependence on Defendants to both protect patients' Private Information and sustain payments to their practices, the impact of a breach and the subsequent shutdown and failure to restore Defendants' systems was also readily foreseeable. CAC ¶¶ 46, 49, 152, 168, 172.

### b.    *Foreseeability of Harm to Providers Also Created a Duty*

The foreseeability of harm to Plaintiffs here also weighs strongly in favor of finding the existence of a duty. Plaintiffs specifically allege that a data breach like the one that occurred here was probable if reasonable care was not exercised, and that it was clear that any such data breach would cause harm to Plaintiffs. CAC ¶¶ 146-53, 450. Courts in Minnesota routinely recognize the foreseeability of harm with respect to data breaches specifically. *See, e.g.*, *Target,* 64 F. Supp. 3d at 1310 ("Plaintiffs have plausibly alleged that Target's actions and inactions—disabling certain security features and failing to heed the warning signs as the hackers' attack began—caused foreseeable harm to Plaintiffs."); *Netgain*, 2022 WL 1810606, at *10 (explaining it was "foreseeable that [ ] alleged harms [flowing from data breach] would result when a cybersecurity provider fails to properly protect data from its clients in the healthcare and accounting industries"); *see also Haney*, 747 F. Supp. 3d at 1111 ("The risk of a data breach is a risk of great harm, and companies are aware—or at least should be aware—of the scale and harm a data breach can cause. Data breaches have affected many large businesses for years and are only increasing in frequency."); *HCA*, 2024 WL 3857330, at *4 ("Plaintiffs plead the [data breach] was

17

foreseeable, and that [d]efendant affirmatively created, collected, and stored [p]laintiffs' PII/PHI. This is sufficient to establish duty for [p]laintiffs' negligence claims.") (internal citations omitted).

Despite the foreseeability of the Ransomware Attack and subsequent harm to Providers, Defendants misconstrue Plaintiffs' allegations as relying solely on foreseeability. As set forth in this Section, Plaintiffs allege Defendants' duty to Plaintiffs arises from multiple sources. Regardless, the Tennessee cases Defendants rely on are inapposite. As an initial matter, the *Glass* court found that the plaintiff's injury was *not* foreseeable to defendants. *Glass v. Northwest Airlines, Inc.*, 761 F. Supp. 2d 734, 743-46 (W.D. Tenn. Jan. 4, 2011) (noting that had plaintiff's injury been foreseeable, it would "weigh in favor of imposing a duty on [the defendant]"). Similarly in *Kae*, the court found that the plaintiff's fall was unforeseeable, and, thus, there was no violation of any duty by co-employees. *Kae v. Cumberland Univ.*, 194 F. Supp. 3d 676, 683 (M.D. Tenn. July 7, 2016) ("*[f]oreseeability is the test of negligence.* [ . . . ] Everyone has a duty to use reasonable care to refrain from conduct that will foreseeably cause injury to another.") (citations omitted) (emphasis added). The Ransomware Attack and shutdown were imminently foreseeable here.

Further, under Minnesota law, no special relationship is required to hold negligent parties responsible for the harm they inflict upon foreseeable victims. *See Netgain*, 2022 WL 1810606, at *11 ("[Defendant's] own conduct, in failing to maintain appropriate data security measures, created a foreseeable risk of the harm that occurred, and [p]laintiffs were the foreseeable victims of that harm.").

Assuming *arguendo* a special relationship is required to hold Defendants liable for their negligence, such a relationship exists between Providers and Defendants because Providers relied on the Change Platform to process claims payments, thereby sustaining their businesses, Change Health Defendants agreed to provide those services, Providers were required to provide Defendants with sensitive patient Private Information to access those services, and Change Health Defendants made several misrepresentations to Providers regarding their data security practices and the timeline for bringing the Change Platform back online after the shutdown. *See Haney*, 747 F. Supp. 3d at 1111 (finding a special relationship existed where plaintiffs alleged "they were required to provide Defendants with highly sensitive personal information as a condition of their employment[.]").

Defendants rely on inapposite cases to support their argument that a special relationship does not exist between Plaintiffs and Defendants. *See Donaldson v. YWCA of Duluth*, 539 N.W.2d 789, 793 (Minn. 1995) (concluding that a lodging house has no duty to prevent a resident from committing suicide); *Banco Industrial de Venezuela, C.A. v. CDW Direct, L.L.C.*, 888 F. Supp. 2d 508, 513 (S.D.N.Y. 2012) (holding that an "arm's-length commercial transaction and the puffery that [the defendant] [was] a 'partner that will earn your trust'" was insufficient to create a special relationship); *Newton v. Tinley*, 970 S.W.2d 490, 492 (Tenn. Ct. App. 1997) (finding Tinley "owed no duty to control the conduct of [plaintiff's] husband or to protect the Newtons from her husband's conduct"). The *Newton* court's decision was also premised on the axiomatic understanding that there is no duty to control the conduct of a third party. *Newton*, 970 S.W.2d at 492-93. By

contrast, here Plaintiffs allege that Defendants' own actions in failing to reasonably secure their systems resulted in Plaintiffs' harms—not the actions of a third party.

   c. *Defendants' Representations Acknowledge the Duties They Owed to Plaintiffs Under Federal and Common Law*

Defendants collect and "store massive volumes of information protected by [HIPAA]" pursuant to direct contractual agreements and sub-contracts between Plaintiffs and Defendants. *See* CAC ¶¶ 45, 154-7 (discussing applicable HIPAA standards), 474 ("Change contracted with Providers, including the Direct Contract Plaintiffs and Change Healthcare Inc. Direct Contract Sub-Class members, to provide the Services."). As evidenced by the terms built into Defendants' contractual agreements with Plaintiffs, Defendants recognize the duties associated with storing HIPAA-protected information. *Id.* ¶ 163.

In contractual agreements with some Plaintiffs, Defendants promised to "retain in confidence and not disclose" "any and all confidential or proprietary information and materials" Plaintiffs provided them. *Id.* ¶ 165. Defendants further represented and promised that they would "comply with federal and state laws regarding the protection of PHI as defined by HIPAA" and "implement and maintain appropriate administrative, physical, and technical safeguards" to comply with HIPAA and "prevent Use or Disclosure of [electronic PHI] other than as provided for by" Defendants' contracts with Plaintiffs. *Id.* Defendants' agreements with Plaintiffs further provide that Defendants would "hold the Confidential Information" provided by Plaintiffs in confidence and "protect the same with at least the same degree of care with which it protects [its] own most sensitive confidential

information, but in any event, no less than reasonable care." *Id.* ¶ 478. Defendants' agreements with Plaintiffs further acknowledge that Defendants "are required to comply with federal and state laws regarding the protection of PHI as defined by HIPAA." *Id.* ¶ 484.

Beyond Defendants' contracts with Plaintiffs, Defendants' websites promise that "[k]eeping our customers' information secure is a top priority for Change Healthcare. We dedicate extensive resources to make sure personal medical and financial information is secure and we strive to build a company culture that reinforces trust at every opportunity[.]" *Id.* ¶ 166. Defendants knew that Plaintiffs relied on them to protect and secure the highly sensitive patient data entrusted to Defendants, and they knew violating that "trust" would be "catastrophic." *Id.* ¶ 172.

Defendants' reliance on *Harris v. Nationwide Mut. Fire Ins. Co.* with respect to HIPAA and the FTC Act ("FTCA") is misplaced because the source of Defendants' duties owed to Plaintiffs here arise under Minnesota *common law*, not HIPAA or the FTCA. *See Target*, 64 F. Supp. 3d at 1309 (analyzing "factors when determining whether a defendant owed a duty of care in a general negligence case" under Minnesota law); *Netgain*, 2022 WL 1810606, at *10-11 (same); *see also Bradshaw*, 854 S.W.2d at 870 (examining whether duty existed under Tennessee common law for negligence); *McClung*, 937 S.W.2d at 902 (same). Furthermore, the court in *Harris* did not consider either HIPAA or the FTCA. Rather, the subject of the plaintiffs' claims and the court's analysis in *Harris* was the National Flood Insurance Act (NFIA). *See Harris v. Nationwide Mut. Fire Ins. Co.*, 367 F. Supp. 3d 768, 777 (M.D. Tenn. 2019) ("The court therefore holds that violation of

21

the NFIA is not a 'special circumstance' sufficient to create a common law duty on the part of lenders."). Defendants' arguments with respect to the common law duties owed to Plaintiffs in the data breach context also ignore the numerous courts across the country, including in Minnesota, that recognize common law duties to protect sensitive information. *See, e.g.*, *Target*, 66 F. Supp. 3d at 1310; *Netgain*, 2022 WL 1810606, at *11; *Haney*, 747 F. Supp. 3d at 1111; *In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 632 (N.D. Cal. 2024); *In re USAA Data Sec. Litig.*, 621 F. Supp. 3d 454, 469 (S.D.N.Y. 2022); *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, No. 19-MD-2879, 2020 WL 6290670, at *6-21 (D. Md. Oct. 27, 2020); *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 400 (E.D. Va. 2020); *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019); *In re Equifax, Inc. Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1325 (N.D. Ga. 2019); *Brush v. Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1365 (S.D. Fla. 2017).

### d.    *Defendants' Maintenance of Uninterrupted Services Argument Is a Strawman*

Defendants argue they owe no duty to Plaintiffs to "maintain uninterrupted services" during a cyber incident. Defendants' arguments once again set up a strawman that mischaracterizes the well-pled allegations in the CAC. Plaintiffs do not allege Defendants had a duty to guard against "*any*" interruption in service. Rather, Plaintiffs allege that Defendants had "a duty to exercise reasonable care in setting up, providing, managing, *maintaining, operating, supervising, and controlling the System*, including a duty to secure the System against reasonably foreseeable breaches[.]" CAC ¶ 449 (emphasis added).

Plaintiffs further allege "that it was reasonably foreseeable that, if an attack on the System caused the System to be disconnected (as happened here), Plaintiffs, Class members, and NCPA members would be injured by the sudden and sustained lack of claims and payment processing by the Change Platform." *Id.* ¶ 450. As set forth above, Defendants had a duty to exercise reasonable care to avoid this specific harm by deploying reasonable data-security practices, such as MFA. *Id.* ¶ 452. Contrary to Defendants' characterization, Plaintiffs here have not alleged strict liability based on the mere fact that service was "interrupted." Instead, Plaintiffs have alleged that Defendants failed to deploy even rudimentary Cybersecurity-for-Dummies-level protections, allowed an intrusion through a basic user-level account to escalate privilege and move laterally while undetected for **nine days**, all while exfiltrating terabytes of data and destroying the Change Platform, and, then, failed to have any apparent process in place to restore service—for **months**. This was not a mere service "interruption": it was a service annihilation.

Defendants attempt to disavow this duty by analogizing the instant Ransomware Attack to the duties that an oil pipeline, music festival, or a single hospital owe to any particular individual. Such cases are not comparable to the scale or severity of the service cessation that occurred here. *In re Fyre Festival Litig.*, for example, alleged injuries following a cancelled music festival. 399 F. Supp. 3d 203 (S.D.N.Y. 2019). Moreover, plaintiffs in those cases alleged a duty of "continuous" service, which again Plaintiffs do not assert here. S*ee, e.g.*, *Dickerson v. Colonial Pipeline Co.*, No. 1:21-CV-2098, 2022 WL 18717801, at *3 (N.D. Ga. June 17, 2022) ("Nothing in [p]laintiffs' response references any common law duty for [defendant] to maintain uninterrupted service.").

### 3.     Plaintiffs Sufficiently Plead Negligence Per Se

Defendants argue that Plaintiffs' negligence per se claims must be dismissed because: (a) all the relevant states either categorically bar negligence per se (California, Illinois, Louisiana, Maine, Massachusetts, and Michigan) or bar negligence per se when the underlying statute, here Section 5 of the FTCA, lacks a private right of action (Florida, Minnesota, New Jersey, New York, Ohio, and Texas); and (b) Plaintiffs and their injuries are not who and what HIPPA and the FTCA were designed to protect. Defendants are wrong. Plaintiffs certainly sufficiently allege negligence per se under Minnesota law.

Minnesota permits negligence per se under the circumstances of this case. "In Minnesota, a violation of a statute or regulation gives rise to negligence per se if (1) the person harmed by that violation is among those the legislature sought to protect and (2) the harm suffered is of the type the statute or regulation was intended to prevent." *Perry v. Bay & Bay Transp. Servs., Inc.*, 650 F. Supp. 3d 743, 754 (D. Minn. 2023); *see also Minn. v. Fleet Farm LLC*, 679 F. Supp. 3d 825, 846 (D. Minn. 2023) (Minnesota follows the Restatement's approach to negligence per se).

Plaintiffs and their injuries are of the type that Section 5 of the FTCA protects, contrary to Defendants' assertions. As set forth above, Defendants had a duty to implement reasonable data security measures to protect the Private Information entrusted to them from unauthorized access. Thus, Defendants' erroneous assertion that Plaintiffs invoke Section 5 of the FTCA concerning a disruption of service is unavailing.

Moreover, assuming *arguendo* that that is what Plaintiffs alleged (it is not), Section 5 is not as narrow as Defendants suggest. It broadly applies to all "[u]nfair or deceptive

24

acts in or affecting commerce[,]" not just those impacting consumers or competitors. 15 U.S.C. § 45(a)(1). The FTC has recognized that Section 5 applies to "unfair" or "deceptive" acts that "cause[] substantial injury to consumers (or competitors or *other businessmen*.)." 29 Fed. Reg. 8324, 8355 (July 2, 1964) (discussing unfair or deceptive cigarette advertisings) (emphasis added); *see also F.T.C. v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 934 (N.D. Ill. 2008) ("The FTC has construed the term 'consumer' to include businesses as well as individuals."). Courts regularly hold, for example, that financial institutions whose customers' data was stolen in data breaches can pursue negligence per se claims for the harm suffered as a result of the breach. *See, e.g.*, *Cap. One*, 488 F. Supp. 3d at 408; *Equifax*, 362 F. Supp. 3d at 1327 (upholding negligence per se claim premised on violation of FTCA even though vast majority of plaintiffs were not direct customers of Equifax); *Arby's Rest. Grp.*, 2018 WL 2128441, at *14; *Home Depot, Inc.*, 2016 WL 2897520, at *4; *see also First Choice Fed. Credit Union*, 2017 WL 9487086, at *4 (declining to dismiss Pennsylvania negligence per se claim based on Section 5 of the FTCA). Defendants' sole authority, *Langbehn v. Pub. Health Tr. of Miami-Dade Cnty.*, 661 F. Supp. 2d 1326 (S.D. Fla. 2009), involved Florida healthcare statutes, not the FTCA, and is thus inapposite.

Moreover, even if the laws of other jurisdictions were to apply, Defendants are incorrect that Plaintiffs' claims would not survive. The outcome in New Jersey, New York, Ohio, and Texas is the same as in Minnesota. California, Illinois, Louisiana, Maine, Massachusetts, Michigan, and Florida recognize the doctrine of negligence per se as an evidentiary presumption, and Plaintiffs' negligence per se allegations can be maintained as part of their negligence causes of action. *E.g.*, *Jack v. Pearson*, No. 1:17-CV-0520, 2018

WL 1567796, at *4 (E.D. Cal. Mar. 30, 2018); *Randall v. Michigan High Sch. Athletic Ass'n*, 965 N.W.2d 690, 703 (Mich. Ct. App. 2020) (citing *Calendaria v. BC Gen. Contractors, Inc.*, 600 N.W.2d 348, 356 (Mich. Ct. App. 1999)); *Smith v. Cent. Maine Power Co.*, 988 A.2d 968, 970 n.3 (Me. 2010); *Kohl v. Kohl*, 149 So. 3d 127, 132 (Fla. Dist. Ct. App. 2014); *Juliano v. Simpson*, 962 N.E.2d 175, 179-80 (Mass. 2012). Should the Court find it appropriate to dismiss any of the negligence per se claims, Plaintiffs request that it do so without prejudice and with leave to amend to include Plaintiffs' per se allegations as part of their negligence claim.

### B.    PLAINTIFFS ADEQUATELY ALLEGE TWO BREACHES OF CONTRACT

#### 1.    Direct Contract Plaintiffs Allege Breach of Service Contracts

In its contracts with the Direct Contract Plaintiffs,[4] Change made several promises. It promised to safeguard and protect Plaintiffs' Private Information with "no less than reasonable care." CAC ¶¶ 478, 483. It agreed to "implement and maintain appropriate administrative, physical, and technical safeguards" to protect Private Information and comply with the HIPAA Security Rule, and to "comply with all applicable federal privacy and security laws governing PHI" as well as "state laws regarding the protection of PHI." *Id.* ¶¶ 165, 480, 484, 486. Change also promised to provide notice of a data breach "without unreasonable delay" and to provide prompt, prior notice of any revisions, modifications, updates, or replacements to its services, committing that no changes could be made if they

---

[4] Direct Contract Plaintiffs include Western New York Retina, H & R Medical Practice, P.C., H. Lee Moffitt Institute Hospital, Inc., Knox Community Hospital, Hackensack Meridian Health, Inc., Plaintiff Professional Arts Pharmacy, DocCare, Pediatric Clinic, Ltd., and York Hospital. CAC ¶ 473.

would "adversely affect[]" the customer "in any material manner." *Id.* ¶¶ 165, 479.

Defendants do not dispute that the alleged contracts exist and are enforceable, which distinguishes this from every case on which Defendants rely. *See Brush*, 238 F. Supp. 3d at 1367 (Notice of Privacy Practices was "not contractual in nature"); *Krichman v. J.P. Morgan Chase & Co.*, No. 06 CV 15305, 2008 WL 5148769, at *3 (S.D.N.Y. Dec. 8, 2008) (existence of employer's statutory wage and hour obligations did not create contract); *Sheldon v. Kettering Health Network*, 40 N.E.3d 661, 674 (Ohio Ct. App. 2015) (no contract claim asserted; discussing negligence per se).

The CAC also plausibly alleges that Change breached these contractual obligations "by failing to safeguard Private Information entrusted to them," "allowing the Ransomware Attack and shutdown to occur," and "not adequately protecting the System and the Private Information of Direct Contract Plaintiffs' . . . patients, as alleged." CAC ¶¶ 489-90. Plaintiffs allege in detail *how* Change breached its promises. *Id.* ¶¶ 8, 176 (no "reasonable" security procedures; lack of "basic" protections; "attack could have been stopped with Cybersecurity 101"); ¶ 58 ("limited roadblocks" for ALPHV); ¶¶ 181, 185-87, 197, 251-4 (failure to protect against "reasonably anticipated threats or hazards"); ¶ 177 (use of insecure "outdated technology"); ¶¶ 204-5 (insecure configuration of low-level accounts); ¶¶ 212-13 (improper implantation of network segmentation); ¶ 218 (failure to isolate backup systems); ¶ 228-9 (lack of adequate internal monitoring); ¶¶ 259-61 (failure to encrypt protected data); *see also id.* ¶ 181 (listing acts and omissions). Change's footnote regarding whose "Private Information" was at stake misquotes the allegation. *See id.* ¶ 490. The contracts memorialize Change's promises to Providers to safeguard and protect

"patients' Private Information" that it obtained. *Id.* ¶¶ 475, 490. Defendants' bald assertion that Plaintiffs plead "no facts" showing breach is simply wrong. Moreover, at this stage, the undisputed fact that the "largest health care ransomware attack in history" (*id.* ¶ 3) and the shutdown occurred is, itself, a plausible basis to allege that Change breached its promises to use reasonable care, maintain appropriate safeguards, and protect the system. *Cf. Flores-Mendez v. Zoosk, Inc.*, No. C 20-04929, 2021 WL 308543, at *4 (N.D. Cal. Jan. 30, 2021) ("[W]hen a [data] breach occurs, *the thing speaks for itself*. The breach would not have occurred but for inadequate security measures, or so it can be reasonably inferred at the pleadings stage.") (emphasis in original).

Plaintiffs also allege ample facts showing that Change repeatedly breached its obligation to provide notice without unreasonable delay. Defendants' contention that severing "connectivity" constitutes notice of the Ransomware Attack is wholly unsupported and, at best, raises a factual dispute. At most, the abrupt stoppage may have allowed some Providers to *guess* at what had happened. But Plaintiffs allege that, instead of performing their contractual obligation to provide actual prompt notice of the Ransomware Attack—including with respect to the extensive damage, lack of a continuity plan, and lack of transparency regarding when systems would be restored—Defendants made statements that were intended to deceive Providers into believing that the Change Platform would be back online quickly. CAC ¶¶ 64-65, 108-17, 123. These facts plausibly support the inference of an unreasonable delay. Similarly, far from merely failing to provide "uninterrupted service," (as Defendants would reframe the CAC), Plaintiffs allege that Change failed, from the start, to provide the *secure* services that the contracts

28

required—and that Change's failure to restore the promised secure services for months plainly was a "change" in service from what the contracts required. *Id.* ¶¶ 478, 483, 489. That change materially affected Direct Contract Plaintiffs each day that Change delayed in fulfilling its contractual commitments. *Id.* ¶¶ 88, 91, 128.

Defendants' argument that HIPAA requirements are unenforceable by contract contradicts Eighth Circuit law. *Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 852 (8th Cir. 2020) ("[W]e conclude that the district court erred in dismissing the Pharmacies' breach-of-contract claim on the basis that HIPAA lacks a private cause of action."). Courts consistently reject the argument that contractual promises to provide systems that comply with HIPAA "only memorialize[] certain preexisting legal obligations." *See, e.g.*, *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617, 2016 WL 3029783, at *19 (N.D. Cal. May 27, 2016) (allowing claims for "breach of contract claim based upon privacy obligations set forth in a Business Associate Agreement," including for failure to "implement safeguards to protect electronic health information as required by the HIPAA Security Rule"); *Maritz Holdings Inc. v. Cognizant Tech. Sols. U.S. Corp.*, No. 4:18-CV-826, 2019 WL 6910051, at *4-5 (E.D. Mo. Dec. 19, 2019) (enforcing contractual obligations to perform "in compliance with applicable laws, rules and regulations," and to "keep all Confidential Information strictly confidential."); *In re LastPass Data Sec. Incident Litig.*, 742 F. Supp. 3d 109, 125 (D. Mass. 2024) (contract that required defendant to "maintain appropriate organizational, administrative, and technical safeguards" breached by inappropriate cybersecurity protocols).

Defendants' argument that the CAC alleges no damages that "flow" from its

breaches also fails. Plaintiffs specifically allege that if Change had provided the promised services compliant with applicable security laws and standards and implemented reasonable safeguards, the Ransomware Attack would have been averted or minimized; there would have been no shutdown; Plaintiffs would have received the benefit of their bargain; and none of the costs resulting from the shutdown would have been incurred. CAC ¶¶ 198, 214, 219, 230, 262, 496. Likewise, Plaintiffs allege that if Change had fulfilled its obligation to provide prompt notice of the Ransomware Attack and of the significant changes that Defendants would be making post hoc to try to secure the systems, "Providers could have made informed decisions" to at least mitigate (and possibly avert), the extensive damages caused by the shutdown. *Id.* ¶ 128; *see also id.* ¶¶ 110, 492, 546.

Defendants' suggestion that the implied covenant might not have required "Change . . . to act fairly and in good faith in carrying out their contractual obligations," CAC ¶ 494, is contradicted by its own cited authority. *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 699 (M.D. Tenn. 2018) ("[T]here is implied in every contract a duty of good faith and fair dealing in its performance and enforcement."); *see also In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) ("Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract."). Defendants' supposed concerns about "mutual assent" and consideration have no application where, as here, there is an actual contract. *See Russell Barnett Ford of Tullahoma, Inc. v. H & S Bakery, Inc.*, 398 F. Supp. 3d 287, 298 (E.D. Tenn. 2019) (no enforceable contract); *see also River City Mortg. Corp. v. Baldus*, 695 N.W.2d 375, 379 (Minn. Ct. App. 2005)

("[W]hen a party signs a contract and promises to perform under the contract, that performance will be required by law."). Thus, even if particular acts and omissions alleged do not violate the express terms of the parties' contracts—a matter to be determined after full discovery—Change breached its implied obligations to act in good faith to provide the secure platform that Change committed to provide during its relationship with Plaintiffs.

## 2.    Defendants Breached the TFAP Contracts of Adhesion

Plaintiffs have extensively briefed Defendants' alleged breach of contracts through TFAP in the Motion for Preliminary Injunction (Doc. 278 ("PI Mem.")) and Motion for Declaratory Judgment (Doc. 291("DJ Mem.")) pending before the Court. Plaintiffs allege that, after Change's service shutdown blocked Plaintiffs' payment streams, Defendants offered loan agreements ("TFAP contracts") to Loan Plaintiffs[5] and National Provider Loan Assistance Sub-Class members. CAC ¶¶ 6, 10. In doing so, Defendants promised not to demand repayment until certain contractual conditions precedent were met. *See id.* ¶ 143; *see also id.* ¶¶ 506, 509. However, before those conditions were met, Defendants sent notices demanding repayment of TFAP loans. *Id.* ¶¶ 11, 510, 514. Plaintiffs sufficiently allege that Defendants breached the TFAP contracts and caused them damages.

### a.    *Defendants' Unreasonable Interpretation of the Contracts Does Not Support Dismissal*

---

[5] Loan Plaintiffs include Total Care Dental & Orthodontics, Ridge Eye Care, Inc., AMB Medical Services d/b/a DocCare, MedCare Pediatric Nursing, LP, MedCare Pediatric Rehab Center, LP, MedCare Pediatric Therapy, LP, K.Wade Foster MD, PA, d/b/a Florida Dermatology and Skin Cancer Centers, Pediatric Clinic Ltd., Cultivating Mind LLC, Irwin Counseling Service, LLC, Advanced Cardiology of South Jersey, PC, and Dillman Clinic. CAC ¶ 500.

Defendants' motion to dismiss the breach of contract claim pertaining to the TFAP contracts turns on the meaning of the following contract term: "CHC will send notice to the Recipient that the Funding Amount is due after claims processing and/or payment processing services have resumed and payments impacted during the service disruption period are being processed." Doc. 40-2 at 3 (Bullock Decl., Ex. B § 5(a)); *see also* CAC ¶ 143 (emphasis added). The plain language of this provision states that CHC cannot send notice that payments are due before claims processing services have resumed *and* all payments impacted during the service shutdown are fully processed (*i.e.*, all payments are in the process of being paid). The reasonableness of this interpretation is evident in the contract's stated purpose of providing "temporary funding assistance to provide [Providers] *with funds that you may have otherwise received but for the disruption.*" Doc. 40-2 at 3 (Bullock Decl., Ex. B at 2); *see also* CAC ¶¶ 506, 509-10, 514. UHG's CEO reasonably interpreted the contract in this way when he testified that UHG had "no intention of asking for repayment until providers determine their business is back to normal." *Id.* ¶ 142.

In seeking dismissal of this claim, Defendants urge this Court to read the TFAP contracts as giving them license to demand repayment as soon as Defendants' system was useable again and *some* of the *claims* backlog was being processed, regardless of the status of processing actual "payments" that Providers "may have otherwise received." Doc. 253-1, at 20. Such a reading is unreasonable because it ignores that "payments" must be "being processed" *in addition* to the resumption of services and because it defies the contractually stated purpose of the loans. As Plaintiffs have argued elsewhere, the language of the TFAP

contracts is sufficiently clear that the Court can interpret it now. Even if this were not the case and the Court were to find the relevant terms ambiguous, that would not be a basis for dismissal. *See Olympus Ins. Co. v. AON Benfield, Inc.*, 711 F.3d 894, 898 (8th Cir. 2013) ("If the court determines that a contract is ambiguous, its interpretation then becomes a question of fact for the jury and the district court should not grant a motion to dismiss."). Defendants rely on two authorities to argue that Loan Plaintiffs lack standing to enforce their contracts, but neither supports that contention. In *Hageman v. Accenture LLP*, No. Civ. 10-1759, 2010 WL 3749246, at *4 (D. Minn. Sept. 21, 2010), the plaintiffs had never entered, or had rescinded, the contracts at issue. *See also Jensen v. Duluth Area YMCA*, 688 N.W.2d 574, 577 (Minn. Ct. App. 2004) (noting that the plaintiff had already received what he was owed under the contract (the unused portion of his YMCA membership fee)).

Defendants' ostensibly equitable arguments for rewriting their adhesion contracts fare no better. Their claims about generating a "windfall" for Plaintiffs and putting Providers in a "better situation" than they would have been in completely ignore the facts alleged. *First*, these "loans" never gave Providers more money than they would *already have received* interest-free, even temporarily, but for the shutdown. CAC ¶ 141. To the contrary, the CAC shows that the loans were for considerably less than Providers would have received absent Defendants' misconduct. *Id.* ¶¶ 271, 278, 310, 346, 353, 396 (Plaintiffs were required to find additional temporary funding). *Second*, the loan amounts were not delivered the moment the shutdown began. *Id.* ¶¶ 137, 141. Instead, Providers waited, incurring losses including the ability to *generate* interest on funds they should already have received, until the TFAP program began to partially offset their forward-

33

looking losses, while Defendants derived tax and other benefits from retaining for themselves funds that should have been in Providers' accounts from the start. *Id.* ¶¶ 132-33. Thus, nothing is inequitable about requiring Defendants to wait now, until all of the *payments* impacted by the shutdown are being processed, as Defendants contractually obligated themselves to do, consistent with the express contractual purpose.

### b.    *Loan Plaintiffs Adequately Plead Damages*

Loan Plaintiffs adequately plead recoverable contract damages. Defendants' primary argument, that the TFAP contracts "plainly described" the terms of the bargain, relies on their unreasonable interpretation of those terms addressed above. Next, Defendants try to minimize Loan Plaintiffs' allegations of harm as "hypothetical" to the extent that individual Plaintiffs do not allege that Defendants targeted them with unauthorized repayment notices. But there is nothing hypothetical about the loss in value of the loan agreements. CAC ¶ 511. Prior to Defendants' alleged breach, the TFAP contracts represented a bargain in which Loan Plaintiffs could retain the loan amounts as though they were funds that they would have otherwise received, with no interference from Defendants until certain conditions precedent were met. *Id.* ¶ 509. Defendants' premature demands for repayment of TFAP loans rendered those protections, and that benefit of Loan Plaintiffs' bargain, a dead letter. A loan agreement that protects contracting parties against premature collections, as the TFAP contracts were intended to do, is obviously more valuable than one without such protections. Defendants' breach has forced Loan Plaintiffs to consider obtaining alternate higher-interest funding, which Defendants promised they would not have to do. *Id.* ¶ 512. Plaintiffs are entitled to receive the benefit of the bargain.

*Lesmeister v. Dilly*, 330 N.W.2d 95, 103 (Minn. 1983).

Even if Loan Plaintiffs had not specified the nature of the damages they suffered (which they have), "an invasion of the plaintiff's legal rights is itself a harm," entitling the non-breaching party to recover nominal damages. *Manderson as Tr. of I.B.E.W. 292 Health Care Plan v. Fairview Health Servs.*, No. CV 21-1797, 2022 WL 2442233, at *10 n.6 (D. Minn. July 5, 2022) (examining Minnesota law and concluding that nominal damages are sufficient to state a claim); *Cardiovascular Sys., Inc. v. Cardio Flow, Inc.*, 37 F.4th 1357, 1362 (8th Cir. 2022) ("absent proof of actual loss[,] nominal damages are recoverable for breach of a contractual obligation.").

None of Defendants' authorities supports precluding Loan Plaintiffs from recovering their damages alleged or, at a minimum, nominal damages. Defendants refer the Court to *Fairview Health Servs. v. Armed Forces Off. of Royal Embassy of Saudi Arabia*, 705 F. Supp. 3d 898, 910 (D. Minn. 2023), without explanation, but that case concerned virtually unintelligible pleading and a factually inapposite scenario (efforts to recover funds delivered to the wrong recipient). Similarly, Defendants try to analogize Loan Plaintiffs' harms alleged to "extra-contractual" emotional distress damages that were not available to a disgruntled airport visitor, but there is no parallel. *See Chey v. Metro. Airports Comm'n*, No. 22-CV-1429, 2023 WL 2308272, at *7 (D. Minn. Mar. 1, 2023). Loan Plaintiffs' breach of contract claim is well pled.

**C.    PLAINTIFFS PLAUSIBLY STATE THEIR CLAIM OF UNJUST ENRICHMENT**

**1.    The Claim for Unjust Enrichment Is Permitted Under Minnesota Law**

As discussed in Plaintiffs' Choice of Law Memorandum, a choice of law analysis is premature at this stage. Regardless, Minnesota law likely applies to Plaintiffs' unjust enrichment claims. *See, e.g.*, *Target*, 66 F. Supp. 3d at 1177 (applying Minnesota law to all claims for unjust enrichment, which the Court found are substantively consistent across all jurisdictions). Plaintiffs clearly state a claim under Minnesota law, and because a choice of law analysis is premature, the Court must deny Defendants' motion.

Under Minnesota law, to establish an unjust enrichment claim, the claimant must show that the defendant has knowingly received or obtained something of value for which the defendant in equity and good conscience should pay. *ServiceMaster of St. Cloud v. GAB Bus. Servs. Inc.*, 544 N.W.2d 302, 306 (Minn. 1996). Plaintiffs pleaded exactly that. They allege that Defendants knowingly received or obtained something of value: (1) payments from Plaintiffs, both directly and indirectly, for use of the Change Platform (CAC ¶ 517); and (2) as to UHG and UHCS, the benefit of Plaintiffs' provision of Services to insureds covered by a UHG subsidiary health insurer for claims that were not paid or delayed because of the shutdown of the Change Platform. *Id.* And Plaintiffs allege that Defendants in equity and good conscience should pay for the value they received: (1) that should have been used to provide appropriate cybersecurity and incident response measures, including maintaining a functioning Change Platform and services, *id.* ¶ 518; and (2) that should have been timely paid to Plaintiffs and other Providers for their provision of covered patient Services, *id.* ¶ 519. Nothing more is required at the pleading stage. *See Twombly*, 550 U.S. at 547 (plausibility standard); *ServiceMaster*, 544 N.W.2d at 306.

The Court need not consider Defendants' "Appendix E" regarding the laws of states other than Minnesota, which implicates a premature choice of law determination. Moreover, as to this case, "[t]he substantive law of unjust enrichment is consistent across all jurisdictions." *Target*, 66 F. Supp. 3d at 1177. Although there are decisions suggesting there is no independent "cause of action" for "unjust enrichment" in several states where Plaintiffs reside, the courts in those states generally allow plaintiffs to claim restitution for unjust enrichment as an equitable theory of recovery. *See, e.g.*, *Hirsch v. Bank of Am.*, 107 Cal. App. 4th 708, 721 (Cal. Ct. App. 2003) ("Unlike a claim for damages based on breach of a legal duty, appellants' unjust enrichment claim is grounded in equitable principles of restitution. An individual is required to make restitution when he or she has been unjustly enriched at the expense of another"); *Flores v. OneWest Bank*, 172 F. Supp. 3d 391, 396 (D. Mass. 2016) (while not an independent cause of action, "unjust enrichment is a theory of equitable recovery"); *In re Riddell Concussion Reduction Litig.*, 121 F. Supp. 3d 402, 423 (D.N.J. 2015) (describing how "to state a claim for unjust enrichment under New Jersey law"); *Show Services, LLC v. Amber Trading Co.*, No. 3:09-CV-2385, 2010 WL 4392544 at *2 (N.D. Tex. Oct. 29, 2010) (not an independent cause of action, but nevertheless "a theory upon which an action for restitution may rest"). The CAC gives notice of and plausibly alleges facts supporting this theory and remedy, regardless of nomenclature.

### 2.    Plaintiffs Are Permitted to Assert Unjust Enrichment Claims in the Alternative at the Pleading Stage

The Federal Rules of Civil Procedure explicitly allow plaintiffs to plead alternative,

and even legally inconsistent, theories of recovery. *See* Fed. R. Civ. P. 8(d)(3). For this reason, Defendants' arguments are better addressed at summary judgment when courts can "assess the likelihood for duplicate recovery, analyze the overlap between claims, and determine whether one claim alone will provide the plaintiff with 'adequate relief.'" *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 727 (8th Cir. 2014). *See also Radisson Hotels Int'l, Inc. v. Westin Hotel Co*., 931 F. Supp. 638, 643-44 (D. Minn. 1996) (declining to evaluate whether claim was duplicative "at this early stage of the litigation"). The Court should deny Defendants' motion on this basis alone.

Further, even where breach of contract or other available legal remedies may *ultimately* preclude recovery, plaintiffs are generally permitted to plead unjust enrichment claims in the alternative at the pleading stage. *See, e.g.*, *In re Pork Antitrust Litig.*, No. CV 18-1776, 2025 WL 964545 at *87 (D. Minn. March 31, 2025) (denying motion for summary judgment on "inconsistent" unjust enrichment claims under the law of numerous jurisdictions, stating "[b]ecause it is still unclear whether the Indirect Plaintiffs' claims will prevail, the Court will allow the unjust enrichment claims to continue"); *Seutter v. Mead Johnson Nutrition Co.*, No. CV 24-2179, 2025 WL 220315, at *8 (D. Minn. Jan. 16, 2025) (rejecting argument that unjust enrichment may not be pleaded in parallel to statutory claims); *In re Levaquin*, 752 F. Supp. 2d 1071, 1081 (D. Minn. 2010) (similar). *Cf. Prudential v. Clark Consulting*, 548 F. Supp. 2d 619, 623 (N.D. Ill. 2008) ("[A]lthough we must look to Illinois law to resolve Prudential's claims on the merits, whether the FAC properly states a claim for relief is a question of *federal* law.") (*citing Johnson v. Hondo, Inc.*, 125 F.3d 408, 417 (7th Cir. 1997) and *Cole–Haddon, Ltd. v. Drew Philips Corp.*, 454

F. Supp. 2d 772, 777-78 (N.D. Ill. 2006) ("Pleading under the Federal Rules is a federal procedural issue, not a matter of state law; therefore, this Court, even when applying state law, has to be cognizant of the notice pleading standards of federal court")). The Court should thus reject Defendants' arguments regarding "duplicative" claims.

Although Defendants contend Direct Contract Plaintiffs' claim for unjust enrichment is particularly susceptible to dismissal because those Plaintiffs pleaded alternative contract claims, courts "routinely permit the assertion of contract and quasi-contract claims [(i.e., unjust enrichment)] together." *Cummins L. Off., P.A. v. Norman Graphic Printing Co*., 826 F. Supp. 2d 1127, 1130 (D. Minn. 2011) (declining to dismiss plaintiff's parallel unjust enrichment claim on that basis). In addition, "[t]he existence of a valid contract, by itself, does not foreclose a claim for unjust enrichment." *Lyon Fin. Servs., Inc. v. MBS Mgmt. Servs., Inc.*, No. CIV. 06-4562, 2007 WL 2893612, at *7 & n.6 (D. Minn. Sept. 27, 2007) (adopting report & recommendation). Thus, for example, "[i]f a contract is valid, but the rights of the parties are ambiguous, the remedy of unjust enrichment remains available." *Id.* The existence here of unproven claims sounding in contract does not doom the claim for unjust enrichment.

### 3. The Complaint Identifies Benefits Unjustly Conferred on Defendants

Plaintiffs did not get the benefit of their bargain in terms of what they paid either directly or indirectly to the Defendants. In addition to paying Defendants fees in exchange for secure services and adequate data security (which Defendants failed to provide), (CAC ¶¶ 517, 518), Plaintiffs further contend that "UHG and UHCS unjustly benefitted from and

retained the value of Plaintiffs' and National Providers Class members' provision of patient services to insureds covered by a UHG subsidiary health insurer" in the form of "money and interest or other investment income earned thereon" which was temporarily or permanently retained. *Id.* ¶¶ 517, 519. To the extent Defendants have, as alleged, knowingly withheld or retained such proceeds that were due and owing to Plaintiffs: (i) that undoubtedly constitutes a benefit "directly" conferred upon the Defendants by the Plaintiffs; and (ii) is, at the very least, "immoral" and "unjust."

Judge Tunheim rejected the same argument that the benefit must be conferred directly from the plaintiff to the defendant. *See Luckey v. Alside*, 245 F. Supp. 3d 1080, 1099, n.26 (D. Minn. 2017) ("[E]ven if a benefit must be conferred by the plaintiff," there is "no authority from the Minnesota Supreme Court imposing the additional requirement that this conferral be *direct*."). Moreover, in this particular case, Plaintiffs have set forth the complex relationship between and among the relevant entities—including particularly both the Plaintiffs and the Defendants—that are integrally necessary to the system of delivering, processing, and paying for medical treatment and care. CAC ¶¶ 34-35, 42, 45-52. *See, e.g.*, *Amaro v. Lincoln Gen.*, 361 Fed. Appx. 338, 347-48 (3d Cir. 2010) (despite arguable lack of a direct financial connection between plaintiff and defendant, the parties to a complex arrangement of insurers, agents, and brokers "recognized that they were in some form of business relationship," which was sufficient to sustain an unjust enrichment claim).

In *Caldas*, cited by Defendants, the Minnesota Supreme Court was primarily concerned with litigants "attempting to bring an unjust enrichment claim to avoid the result

that they lack third-party beneficiary status to enforce the contract." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 839 (Minn. 2012). Here, by contrast, Plaintiffs are not attempting to stand in the shoes of intermediary entities in order to compel the Defendants to provide them with claims processing services; rather, they are complaining about the fact that they have been unfairly impoverished by the Defendants' refusal to invest in reasonable security measures, which has not only prevented Plaintiffs from being able to get their claims processed, but has also allowed the Defendants themselves to retain proceeds (and interest or investment income thereon) that should have been due and owing to Plaintiffs.

Finally, the Minnesota Supreme Court recently "cautioned against restricting the broad scope of the unjust enrichment remedy." *Herlache v. Ruchs*, 990 N.W.2d 443, 451 (Minn. 2023). While noting that the remedy generally requires some "immoral" conduct on the part of the defendant, the *Herlache* court also equated the claim with the traditional "money had and received" cause of action, which can be maintained "whenever one person has received or obtained the possession of the money of another, which they ought in equity and good conscience to pay over." *Id.* at 450 (quoting *Brand & Co. v. Williams*, 13 N.W. 42, 42 (1882)).

Plaintiffs' unjust enrichment claim more closely resembles *Resnick v. AvMed, Inc.*, 693 F.3d 1317 (11th Cir. 2012) than *Target*, *supra*, as *all* of the Plaintiffs' patient data is being transferred to Defendants, and as alleged, *all* of the Plaintiffs are paying an overcharge for the security of that data, as opposed to the *Target* customers, who were paying the same price for the same goods, even when they shared no data and paid with

41

cash. *See Target*, 66 F. Supp. 3d at 1178; *see also, e.g.*, *In re Rutter's Data Sec. Breach Litig.*, 511 F. Supp. 3d 514, 540 (M.D. Pa. 2021) (allowing unjust enrichment claims to proceed against defendant who accepted and retained money that was not dedicated to adequate data security). Defendants' retention of money collected directly and/or indirectly from the Plaintiffs to Defendants in this case was, and remains, "unjust," as the Plaintiffs did not get the benefit of the bargain in terms of data security.

Plaintiffs adequately state their claim for unjust enrichment.

### D.    PLAINTIFFS ADEQUATELY PLEAD THEIR INTERFERENCE CLAIMS

#### 1.    California Plaintiffs Adequately Allege Negligent Interference

California Plaintiffs[6] properly allege their negligent interference claim, including by detailing the third party relationships Defendants disrupted and the bases for establishing Defendants' duty of care. Under California law, the tort of negligent interference with prospective economic advantage requires Plaintiffs to allege:

> (1) the existence of a valid economic relationship between the plaintiff and a third party containing the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge (actual or construed) of (a) the relationship and (b) that the relationship would be disrupted if the defendant failed to act with reasonable care; (3) the defendant's failure to act with reasonable care; (4) actual disruption of the relationship; and (5) resulting economic harm.

*Logistick, Inc. v. AB Airbags, Inc.*, 543 F. Supp. 3d 881, 885 (S.D. Cal. 2021). Plaintiffs have adequately pleaded each element. *See* CAC ¶¶ 531-7.

First, California Plaintiffs allege facts showing that Defendants owed them a duty.

---

[6] The "California Plaintiffs" include Total Care Dental and Orthodontics, Ridge Eye Care, Inc., Bay Area Therapy Group A Marriage and Family Counseling Corp. CAC ¶¶ 266-86.

*See* CAC ¶¶ 452-3, 449-50, 533. Whether a duty of care exists in this context turns on:

> (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to the plaintiff, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct and (6) the policy of preventing future harm.

*J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979). Every one of these factors supports finding a duty of care here. Defendants chose to make the Change Platform a linchpin of the national healthcare payment-processing infrastructure; they processed and directed claim payments to Plaintiffs; it was foreseeable that the failure to adequately protect the Change Platform or implement an effective remediation plan would severely and directly harm Plaintiffs; and both basic morality and public policy support requiring critical infrastructure providers to harden their systems to prevent these catastrophic nationwide disruptions. Plaintiffs have pleaded this duty. CAC ¶ 533; *see Ott v. Alfa-Laval Agri, Inc.*, 31 Cal. App. 4th 1439, 1449 (1995) (recognizing a duty of care where defendant's services were central to plaintiff's operations and collecting cases).

Second, Plaintiffs have meticulously detailed the relationship between Plaintiffs and payers/insurers. CAC ¶¶ 36-42, 46-8, 4, 66, 90, 99-103, 128, 523, 532. Plaintiffs further identified numerous exemplar business partners, including Aetna, BlueCross/Blue Shield, Kaiser, and Medicaid. *Id.* ¶ 49. This level of detail is enough because it "serves the purpose of ensuring that there is a sufficient 'factual basis' from which it may be inferred that there was a benefit that 'the plaintiff was likely to have . . . received' and that the defendant's conduct interfered with plaintiff's receipt of this benefit." *Damabeh v. 7-Eleven, Inc.*, No. 5:12-CV-1739, 2013 WL 1915867, at *10 (N.D. Cal. May 8, 2013). *See also Unite*

*Eurotherapy, Inc. v. Walgreen Co.*, No. 16-CV-01706, 2017 WL 513008, at *3 (S.D. Cal. Feb. 7, 2017) (plaintiff need only plead "enough facts from which the Court can determine which contractual right it possessed" and need "not specifically identify a third party"); *Paisley Park Enter's, Inc. v. Boxill*, 361 F. Supp. 3d 869, 881 (D. Minn. 2019) (assuming that if identification of a business partner is required, requirement is satisfied where pleading includes examples of "specific business partners with whom [plaintiffs] expected to have an ongoing relationship"); *Toyota Motor Sales, U.S.A., Inc. v. Allen Interchange LLC*, No. 22-CV-1681, 2023 WL 5206884, at *11 (D. Minn. Aug. 14, 2023) (finding that "even if identification of a specific business partner or customer is a pleading requirement," it is satisfied where a single example is included).

None of the cases Defendants cite require Plaintiffs to specifically name each thirdparty partner. Instead, they simply reject generic and conclusory allegations. *See UMG Recordings, Inc. v. Glob. Eagle Ent., Inc.*, 117 F. Supp. 3d 1092, 1117 ("Allegations of an 'as yet unidentified' customer will not suffice."); *Varsity News Network, Inc. v. Carty Web Strategies, Inc.*, No. CV 17-2574, 2017 WL 7201873, at *11 (C.D. Cal. Aug. 30, 2017) (finding allegations of interference with relationships between plaintiff and prior and "prospective consumers" insufficiently specific).

### 2. Plaintiffs State a Claim for Interference with Prospective Economic Advantage

#### a. The Direct Contract Plaintiffs' Claim Is Not Barred

Defendants claim that some Direct Contract Plaintiffs' claims fail because they are "indistinguishable" from these Plaintiffs breach of contract claims. But Defendants do not

44

identify these Plaintiffs, nor explain how the authorities they cite apply to any Plaintiff. Moreover, these arguments are better addressed at summary judgment for the reasons explained above.

Even if addressed now, the duplication argument fails. Plaintiffs have alleged duties arising outside the four corners of any contract. CAC ¶¶ 179, 449-50, 452-4. Accordingly, on their face, the Direct Contract Plaintiffs' claims are not entirely duplicative.

### b.    *Plaintiffs Sufficiently Allege Intentional Interference*

Plaintiffs sufficiently allege the elements required to state a claim for tortious interference with prospective economic advantage, business relationship, or expectancy, which are:

> (1) the existence of a reasonable expectation of economic advantage belonging to the plaintiff; (2) the defendant's knowledge of that expectation; (3) the defendant's wrongful interference with that expectation; (4) a reasonable probability that the plaintiff would have realized the expectation absent the defendant's conduct; and (5) damages.

*Inline Packag'g, LLC v. Graphic Packag'g Int'l, Inc.*, 164 F. Supp. 3d 1117, 1136 (D. Minn. 2016).

Defendants first argue that Plaintiffs have not sufficiently identified third parties. This is incorrect. *See* CAC ¶¶ 36-42, 46-9, 66, 90, 99-103, 128, 523, 532). Defendants' citation to *Bortell v. White Mountains Ins. Grp., Ltd.*, 2 So. 3d 1041 (Fla. Dist. Ct. App. 2009), in their Appendix E, is inapposite. There, the court dismissed the plaintiff's claim, not for failure to identify the third parties, but because the plaintiff's "own allegations show that he did not have any agreements with these clients" that could have established liability. *Id.*

Defendants next argue that Plaintiffs fail to plead *intentional* interference. But specific intent is not required. *Cf. AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1151 (N.D. Cal. 2019) (dismissing claim for multiple reasons including the plaintiff's "fail[ure] to explain how Defendants' actions [] jeopardized the ongoing supplier relationship between [plaintiff and the third party[]" and allege disruption). "Liability for a tortious interference with prospective economic advantage claim rests on whether the actor's conduct was improper." *Inline Packaging*, 164 F. Supp. 3d at 1137 (citing *Fox Sports Net N., L.L.C. v. Minn. Twins P'ship*, 319 F.3d 329, 337 (8th Cir. 2003)). "For purposes of this tort, improper means are those that are independently wrongful such as . . . misrepresentation of fact . . . or any other wrongful act recognized by statute or common law." *Id.* (citation omitted). *Compare PPD Enterprises, LLC v. Stryker Corp.*, No. 4:16-CV-0507, 2017 WL 4950064 (S.D. Tex. Nov. 1, 2017) (claim failed on summary judgment because, under Texas law, defendants' conduct must be "defamatory, fraudulent—or in violation of state law"). Plaintiffs have alleged significant misrepresentations of fact made by Defendants (CAC ¶¶ 108-28, 583-4), *and* that Defendants' conduct violated numerous state and federal statutes (*id.* ¶¶ 261, 461-4, 581-8, 590-9, 601-7, 609-17, 619-25, 627-35, 637-44), *and* that Defendants' conduct was unlawful under common law. *See Paisley Park*, 361 F. Supp. 3d at 881 (misrepresentation allegations sufficed as allegations of "independently tortious act").[7]

---

[7] In Appendix E, Defendants rely on *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 218-19 (Minn. 2014), but "*Gieseke* provides only the elements required to *prove* tortious interference with prospective economic advantage, not the elements required to *plead* that claim." *Toyota Motor Sales*, 2023 WL 5206884, at *11.

Finally, Defendants' justification argument is contradicted by Plaintiffs' factual allegations and, in any event, premature. Defendants ignore Plaintiffs' well-pled allegations about how it was Defendants' own failures (and not merely the fact of the Attack) that "necessitated" the shutdown. CAC ¶¶ 194, 215-19. Had Defendants taken reasonable precautions to back up their systems, the shutdown could have been averted. *Id.* Moreover, justification cannot be determined at this stage, as "[o]rdinarily, whether interference is justified is an issue of fact[.]" *Kjesbo v. Ricks*, 517 N.W.2d 585, 588 (Minn. 1994); *Inline Packaging*, 164 F. Supp. 3d at 1138 (quoting *Kjesbo*; noting discovery will assist in determining whether defendant's conduct was improper or justified).

### E.    PLAINTIFFS ADEQUATELY ALLEGE PUBLIC NUISANCE

As demonstrated in Plaintiffs' Choice of Law Memorandum, a full-blown choice of law analysis is premature at this stage. Based on the record developed so far, it appears that Minnesota law will apply to Plaintiffs' claim for public nuisance. Plaintiffs' allegations are more than sufficient to allege a claim for public nuisance under both Minnesota law and the law of other potentially applicable jurisdictions, making it inappropriate to dismiss at this stage. Defendants' arguments to the contrary either (a) ignore or dispute Plaintiffs' factual allegations, or (b) rely on inapplicable cases.[8]

#### 1.    Plaintiffs Allege Ample Facts to Sustain a Claim for Public Nuisance

A public nuisance is "an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B (1979); Minn. Stat. § 609.74(1)

---

[8] As explained above, the ELR does not bar Plaintiffs' public nuisance claims.

(defining public nuisance as "a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public"). Here, Plaintiffs allege that Defendants are liable for public nuisance because they operated the Change Platform—a "critical linchpin in the country's healthcare services infrastructure"—in an unreasonable manner that made the Platform both vulnerable to a cyber-attack and impossible to promptly restore to service. CAC ¶ 570. The resulting outage "substantially disrupted, compromised, and endangered" the delivery of healthcare services throughout the country. *Id.* ¶¶ 568-75. Plaintiffs allege that, in addition to the unreasonable interference with the public right to health (*id.* ¶ 568), Defendants also caused Plaintiffs to suffer "special economic injuries distinct from the general harm to healthcare suffered by the public at large," including delayed payments for Services and expenses incurred trying to keep their practices operating after Defendants took down the Change Platform. *Id.* ¶ 576.

In the face of these allegations, Defendants' arguments for dismissal fail. *First*, Defendants do not contest that health is a "public right." As such, *Colonial Pipeline* is inapposite. *Dickerson*, 2022 WL 18717801, at *9 (no "common right to the uninterrupted flow of oil from Colonial").

Defendants' assertion that they are unaware of any prior recognition of a public nuisance claim arising from a cyber-attack may be true, but it is also not surprising given the wholly unprecedented scope and devastating impact of *this* cyber-attack on the nation's healthcare infrastructure. *E.g.*, CAC ¶¶ 5, 71-74, 96-7, 107, 575. UHG CEO, Andrew Witty, admitted that the Attack and shutdown created "incredible disruption across the

48

health care system," which hobbled pharmacies, hospitals, physicians, and other Providers for *months*. *E.g., id.* ¶¶ 5, 71-74, 96-7, 107. The devastating impacts of the shutdown persist today, as some of Defendants' systems are still not up and running, and Defendants' illegal loan collection efforts are continuing to disrupt Providers' ability to deliver care. *See id.* ¶¶ 7, 9, 11, 73, 91, 102, 107, 121, 142-44.

As shown by cases upholding public nuisance claims addressing the impact of social media on children, the opioids crisis, and the addiction of children to nicotine, the mere fact that a particular form of nuisance is new is not a valid basis to block plaintiffs from seeking abatement and redress. *E.g.*, *In re: Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, 4:22-md-03047, Doc. 1332 (N.D. Cal. Nov. 15, 2024) (allowing public nuisance claims brought by schools responding to mental health, learning, safety, and behavioral impact of social media on children in all but four jurisdictions); *In re National Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 784 (N.D. Ohio 2020) (allowing public nuisance claims brought by hospitals alleging impact on resources to respond to opioids crisis); *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 648 (N.D. Cal. 2020) (allowing public nuisance claims arising from "public health crisis of youth e-cigarette use and wholesale addiction of kids to nicotine."). As harms evolve, so does the law to meet those harms. *Social Media*, Doc. 1332 at 1 ("Public nuisance, like negligence, provides a flexible mechanism to redress evolving means for causing harm.").

*Second*, Defendants urge this Court to decide, as a matter of law, that their interference with public health cannot be deemed "unreasonable." Defendants are wrong.

49

The unreasonableness of the interference can be shown by: (a) how "significant" the interference is, (b) whether "the conduct is proscribed by a statute," or (c) whether there is a "long-lasting effect" on the public right. Restatement (Second) of Torts § 821B(2) (1979). Here, Plaintiffs satisfy all three alternatives. The interference to healthcare was not just significant, but was also, according to government officials, a "direct threat to critically needed patient care and essential operations of the health care industry." CAC ¶ 69. And the numbers speak for themselves, with 94% of hospitals, 100 million people, huge swaths of pharmacies and Providers, and roughly one in every three healthcare transactions affected. *E.g.*, *id.* ¶¶ 69-73, 86, 570. Moreover, Defendants' security failures were proscribed by HIPAA. *E.g.*, *id.* ¶¶ 154-63. And Plaintiffs allege that the initial outage lasted months, systems *still* have not been fully restored, the Change Platform remains unsecure, and Defendants' illegal collection efforts continue to threaten Providers' ability to deliver care. *E.g.*, *id.* ¶¶ 6-7, 9, 70, 88, 102, 114-6, 118, 119-27, 129, 142-5, 499-514, 577. While Defendants claim their shutdown was "protective," Plaintiffs allege that it was Defendants' unreasonably inadequate security that made the Change Platform vulnerable to attack in the first place, and that Defendants' characterizations of the shutdown as a "proactive" measure to "isolate" the impact were *false*. *E.g.*, CAC ¶¶ 63-68, 146-262, 572-75. All of this is more than enough to allege "unreasonable" interference to support Plaintiffs' public nuisance claim. The sole case Defendants cite in support of their "reasonableness" arguments (*San Diego Gas & Elec, Co. v. Super. Ct. Orange Cnty.*, 920 P.2d 669, 697 (Cal. 1996)) is distinguishable. There, the conduct at issue (design and placement of power lines alleged to cause potential harm due to electromagnetic fields) adhered to safety

50

determinations made by utility regulators. Defendants point to no such government sanctions for their cybersecurity failures.

*Finally*, Plaintiffs allege they have suffered special injury, including: missed and delayed payments for services, financing, labor, and other time and expenses incurred trying to keep their practices operating after the Change Platform was taken down with no backup or alternative; penalties for "untimely" claims submissions; and other lost time and monies. CAC ¶¶ 95-107, 576. Multiple federal and state courts have recognized that these types of economic and business injuries are different in kind from those suffered by the public at large. *Social Media*, 4:22-md-03047, Doc. 1332 at 24-26 (N.D. Cal. Nov. 15, 2024) ("The proper inquiry before the Court is to compare the risks defendants' conduct imposes on the school districts with the risks imposed on the public at large"; schools alleged special injury based on their "resource diversion" and costs "uniquely imposed on them and not similarly borne by any other members of the community"); *In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 774 ("West Boca has alleged concrete economic costs, unique to hospital entities, that are different than the alleged interference with human health outcomes suffered by the general public."); *In re StarLink Corn Prod. Liab. Litig.*, 212 F. Supp. 2d 828, 848 (N.D. Ill. 2002) ("[c]ommercial corn farmers, as a group, are affected differently than the general public" because "[w]hile the general public has a right to safe food, plaintiffs depend on the integrity of the corn supply for their livelihood"); *State v. Purdue Pharma L.P.*, No. 3AN-17-09966CI, 2018 WL 4468439, at *4 (Alaska Super. July 12, 2018) (public nuisance caused state special injury in form of overwhelming medical resources and emergency rooms, law enforcement activities, costs

for medical care, and addiction treatment); *James v. Arms Tech., Inc.*, 820 A.2d 27, 35, 50-53 (N.J. App. Div. 2003) (nuisance caused city "to expend significant government funds on 'police protection, overtime, emergency services, coroner and morgue services, pension benefits, health care, social services and other necessary facilities and services'"). *See also Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 222 (3d Cir. 2020) (reversing dismissal for lack of special injury; "the District Court should have compared the injuries suffered by putative class members . . . with the harm shared by all community members" rather than just "similarly situated class members").

### 2. Plaintiffs' Public Nuisance Claims Cannot Be Dismissed As "Duplicative" of Their Negligence Claims

Defendants' assertion that the public nuisance claims of New York, Ohio, New Jersey, and California Plaintiffs must be dismissed as "duplicative" of their negligence claims has no basis in law—nor even in the cases Defendants mischaracterize. These arguments are better addressed at summary judgment for the reasons explained above.

Further, a claim for public nuisance is not "duplicative" of one for negligence because the former requires unreasonable interference with a *public right*, whereas the latter merely requires breach of a duty owed by the defendant to the plaintiff. Moreover, none of the cases Defendants cite actually dismissed a public nuisance claim as "duplicative" of a negligence claim. For example, *Drake v. Village of Lima*, 200 N.Y.S.3d 600 (2023), applied New York state court pleading standards to affirm dismissal of a *private* nuisance claim as duplicative, but separately analyzed dismissal of the *public* nuisance claim on its merits. *Id.* at 604. Defendants' other cases similarly addressed private

or "qualified" nuisance claims that do not implicate a public right. *See Carpenter v. Amazon.com, Inc.*, No. 17-CV-03221, 2017 WL 4071383, at *3 (N.D. Cal. 2017); *Champion Labs. v. Metex Corp.*, No. CIV. 02-5284, 2009 WL 2496888, at *24 (D.N.J. 2009); *Allen Freight Lines, Inc. v. Consol. Rail Corp.*, 595 N.E.2d 855, 856 (Ohio 1992). Finally, Defendants do not even feign to argue that Minnesota public nuisance law compels dismissal.

### F.    PLAINTIFFS ADEQUATELY STATE THEIR CLAIMS ARISING FROM DEFENDANTS' MISSTATEMENTS AND OMISSIONS

#### 1.    Plaintiffs State a Claim for Fraudulent Inducement

In Minnesota, a fraudulent inducement claim requires a plaintiff to show "(1) there was a false representation by a party of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made as of the party's own knowledge without knowing whether it was true or false; (3) with the intention to induce another to act in reliance thereon; (4) that the representation caused the other party to act in reliance thereon; and (5) that the party suffered pecuniary damage as a result of the reliance." *Hoyt Props., Inc. v. Prod. Res. Grp., LLC*, 736 N.W.2d 313, 318 (Minn. 2007); *see also Alotech, Ltd. v. North Star Imaging, Inc.*, No. CV 14-3414, 2016 WL 1122024, at *5 (D. Minn. 2016). Plaintiffs satisfy each element.

#### a.    *Plaintiffs Have Stated Specific Misrepresentations with Particularity*

Contrary to Defendants' assertion that Plaintiffs make only "general references to misrepresentations," the CAC identifies numerous specific misrepresentations made by Defendants regarding the security of their systems and their compliance with federal

regulations. *See, e.g.*, CAC ¶¶ 164-75. Change represented in its contracts that it would "retain in confidence and not disclose" "any and all confidential or proprietary information and materials" of the Providers. *Id.* ¶ 165. Change represented it would "implement and maintain appropriate administrative, physical, and technical safeguards" to comply with HIPAA and "comply with federal and state laws regarding the protection of PHI as defined by HIPAA." *Id.* Change further represented that it would "protect and safeguard" confidential information "with at least the same care used for its own Confidential Information of a similar nature, but no less than reasonable care." *Id.* ¶¶ 478, 483.

Change publicly claimed that "keeping our customers' information secure is a top priority" and that it "dedicate[s] extensive resources to make sure personal medical and financial information is secure." *Id.* ¶ 166. Change specifically represented on its websites that it has "various processes and policies in place to protect their clients' and patients' sensitive information." *Id.* Change's Global Privacy Notice represented that "Privacy matters to Change Healthcare, so we follow a privacy framework that helps us to manage and protect your personal information." *Id.* ¶ 170. Change further represented that it implemented and maintained "security measures designed to safeguard the data we process against unauthorized access" such that "Your Personal Information is only accessible to personnel who need to access it." *Id.* ¶ 170. Change's Code of Conduct additionally made a multitude of similar representations. *Id.* ¶ 171.

Moreover, as part of the merger with Change, UHG made "binding commitments" to customers to apply and maintain data security policies to protect customers' data "and to uphold all contractual rights of Change's customers to audit the protection and security

54

of their data." *Id.* ¶ 168. UHG and Optum Insight adhere to the same "Privacy Policy," which assures the public—including patients and providers—that they have implemented "organizational, technical, and administrative security measures" to safeguard patients' Private Information. *Id.* ¶ 173. Their "Social Security Number Protection Policy" explicitly states their commitment to preserving the confidentiality of Social Security numbers received or collected during business operations. Change Health Defendants represent to the public that these are not mere words or policies. Optum Insight's Chief Operating Officer has testified that the company's culture is to "treat customers' data as they would treat their data themselves." *Id.* ¶ 174. Change Health Defendants represented, under oath, that they had built a top-down "culture of trust and integrity around protecting customers' sensitive information." *Id.*

Unlike the examples of sweeping references to collective fraudulent actions cited by Defendants, Plaintiffs' allegations identify specific statements made in contracts and public materials that Plaintiffs relied upon. Defendants contend that Plaintiffs cannot rely on representations within the contracts to abide by contract terms because such representations are future promises that cannot support a fraudulent inducement claim. This mischaracterizes Plaintiffs' claims. The misrepresentations alleged in the CAC are not mere future promises, but rather false statements of present fact, including false representations: about existing security measures Defendants claimed to have in place; that Defendants were already complying with federal regulations; and that Defendants had implemented appropriate safeguards. Contrary to Defendants' contentions, these are statements of present compliance with security standards that Defendants knew they were

not meeting, not promises of future performance. Courts have recognized that such misrepresentations of present fact or condition can support a fraudulent inducement claim, even when made in connection with a contract. *See, e.g., InCompass IT, Inc. v. Dell, Inc.*, No. 11-CV-0629, 2012 WL 383960, at *2 (D. Minn. Feb. 6, 2012) ("InCompass has pleaded a plausible claim that Carder and Coulter fraudulently induced InCompass to disclose its confidential information to Dell by making promises that they knew would not be kept."). Plaintiffs have stated with particularity the "who, what, where, when, and how" of Defendants' misrepresentations and omissions serving as the basis for their fraudulent inducement claims. *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009) (standard for pleading claim).

### b.    *Plaintiffs Have Adequately Pled Knowledge of Falsity*

As a preliminary matter, distinct from the misrepresentation element, Plaintiffs need not satisfy a heightened pleading standard when pleading Defendants' knowledge of falsity. While fraud claims generally face heightened pleading standards, Rule 9(b) states that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Regardless, the CAC provides detailed allegations supporting a strong inference of fraudulent intent. Plaintiffs have sufficiently alleged that Defendants had knowledge of the falsity of their representations, or, at a minimum, made the representations without knowing whether they were true or false. CAC ¶ 564. The CAC further alleges that Defendants knew about their security vulnerabilities, including the lack of MFA on remotely accessible systems, failure to properly segment networks, inadequate backup

56

systems, and insufficient monitoring. *Id.* ¶ 565. Defendants knew their data security obligations were particularly important given the substantial increase in cyber-attacks and/or ransomware attacks targeting healthcare entities that collect and store Private Information. *Id.* The CAC alleges that Defendants were further aware that, in their industry, Providers and their affiliates are prime targets because of the sensitive information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees and patients—all extremely valuable on underground markets. *Id.* Indeed, in its SEC filings, Change Healthcare explicitly acknowledged the broad range of cybersecurity risks that they face. *Id.* These factual allegations exceed mere conclusory statements and, when taken as true, satisfy Plaintiffs' burden under both a traditional and a heightened pleading standard.

### c.    *Plaintiffs Pleaded Defendants' Intent to Induce Reliance*

Again, Plaintiffs need not satisfy a heightened pleading standard when pleading Defendants' intent to induce reliance. Rule 9(b) explicitly allows "intent" to be pled generally. Fed. R. Civ. P. 9(b).

Nevertheless, Plaintiffs have adequately pleaded that Defendants intended to induce Plaintiffs' reliance with their misrepresentations. Defendants made these representations in contracts and public-facing materials specifically designed to induce Providers to use their services. CAC ¶ 563. The CAC alleges that Defendants intended Direct Contract Plaintiffs, in particular, to rely on these misrepresentations about security and compliance with federal law when entering into and maintaining contracts for claims processing

services. *Id.* ¶¶ 561-63.

### d.    *Plaintiffs Pleaded Reliance*

Finally, as with the above, Plaintiffs need not satisfy a heightened pleading standard when pleading reliance.

In any event, Plaintiffs have adequately pleaded that they relied on Defendants' misrepresentations in contracting with Defendants.  In Minnesota, "reasonable" reliance is required. *Nicollet Restoration, Inc. v. City of St. Paul*, 533 N.W.2d 845, 848 (Minn. 1995). Plaintiffs have met this burden and, in any event, the "reasonableness [of their] reliance is a fact question for the jury." *Id.* The CAC alleges that Defendants' misrepresentations were material to Plaintiffs, who, when initially executing and maintaining contracts with Change, reasonably relied on Change's representations (that turned out to be false) that its services were secure and complied with federal regulations. CAC ¶ 561. Further, Plaintiffs allege that the Direct Contract Plaintiffs and members of the Change Healthcare Inc. Direct Contract Sub-Class would not have contracted with Change to use the services had they known that the services were not as secure as represented (or by any reasonable standard) and failed to comply with federal regulations. *Id.* ¶ 562. This is sufficient to allege reliance.

### 2.    Plaintiffs State a Claim for Negligent Omission and Negligent Misrepresentation.

### a.    *Negligent Omission*

Minnesota law recognizes that an omission can form the basis of a negligent misrepresentation claim. *See Trooien v. Mansour*, No. CIV. 06-3197, 2012 WL 3030784, at *2 (D. Minn. July 25, 2012) ("[N]egligent misrepresentation claims under Minnesota

58

law encompass the omission of material information.") (citing *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 289 (Minn. 1992) ("A misrepresentation may be made . . . by concealing or not disclosing certain facts that render the facts that are disclosed misleading.")). Minnesota recognizes certain "special circumstances" which can give rise to a duty to disclose, absent a fiduciary or confidential relationship. *Liberty Mut. Fire Ins. Co. v. Acute Care Chiropractic Clinic P.A.*, 88 F. Supp. 3d 985, 1014 (D. Minn. 2015) (citing *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 244 N.W.2d 648, 650 (1976)). One such circumstance is "when a party has special knowledge of material facts to which the other party does not have access[.]" *Liberty Mut. Fire Ins. Co,* at 1014. (citing *Richfield Bank*, 244 N.W.2d at 650). Additionally, "a party must say enough in order to prevent his words from misleading the other party." *Id.* (citation omitted); *see also Target*, 64 F. Supp. 3d at 1311 (summarizing that a duty to disclose material facts generally will not be found, "unless (1) there existed a fiduciary or confidential relationship between the parties; (2) *one party was in possession of special facts that could not have been discovered by the other*; or (3) *one party who chooses to speak omits information so as to make the information actually disclosed misleading*") (citation and quotation marks omitted) (emphasis added). Defendants cite Louisiana law to argue that Plaintiffs have not identified a duty to disclose, but Louisiana law recognizes a similar circumstance creating a duty to disclose, absent a fiduciary or confidential relationship, through which a party who willingly discloses information has a duty to make sure that the information is true. *See Kadlec Med. Ctr. v. Lakeview Anesthesia Assocs.*, 527 F.3d 412, 419 (5th Cir. 2008) ("In negligent misrepresentation cases, Louisiana courts have held that even when there is no

59

initial duty to disclose information, 'once [a party] volunteer[s] information, it assume[s] a duty to insure that the information volunteered [is] correct.'") (quoting *Pastor v. Lafayette Bldg. Ass'n*, 567 So.2d 793, 796 (La. Ct. App. 1990)).

Plaintiffs identify the source of Change Health Defendants' duty to disclose by alleging several material facts of which Defendants had special knowledge and to which Plaintiffs did not have access, and incorporate these allegations into their negligent omission claim. CAC ¶¶ 109, 538. These material facts, "which only Change Health Defendants were privy to, included (i) the extensive damage caused by the cybercriminals, (ii) Change Health Defendants' lack of disaster recovery or business continuity plans and preparations to provide an adequate substitute for the Services offered on the Change Platform, and (iii) the labor required to reconnect the massive volume of entities to the Change Platform, all of which are required for the Platform to function at full capacity." *Id.* ¶ 109. Plaintiffs further identified the source of the duty by alleging that Change Health Defendants had special knowledge that restoring the Change Platform would take months, and failed to clarify misleading statements, such as that the "disruption is expected to last at least through the day." *Id.* ¶¶ 111-13. Plaintiffs further identified the source of the duty by alleging that when Change Health Defendants misleadingly stated that the Change Platform would be restored on March 18 and the following week, they incurred a duty to "update and correct these misleading statements regarding medical claims functionality . . . after choosing to make statements on the topic." *Id.* ¶¶ 116, 117.

A fiduciary or confidential relationship is not the only circumstance by which a duty to disclose can be created, and Plaintiffs' allegations are sufficiently plausible to adequately

plead that Defendants had a duty to disclose. *See Target*, 64 F. Supp. 3d at 1311 ("Plaintiffs have not alleged that there is a fiduciary or confidential relationship between Target and Plaintiffs. Rather, Plaintiffs contend that Target knew facts about its ability to repel hackers that Plaintiffs could not have known, and that Target's public representations regarding its data security practices were misleading. Target takes issue with Plaintiffs' allegations in this regard, but on a Motion to Dismiss, the Court must determine only whether the allegations are plausible.").

Plaintiffs allege the omissions cited above with particularity. "In the context of a claim of negligent omission, [Rule 9(b)] is satisfied if the omitted information is identified and how or when the concealment occurred." *Id.* (cleaned up). As described in further detail above, Plaintiffs identified the information that Defendants omitted as "(i) the extensive damage caused by the cybercriminals, (ii) Change Health Defendants' lack of disaster recovery or business continuity plans and preparations to provide an adequate substitute for the Services offered on the Change Platform, and (iii) the labor required to reconnect the massive volume of entities to the Change Platform, all of which are required for the Platform to function at full capacity." CAC ¶ 109. Plaintiffs identified the dates that the concealment occurred by identifying the dates on which Change Health Defendants possessed material information and the dates on which Change Health Defendants omitted this material information in various statements. *Id.* ¶¶ 111-13; 116-17; 119-21. Plaintiffs identified how the concealment occurred by alleging that Change Health Defendants "omitted or otherwise failed to disclose that [Change Health Defendants]: (1) lacked adequate data privacy practices, which rendered the Services unsecure and led to the

Ransomware Attack and prolonged Shutdown; and (2) facts that clearly indicated that it would be months before the Change Platform was up and running at its previous capacity." *Id.* ¶ 540. At this early stage of litigation, Plaintiffs have met the requirements to sufficiently allege how and when the Change Health Defendants omitted information relating to their data privacy practices, and to the true duration and extent of the shutdown of the Change Platform.

### b.    *Negligent Misrepresentation*

To establish a negligent misrepresentation claim under Minnesota law, a plaintiff must establish: "(1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplies false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff; and (4) failure by the defendant to exercise reasonable care in communicating the information." *Williams v. Smith*, 820 N.W.2d 807, 815-16 (Minn. 2012).

As explained above, Change Health Defendants owed a duty of care to Plaintiffs because Change Health Defendants had special knowledge of material information to which Plaintiffs did not have access: (1) before the Ransomware Attack, that the services were not adequately secure; and (2) following the Ransomware Attack, the true impact of the Attack and the duration that the Change Platform would remain not fully operational.

To adequately plead a negligent misrepresentation claim, a plaintiff "must plead the time, place, and contents of the false representations, the identity of the individual who made the representations, and what was obtained thereby[.]" *Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 673 (8th Cir. 2012) (citation and quotation marks omitted). Contrary to Defendants' assertion, Plaintiffs identify several specific, actionable

misrepresentations made by Change Health Defendants to support their negligent misrepresentation claim, which are described above. *See also* CAC ¶¶ 165-66, 168, 170-74. Plaintiffs identify several additional, actionable misrepresentations which support their negligent misrepresentation claim, including: (a) statements made on February 29, 2024 by UHG's COO that programs designed to help Providers who could not submit claims amid the shutdown would last "for the next couple of weeks as this continues to go on"; (b) UHG's statement in a March 7, 2024 press release "that all major pharmacy claims and payment systems were back up and functioning"; (c) statements made by Change Health Defendants in an April 22, 2024 press release that "[m]edical claims across the U.S. health system are now flowing at near-normal levels," "there are a small number of providers who continue to be adversely impacted[,]" and "other Services, such as eligibility software, were still in the process of 'being restored on a rolling basis[,]'" while in actuality, "[p]ublicly available facts show the restoration was still not complete nearly six months after the Ransomware Attack and shutdown"; and (d) Change's report on or around November 21, 2024, that it had "complete[d] restoration of its clearinghouse services" while in fact, "[e]ven then, Change was only offering 'partial service' for some Services." *Id.* ¶¶ 114-16, 118, 119-26. These allegations are sufficient to identify the time, place, and contents of the false representations and the identities of the individuals who made them. *Cox*, 685 F.3d at 673.

To plead a negligent misrepresentation claim with particularity, a plaintiff "must plead 'the time, place, and contents' of the false representations, the identity of the individual who made the representations, and what was obtained thereby[.]" *Id.* (quoting

*BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007)). Plaintiffs plausibly identified what Change Health Defendants gained from their misrepresentations made after the Ransomware Attack by alleging that "UHG acknowledged that it experienced certain *positive* financial impacts resulting from the Ransomware Attack." CAC ¶ 130. Specifically, Plaintiffs alleged that these positive financial impacts included: a positive tax effect for 2024; UHIC's interest earnings as a result of not having to pay out Providers, who were unable to submit claims amid the shutdown; and UHIC's further enrichment resulting from "permanently denying payment" to Providers by "aggressively enforce[ing] Timely Filing Deadlines for claims that could not be submitted because of the shutdown[.]" *Id.* ¶¶ 131-35.

Plaintiffs plausibly alleged that they relied on Change Health Defendants' misrepresentations by alleging that: (a) Plaintiffs used and relied on the Change Platform at the time of the shutdown to process insurance claims; (b) Plaintiffs reasonably relied on Defendants' representations at the time they initially executed and maintained contracts with Change for the services and/or after the Ransomware Attack when Plaintiffs attempted to mitigate the harms resulting from Defendants' shutdown of the Change Platform; (c) Plaintiffs would have taken different measures to mitigate their harm had Defendants provided truthful and accurate information about the duration of Defendants' intentional shutdown of the Change Platform; and (e) Direct Contract Plaintiffs and members of the Change Healthcare Inc. Direct Contract Sub-Class executed contracts with Change based on Defendants' false representations that the services were secure, and/or that Plaintiffs relied on Defendants' representations when deciding how to mitigate the harm imposed by

Change Health Defendants' shutdown of the Change Platform. *Id.* ¶¶ 264, 551-54.

Plaintiffs plausibly alleged that their reliance on Defendants' misrepresentations was justifiable by pleading: "Defendants intended for Plaintiffs and Class members to rely on their representations both before and after the Ransomware Attack"; and throughout the shutdown, "Defendants published misleading statements and omitted key facts regarding the impact of the Ransomware Attack" which "were intended to (and did) deceive Providers into believing that the Change Platform would be back online quickly." *Id.* ¶¶ 554, 108.

### 3.    Plaintiffs' Claims Are Not Precluded

Defendants' argument (which is impermissibly contained in a lengthy Appendix) that Plaintiffs' claims are precluded because they allegedly duplicate other common law claims fails because, among other reasons, it would require a premature choice of law analysis. Minnesota law, which applies at this stage, does not require dismissal of an allegedly duplicative claim. *See* Minn. R. Civ. P. 8.05(b); *Columbia Cas. Co. v. 3M Co.*, 814 N.W.2d 33, 38 (Minn. Ct. App. 2012).[9]

With regard to the other states Defendants cite in Appendix H, Plaintiffs' claims rely on different facts. That is, Plaintiffs' negligent omission and negligent misrepresentation causes of action rely on the specific misrepresentations and omissions made by Change Health Defendants before and after the Ransomware Attack, while Plaintiffs' other common law claims do not. Further, a negligence-based claim pled

---

[9] Plaintiffs' negligent omission and negligent misrepresentation claims are not barred by the ELR under the laws of Louisiana and Maine, as explained in Section IV.A.1, *supra*.

alongside a breach of contract claim is not precluded where the former is independent of the latter. *See e.g.*, *Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 77 F. Supp. 3d 887, 896 (N.D. Cal. 2014) (negligence claim not duplicative of a negligent misrepresentation claim where "the FAC alleges sufficient facts to support the existence of a duty giving rise to liability other than that for negligent misrepresentations"); *Szalla v. Locke*, 421 Mass. 448, 454, (1995) ("[w]here the *same acts* cause the same injury under more than one theory, duplicative damage recoveries will not be permitted.") (emphasis added) (citation omitted); *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 869 (2d Cir. 2015) ("[u]nder New York law, claims are duplicative when both arise from the same facts and seek the identical damages for each alleged breach.") (citation and quotation marks omitted).

In addition to relying on different facts in their negligent omission and misrepresentation claims than in their breach of contract claims, Plaintiffs do not seek the same recovery for each cause of action; their theories of recovery distinguish between the out-of-pocket damages Plaintiffs suffered as a result of Defendants' negligent omissions and misrepresentations, and the benefit of the bargain Plaintiffs lost out on as a result of Defendants' breach of contract. *See D.S.A., Inc. v. Hillsboro*, 973 S.W.2d 662, 664 (independent injury requirement not met where "[plaintiff's] theory of recovery and charge to the jury did not attempt any distinction between its out-of-pocket damages and the benefit of the bargain") (citation omitted)).

### G.    PLAINTIFFS ADEQUATELY PLEAD CLAIMS UNDER THEIR RESPECTIVE CONSUMER PROTECTION STATUTES

The CAC contains sufficient factual allegations to state plausible claims under the consumer protection statutes of California, Florida, Illinois, Massachusetts, Minnesota, New Jersey, and New York.

### 1.    Rule 9(b) Does Not Bar These Claims

Defendants incorrectly seek to impose Rule 9(b)'s heightened pleading standard to Plaintiffs' claims under the California, Illinois, Massachusetts, Minnesota, New Jersey, and New York consumer protection statutes. However, these are broad statutes that prohibit both fraudulent conduct *and* other kinds of unlawful behavior.

Rule 9(b) applies only to claims under the California, Illinois, Massachusetts, and New Jersey statutes that involve allegations of fraud. It does not apply to claims under the New York statute at all. *See Battle v. Taylor James, LLC*, 607 F. Supp. 3d 1025, 1045 (C.D. Cal. 2022) (California law) ("The heightened pleading standard of Rule 9(b) applies to claims brought under the fraudulent prong under the UCL or that are otherwise grounded in fraud."); *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008) (Illinois law) ("Because neither fraud nor mistake is an element of unfair conduct under Illinois' Consumer Fraud Act, a cause of action for unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule 9(b)."); *Crisp Hum. Cap. Ltd. v. Authoria Inc.*, 613 F. Supp. 2d 136, 139 (D. Mass. 2009) (Massachusetts law) ("[T]o the extent it does not involve fraud, a Chapter 93A claim is not subject to a heightened pleading requirement."); *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, No. CV 19-MD-2904, 2021 WL 5937742, at *21 (D.N.J. Dec. 16, 2021) (New Jersey law)

("Plaintiffs must satisfy Rule 9(b) to the extent their [New Jersey CFA] claims rely on alleged misrepresentations and knowing omissions made by Defendants, while Rule 8 applies to the extent Plaintiffs allege other deceptive or unfair conduct."); *Schneider v. Colgate-Palmolive Co.*, 677 F. Supp. 3d 91, 99 (N.D.N.Y. 2023) (New York law) ("Claims under [N.Y. Gen. Bus. Law §] 349 . . . are not required to meet the heightened pleading standard of Rule 9(b)"). But even against the stricter standard, Plaintiffs have stated claims for relief by pleading with particularity the "who, what, where, when, and how" of Defendants' misrepresentations and omissions regarding Defendants' data security and compliance with federal law, the impact of the Ransomware Attack, and the timeline for restoring services. *See Drobnak v. Andersen Corp.*, 561 F.3d at 783.

### 2.    State Claims for Unlawful Conduct

Contrary to Defendants' assertions, Plaintiffs have alleged specific, unlawful conduct. For instance, Plaintiffs allege that Defendants violated Section 5 of the FTCA by failing to employ reasonable security measures to protect against unauthorized access to Private Information. CAC ¶¶ 162, 180, 261; 15 U.S.C. § 45. Plaintiffs also allege that Defendants violated HIPAA and its implementing regulations by, *inter alia*, failing to implement adequate safeguards for Private Information in their systems. *See, e.g.*, CAC ¶ 181 (listing specific violations of 45 C.F.R. § 164 *et al.*); *see generally id.* ¶¶ 154-262. This is sufficient to state a cause of action under the California UCL's "unlawful" prong. *See People ex rel. Bill Lockyer v. Fremont Life Ins. Co.*, 104 Cal. App. 4th 508, 515 (2002), *as modified on denial of reh'g* (Jan. 16, 2003) ("With respect to the *unlawful* prong, [v]irtually any state, federal or local law can serve as the predicate for an action under section 17200"

(internal quotations and citation omitted)).

Moreover, there is no support for Defendants' threadbare assertion that Plaintiffs' claims predicated on the violation of other laws that do not contain a private right of action. The Ninth Circuit squarely rejected this argument as to claims under the UCL. *See Webb v. Smart Document Sols., LLC*, 499 F.3d 1078, 1082 (9th Cir. 2007) (holding that absence of private right of action under HIPAA does not foreclose UCL claim based on HIPAA violation); *Rubenstein v. Neiman Marcus Grp. LLC*, 687 F. App'x 564, 567 (9th Cir. 2017) (same as to FTC Guides). In fact, *Slimm v. Bank of Amer. Corp.*, No. 12-5846, 2013 WL 1867035 (D.N.J. May 2, 2013)—the only case Defendants cite in support of their argument—has been subsequently rejected by multiple courts. *See Smith v. Citimortgage, Inc.*, No. CV 15-7629 ,2015 WL 12734793, at *4 (D.N.J. Dec. 22, 2015) (collecting cases); *MacDonald v. Cashcall, Inc.*, 333 F.R.D. 331, 351 (D.N.J. 2019) (recognizing "New Jersey's courts regularly find that the violation of a different statute or even municipal ordinance may also violate the [New Jersey] CFA as an affirmative act"); *see also Curran v. Wells Fargo Bank, N.A.*, No. 20-CV-492, 2021 WL 6753480, at *4 (D.D.C. Mar. 11, 2021) (explaining the *Slimm* court's dismissal of state law claims "on the grounds that HAMP failed to create a private right of action" did not create a per se rule and "[t]o the extent that *Slimm* can be read to categorically bar all state law claims in the context of HAMP, it runs contrary to the weight of authority and is otherwise unconvincing"). Plaintiffs have adequately pleaded claims for unlawful conduct under both California and New Jersey law.

### 3.    State Claims for Fraud

Defendants maintain that Plaintiffs fail to allege actionable misrepresentations and omissions under the state consumer protection statutes, ignoring the abundant factual allegations in the CAC detailing Defendants' misrepresentations and omissions with respect to their data security, compliance with federal law, the impact of the Ransomware Attack, and the timeline for restoring services.

Plaintiffs allege that, before the shutdown, Defendants repeatedly represented— through contracts, public statements, privacy policies, and corporate codes of conduct— that their network maintained adequate, HIPAA-compliant protections (CAC ¶¶ 165, 168-74), despite knowing that they actually maintained weak data security that failed to comply with the law. *Id.* ¶¶ 177, 181-82, 186, 189, 191, 196-99, 201-03, 207-08, 211-14, 216-31, 236, 238, 244-45. Plaintiffs further allege that, after the Ransomware Attack, Defendants issued a series of misleading statements and omitted key facts about the extent and impact of the shutdown.

These affirmative misrepresentations and material omissions of facts, that Defendants had duties to disclose, are likely to mislead reasonable providers, and did mislead Plaintiffs, just as Defendants intended. *See* CAC ¶¶ 561-63. Plaintiffs further allege that they relied on these material misrepresentations and omissions: their decisions to trust Defendants with their processing needs were based on the belief that Defendants took sufficient security precautions in accordance with industry standards, and had Plaintiffs received accurate information regarding the scope of the damage and expected duration of the shutdown, they would have taken different steps to mitigate harm. *See id.* ¶¶ 540-44, 550-44, 561-63, 596-98, 603-07, 612-06, 624, 630-31.

These are actionable misrepresentations and omissions under each state's statute. *See Graham v. Bank of Am., N.A.*, 226 Cal. App. 4th 594, 613 (2014) (to state a claim for fraudulent business practices under the UCL, plaintiffs must show that "members of the public are likely to be deceived"); *Office of Attorney Gen. v. Bilotti*, 267 So.3d 1, 2 (Fla. 4th DCA 2019) (conduct is deceptive under FUDTPA if it is "likely to deceive a consumer acting reasonably in the same circumstances"); *Patenaude v. Orgain, LLC*, 594 F. Supp. 3d 108, 113 (D. Mass. 2022) (citing *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 71 (1st Cir. 2020)) (applying Massachusetts Chapter 93A, stating: "To plausibly claim that an act or practice is deceptive, a complaint must allege that the act has the "capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted"); *Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 695 (Minn. 2014) (under Minnesota CFA, "the term 'deceptive practice' refers to conduct that tends to deceive or mislead a person"); *Monogram Credit Card Bank of Georgia v. Tennesen*, 390 N.J. Super. 123, 133 (App. Div. 2007) (internal citations omitted) (under New Jersey CFA, the "unlawful practice" can be "'[a]n affirmative misrepresentation, even if unaccompanied by knowledge of its falsity or an intention to deceive'" or "'[a]n omission or failure to disclose a material fact, if accompanied by knowledge and intent'"); *Petrosino v. Stearn's Products, Inc.*, 95 U.C.C. Rep. Serv. 2d 679, No. 16-CV-7735, 2018 WL 1614349, at *7 (S.D.N.Y. 2018) (under New York DPA, conduct is "misleading in a material way" if it would be "misleading to a reasonable consumer acting reasonably" under the circumstances).

Defendants argue that Plaintiffs do not adequately plead causation. Not so. First,

Plaintiffs are not required to plead reliance, as Defendants suggest. *See Fla. Emergency Phys. Kang & Assocs., M.D., Inc. v. United Healthcare of Fla., Inc.*, 526 F. Supp. 3d 1282, 1301 (S.D. Fla. 2021) (allegations of actual deception or reliance are not necessary to state a claim under the FUDTPA); *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d at 593 ("Plaintiff's reliance is not an element of statutory consumer fraud" under the ICFA); *Sebago, Inc. v. Beazer E., Inc.*, 18 F. Supp. 2d 70, 103 (D. Mass. 1998) (internal quotations and citation omitted); *Markarian v. Connecticut Mut. Life Ins. Co.*, 202 F.R.D. 60, 68 (D. Mass. 2001) ("proof of actual reliance on a misrepresentation is not required" to establish a claim pursuant to Massachusetts statute); *Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 675 (D. Minn. 2021) (allegations of reliance are not necessary to state claim for damages resulting from violation of Minnesota CFA); *Fero v. Excellus Health Plan, Inc.*, 502 F. Supp. 3d 724, 740 (W.D.N.Y. 2020) ("[A] plaintiff pursuing a GBL § 349 claim need not have relied on (or even necessarily have believed) the allegedly deceptive conduct."). Nonetheless, as explained above, Plaintiffs do allege reasonable reliance on material misrepresentations and omissions regarding data security and the restoration timeline. *See, e.g.*, CAC ¶¶ 561-62 (alleging Plaintiffs' reliance on Defendants' assurances of data security and compliance with federal regulations when contracting for Change's services, and that Plaintiffs would not have contracted had they known the truth); ¶ 128 ("Defendants' misleading statements and omissions, which were widely covered in the media and reported to and relied on by Providers, prevented Providers, insurers, and EHR vendors from making informed decisions during the shutdown," and had Plaintiffs received accurate information, they "could have made informed decisions about obtaining

financing, investing the resources to switch to alternative clearinghouses, obtaining resources to submit paper claims, negotiating Timely Filing Deadlines, obtaining alternative financing, and keeping employees on payroll.").

Finally, Defendants' argument that their public disclosures about security risks and uncertain service restoration timelines negate any misrepresentation or duty to disclose is unavailing. Defendants' disclosures were themselves incomplete, misleading, and contradicted by information they knew at the time. Courts consistently hold that a technically true statement may still be actionable where it omits material information that renders the overall message deceptive. *See, e.g.*, *Coleman v. CubeSmart*, 328 F. Supp. 3d 1349, 1361 (S.D. Fla. 2018) (quoting *F.T.C. v. Peoples Credit First, LLC*, 244 F. App'x 942, 944 (11th Cir. 2007)) (under the FUDTPA, "[i]f the statements are 'likely to mislead reasonable consumers,' then it makes no difference if the statements are 'technically or literally true'"); *Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1255 (2009) ("A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable under the UCL."). Further, Defendants' partial representations and exclusive knowledge of material facts not known or accessible to Plaintiffs triggered a duty to disclose. *See, e.g.*, *Collins v. eMachines, Inc.*, 202 Cal. App. 4th 249, 255 (2011) (a duty to disclose arises when the defendant "has exclusive knowledge of material facts not known or reasonably accessible to the plaintiff," "actively conceals a material fact from the plaintiff," and "makes partial representations that are misleading because some other material fact has not been disclosed"); *Graphic Commc'ns Loc. 1B Health & Welfare Fund*

73

*A v. CVS Caremark Corp.*, at 695 (duty to disclose arises when a person has a confidential or fiduciary relationship with the other party, the person has special knowledge of material facts to which the other party does not have access, and if a person speaks, the person must say enough to prevent the words communicated from misleading the other party).

### 4.    State Law Claims for Unfair Conduct

Finally, Plaintiffs more than adequately plead claims for unfair practices under various state consumer protection statutes. Indeed, the California Plaintiffs have pleaded more than enough to state a claim under the UCL's unfair prong. For instance, Plaintiffs allege that Defendants failed to use adequate security measures to protect Private Information, while knowingly representing otherwise to Providers. CAC ¶¶ 166-74, 186-99, 220-30. Meanwhile, Defendants solicited Private Information and collected fees from Plaintiffs and induced Plaintiffs' use of the Change Platform while failing to have adequate security measures or disaster recovery plans in place. *Id.* ¶ 593. Moreover, Plaintiffs allege Defendants also knowingly and willingly misrepresented the extent and impact of the Change Platform shutdown. *See id.* ¶¶ 109-28. Finally, the California Plaintiffs allege that this conduct "is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers," (*id.* ¶ 594), and that they were injured as a result, *id.* ¶ 597.

This more than satisfies the pleading standard for a claim for unfair conduct under the UCL. *See Schmitt v. SN Servicing Corp.*, No. 21-CV-03355, 2021 WL 5279822, at *7 (N.D. Cal. Nov. 12, 2021). In *Schmitt*, the court found that the plaintiff plausibly alleged immoral, unethical, oppressive, unscrupulous, or substantially injurious conduct by claiming that the defendant represented that it used security measures to protect customers'

personal information "but knowingly failed to employ adequate safeguards," and, additionally, failed to disclose its data breach in a timely manner. *Id.* at *7. Here, Plaintiffs' *nearly identical* allegations are sufficient to state a claim under the unfair prong of the UCL.

Defendants' other attacks on the California Plaintiffs' UCL claim are similarly baseless. For example, because the California Plaintiffs have adequately pleaded UCL claims under both the fraudulent and unlawful prongs of the statute, Defendants' argument that Plaintiffs' unfairness claim fails for being based on similar allegations is unfounded. *See Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1104-05 (N.D. Cal. 2017) (explaining that "where the unfair business practices alleged under the unfair prong of the UCL *overlap entirely* with the business practices addressed in the fraudulent and unlawful prongs of the UCL, the unfair prong of the UCL cannot survive *if the claims under the other two prongs of the UCL do not survive*") (emphasis added)). Further, Plaintiffs' allegations of unfair conduct do not entirely overlap with their allegations under the other prongs, so *Hadley* is inapplicable. *Compare, e.g.*, CAC ¶ 593, *with* ¶ 596.

Finally, Defendants' argument that an unfairness claim fails because "any conduct Plaintiffs challenge as unfair was disclosed" makes little sense. First, Defendants do not explain what "conduct" was purportedly disclosed, and the portions of the CAC that Defendants cite to are Plaintiffs' allegations about Defendants' *misleading* representations. Second, any attempt to make such a factual assertion is not only improper at this stage, but also runs afoul of the established principal that courts must accept as true the factual allegations in the complaint and draw all the reasonable inferences in the plaintiffs' favor.

*See Gorog*, 760 F.3d at 792. Moreover, the caselaw Defendants point to is inapposite. In *Hodsdon v. Mars, Inc.*, the court held that the plaintiff did not have a UCL claim for the defendant's failure to disclose its labor practices on its packaging when it had no duty to disclose that information and the information was available on its website. *See* 162 F. Supp. 3d 1016, 1027 (N.D. Cal. 2016), *aff'd*, 891 F.3d 857 (9th Cir. 2018). Defendants fail to explain how this case has any bearing on Plaintiffs' claim of unfair conduct.

Defendants' attacks on Plaintiffs' claims for unfair practices under New Jersey, Massachusetts, Illinois, and Florida law likewise fail. Contrary to Defendants' assertions, disclosure of challenged conduct does not foreclose unfairness claims as a matter of law in any of these jurisdictions. In New Jersey, conduct can be "unconscionable," and thereby unlawful under the New Jersey CFA, if it demonstrates "a lack of good faith, honesty in fact and observance of fair dealing and [has] the capacity to mislead," even if technically disclosed. *Rapoport v. Caliber Home Loans, Inc.*, 617 F. Supp. 3d 241, 246 (D.N.J. 2022). Similarly, the Illinois CFA expressly provides that unfair competition is "unlawful whether any person has in fact been misled, deceived or damaged thereby." *Miller v. William Chevrolet/GEO, Inc.*, 762 N.E.2d 1, 11 (Ill. Ct. App. 2001) (quoting 815 ILCS 505/2). The cases Defendants cite—including *Zlotnick v. Premier Sales Grp., Inc.*, 480 F.3d 1281 (11th Cir. 2007) (holding acts in compliance with a contract's express terms were not unfair or deceptive), and *Tomasella,* 962 F.3d at 36 (reaching fact-specific conclusion regarding disclosures on product packaging)—establish no per se rule that disclosure immunizes otherwise unfair practices. Plaintiffs here allege conduct that is independently "immoral, unethical, oppressive, unscrupulous or substantially injurious" regardless of any purported

76

disclosure, particularly where Plaintiffs were unable to reasonably avoid the resulting injuries.

Further, Defendants' contention that the Illinois Plaintiffs' unfairness claims cannot survive because they are duplicative of other misrepresentation and omission claims fundamentally misinterprets Illinois law. Indeed, it is well established that the Illinois CFA permits claims based on "deceptive conduct or unfair conduct *(or both)*." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019) (emphasis added). As the Seventh Circuit explained, the nature of the alleged conduct—unfair or deceptive—simply determines which pleading standard applies: the notice pleading requirements of Rule 8(a) (unfair conduct) or the particularity requirement of Rule 9(b) (deceptive conduct). *Id.* Defendants' reliance on *In re VTech Data Breach Litigation* is misplaced, as that case dismissed the plaintiffs' unfairness claim not because it duplicated their fraud claim, but because plaintiffs alleged only deceptive conduct, while failing to satisfy Rule 9(b)'s pleading requirement. No. 15 CV 10889, 2018 WL 1863953, at *7 (N.D. Ill. Apr. 18, 2018). Here, the CAC contains detailed allegations of unfair conduct that independently satisfy the unfairness standards across all relevant jurisdictions.

## H.    THE PLAINTIFFS' DECLARATORY JUDGMENT CLAIM IS APPROPRIATE, AND THE PLAINTIFFS HAVE STANDING TO PURSUE SUCH RELIEF

Plaintiffs' claim under the Declaratory Judgment Act ("DJA") is appropriate here and has a basis in fact and law. Although Defendants have failed to address Plaintiffs' Motion for Declaratory Judgment at the time of this memorandum, Plaintiffs' requested declaratory relief as to the TFAP contracts is also appropriate and based in law and fact.

First, the DJA claim (CAC Count XIX) is independent of the substantive claims because it addresses uncertainty arising from any present and future harm due to the existing vulnerabilities of Defendants' systems. Its inclusion thus promotes efficient resolution of all claims that may arise during this action. *See Sherwood Med. Indus., Inc. v. Deknatel, Inc.*, 512 F.2d 724, 729 (8th Cir. 1975) (emphasizing that the DJA should be liberally construed to promote efficiency in legal dispute resolution).

Defendants' argument that the supposed failure of earlier substantive claims undermines the DJA fails for at least the following reasons: (1) a data breach indisputably occurred, (2) there is no showing that another breach can be avoided, given the weaknesses in Defendants' systems, and (3) even if Defendants' acts do not create liability for the prior breach, any future incident based on Defendants' inaction after notice would be sufficient to hold them accountable.

Second, while the claims have some factual overlap, Plaintiffs' DJA claim is not duplicative and serves a useful purpose. Defendants' conclusory assertion to the contrary fails to even apply the six-factor test for "useful purpose." *See Lexington Ins. Co. v. Integrity Land Title Co., Inc.*, 721 F.3d 958, 968 (8th Cir. 2013). The six-factor test is: (1) whether the declaratory judgment sought will serve a useful purpose in clarifying and settling the legal relations in issue; (2) whether the declaratory judgment will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the federal proceeding; (3 through 5) inapplicable factors relating to parallel state court proceedings;[10]

---

[10] Defendants agree there are no parallel state court issues.

and (6) whether the declaratory judgment action is being used merely as a device for procedural fencing—that is, to provide another forum in a race for *res judicata* or to achieve a federal hearing in a case otherwise not removable. *Id.*

Factors (1) and (2) support allowing the DJA claim. Plaintiffs seek a declaration clarifying Defendants' *ongoing* "present and prospective common law and other duties to reasonably safeguard the networks that provide services" (CAC ¶ 647) and several district courts have allowed such claims in similar situations. *See Hameed-Bolden v. Forever 21 Retail, Inc.*, 2018 WL 6802818, at *9 (C.D. Cal. Oct. 1, 2018); *Home Depot*, 2016 WL 2897520, at *5; *In re Adobe Sys. Privacy Litig.*, 66 F. Supp. 3d 1197, 1221 (N.D. Cal. 2014); *Netgain*, 2022 WL 1810606, at *16-17. Defendants' reliance on *WMC Mortgage* and *Portier* is flawed because, unlike here, those cases did not involve an allegation of present or future harm. CAC ¶¶ 152, 246, 436, 645-9; *see MASTR Asset Backed Sec. Tr. 2006-HE3 v. WMC Mortg., LLC*, 983 F. Supp. 2d 1104, 1116 (D. Minn. 2013); *Portier v. NEO Tech. Sols.*, 2019 WL 7946103, at *30 (D. Mass. Dec. 31, 2019). Lastly, factor (6) does not apply to this federal MDL, and certainly does not support dismissal.

Even if the Court were to determine that the Plaintiffs' DJA claim is derivative of their earlier substantive claims, such claims are not precluded. *See Weavewood, Inc. v. S & P Home Invs., LLC*, 821 N.W.2d 576, 579 (Minn. 2012) ("[T]he underlying substantive law, including any applicable defenses, forms the foundation for a declaratory judgment action."); *Taxpayers Allied for Constitutional Taxation v. Wayne Cnty.*, 537 N.W.2d 596, 601 (Mich. 1995) (concluding that "[c]laims for declaratory relief necessarily derive from claims for substantive relief"). So long as substantive claims remain pending, a live

controversy exists to support declaratory relief.

Third, Plaintiffs have standing to pursue their requested declaratory relief under well-established Eighth Circuit and Supreme Court precedents. *Braden v. Wal-Mart Stores, Inc.*, at 592 (quoting *Iqbal*, 556 U.S. at 678 (2009)). Plaintiffs have shown a significant risk of present and future harm and have explained how the injuries and harm they suffered are a direct and proximate result of the Defendants' actions. CAC ¶¶ 468-69. The risk has not been cured by Defendants. Here, the Ransomware Attack included an encryption attack that blocked Change Healthcare from accessing its own data servers. *Id.* ¶¶ 53-64. Given the already-exhibited vulnerability to encryption attacks and their lucrative reward, there is an imminent danger that hackers may engage in a similar attack again. The facts here thus differ from *Pawn Am.*, where there was no showing of imminent danger. *In re Pawn Am. Consumer Data Breach Litig.*, No. 21-CV-2554, 2022 WL 3159874, at *3 (D. Minn. Aug. 8, 2022).

Lastly, Defendants fail to address the fact that Plaintiffs have sought declaratory judgment as to the meaning of the TFAP contracts. Plaintiffs are plainly entitled to "seek a declaration about the meaning of a contract." *Gooch v. Life Invs. Ins. Co. Of Am.*, 672 F.3d 402, 427 (6th Cir. 2012). The parties disagree as to the proper reading of the TFAP contracts, and the Court's issuance of declaratory relief on this question would clarify the parties' legal relationship and resolve existing uncertainty as to whether the Providers are immediately obligated to repay the TFAP loans. The Court should, therefore, issue a declaratory judgment as to the plain reading of the TFAP contracts.

## I.    NCPA ALLEGES FACTS TO SUPPORT ASSOCIATIONAL STANDING

To establish it has associational standing to bring claims on its members' behalf (CAC ¶¶ 263, 435), NCPA must show: "(1) the individual members would have standing to sue in their own right; (2) the organization's purpose relates to the interests being vindicated; and (3) the claims asserted do not require the participation of individual members." *Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 986 (8th Cir. 2011). NCPA has alleged all three elements. Defendants challenge whether NCPA meets the first and third elements, thus conceding that NCPA's purpose relates to the "interests being vindicated."

First, NCPA pleads facts showing its members suffered concrete harm. NCPA brings claims on behalf of its member pharmacies who relied on the Change Platform in the daily operation of their businesses. CAC ¶¶ 434, 435, 436(a). NCPA alleges that during the shutdown "pharmacies were unable to use the Change Platform to confirm patients' insurance coverage," leaving them "unable to fill prescriptions for many patients, including patients who could not, or would not, cover the full cost of prescriptions." *Id.* ¶ 5. NCPA further alleges that UHG admitted to Congress that the shutdown resulted in added costs to pharmacies, including that they had to "manually submit claims." *Id.* ¶ 74.

These allegations are not "vague" or "conclusory" as Defendants contend. For example, plaintiffs in *Minnesota. R-80 Med. Transportation. Coal. v. Comm'r. of the Minnesota. Dep't. of Hum. Servs.*, No. CV 1704539, 2018 WL 4120075 (D. Minn. Aug. 29, 2018), did not allege that their members had "not been reimbursed for services provided" or that they had "incurred particular costs" as a result of the defendant's conduct. *Id.* at *6 n.4. Here, NCPA alleges that pharmacies both lost transactions and incurred extra

costs. *See also Northland Parent Ass'n v. Excelsior Springs Sch. Dist. # 40*, 571 F. Supp. 3d 1104, 1113 (W.D. Mo. 2021) (plaintiffs did not assert that members' "children had been impacted in various ways by [] mask mandates"). Because NCPA specifically alleges how the Ransomware Attack and shutdown directly impacted its members, it has met its burden on the first element.

Second, NCPA's claims seeking only declaratory and injunctive relief do not require the participation of its members. CAC ¶¶ 436(b), 459, 471, 579, 649 & pp. 200-1. When a plaintiff "seeks only declaratory and prospective injunctive relief, the participation of individual [members] . . . is not required." *Heartland Acad. Cmty. Church v. Waddle*, 427 F.3d 525, 533 (8th Cir. 2005); *see also Warth v. Seldin*, 422 U.S. 490, 515 (1975) (where an "association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured"); *Nebraska Beef Producers Comm. v. Nebraska Brand Comm.*, 287 F. Supp. 3d 740, 750 (D. Neb. 2018) (individual member's participation may be required "only when an association seeks relief in damages"). NCPA seeks only remedies that "will inure to the benefit of those members of the association actually injured." *Warth*, 422 U.S. at 515; *see also* CAC, ¶¶ 200-01.

Defendants' claim that individual NCPA members will be required to participate is based on cases that are distinguishable, because in those cases, the plaintiffs sought relief requiring individual evidence, which individual members controlled. *See Int'l Bhd. of Teamsters v. Sun Country, Inc.*, 753 F. Supp. 3d. 764, 722 (D. Minn. Oct. 15, 2024) (association sought injunctive relief as to two individual members); *CSP Cmty.*

*Stabilization Project v. Cuomo*, 199 F.R.D. 327, 333 (D. Minn. 2001) (injunctive relief claims premised on member's entitlement to Section 8 housing vouchers); *Northland Parent Ass'n*, 571 F. Supp. 3d at 1114 (relief sought required information on how each student's disability interacted with mask requirement). Here, by contrast, NCPA seeks corrective action by Defendants, and Defendants identify no evidence necessary for the claims which they do not already possess. *See Disability Support All. v. Monali, Inc.*, No. 15-CV-1522, 2016 WL 859442, at *11 (D. Minn. Feb. 12, 2016) (participation of individual members not necessary for claims seeking removal of architectural barriers), *r. & r. adopted*, 2016 WL 868174 (D. Minn. Mar. 4, 2016).

The Court should deny Defendants' motion to dismiss NCPA's claim for lack of associational standing.

## V.   CONCLUSION

For the reasons set forth herein the Court should deny Defendants' Motion in full.


Dated: April 25, 2025                         *s/Daniel E. Gustafson*
                                              Daniel E. Gustafson (#202241)
                                              **GUSTAFSON GLUEK PLLC**
                                              Canadian Pacific Plaza
                                              120 South Sixth Street, Suite 2600
                                              Minneapolis, MN 55402
                                              Telephone: (612) 333-8844
                                              dgustafson@gustafsongluek.com

                                              *Plaintiffs' Overall Lead Counsel*

Shawn M. Raiter
**LARSON-KING LLP**
30 East Seventh Street, Suite 2800
St. Paul, MN 55101
Telephone: (651) 312-6500
sraiter@larsonking.com

*MDL Liaison Counsel*

E. Michelle Drake (#387366)
**BERGER MONTAGUE**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5933
emdrake@bm.net

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112
Telephone: (816) 714-7100
siegel@stuevesiegel.com

Warren Burns
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 458-9890
wburns@burnscharest.com

*Provider Track Co-Lead Counsel*