# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

---

IN RE: CHANGE HEALTHCARE, INC.
CUSTOMER DATA SECURITY BREACH
LITIGATION

This Document Relates To:

All Provider Actions &

*Total Care Dental and Orthodontics, et al.
v. UnitedHealth Group Incorporated, et al.,*
No. 0:25-cv-00179;

*Odom Sports Medicine
P.A. d/b/a Odom Health & Wellness v.
UnitedHealth Group Incorporated, et al.*,
No. 0:25-cv-00949

MDL No. 24-3108 (DWF/DJF)


**PROVIDER PLAINTIFFS' REPLY
IN SUPPORT OF MOTIONS FOR
PRELIMINARY INJUNCTION
AND DECLARATORY
JUDGMENT**

---

## I.    INTRODUCTION[1]

Provider Plaintiffs are among the many victims of the largest healthcare disruption in U.S. history, caused by Defendants' inexcusable negligence, which led to the breach and resulting shutdown of Defendants' claims processing system, the Change Platform ("Service Shutdown"). Many Providers, including Plaintiffs, may never get paid for medical services that they provided to patients during the Shutdown. Providers rendered those services during Defendants' Service Shutdown of the Change Platform, meaning that they were unable to submit claims to get reimbursed by insurance companies for the medical care that they provided to patients. Providers still offered care to patients during this time because patients needed medical care and because they had faith that Defendants—one of the largest healthcare conglomerates on the planet—would quickly fix their systems and process and pay claims.

Defendants responded to the shutdown not by fixing their systems but by offering the Temporary Funding Assistance Program ("TFAP"). The TFAP loaned money to Providers that otherwise would have suffered substantial distribution or gone out of business because of the sudden and acute halt in insurance reimbursements caused by the Defendants' Service Shutdown. Although Defendants tout this as a selfless act, had there been a mass closure of healthcare providers and pharmacies across the country, the crisis for Providers that Defendants caused would have ballooned into a healthcare crisis for

---

[1] Although Provider Plaintiffs filed separate Preliminary Injunction Motions on behalf of Plaintiffs Dillman Clinic and Odom Health [ECF 278] and a Motion for Declaratory Judgment on behalf of the Provider Plaintiffs [ECF 291], Defendants responded to both motions in a single responsive pleading [ECF 332]. As such, Provider Plaintiffs have combined their reply to both Motions in this single pleading.

millions of Americans that would have had even more drastic repercussions for Defendants. Defendants offered the loans with no interest or fees and told Congress that they would not "ask[] for repayment until providers determine their business is back to normal."[2] Consistent with those representations, the TFAP Loan Agreements ("TFAP Agreements") state that repayment is only due once "payments impacted during the service disruption period are being processed." ECF No. 279 ("Dillman Decl.") Ex. A at 2.

Defendants soon, however, revealed the TFAP for what it really was: a public relations ploy that would last only so long as Congress and the public were focused on Defendants' misconduct. In October 2024, once Congressional and public attention had shifted elsewhere, Defendants unmasked their true intentions by demanding lump sum repayments from Providers. Defendants' demands for repayments were made indiscriminately, even as many Providers were still struggling financially and in spite of the fact that payments impacted during the service disruption period were still not being processed. Defendants demanded repayment based on the unfounded and entirely counter-textual position that the TFAP Agreements empowered them to forcibly collect on loans once any claims impacted by the service shutdown were being processed, without regard to whether *payments* impacted by the Shutdown had been processed. Since October 2024, Defendants have recouped an additional $2.3 billion in TFAP loans

---

[2] *Responses to Questions for the Record for Andrew Witty*, U.S. Senate Committee on Finance, Full Committee Hearing, at 34 (May 1, 2024) https://www.finance.senate.gov/imo/media/doc/responses_for_questions_for_the_record_ to_andrew_witty.pdf (last visited April 30, 2025).

from Providers, meaning that they have recovered a total of $5.5 billion of the $9 billion loaned. ECF No. 333 ("Sidwell Decl.") ¶ 9; CAC ¶ 145.

Although Defendants characterize Providers' Motions for a determination of the meaning of the terms of the TFAP Agreements and to stop Defendants' efforts to collect from two struggling providers as a "shakedown," what Plaintiffs actually seek is this Court's assistance in requiring Defendants to honor their promises. Defendants' characterization of Plaintiffs' need for judicial relief as a "shakedown" is impressively tone deaf. Plaintiffs have done nothing wrong. They did not set the stage for the Shutdown, and even in its wake, and at great cost to themselves, they continued to care for their patients. They have now provided uncontroverted and detailed evidence that Defendants' Service Shutdown pushed their businesses to the brink of bankruptcy and that they have not yet recovered. *See generally* Dillman Decl.; ECF No. 280 ("Adiukwu Decl.").

While Defendants' enjoy the financial benefit they obtained as a result of not paying claims impacted by the Service Shutdown (CAC ¶¶ 130-34), for Providers, the crisis engendered by Defendants' failings in February 2024 has yet to be resolved. Defendants' attempts to force repayment before the payments to which Plaintiffs are entitled have been processed presents the risk that Plaintiffs will have to shut their doors and leave their patients without the care they need. The Court need not allow these risks to become reality before ruling on the merits of Plaintiffs' interpretation of the TFAP Agreements. Plaintiffs seek relief—in the form of declaratory judgment and in the form of a preliminary injunction maintaining the status quo.

In the face of Plaintiffs' hardship and Defendants' disregard of the explicit terms of a contract they authored, Defendants raise a series of largely procedural objections, all aimed at a single goal: avoiding a ruling on what the TFAP Agreements mean. Defendants' procedural arguments fall flat. Plaintiffs Dillman Clinic and Odom meet the requirements to obtain a preliminary injunction, have made the required showing of irreparable harm, and have demonstrated the strength of their position on the merits. And the Provider Plaintiffs' request for declaratory judgment is supported by the facts and the law and is procedurally proper, as to both the relief requested in the Complaint and the propriety of the instant motion.

## II.    BACKGROUND

Plaintiffs recite the relevant facts in their opening briefs. (ECF No. 278, "PI Mem."; ECF No. 291, "DJ Mem."). However, since Defendants provide new factual allegations in their responsive brief and two supporting declarations, Plaintiffs respond briefly to those new allegations here.

*First*, Defendants omit what is well known: that the data breach and resulting Service Shutdown of the Change Platform was caused by their substandard data security policies. The Change Health Defendants failed to implement even the most basic data security measures to secure the largest healthcare payment platform in the United States—namely, multifactor authentication, a common requirement for social media profiles, email inboxes, and personal bank accounts, that has been around for decades. This inexcusable failure, along with multiple other failures identified by Plaintiffs, allowed a well-known ransomware gang, ALPHV, to access and essentially destroy

Change's systems—all without the Change Health Defendants detecting the intrusion for *nine days*. CAC ¶¶ 183-262.

*Second*, Defendants admit that the Change Platform's clearinghouse services were not restored until October 2024—eight months after the "temporary pause" in services began. Sidwell Decl. ¶ 13. Defendants also admit that UHG's insurer, UnitedHealthcare Insurance Co. ("UHIC"), only paused timely filing requirements for providers submitting claims from February 15, 2024, through June 15, 2024, a full four months *before* the Change Platform's clearinghouse services were restored. ECF No. 334 ("Black Decl.") ¶ 7. Even if, as Defendants assert, claims services were "largely" restored by June 2024 (Sidwell Decl. ¶ 13), Providers had no time to catch up in submitting claims that had accrued during the Service Shutdown before UHG began enforcing timely filing deadlines, rendering this pause largely superfluous. Defendants also do not adequately address how other insurers enforced timely filing deadlines against Providers to deny claims that could not be submitted because of the Service Shutdown. Defendants further admit that they began sending demand letters with invoices for TFAP loans to Providers in October 2024, the *same month* in which claims services were finally restored (Sidwell Decl. ¶ 14) and *less than one month* after Defendants recognized that Providers still needed funding by disbursing additional TFAP loans (Dillman Decl. ¶ 9 (Dillman Clinic received TFAP funds on September 27, 2024)).

*Third*, Defendants advance an interpretation of the TFAP Agreements that directly conflicts with UHG CEO Andrew Witty's representations to Congress regarding the TFAP. In their opposition, Defendants claim that the TFAP Agreements require providers

to "repay [TFAP loans] once services were restored and claims payments were back to being processed." Sidwell Decl. ¶ 5. Meanwhile, Mr. Witty represented to Congress in May 2024 that Defendants had "no intention of asking for repayment until providers determine their business is *back to normal*."[3] (Emphasis added). Defendants attempt to avoid taking a position that is plainly inconsistent with Mr. Witty's statements by equivocating on the meaning of "normal." ECF No. 332 ("Defs.' Opp.") at 39. But the import of Defendants' inconsistency is clear: Defendants used one interpretation of the TFAP Agreements in Congress soon after the Service Shutdown to mollify intense Congressional and public criticism of Defendants' failures and the havoc they wrought on the healthcare system, and now seek to advance another interpretation so that Defendants can prematurely collect on the TFAP loans even though many Providers' businesses are not back to normal following the eight-month Service Shutdown.

*Fourth*, Defendants provide an incomplete picture of the extent to which payments impacted by the Shutdown have been processed. Defendants provide all kinds of facts and figures but never provide the key one: *how many payments impacted by the Shutdown have been processed and paid*. Defendants provide no evidence that contradicts the financial statements cited in Plaintiffs' Complaint, which demonstrate that Defendants have turned the Shutdown into a profit center, using it as a basis on which to deny as untimely claims that could not have been submitted because Defendants' systems were non-operational. Instead, Defendants provide detailed information about the outcome of the claims submitted by Dillman Clinic and Odom before and after the

---

[3] *Responses to Questions for the Record for Andrew Witty*, *supra* n.2.

Service Shutdown, which support precisely this proposition. Defendants admit that, as to UHIC, the proportion of claims denied as untimely after the Shutdown increased dramatically, proving that UHIC is doing exactly what Plaintiffs allege. For Odom, the percentage of services denied by UHIC as untimely went from 0.03% pre-shutdown to 0.8% post-shutdown, a more than twenty-six-fold increase. Black Decl. ¶ 17.[4] For Dillman Clinic, the percentage of services denied by UHIC as untimely went from 0.4% to 2.5%—a more than six-fold increase. Black Decl. ¶ 14. Defendants do not, and cannot, provide insight into the number or amount in claims that have been denied by other insurers as untimely because of the Shutdown.

In contrast to the paucity of information, Odom estimates that they have "approximately $235,000 in outstanding claims that accrued from approximately February through August 2024 that [they] are still trying to get processed through insurance." Adiukwu Decl. ¶ 18. Dillman Clinic estimates that approximately $4,704 in claims has been denied as untimely due to the Shutdown. Dillman Decl. ¶ 14. Moreover, the denial of claims on the basis of purported untimeliness is not the only financial hit that Plaintiffs took because of Defendants' shutdown of the Change Platform. Plaintiffs also suffered a number of other negative consequences, including a decreased ability to see and provide care to patients. Dillman Decl. ¶¶ 7-8, 12-13; Adiukwu Decl. ¶¶ 8-11, 15-18. Importantly, Defendants fail to provide data showing what either Odom or Dillman Clinic received in claims payments before the Service Shutdown as compared to

---

[4] Odom believes that UHIC has denied $18,095 in claims as untimely due to the Service Shutdown. Adiukwu Decl. ¶ 19.

what they received after the Service Shutdown, and how many valid claims payments that were delayed because of the Shutdown are still outstanding. All of which belies the assertion that Plaintiffs' businesses are back to normal.

*Lastly*, Defendants' assertions that they have worked cooperatively with Providers on TFAP repayment stands in stark contrast to the experiences of Dillman Clinic and Odom. Both Dillman Clinic and Odom were met with non-responses to their inquiries regarding delaying repayment or negotiating a repayment plan that would work for their businesses. Dillman Decl. ¶¶ 16-18; Adiukwu Decl. ¶¶ 21-22. When these Providers informed Defendants that the proposed repayment plans were not workable, they were met with threatening correspondence from Defendants demanding repayment of the entire loan in one lump sum due in five business days. Dillman Decl. ¶¶ 19-21; Adiukwu Decl. ¶¶ 24-27.

Moreover, since Plaintiffs filed their Motions, alarming details have come to light regarding the Defendants' aggressive attempts to collect on TFAP loans from struggling Providers. Specifically, Defendants have begun making good on their threats to garnish Providers' insurance claims payments in what one Provider has described as a "shakedown."[5] For example, between February 19 and March 29, 2025, Defendants garnished $68,000 from the claims payments of Dr. Catherine Mazzola, a Morristown,

---

[5] Ashley Capoot, *UnitedHealth is making struggling doctors repay loans issued after last year's cyberattack*, CNBC (Apr. 11, 2025, 5:44 PM), https://www.cnbc.com/2025/04/11/unitedhealth-makes-doctors-repay-loans-issued-after-change-cyberattack.html.

NJ-based pediatric neurosurgeon, against the $500,000 TFAP loan she took last year.[6] A spokesman for Change admitted that Defendants "have begun the process of recouping the interest-free funding we provided to providers."[7]

Defendants also continue to demand full, lump-sum repayment of TFAP loans from struggling Providers, failing to uphold UHG's promises to Congress last year when it was under intense scrutiny for its data security failures and the resulting widespread chaos that it inflicted upon Providers and the healthcare system at large. Before the Congressional testimony in which UHG made these promises, Dr. Christine Meyer, the owner of a primary-care practice in Exton, PA, took out a TFAP loan, which ultimately totaled $750,0000. During a May 2024 Senate hearing about the cyberattack, former Senator Bob Casey Jr., D-PA, shared Dr. Meyer's story from the attack and subsequent Shutdown. Upon questioning from Sen. Casey, UHG CEO Andrew Witty "absolutely confirm[ed]…that we have no intention of asking for [TFAP] loan repayment until after [Dr. Meyer] determines that her business is back to normal."[8]

But just last month, on April 1, 2025, Dr. Meyer received a letter from Optum demanding immediate repayment of the entire loan in five days, after which point "the

---

[6] Amina Niasse & Bhanvi Satija, *UnitedHealth asks healthcare providers for hack loan repayments*, Reuters (Apr. 11, 2025, 3:32 p.m.), https://www.reuters.com/business/healthcare-pharmaceuticals/unitedhealth-asks-healthcare-providers-hack-loan-repayments-2025-04-11/.

[7] *Id.*

[8] Capoot, *supra* n.5.

company would start withholding her UnitedHealthcare payments."[9] Dr. Meyer, who estimates that she lost more than $1 million in revenue due to the Service Shutdown, is "not in any position to pay" back the loan.[10] When she called Optum after receiving the April 1 letter, Dr. Meyer spoke with an Optum representative who confirmed Optum's intentions to forcibly and prematurely recoup payments. Ms. Meyer asked if the company really intended to "withhold payments for patient care [her practice] ha[d] already delivered until [it] recoup[s] this money," and the representative replied, "Yeah, we're prepared to do that."[11] Dr. Meyer stated in an April 10 LinkedIn post that she feels like "a tiny ant at the mercy of a monster."[12]

## III.  ARGUMENT

### A.  The Court Should Grant Plaintiffs Dillman Clinic and Odom a Preliminary Injunction.[13]

#### 1.  Plaintiffs have established that they are at risk of irreparable harm.

---

[9] *Id.*

[10] *Id.*

[11] Joyce Frieden, *Docs Decry Optum's Tactics for Collecting Loan Repayments from Change Cyberattack*, MedPage Today (Apr. 14, 2025), https://www.medpagetoday.com/practicemanagement/practicemanagement/115117 (cleaned up).

[12] Christine Meyer, MD, Post to *Empowering Physicians and Startups to Succeed in Value-Based Care* (April 2025), LinkedIn, https://www.linkedin.com/posts/christinemeyermd_changehealthcarecrisis-independentphysicians-activity-7316233616366161920-GlXg?utm (cleaned up).

[13] Plaintiffs' arguments relating to the Preliminary Injunction Motion are applicable to the Declaratory Judgment Motion, including with respect to the meaning of the TFAP Agreement.

**a.**    **Plaintiffs are at risk of irreparable harm despite an indeterminate pause in collection.**

This Court should reject Defendants' argument that simply because Defendants have paused, for the time being, TFAP loan collections for named Plaintiffs, Plaintiffs' motion for a preliminary injunction is moot.

First, Defendants' argument is flawed because at no point have Defendants stated that they will cease their objectionable conduct, as Plaintiffs request. Through their Motions, Plaintiffs seek to stop Defendants from acting against Plaintiffs Dillman Clinic and Odom to recoup the TFAP loans "*until the Court has had an opportunity to consider and determine Providers' claims for Defendants' breach of the TFAP contracts and declaratory relief on the merits.*" PI Mem. at 4-5 (emphasis added). In response, Defendants' counsel has merely stated that "there are not *currently* any collection attempts" on the TFAP loans from the named Plaintiffs. ECF No. 335 ("Ryan Decl.") Ex. A (emphasis added). Defendants have not, however, agreed to pause collection attempts for any specific time period, much less for the time period that Plaintiffs request. Defendants' commitment not to collect on Plaintiffs' loans is shaky at best and leaves open the very real possibility that Defendants could change their mind tomorrow and immediately start collecting on these loans.

Second, Defendants have failed to show how their decision to *currently* pause repayment efforts, for an undetermined amount of time, moots Plaintiffs' Motion for a Preliminary Injunction or removes the risk of irreparable harm that Plaintiffs face. For example, under the voluntary-cessation exception, "[t]he heavy burden of persuading the

court that the challenged conduct cannot reasonably be expected to recur lies with the party asserting mootness." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000) (citation omitted). "Mere voluntary cessation of a challenged action does not moot a case. Rather, a case becomes moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to occur." *Strutton v. Meade*, 668 F.3d 549, 556 (8th Cir. 2012) (internal quotation and citation omitted). *See also Rinne v. Camden Cnty.*, 65 F.4th 378, 386 (8th Cir. 2023) (the "voluntary cessation exception provides that a defendant cannot 'automatically moot a case simply by ending its unlawful conduct once sued'") (citation omitted).

Here, Defendants sent Plaintiffs Dillman Clinic and Odom repeated demands for repayment and threatened that they would begin withholding claims payment if Plaintiffs failed to repay. Adiukwu Decl. ¶ 25; Dillman Decl. ¶¶ 19, 21.[14] To date, Defendants continue to insist upon an interpretation of the repayment clause that would render full repayment of the funds loaned under the TFAP Agreements due immediately—for Dillman Clinic and Odom as well as for all other named Plaintiffs. Defendants could thus restart collections efforts on Dillman Clinic and Odom tomorrow. Given the absence of any commitments made by Defendants to not resume collection efforts, Plaintiffs still face a risk of irreparable harm. Defendants thus fail to meet the voluntary cessation exception's heavy burden. *See Council on American-Islamic Relations—Minnesota v.*

---

[14] Regardless of whether Defendants sent communications to Plaintiffs on or before January 15, 2025 (including one on January 24, 2025, that Defendants contend was sent "in error"), Defendants have demanded repayment in full and stated it would withhold payments.

*Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 377-78 (D. Minn. 2020) (finding that defendant's agreement to a certain scope of restrained conduct in an agreement did not moot the controversy); *see also B & D Land & Livestock Co. v. Conner*, 534 F. Supp. 2d 891, 908 (N.D. Iowa 2008) (finding that even though "the assurances . . . were made in good faith," it did not moot a motion for preliminary injunction and "[i]n the absence of a preliminary injunction, nothing will preclude [defendants] . . . from changing their minds").

Defendants' cited cases are factually inapposite. In *Holmes v. Minnesota DOC*, the court found that the plaintiff's motion for a preliminary injunction was *not* moot under the voluntary cessation exception because "defendants ha[d] not expressly stated—nor provided any assurances" that the plaintiff would be provided with the requested relief. No. 23-CV-2969 (PJS/DJF), 2024 WL 2956632, at *2 (D. Minn. June 12, 2024). Moreover, in *Holmes*, the plaintiff did not provide any evidence that the defendants intended to move him away from the facility or take away an adjustable hospital bed— the challenged conduct—whereas here Defendants sent Plaintiffs *multiple* letters, expressly stating that they would engage in the challenged conduct: collecting on Plaintiffs' TFAP loans. In *Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, the defendants presented evidence that they had already ceased and were reversing the challenged conduct by removing marks from certain models of air compressors. 997 F.2d 484, 489 (8th Cir. 1993). In *Med. Graphics Corp. v. SensorMedics Corp.*, the court found that "the undisputed evidence" showed that the defendants "ceased to distribute the documents complained of," and that if they "were to resume distributing the...letters, it

would face lawsuits from those entities." 872 F. Supp. 643, 649 (D. Minn. 1994). By contrast, here Defendants merely state that they are not currently collecting on Plaintiffs Dillman Clinic and Odom's TFAP loans, *not* that they have voluntarily agreed to cease their conduct against Plaintiffs for any determinate time period, much less the requested time period. Accordingly, the Court should reject this argument.

        **b.**      **Plaintiffs have substantiated their risk of irreparable harm.**

Plaintiffs Dillman Clinic and Odom have sufficiently detailed and substantiated the irreparable harm that they would experience should Defendants prematurely collect on their TFAP loans or begin garnishing their claims, as Defendants have repeatedly threatened to do. Defendants' arguments to the contrary—which rely on inapposite caselaw, ignore the bulk of Plaintiffs' declarations, and mischaracterize Defendants' attempts (or lack thereof) to "work collaboratively" with Providers on reasonable repayment plans—all fail.

*First*, in urging that Plaintiffs Dillman Clinic and Odom's allegations of harm are "speculative say-so," Defendants primarily rely on *Padda v. Becerra*, 37 F.4th 1376 (8th Cir. 2022).[15] There, the United States Court of Appeals for the Eighth Circuit affirmed the district court's denial of plaintiff Dr. Padda's requested preliminary injunction, which

---

[15] Defendants' other cited authority fares no better. For example, in *Packard Elevator v. I.C.C.*, the Eighth Circuit rejected petitioners' "unsubstantiated" and "speculative" claims that they would suffer irreparable injury if the Chicago, Central & Pacific Railroad Co. set predatory prices, as this allegation was premised entirely on the fact that a *different* company, Cedar Valley Railroad Co., had previously set such prices. 782 F.2d 112, 115-16 (8th Cir. 1986). Here, Plaintiffs Dillman Clinic and Odom will suffer certain and immediate irreparable harm if Defendants carry out threats that they themselves have repeatedly made.

sought to prevent Medicare from recovering millions of dollars in overpayments made to Dr. Padda. *Id.* at 1379. The Court determined that "Dr. Padda's alleged harms are insufficient to support a preliminary injunction," because Dr. Padda's statements were both "vague and speculative." *Id.* at 1384. Plaintiffs Dillman Clinic's and Odom's declarations, by contrast, do not suffer from either of these flaws.

As to vagueness, unlike Dr. Padda, Plaintiffs Dillman Clinic and Odom have provided tremendous detail to "specifically identif[y] what harm [they] will suffer" if Defendants force loan repayment. *Id.* at 1385. For example, Mr. Dillman explains that, among other things, Dillman Clinic: "would be unable to purchase the supplies necessary to serve [its] patients" (Dillman Decl. ¶ 27); "would be forced to make decisions about which vaccines to stock, and [] would have to forgo or delay the more expensive vaccine treatments" (*id.* ¶ 28); "may have to stop offering crucial and high-demand pediatric vaccines, including Rotovirus, Tenivac, Menveo, Pediarix, Prevnar, Infanrix, Boostrix, Gardisil 9, MMR, and the Varicella vaccines" (*id.*); "would [] have to shut down [its] on-site lab," which would make it impossible for the clinic to deliver the "comprehensive and timely care" that it advertises" (*id.* ¶ 29); "would be unable to do any additional hiring, and [its] operations would remain stretched" (*id.* ¶ 30); "would not be able to pay [its] staff [] at their current rate," which would "dec[r]ease the quality of services to [] patients" (*id.* ¶ 31); would have to expand cash-paying elective procedures to maximize immediate cash-flow, thereby "divert[ing] staff time available for [] patients with essential medical needs" (*id.* ¶ 32); and "would be at increased risk of closing [its] doors or filing for bankruptcy" (*id.* ¶ 33).

Meanwhile, Ms. Adiukwa declares that Odom would, among other things: "be unable to meet payroll" (Adiukwu Decl. ¶ 32); "have to cut staff immediately" and "cut the number of providers by at least 22" (*id.*) (when the clinic currently has a total of approximately 110 employees (*id.* ¶ 5)); have to "dramatically reduce the number of patients that [the clinic] could see" and likely "lose patients who choose to follow their providers to another practice" (*id.* ¶ 32); likely lose the ability to service senior patients in certain residence communities because the clinic was forced to cut providers (*id.*); and "be at a high risk of closing [its] doors and filing for bankruptcy" (*id.* ¶ 33).

These allegations are a far cry from those of Dr. Padda, who neither explained how many employees he would have to fire nor articulated how exactly his patients would be "impacted" if Medicare recouped the overpayments. *Padda*, 37 F.4th at 1384-85. That is, "[Dr. Padda] d[id] not explain if [his patients] will be 'impacted' because they will have to wait longer at their appointments, or if they will be 'impacted' because they will totally lose access to life-saving treatments. Without these details, Dr. Padda has not specifically identified what harm he will suffer." *Id.* Here, by contrast, Plaintiffs Dillman Clinic and Odom have both described precisely how they, and their patients, would be impacted.

Also unlike Dr. Padda, both Plaintiffs Dillman Clinic and Odom have provided much more than mere "speculation" by elaborating as to *how* Defendants' collection efforts could force them to close their practices. They have explained that, if Defendants demand immediate payment of their loans or withhold claims payments, the clinics will lose staff, necessary resources (including high-demand vaccines), facilities (e.g., Dillman

Clinic's on-site lab), patients, credibility, and patient goodwill; be unable to obtain alternative financing; and "have no contingency plan in place for unexpected expenses"—all of which could ultimately force them to close their doors and file for bankruptcy. Dillman Decl. ¶¶ 24-33; Adiukwu Decl. ¶¶ 30-33. These allegations are distinguishable from those of Dr. Padda, who "assert[ed] that recoupment may cause 'the potential for practice closure,' [but] d[id] not elaborate on that claim" nor "identify what factors would cause that 'potential' to become a reality." *Padda*, 37 F.4th at 1385. Further, in *Padda*, "[t]he only evidence available indicate[d] that recoupment would *not* cause practice closure"; Dr. Padda's practice remained open long after Medicare commenced recoupment. *Id.* (emphasis added).[16] Here, no similar unavailing evidence or circumstances exist.[17]

*Second*, Defendants repeatedly mischaracterize Dillman Clinic's and Odom's allegations of irreparable harm. They claim, for example, that "most of Dillman and Odom's allegations focus on the *retrospective* harm they allegedly have suffered." Defs.' Opp. at 23 (emphasis in original). This is false. As discussed above, both Plaintiffs have

---

[16] Defendants attempt to compare Dillman Clinic's allegations to those of Dr. Padda, because Dillman Clinic "alleges that it is *already* 'being forced to consider closing [its] primary care practice.'" Defs.' Opp. at 24 (emphasis in original). This cherry-picked reading of Dillman Clinic's declaration is unavailing. The fact that Dillman Clinic is *already* struggling (largely because of Defendants' Shutdown) does not change the fact that it will suffer *much more*, and irreparably so, if Defendants are free to force loan repayment at any time, and on any terms they wish.

[17] Defendants also criticize Dillman Clinic and Odom for not attaching to their declarations "documentation reflecting their monthly revenues, expenses, or profits," *Id.* at 23. But *Padda* does not hold that such documentation is required. *Padda*, 37 F.4th at 1385.

detailed the many ways in which they would suffer additional and *future* harm if Defendants resume their collection efforts. *See* Dillman Decl. ¶¶ 24-33; Adiukwu Decl. ¶¶ 30-33. True, Dillman Clinic's and Odom's declarations also describe how the Service Shutdown harmed and has continued to harm their practices, but this is critical context: Dillman Clinic's and Odom's businesses are not "back to normal" following the Shutdown. Moreover, if Defendants force loan repayment now, Plaintiffs will be forced to make significant cuts, if not close altogether and file for bankruptcy. Defendants' continued aggressive efforts to collect TFAP proceeds from other Providers, including by forcibly garnishing claims payments, illustrate that, absent injunctive relief, Defendants are likely to resume their conduct again.

*Third*, Defendants insist that, like Dr. Padda, Dillman Clinic and Odom cannot show irreparable harm because they had "an available, alternative method for reducing [their] purported harms: a repayment plan." Defs.' Opp. at 24. Defendants further claim that they tried to "work collaboratively" with Plaintiffs Dillman Clinic and Odom and offered generous repayment plans that these providers rejected, thereby purportedly revealing "their apparent intent to retain the [TFAP] loans in perpetuity." *Id.* at 24-25. Defendants' retelling of the facts—which insinuates that Providers who *cannot* pay their loans on Defendants' demanded time-table are nothing more than money-hungry opportunists—is offensive. It is also inaccurate. Unlike Dr. Padda—who did "not show[] that he ever sought [a repayment] plan," *Padda*, 37 F.4th at 1384-85, both Dillman Clinic and Odom informed Defendants that a six-month repayment plan was not feasible and tried to engage with Defendants to negotiate a realistic resolution. *See* Dillman Decl. ¶¶

16-20; Adiukwu Decl. ¶¶ 20-26. However, Defendants refused to budge, and thereafter ignored Plaintiffs' continued outreach. *See* Dillman Decl. ¶¶ 16-20; Adiukwu Decl. ¶¶ 20-26. Ultimately, Defendants demanded that both Plaintiffs repay their full loan balances immediately or face claims garnishment. *See* Dillman Decl. ¶¶ 19-21; Adiukwu Decl. ¶¶ 25-26.

All told, Defendants' arguments rely on inapposite caselaw and revisionist history. They should be rejected, and Plaintiffs' Motion for a Preliminary Injunction should be granted.

### 2. Plaintiffs Dillman Clinic and Odom Have Shown a Likelihood of Success on the Merits.

Plaintiffs are likely to prevail on the question of the TFAP's present enforceability regardless of whether the Court determines that the TFAP Agreements are ambiguous. "A contract is ambiguous if, based upon its language alone, it is reasonably susceptible of more than one interpretation." *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997). "The determination of whether a contract is ambiguous is a question of law for this court to decide." *Id.*

#### a. The TFAP Agreements are unenforceable contracts of adhesion and are not mutually exclusive with the CAC's allegations.

Plaintiffs do not disagree that boilerplate language and the "take-it-or-leave-it" basis of a contract do not alone necessarily render a contract unenforceable. But here Plaintiffs assert much more than just those two elements. As set out more fully in their initial Memoranda in support of the Motions for Declaratory Judgment and Preliminary

Injunction ("DJ Mem.," "PI Mem.," respectively), Providers entered into the TFAP Agreements under dire circumstances. Because of Defendants' gross failures, Defendants implemented the Service Shutdown, resulting in Providers going months without payment for services that they had provided to patients. Without payment, Providers needed an immediate influx of funds to keep their doors open, and Defendants offered the TFAP. The combination of the Provider Plaintiffs' desperate situation, the parties' disparate bargaining power, and the boilerplate language of the TFAP Agreements renders those contracts a quintessential "contract of adhesion."

Defendants' analysis focuses primarily on whether there was a disparity in bargaining power in demonstrating that a contract is one of adhesion, relying on *Schlobom v. Spa Petit, Inc.*, 326 N.W.2d 920, 924-25 (Minn. 1982) (holding that allegations of disparate bargaining power can be supported by a showing that there was no opportunity for negotiation *and* that the services could not be obtained elsewhere). In this case, given the circumstances caused by the data breach and resulting Service Shutdown, Plaintiffs were in a much weaker bargaining position than Defendants.

Although Defendants argue that Dillman Clinic and Odom are each "unquestionably sophisticated entities"—highlighting that Odom has been operating in the healthcare industry since 2006 and Dillman Clinic since 2022—and therefore no disparity in bargaining power existed between the parties when the contracts were formed, the facts show otherwise. At the time Plaintiffs entered into these contracts, Dillman Clinic, Odom, and the other Provider Plaintiffs were not on equal footing with Defendants. At the time of the Service Shutdown (over which Plaintiffs had no control),

Plaintiffs needed immediate financial assistance to continue operating their businesses. Defendants do not squarely address this argument but instead assert that (1) because the Providers were businesses and (2) because the terms of the contract were simple, there could be no contract of adhesion. But Defendants completely ignore the circumstances under which the TFAP Agreements were even needed. As such, even if the terms of the contract were simple—and they are not, as evidenced by the very need for the instant motions—the circumstances of the contracts' formation were complex.

At the time that Plaintiffs entered into the TFAP Agreements with Defendants, the information landscape regarding Defendants' ability to restore the functionality of the Change Platform was fraught and disorienting. While Defendants generated billion-dollar profits (CAC ¶ 134), Plaintiffs were in dire financial straits attempting to prevent their businesses from collapsing (CAC ¶ 9).[18] And due to Defendants' misleading statements and omissions, Plaintiffs were unable to make reasoned, informed decisions about how to keep their businesses above water. *Id.* Even accepting Defendants' contention that Plaintiffs were "sophisticated entities," Plaintiffs nonetheless were, relative to Defendants, powerless. Plaintiffs lacked the knowledge needed to estimate when the Change Platform would return to normal, they were dependent on the Change Platform, and they needed to resolve their financial descent immediately. *Compare with Staffing*

---

[18] Defendants cite to *Interfund Corp. v. O'Byrne*, 462 N.W.2d 86, 89 (Minn. Ct. App. 1990) for their assertion that courts routinely find that contracts are not unconscionable even when parties have financial motives to enter into contracts. Their reliance on *Interfund* is misleading because, in that case, the relevant party did not enter into the contract—which was for interest in a thoroughbred horse—due to risk of financial ruin but instead to further increase his financial position.

*Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 896 N.W.2d 115, 130 (Minn. Ct. App. 2017), *aff'd*, 913 N.W.2d 687 (Minn. 2018) (finding no contract of adhesion under factual circumstances where plaintiff was a sophisticated entity and also had *equal* bargaining power). The circumstances under which Plaintiffs entered into the TFAP Agreements thus make clear that Defendants and Plaintiffs had disparate bargaining power. *Powell v. Trans Global Tours, Inc.*, No. CT 98-002821, 1998 WL 777022, at *3 (D. Minn. Aug. 4, 1998).

Defendants also argue that Plaintiffs fail to show that they could not have obtained loans elsewhere and include allegations from the CAC that state that some Providers "took out high-interest loans" or "secured an emergency line of credit" at great detriment to their businesses. CAC ¶ 278. This argument is unpersuasive. The mere fact that certain Plaintiffs may have secured other loans, including at least one loan with a 69% interest rate (CAC ¶ 285), does not diminish the lack of choice that Plaintiffs faced in deciding whether to accept Defendants' offer. Plaintiffs were not choosing between two viable options, and Defendants' suggestion to the contrary should be rejected. Additionally, although Minnesota courts have found that a financing agreement is not unconscionable when there is "no showing that financing could not have been obtained elsewhere," such holdings have been made in cases where the type of financing sought is commonplace. *See, e.g.*, *Lindsley v. DaimlerChrysler Fin. Servs. Americas LLC*, No. 08-1466 (DWF/SRN), 2009 WL 383616 (D. Minn. Feb. 11, 2009) (holding that a contract for the financing of the *purchase of a motor vehicle* was not unconscionable). Here, Plaintiffs were dealing with more uncommon, sophisticated, and urgent financing needs.

Defendants also argue that Plaintiffs' contentions that the TFAP Agreements were contracts of adhesion conflict with allegations in the CAC stating that there was a meeting-of-the-minds when these contracts were formed. But Plaintiffs are plainly permitted to plead these alternative arguments by the Federal Rules of Civil Procedure, which explicitly allow plaintiffs to plead alternative, and even legally inconsistent, theories of recovery. *See* Fed. R. Civ. P. 8(d)(3); *see also, e.g.*, *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 727 (8th Cir. 2014); *Radisson Hotels Int'l, Inc. v. Westin Hotel Co.*, 931 F. Supp. 638, 643-44 (D. Minn. 1996) (declining to evaluate whether claim was duplicative "at this early stage of the litigation").

> **b.    The TFAP Agreements are unambiguous, and their plain meaning unambiguously favors Plaintiffs' reading.**

Under Defendants' own cited case law governing the interpretation of unambiguous contracts, Plaintiffs' interpretation of the TFAP Agreements must prevail. A contract is unambiguous when it is not "reasonably susceptible to more than one meaning." *Mollico v. Mollico*, 628 N.W.2d 637, 641 (Minn. Ct. App. 2001). "If a contract is unambiguous, the 'contract language must be given its plain and ordinary meaning.'" *Denelsbeck v. Wells Fargo & Co.*, 666 N.W.2d 339, 346–47 (Minn. 2003) (quoting *Minneapolis Pub. Hous. Auth. V. Lor*, 591 N.W.2d 700, 704 (Minn. 1999). The TFAP Agreements clearly state that Defendants may send notice that repayment is due only "after claims processing and/or payment processing services have resumed *and payments impacted during the service disruption period are being processed*." Dillman Decl. Ex. A ¶ 10 (emphasis added).

*First*, as much as Defendants may wish it were not so, the TFAP Agreements do not condition repayment on *a* payment or *some* payments "impacted during the disruption period…being processed." *See id.* Instead, the TFAP Agreements clearly state that repayment is not due until those "payments impacted during the service disruption are being processed." *Id.* It is true that "[t]he object of construction is to ascertain and give effect to the intention of the parties, as expressed in the language used," *Grimes v. Toensing*, 277 N.W. 236, 238 (Minn. 1938), which is why Plaintiffs—unlike Defendants—do not read into the TFAP Agreements a limitation that is entirely absent from those agreements. Plaintiffs instead take into account the limitation that Defendants actually wrote into the contracts: that the relevant payments are limited to those payments that were "impacted during the service disruption"—that is, not all payments filed at any moment in time. Dillman Decl. Ex. A ¶ 10. Courts "read contract terms in the context of the entire contract and will not construe the terms so as to lead to a harsh and absurd result." *Brookfield Trade Ctr., Inc. v. Cnty. of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998). To suddenly now read into the TFAP Agreements an unwritten further limitation that the relevant payments are some undefined *subset* of "payments impacted during the service disruption" not only runs counter to the plain meaning of the contracts but would lead to a harsh and absurd result as it might possibly require Plaintiffs to begin repayment before Defendants processed a single one of Plaintiffs' impacted payments—all because some other provider received a payment from Defendants.

*Second*, Defendants confuse the terms "claim" and "payment." Claims certainly do undergo "reviews for completeness, accuracy, timeliness, and coverage." Defs.' Opp. at

34. But once an insurer reviews a claim and determines that payment is appropriate, all that is left is for the insurer to pay the claim. Payment is not "processed" for a claim that insurers review for coverage and then deny. Payment is only "processed" for claims that are approved. For a *payment* to be deemed "processed," therefore, insurers must have already reviewed and approved the relevant claim, and all that remains is for Defendants to process the payment.

Defendants next try to distract from the fact that a number of Plaintiffs' claims have been denied as "untimely" precisely because Defendants shut down the claim submission systems, making it impossible for Plaintiffs to submit claims. *See* PI Mem. at 4; DJ Mem. at 3. Plaintiffs are not arguing that repayment of their TFAP loans is conditioned on their receiving payment on *all* claims that they have *ever* made, *regardless* of coverage limitations and the like. Instead, Plaintiffs are pointing to the plain language of the TFAP Agreements and insisting that Defendants abide by the language of a contract that they themselves wrote. That Agreement provides that Defendants cannot notice an obligation to repay until "payments impacted during the service disruption period are being processed."

Plaintiffs had to delay submissions of claims for months while Defendants kept their claim submission systems offline. *See* PI Mem. at 3-4; DJ Mem. at 3. Months later, when Defendants' claim-submission systems were at least partially back online, Plaintiffs were finally able to start submitting claims that had accrued during the months of the Service Shutdown—and there was a substantial backlog of claims to work through. Some of those claims were subsequently denied solely on the basis of being "untimely" even

though Plaintiffs had had no way of submitting these claims at an earlier date due to Defendants' Service Shutdown. *See* PI Mem. at 8-9, 11-12; DJ Mem. at 3, 8; *see also* CAC ¶ 104. Plaintiffs still await payment on these wrongfully denied claims and such payments clearly constitute "payments impacted during the service disruption period." The gravity of these claim denials is made all the more acute by the fact that the Service Shutdown not only made it impossible to submit claims to United Health Group, but also made it impossible to submit claims to many other insurers. *See* PI Mem. at 5, 8-9, 11; DJ Mem. at 5, 8-9. Since it was Defendants' fault that Plaintiffs could not submit these claims through the Change Platform, it is entirely reasonable that Defendants offered loans to keep Plaintiffs afloat during the period of time in which Plaintiffs could not submit claims on Defendants' systems due to Defendants' cybersecurity failures, resulting in financial losses that Plaintiffs would not have suffered but for Defendants' failures. Defendants' decision to attempt to mitigate damage was across all affected insurance claims and payments, a global approach that is reflected in the terms of the TFAP Agreements, which in no instance limit the claims or payments at issue to those controlled by Defendants. Though Defendants may not control other insurance companies' payment determinations, they certainly are the sole reason why some other insurance companies denied Plaintiffs' claims from the "service disruption" period as "untimely." Plaintiffs also experienced increased denied claims after attempting to switch clearinghouses on expedited timelines during the Service Shutdown for reasons including minor formatting problems. E.g., CAC ¶¶ 46, 98, 100. Defendants cannot now, ex post

facto, reduce the obligation that they affirmatively took on in making the TFAP loans to try to help Plaintiffs mitigate their damages.

*Third*, Plaintiffs are not making arguments or seeking relief that conflict with insurer-provider contracts. Plaintiffs are not saying that UHIC must approve and make payment on claims that are not "clean and covered" before Defendants can demand repayment. Nor are Plaintiffs claiming that Defendants must defer repayment until all clams are paid. Payment for claims that are not covered by insurance were not impacted by the Service Shutdown, as those claims would not have been paid regardless. Instead, Plaintiffs want precisely what the TFAP Agreement promises, namely that Defendants not seek repayment of their TFAP loans until payments that were "impacted during the service disruption period" are being processed. These impacted payments include ones that are based on claims that have—thus far—been denied as "untimely" simply because Plaintiffs were not able to submit them in the correct format or on time due to Defendants' cybersecurity failures and resulting Service Shutdown. *See* PI Mem. at 4, 9, 12, 18; DJ Mem. at 3, 17, 20.

*Fourth*, Plaintiffs do not ask for a permanent donation; they simply ask that Defendants abide by the terms of their contract. The TFAP loans were an attempt to mitigate the financial losses that Plaintiffs and others suffered as a result of Defendants' cybersecurity failures and resulting Service Shutdown. Defendants supposedly calibrated the loan amounts extended to Plaintiffs to align with the payments on qualifying claims that Plaintiffs would have expected to have received from the various insurance companies that used Defendants' platforms during the Service Shutdown. CAC ¶ 141.

Once "payments impacted during the service disruption period are being processed" for Plaintiffs, Defendants will have the right to notice their intent to collect, and in fact collect, on Plaintiffs' TFAP loans. Until that point, however, Defendants will have to wait for full and adequate resolution of the far-reaching chaos caused by Defendants' colossal cybersecurity failures.

Put simply, the plain and unambiguous wording of the TFAP Agreements is their *actual wording*: Defendants may send notice that repayment is due only "after claims processing and/or payment processing services have resumed and payments impacted during the service disruption period are being processed." The Court should decline Defendants' invitation to read limiting words into this contract when no such language exists. Given that the actual words of the TFAP Agreements are the only reasonable and unambiguous read of the contract language, Plaintiffs can show that they are likely to prevail on the merits of their claim that Defendants breached the TFAP Agreements. Plaintiffs do not now—nor have they ever—sought a windfall from Defendants. Plaintiffs merely seek to protect themselves from Defendants' unlawful and unconvincing attempts to evade their contractual obligations.

### c.    Parol evidence supports Plaintiffs' interpretation of the contract.

Despite Defendants' assertion to the contrary, Plaintiffs never argued that "all submitted claims must be paid as submitted" in order for repayment to begin. Rather, Plaintiffs argued that, under the terms of the contract, repayment would not be due until (1) after claims processing and/or payment processing services have resumed, and (2)

*payments impacted during the service disruption period are being processed*. Obviously, there are claims that—once processed—result in a valid denial of the claim. Since there is no payment on a validly denied claim, these claims do not involve "payments impacted during the service disruption period." What Plaintiffs object to is Defendants' attempts to collect repayment on TFAP loans in the narrow circumstance in which there remain payments (on valid, covered claims) that have not yet been processed because of Defendants' Service Shutdown.

Based on their inaccurate interpretation of Plaintiffs' argument, Defendants contend that Mr. Witty's May 2024 statements do not mean that all submitted claims had to be paid as submitted. Plaintiffs agree. Plaintiffs assert that Mr. Witty's statements confirmed that Defendants would not seek repayment under the TFAP Agreements until *payments* impacted during the service disruption period were being processed. Again, Mr. Witty made clear that:

> We have no intention of asking for repayment until providers determine their business is back to normal. Once providers determine their business is back to normal we will work with each provider to determine when the 45 business days will start with no fees or interest.[19]

Given that, in relation to insurers other than UHIC, Defendants are not in a position to know whether payments on valid claims had been processed, Providers are the only parties who would know if such payments are being processed and their businesses had returned to normal.  As such, the extrinsic evidence supports Plaintiffs' interpretation of the contract.

---

[19] *Responses to Questions for the Record for Andrew Witty*, *supra* n. 2

        **d.**      **The convention of *contra preferentum* applies to the TFAP Agreements.**

Defendants argue that the rule of *contra preferentum* does not apply to the TFAP Agreements because the parties are relatively equally sophisticated. Plaintiffs acknowledge that "this rule has less application as between parties of equal bargaining power." *In re ResCap Liquidating Tr. Litig.*, 428 F. Supp. 3d 53, 77 (D. Minn. 2019). But, as discussed above, the circumstances under which Plaintiffs entered into the TFAP Agreements created greatly disparate bargaining power between Plaintiffs and Defendants, despite the fact that the contracts were made between businesses. *See Staffing Specific,* 913 N.W.2d at 691 (disparity in bargaining power is a relevant consideration in applying the rule of *contra proferentem*).

Defendants also claim that ambiguous terms should not be construed against the drafter in this case because this is not an "insurance contract." But, as Defendants note, the doctrine of *contra preferentum* is "commonly (*but not exclusively*) applied in the insurance context." *Staffing Specifix, Inc.*, 913 N.W.2d at 693 (emphasis added); *see also ICC Leasing Corp. v. Midwestern Machinery Co.*, 257 N.W.2d 551, 556 (Minn. 1977) (applying the doctrine of *contra preferentum* to commercial parties in an equipment leasing agreement). Though the TFAP Agreements are not themselves insurance contracts, they are nevertheless contracts drawn up to address a situation that is anything but commonplace: to mitigate the significant damage caused by Defendants' calamitous cybersecurity failures. The parties to the TFAP Agreements may have been businesses, but in entering into these contracts—which were far outside the norm of the sorts of

contracts into which Plaintiffs entered—Plaintiffs lacked the requisite expertise and resources to make them sophisticated parties to the contract.

Lastly, Defendants further seek to distinguish themselves from the drafting party in *Lowry* by stating that the *Lowry* consumer needed protection from the insurance company's "sophisticated and independent drafting." This characterization is not persuasive, as Defendants constitute some of the largest companies in the world (and the Change Platform is the largest healthcare payment processing service in the country). Surely Defendants' drafting can be considered at least as sophisticated as that the insurance company in *Lowry. See generally Lowry v. Kneeland,* 117 N.W.3d 207 (Minn. 1962).

### 3.    The Balance of Harm Favors Plaintiffs.

Defendants claim that Plaintiffs would suffer no harm whatsoever from denial of the requested injunction because Defendants have paused loan collections for all named Plaintiffs. But, as explained above (*supra* Section III.A.1.a) a preliminary injunction cannot be defeated purely on the basis of voluntary cessation, especially where, as here, Defendants' only represent that they are not currently collecting on the loans, not that they will not collect on the loans until the issue is decided by the Court.

Defendants do not contest that a preliminary injunction enjoining them from collecting on the relatively small amounts owed by Dillman Clinic and Odom would cause them harm. Instead, Defendants speculate that a preliminary injunction could be used by other providers to stop Defendants from collecting on their TFAP loans. Defendants fail to explain how exactly other Providers could achieve this, or even how

such conduct would amount to Providers holding TFAP funds "hostage" if the Court finds that Plaintiffs are likely to prevail on the merits of their claim. Defendants also fail to present any evidence that, even if such a speculative outcome should come to pass, it would cause substantial harm to Defendants, nor could they. Defendants admit that $3.5 billion in TFAP loans remain outstanding. Sidwell Decl. ¶ 9. While certainly a large sum, it is a mere 12% of UHG's $29.1 billion cash on hand.[20] Thus even accepting Defendants' speculative assertions of harm as true, the harms that Dillman Clinic and Odom would suffer if a preliminary injunction is denied, outweigh the harms that Defendants would experience as a result.

### 4.    Plaintiffs' Requested Relief is Necessary to Prevent Further Harm to the Public.

Defendants argue that Plaintiffs are not at risk of their loans being collected and, as such, the public is not at risk of harm by a lack of medical care if Plaintiffs' Motion for Preliminary Injunction is not granted. As argued above, Plaintiffs' harm is not speculative; Plaintiffs are at continued and sustained risk of being unable to keep their doors open if the Court does not grant the relief they seek. *See supra* Section III.A.1.b. Defendants further argue that the public has an interest in enforcing valid contracts. Plaintiffs agree. If this Court finds the TFAP Agreements are enforceable, Plaintiffs have argued that it should enforce the contract consistent with Plaintiffs' interpretation— serving the public interest by finding that the repayment of the TFAP loans is not due until all relevant payments have been processed. *See Mercy Health Servs.-Inc. v.*

---

[20] *Unitedhealth Group Inc.*, CNBC (Jan. 28, 2025), https://www.cnbc.com/quotes/UNH (last accessed April 1, 2025).

*Efstratiadis,* 579 F. Supp. 3d 1096, 1117 (N.D. Iowa 2022) (finding that the "public interest is served in the enforcement of valid contracts" and "by increasing the availability of qualified medical providers," and noting that "the parties do not dispute that [clauses] are valid").

Defendants further argue that if Plaintiffs' relief is granted, no programs similar to the TFAP will be offered in the future as Defendants have been greatly harmed to the tune of "$9 billion in interest-free, fee-free loans…for over a year" which "Plaintiffs seek to continue to hold in hock." Defs.' Opp. at 44. While it is well and good for Defendants to now tout their generosity in offering these funds without interest or fees, had Defendants followed cybersecurity 101, Defendants would have had no need to offer the loans in the first place. Plaintiffs are not asking for anything that they are not already entitled to, which is the right to repay the loans once they are put back in the position that they would have been in but for Defendants' data breach and Service Shutdown—a state of play that will be achieved once payments on all relevant, valid claims are being processed.

Plaintiffs are not yet in a position to repay the TFAP funds over a year after their inception largely because of how long Defendants' Service Shutdown lasted and Defendants' lack of transparency regarding when Providers could expect to have their claims processed. Plaintiffs do not seek to permanently retain funds received to temporarily offset Provider losses; once their businesses have returned to "normal," Providers intend to fulfill their obligations under the TFAP Agreements.

### B.    Plaintiffs' Declaratory Judgment Motion Is Procedurally Proper and Aligns with the TFAP Agreement's Plain Terms.

Defendants argue that Plaintiffs' Motion for Declaratory Judgment is improper because (1) motions for declaratory judgment are a procedurally improper vehicle; (2) Plaintiffs purportedly did not seek declaratory relief in their pleadings; (3) Plaintiffs should have sought to amend the CAC to seek declaratory relief; and (4) Plaintiffs seek to circumvent the requirements of Rule 23. This Court should reject all of these arguments.

Defendants first assert that declaratory judgment may not be brought by motion as such motions are inconsistent with the federal rules. Defendants cite a number of cases to support this contention. But many of these purported authorities are not relevant to the instant Motion for Declaratory Judgment, as those cases are limited to instances in which the plaintiffs did not seek declaratory relief in their pleadings. For example, in *I.E.C. ex rel. J.R. v. Minneapolis Pub. Sch., SSD No. 1*, the court denied the plaintiff's motion for declaratory judgment because the plaintiff was limited to the claims in its pleadings and had not included a claim for declaratory judgment in the complaint. 970 F. Supp. 2d 917, 922 (D. Minn. 2013) (holding that plaintiff could not "simply incorporate a claim" for declaratory judgment plead in a related case where the same parties were "not named as party defendants, into an entirely different case").

Unlike the plaintiffs in the cases on which Defendants rely, Plaintiffs in the instant dispute did plead declaratory judgment in the CAC. Although Defendants assert that Plaintiffs failed to file an appropriate pleading to maintain an action for declaratory judgment (*see* 28 U.S.C. § 2201) they are wrong. Plaintiffs specifically plead relief from

repayment of the TFAP loans along with other claims for injunctive relief. *See also* CAC ¶¶ 459(6) (seeking injunctive relief "precluding Defendants' further demands for repayment of the TFAP loans until payments impacted during the service disruption period have been processed"), 514 (Plaintiffs are "entitled to an injunction precluding Defendants' further demands for repayment of TFAP loans until payments impacted during the service disruption have been processed"), pp.199-200, "Request for Relief", ¶ (m) (requesting injunctive relief including "forgiving (in whole or part) loans or advances made by Change Health Defendants to Providers (including NCPA members) in the wake of the Ransomware Attack"); ¶(f) (Plaintiffs "respectfully request the following relief: […] Plaintiffs be granted the declaratory and injunctive relief sought herein"). Finally, although not specific to the TFAP Agreements, Plaintiffs' CAC does set out a claim for Declaratory Judgment. *See* CAC ¶¶ 645-49. As such, the CAC contains sufficient pleadings to maintain an action for declaratory judgment.

But even if the Court were to find that Plaintiffs' Motion for Declaratory Judgment is inherently procedurally faulty, it should not deny the motion outright and should instead treat it as a motion for summary judgment on an action for a declaratory judgment. *See Int'l Bhd. Of Teamsters v. E Conference of Teamsters,* 160 F.R.D. 452, 456 (S.D.N.Y. 1995). The *Int'l Bhd. Of Teamsters* court found that a motion for declaratory judgment can be construed instead as a motion for summary judgment on an action for declaratory judgment. This is consistent with the committee note to Federal Rule of Civil Procedure 57 "Declaratory Judgment"—which "govern[s] the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201"— that states the "fact that a

declaratory judgment may be granted 'whether or not further relief is or could be prayed' indicates that declaratory relief is alternative or cumulative and not exclusive or extraordinary." Fed. R. Civ. P. 57 (citations omitted). Further, the committee note makes it clear that declaratory judgment "operates frequently as a summary proceeding, justifying docketing the case for early hearing as on a motion." *Id.* Thus, when this Court finds that a motion for declaratory judgment is inherently procedurally faulty, it should treat the motion as a motion for summary judgment on an action for a declaratory judgment. *See I.E.C. ex rel. J.R.*, at 92, (quoting *Fusco v. Rome Cable Corp.*, 859 F.Supp. 624, 828 (N.D.N.Y Aug. 4, 1994) (noting that a declaratory judgment may, "in the interest of justice", be construed as a motion under Rule 56)). The Court should, therefore, do so in this case in the event it finds that Plaintiffs' Motion for Declaratory Judgment is inherently procedurally faulty.

Defendants also argue that Plaintiffs' Motion for Declaratory Judgment would effectively permit Plaintiffs to improperly amend the CAC. But, as stated above, the CAC is full of allegations that support the type of relief sought in Plaintiffs' motion for declaratory judgment. And again, if the Court finds that this motion is better treated as a motion for summary judgment, it should nonetheless rule on its merits pursuant to Rule 56. In any case, amending the CAC would be unnecessary.

Finally, Defendant argues that Plaintiffs' Motion for Declaratory Judgment seeks to circumvent the requirements of Rule 23 by seeking class-wide relief via contract interpretation. Plaintiffs find this argument perplexing as neither their Motion for Declaratory Judgment nor Motion for Preliminary Injunction are sought on a class-wide

basis. Plaintiffs, therefore, neither address Defendants' arguments that class certification and class relief—which are premature at this stage of litigation—nor Defendants' arguments on the merits of Rule 23.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motions for Preliminary Injunction and Declaratory Judgment.

Dated: May 1, 2025

    *s/Daniel E. Gustafson*
Daniel E. Gustafson (#202241)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza
120 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
dgustafson@gustafsongluek.com

*Plaintiffs' Overall Lead Counsel*

Shawn M. Raiter
**LARSON-KING LLP**
30 East Seventh Street, Suite 2800
St. Paul, MN 55101
Telephone: (651) 312-6500
sraiter@larsonking.com

*MDL Liaison Counsel*

E. Michelle Drake (#387366)
**BERGER MONTAGUE**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Telephone: (612) 594-5933
emdrake@bm.net

Norman E. Siegel
**STUEVE SIEGEL HANSON LLP**
460 Nichols Road, Suite 200
Kansas City, Missouri 64112

Telephone: (816) 714-7100
siegel@stuevesiegel.com

Warren Burns
**BURNS CHAREST LLP**
900 Jackson Street, Suite 500
Dallas, TX 75202
Telephone: (469) 458-9890
wburns@burnscharest.com

*Provider Track Co-Lead Counsel*