## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re: CHANGE HEALTHCARE, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 24-3108 (DWF/DJF) |

| | |
|---|---|
| This Document Relates to:<br><br>Total Care Dental and Orthodontics, et al., *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.      Civil No. 25-179 (DWF/DJF)<br><br>UnitedHealth Group Incorporated, et al.,<br><br>Defendants.<br><br>and<br><br>Odom Sports Medicine P.A. *d/b/a* Odom Health & Wellness, *on behalf of itself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.      Civil No. 25-949 (DWF/DJF)<br><br>UnitedHealth Group Incorporated, et al.,<br><br>Defendants. | **MEMORANDUM OPINION AND ORDER** |

## INTRODUCTION

This matter is before the Court on three motions: (1) Plaintiffs Dillman Clinic and

Lab, Inc. ("Dillman Clinic") and Odom Sports Medicine P.A.'s ("Odom") motion for

preliminary injunction (MDL No. 24-3108 (Doc. No. 276), Civil No. 25-179 (Doc.

No. 45), Civil No. 25-949 (Doc. No. 6) (collectively, "Prelim. Inj. Mot.")); (2) Provider

Plaintiffs'[1] motion for declaratory judgment (MDL No. 24-3108 (Doc. No. 289), Civil

No. 25-179 (Doc. No. 59) (collectively, "Decl'y J. Mot.")); and (3) Provider Plaintiffs'

motion for court supervision of communications between Defendants[2] and the putative

class[3] (MDL No. 24-3108 (Doc. No. 283), Civil No. 25-179 (Doc. No. 52) (collectively,

"Ct. Super. Mot.")).  Defendants oppose all motions.  (MDL No. 24-3108 (Doc. No. 332),

Civil No. 25-179 (Doc. No. 70), Civil No. 25-949 (Doc. No. 16) (collectively, "Opp'n

Prelim. Inj. & Decl'y J. Mots."); MDL No. 24-3108 (Doc. No. 336), Civil No. 25-179

(Doc. No. 74) (collectively, "Opp'n Ct. Super. Mot.").)  For the reasons set forth below,

the Court denies as moot the motion for preliminary injunction, denies the motion for

declaratory judgment, and grants the motion for court supervision.

---

[1]      "Provider Plaintiffs" refers to all plaintiffs in *Total Care Dental and Orthodontics, et al. v. UnitedHealth Group Incorporated, et al.*, Civil No. 25-179.

[2]      For purposes of this Order, "Defendants" refers to all defendants in *Total Care Dental and Orthodontics, et al. v. UnitedHealth Group Incorporated, et al.*, Civil No. 25-179.

[3]      For purposes of this Order, the "putative class" is limited to putative class members of the proposed provider class action.  *See Total Care Dental & Orthodontics, et al. v. UnitedHealth Grp. Inc., et al.*, Civil No. 25-179.

## BACKGROUND

### I.    Temporary Funding Assistance Program

Change Healthcare ("Change") operates an Electronic Data Interchange clearinghouse through which healthcare providers and payers communicate regarding healthcare service claims (the "Platform").  (Civil No. 25-179 (Doc. No. 1 ("Providers' CAC") ¶¶ 34, 42, 49-50).)  On February 21, 2024, Change discovered that its Platform had been breached by cyber-attackers (the "Cyberattack").  (MDL No. 24-3108 (Doc. No. 333), Civil No. 25-179 (Doc. No. 71), Civil No. 25-949 (Doc. No. 17) (collectively, "Sidwell Decl.") ¶ 3.)  To contain the Cyberattack, Change took the Platform offline (the "Shutdown").  (Providers' CAC ¶¶ 4, 65.)  While the Shutdown was in effect, providers that utilized the Platform were unable to verify insurance, determine copays, submit claims, or receive payment.  (*Id.* ¶ 5.)  This lack of payment had numerous financial repercussions for providers, including the inability to make payroll and rent or mortgage payments.  (*Id.* ¶¶ 6, 9.)

To mitigate the impact of the Cyberattack and the subsequent Shutdown, Change implemented the Temporary Funding Assistance Program ("TFAP").  (Sidwell Decl. ¶ 3.)  The TFAP's stated purpose was to "provide [impacted providers] with temporary funding assistance to provide [impacted providers] with funds that [they] may have otherwise received but for the disruption in processing of electronic healthcare transactions, claims processing and administrative services and payments operations of Change Healthcare."  (MDL No. 24-3108 (Doc. No. 292 ¶ 3, Ex. A ("TFAP Agreement") at 2).)  As of April 1,

2025, Defendants had advanced approximately $9.03 billion in temporary loans to over

10,000 providers nationwide.  (Sidwell Decl. ¶ 8.)

The terms of these loans were set out in an agreement provided to the loan

recipients.[4]  (*Id.* ¶ 6.)  The Repayment section of the TFAP Agreement states:

> (a)  Repayment.  Recipient agrees to pay the total Funding Amount disbursed
> to Recipient in full within forty-five (45) business days of receiving notice
> that the Funding Amount is due ("Repayment Date").  CHC will send notice
> to the Recipient that the Funding Amount is due after claims processing
> and/or payment processing services have resumed and payments impacted
> during the service disruption period are being processed.  In the event of a
> failure to repay CHC the full Funding Amount due on the Repayment Date,
> CHC may seek repayment as outlined in Section 5(b).

> (b)  Rights upon Failure to Repay.  In the event Recipient fails to pay the total
> Funding Amount by the Repayment Date, the Recipient acknowledges and
> agrees that CHC and/or its parents or subsidiaries may:  (i) demand
> immediate repayment of the Funding Amount; (ii) offset the Funding
> Amount due from any claims or claims payments that are processed or
> otherwise owed to the Recipient through CHC, Optum Inc., its parent
> companies, affiliates, or its subsidiaries, and (iii) enforce any other rights and
> remedies available to it under this Agreement in equity or in law.  In the event
> that any amount remains unpaid following all attempts at collections, CHC
> reserves the right to treat any outstanding amount as a taxable payment to
> Recipient and to report such amount to the Internal Revenue Service and any
> State Department of Revenue or Taxation as applicable.

(*Id.* ¶ 5.)

These terms of the TFAP Agreement are in dispute in the current litigation (the

"multi-district litigation" or "MDL").  In the Provider Plaintiffs' consolidated class action

complaint (the "Providers' CAC"), Provider Plaintiffs allege that Defendants breached

---

[4]    All TFAP loan recipients had the same contract with Change, including Plaintiffs
Dillman Clinic and Odom.  (Opp'n Prelim. Inj. & Decl'y J. Mots. at 14 n.2.)

the contract "by demanding repayment of TFAP loans before payments impacted during the service disruption were processed, and by threatening to offset[] claims payments for temporary funding repayments."  (Providers' CAC ¶ 510.)  Provider Plaintiffs request "an injunction precluding Defendants' further demands for repayment of TFAP loans until payments impacted during the service disruption period have been processed" to remedy that alleged breach.  (*Id.* ¶ 514.)  In response, Defendants filed a motion to dismiss (MDL No. 24-3108 (Doc. No. 253), Civil No. 25-179 (Doc. No. 38)), arguing that the unambiguous contract terms allow Defendants to collect the TFAP loans now (MDL No. 24-3108 (Doc. No. 261), Civil No. 25-179 (Doc. No. 39) at 34-38).  That motion will be heard on June 12, 2025.  (*See* MDL No. 24-3108 (Doc. No. 265).)

While the motion to dismiss is pending, Defendants have paused collection efforts as to the named Plaintiffs.  (MDL No. 24-3108 (Doc. No. 335), Civil No. 25-179 (Doc. No. 73), Civil No. 25-949 (Doc. No. 19) (collectively, "Ryan Decl.") ¶ 2, Ex. A at 2.)  Collection efforts as to the putative class are ongoing.  (*See id.*)  As part of the communications with putative class members regarding repayment, "certain Defendants have agreed to offset certain providers' claims for alleged damages against TFAP loan amounts," meaning that "parties have agreed to a release of claims that the parties might possess."  (Sidwell Decl. ¶ 17.)

## II.    Plaintiff Dillman Clinic

Dillman Clinic is an internal medicine and pediatric practice in Lakeville, Minnesota.  (MDL No. 24-3108 (Doc. No. 279), Civil No. 25-179 (Doc. No. 48), Civil No. 25-949 (Doc. No. 10) (collectively, "Dillman Decl.") ¶ 4.)  It was founded in

September 2021 and opened to patients in June 2022. (*Id.*) Dillman Clinic provides essential medical care, including vaccinations. (*Id.* ¶ 5.) It also has an in-house laboratory, allowing test results to be discussed with patients at the same appointment. (*Id.*)

At the time of the Cyberattack, Dillman Clinic utilized the Change Platform as its clearinghouse for submitting and processing medical claims. (*Id.* ¶ 6.) During the Shutdown, Dillman Clinic was unable to submit claims to insurers or receive payment for care provided. (*Id.* ¶ 7.) The Shutdown also impacted Dillman Clinic's ability to take on new patients, resulting in fewer patient visits per week. (*Id.* ¶ 12.) To date, Dillman Clinic still has payments impacted by the Shutdown that have not been processed. (*Id.* ¶ 13.) Additionally, Richard Dillman ("Dillman"), Dillman Clinic's Chief Executive Officer, estimates that approximately $4,704 in claims payments were denied as untimely because Dillman Clinic could not submit them during the Shutdown. (*Id.* ¶ 14.)

Dillman Clinic utilized TFAP to cover these financial losses. (*Id.* ¶ 8.) Between April 9, 2024, and September 27, 2024, Dillman Clinic received $157,600.00 in funds from TFAP. (*Id.* ¶ 9.)

Dillman Clinic and Defendants[5] have communicated multiple times regarding repayment of these funds. On November 4, 2024, Defendants emailed Dillman demanding repayment of the full balance of $157,600.00 by January 10, 2025. (*Id.* ¶ 11,

---

[5]    Communications came from various subsidiaries of UnitedHealth Group, Inc., primarily Optum. Because the distinction is not legally relevant at this stage of litigation, the Court refers to UnitedHealth Group and its subsidiaries collectively as "Defendants."

Ex. B.)  On November 11, 2024, Defendants emailed Dillman setting forth a payment

plan requiring full repayment by May 5, 2025, with the first payment due on December 4,

2024.  (*Id.* ¶ 16.)  Concerned about Dillman Clinic's inability to repay the loan, Dillman

emailed Defendants on November 22, 2024, informing them that Dillman Clinic

"continue[d] to face significant financial strain directly resulting from the disruptions

caused by the cyberattack," and that "repaying the debt in full or in accordance with the

repayment schedule" was unrealistic and could jeopardize the practice's sustainability.

(*Id.* ¶ 17 (alteration in original).)  Defendants replied acknowledging the message and

indicating that someone would review the issue and contact Dillman, but Defendants

never responded.  (*Id.* ¶ 18.)  Then, on January 15, 2025, Defendants emailed Dillman

asking for immediate, full repayment within five business days.  (*Id.* ¶ 19, Ex. C.)  This

email warned that failure to pay as requested could result in claim offsetting to cover the

balance.  (*Id.*)  Dillman again contacted Defendants to express concern but received no

response.  (*Id.* ¶ 20.)  Finally, on January 24, 2025, Defendants emailed Dillman

informing him that payment was past due, and that Change would start withholding

payment on United Healthcare claims the following week.[6]  (*Id.* ¶ 21, Ex. D.)  None of

the communications from Defendants mentioned the ongoing multi-district litigation.

(*Id.* ¶ 22.)

---

[6]    Defendants contend that this communication was sent in error, as collection efforts
had been paused at that point.  (Opp'n Prelim. Inj. & Decl'y J. Mots. at 28 n.4.)

Dillman Clinic is currently unable to repay the loan balance. Dillman Clinic's current cash reserves of approximately $40,000 would not cover the full balance. (*Id.* ¶ 25.) And Dillman believes it would be unlikely to obtain another loan due to being a young practice and having a lack of existing credit lines. (*Id.* ¶ 26.) Dillman asserts that repayment of the loan—whether in lump sum payment or via claim offsets—would put Dillman Clinic in a precarious financial situation. Dillman asserts that claim offsetting would "decimate[]" Dillman Clinic's finances and would "likely result in bankruptcy" because United Healthcare insurers make up about a quarter of Dillman Clinic's total payments. (*Id.* ¶ 24.) Specifically, Dillman Clinic would be unable to hire the additional employees necessary to accommodate patients and would need to cut current staff's pay. (*Id.* ¶¶ 30-31.) Loan repayment risks Dillman Clinic shutting down or filing for bankruptcy. (*Id.* ¶ 33.)

Repayment of the loan would also impact Dillman Clinic's patient care. Specifically, the clinic would be unable to purchase the necessary medical supplies, have to forgo or delay crucial and high-demand pediatric vaccines, and need to shut down the on-site lab. (*Id.* ¶¶ 27-29.) Further, Dillman Clinic would be forced to transition from essential medical procedures to elective procedures to maximize cash flow. (*Id.* ¶ 32.) Dillman believes that this diminished patient care would result in a loss of patient goodwill. (*Id.* ¶ 29.)

Defendants have now paused collection efforts as to Dillman's loan. (Sidwell Decl. ¶¶ 12, 25.) This is part of the voluntary pause that applies to all named plaintiffs in the MDL. (Ryan Decl. ¶ 2, Ex. A at 2.)

8

### III.     Plaintiff Odom

Odom is a rehabilitation provider located in Eden Prairie, Minnesota. (MDL No. 24-3108 (Doc. No. 280), Civil No. 25-179 (Doc. No. 49), Civil No. 25-949 (Doc. No. 9) (collectively, "Adiukwu Decl.") ¶¶ 4-5.) Odom opened in 2005. (*Id.* ¶ 4.) Odom operates through two divisions, both of which predominantly serve geriatric patients in senior housing communities and senior care facilities. (*Id.* ¶¶ 1, 5.) Odom Health and Wellness offers medical and general wellness treatments such as rehabilitation, nutrition counseling, and personal training. (*Id.* ¶ 5.) Odom Rehab offers physical, occupational, and speech therapy to improve quality of life. (*Id.*)

At the time of the Cyberattack, Odom utilized the Change Platform as its clearinghouse for submitting and processing medical claims. (*Id.* ¶ 7.) During the Shutdown, Odom was unable to submit claims to insurers or receive payment for care provided. (*Id.* ¶ 8.) Odom's providers and management team diverted time from patient care to navigate the response to the Shutdown, resulting in fewer patient care appointments. (*Id.* ¶¶ 9, 15.) Odom also hired a new biller to help with the response. (*Id.* ¶¶ 9, 17.) Additionally, Odom had relocated in January 2024 and promotional outreach in the new location was hindered. (*Id.* ¶¶ 9, 15.) Ugonma Adiukwu, Odom's Controller and Chief Financial Officer, estimates that these impacts resulted in approximately $485,000 in lost revenue, and at least $700,000 in net deficit. (*Id.* ¶ 10.)

Odom utilized TFAP to cover these financial losses. (*Id.* ¶ 11.) In the spring and summer of 2024, Odom received $569,680.00 in TFAP funds. (*Id.* ¶ 12.)

Odom and Defendants have had multiple communications regarding repayment of these funds. On October 28, 2024, Defendants emailed Adiukwu requesting full repayment by January 2, 2025. (*Id.* ¶ 20, Ex. C.) With no way to pay back that large sum by the deadline, on November 7, 2024, Adiukwu called Defendants to request a delayed repayment schedule. (*Id.* ¶¶ 20-21.) Defendants offered a six-month repayment plan with a twenty-five percent initial payment on January 31, 2025, which was confirmed in writing that same day. (*Id.* ¶ 21; *id.* ¶ 22, Ex. D.) Adiukwu rejected that offer. (*Id.* ¶ 21.) On December 19, 2024, Odom's legal counsel emailed Defendants asking that Defendants withdraw their payment requests indefinitely. (*Id.* ¶ 24, Ex. E.) On January 7, 2025, Defendants emailed Adiukwu asking for immediate, full repayment within five business days. (*Id.* ¶ 25, Ex. F.) This email warned that failure to pay as requested could result in claim offsetting to cover the balance. (*Id.*) Defendants sent a substantially similar email on January 13, 2025. (*Id.* ¶ 26, Ex. G.) On January 14, 2025, Defendants emailed Adiukwu informing him that payment was past due, and that United Healthcare would start withholding claims payments beginning on January 13, 2025.[7] (*Id.* ¶ 27, Ex. H.) Defendants sent an identical email the following day, January 15, 2025. (*Id.* ¶ 27, Ex. I.) On February 26, 2025, Defendants' counsel emailed a letter to Odom's counsel asserting that Defendants were "well within their rights to seek repayment of TFAP funds from Odom," but offering a pause on repayment if Odom supplied

---

[7]    The record is unclear as to whether Defendants intended to list January 13, 2025, the day before the email was sent.

documentation of the alleged harms impacting Odom's ability to repay the loan.  (*Id.* ¶ 28, Ex. J.)  None of the communications from Defendants mentioned the ongoing multi-district litigation.  (*Id.* ¶ 29.)

Adiukwu asserts that the impacts of the Shutdown continue to this day.  (*Id.* ¶¶ 14, 30.)  In direct costs, Adiukwu estimates that Odom has yet to be paid for approximately $235,000 in claims that have yet to be processed, and that approximately $18,095 in claims were denied by United Healthcare as untimely.  (*Id.* ¶¶ 18-19.)

Adiukwu asserts that repayment of the loan—whether in lump sum payment or via claim offsets—would put Odom in a precarious financial situation.  Adiukwu believes Odom would be unlikely to secure another loan to cover repayment because of the impact of its decreased cash flow on its creditworthiness.  (*Id.* ¶ 31.)  If forced to repay the full balance, Odom would not be able to pay its staff, resulting in closure.  (*Id.* ¶ 32.)  Even with a repayment plan, Odom would need to cut at least twenty-two providers from staff.  (*Id.*)  Cutting providers from staff, or shutting down entirely, would result in inability to see some patients.  (*Id.*)  Additionally, this loss of patients would cause Odom to lose industry market share.  (*Id.*)  Loan repayment risks Odom shutting down or filing for bankruptcy.  (*Id.* ¶ 33.)

Defendants have now paused collection efforts as to Odom's loan.  (Sidwell Decl. ¶¶ 12, 35.)  This is a voluntary pause that began once Odom filed suit.  (*Id.* ¶ 35.)

## DISCUSSION

### I.    Motion for Preliminary Injunction

First, Plaintiffs Dillman Clinic and Odom move to enjoin "Defendants from taking any action against Plaintiffs Dillman Clinic and Odom relating to [TFAP] loans until the Court has had an opportunity to consider and determine Providers Plaintiffs' claims for Defendants' breach of the TFAP contracts and declaratory relief on the merits." (Prelim. Inj. Mot. at 2.) The Court denies this motion as moot because the conduct has been voluntarily ceased and Defendants have shown that collection efforts are not reasonably expected to restart.

Generally, "a defendant cannot automatically moot a case simply by ending its unlawful conduct once sued." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citing *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). However, voluntary cessation of the conduct does render a motion for preliminary injunction moot "if subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). The "formidable burden" of persuading "the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth*, 528 U.S. at 189-90.

Defendants have met their burden. There is no dispute that Defendants have voluntarily paused collection efforts as to Dillman Clinic and Odom. (Sidwell Decl. ¶ 12;

*see also* MDL No. 24-3108 (Doc. No. 342), Civil No. 25-179 (Doc. No. 76) (collectively,

"Reply Prelim. Inj. & Decl'y J. Mots.") at 12.)  Dillman Clinic and Odom emphasize that

Defendants' phrasing only confirms a current pause on collection efforts, not a promise of

a pause in the future.  This concern was addressed at oral argument when Defendants

stated on the record that they would not restart collection efforts on the named plaintiffs'

loans until the merits of TFAP loan collection are decided.  (*See* MDL No. 24-3108 (Doc.

No. 356), Civil No. 25-179 (Doc. No. 84), Civil No. 25-949 (Doc. No. 27) (collectively,

"Pls.' Mots. Hr'g").)  Dillman Clinic and Odom are also concerned that demands for

repayment were not rescinded.  (Reply Prelim. Inj. & Decl'y J. Mots. at 13.)  The Court

understands that Dillman Clinic and Odom need such reassurance.  To remedy this, the

Court orders Defendants to send a letter to each provider for which they stopped

collecting funds that (1) confirms the pause, (2) rescinds previous payment demands, and

(3) clarifies that they will not collect until the merits of TFAP loan collection efforts have

been adjudicated and the Court finds that collection may continue.  Defendants agreed to

do so on the record.  (*See* Pls.' Mots. Hr'g.)  Defendants' promises to the Court,

combined with Defendants' conduct demonstrating that they have not attempted to collect

since the relevant cases were filed,[8] makes it absolutely clear that collection efforts as to

Dillman Clinic and Odom are not reasonably expected to restart.  Dillman Clinic and

Odom's concern is fully addressed.  The motion is denied as moot.

---

[8]     Defendants sent an email to Dillman on January 24, 2025, after the Providers' CAC was filed, but Defendants explained that it was sent in error.  (*See supra* note 6.)

## II.    Motion for Declaratory Judgment

Second, all Provider Plaintiffs seek an order declaring that TFAP loan repayment is only triggered after claims processing services have resumed and all impacted payments are fully processed, and ordering Defendants to pause collection efforts until the repayment timeline is resolved.  (Decl'y J. Mot.)  The Court denies this motion because it is procedurally deficient.

Declaratory judgment can only be brought as an action, not as a motion.  *See* Fed. R. Civ. P. 57 (considering an "action" for declaratory judgment); *see, e.g.*, *I.E.C. ex rel. J.R. v. Minneapolis Pub. Schs., SSD No. 1*, 970 F. Supp. 2d 917, 925 (D. Minn. 2013); *Allen v. Reid*, No. 15-cv-1905, 2016 WL 7670606, at *7 (D. Minn. Nov. 29, 2016), *adopted by* 2017 WL 102963 (D. Minn. Jan. 10, 2017).  Provider Plaintiffs did not bring this request for declaratory judgment in the Providers' CAC.  The only explicit request for declaratory judgment in the Providers' CAC is limited to security measures. (Providers' CAC ¶¶ 645-49.)  Provider Plaintiffs argue that they "specifically plead relief from repayment of the TFAP loans along with other claims for injunctive relief."  (Reply Prelim. Inj. & Decl'y J. Mots. at 35-36 (citing Providers' CAC ¶¶ 459(6), 514).)  While such a request does implicate contract interpretation, it does not specifically ask the Court for declaratory judgment.  Without a specific request in the Providers' CAC, the Court cannot order the requested declaratory judgment.

Alternatively, Provider Plaintiffs encourage the Court to look past any procedural deficiency and treat the motion for declaratory judgment as a motion for summary judgment.  *(Id.* at 36-37 (citing *Int'l Bhd. of Teamsters v. E. Conf. of Teamsters*, 160

14

F.R.D. 452, 456 (S.D.N.Y. 1995); *Fusco v. Rome Cable Corp.*, 859 F. Supp. 624, 628

(N.D.N.Y. 1994)).)  Courts that look past the procedural issues of a motion for

declaratory judgment do so in the interest of justice.  *E.g.*, *Fusco*, 859 F. Supp. at 628

("Despite this procedural irregularity, in the interest of justice, the court will construe this

alternative motion as also seeking relief under [Rule] 56."); *I.E.C. ex rel. J.R*, 970

F. Supp. 2d at 925 (citing *Fusco* before analyzing the motion under the summary

judgment framework).  Here, there is no such need.  As stated, the dispute over the TFAP

Agreement interpretation will be heard next month.  Provider Plaintiffs will get an answer

on the contract interpretation and the impact on payment collection then.  Justice does not

require that this issue be decided now.  For this reason and the procedural error, the

motion for declaratory judgment is denied.

## III.    Motion for Court Supervision

Third, Provider Plaintiffs move for court supervision of Defendants'

communications with putative class members.  (Ct. Super. Mot.)  Specifically, Provider

Plaintiffs seek:  (1) a prospective notice from Defendants informing providers with whom

Defendants communicate of (a) the existence of the putative class action, (b) the contact

information for Plaintiffs' Counsel, (c) the existence of Provider Plaintiffs' breach of

contract claim related to TFAP loan collection, and (d) the effect of a release or

settlement; (2) a curative notice from Defendants to providers with whom Defendants

have previously communicated with the same four categories of information; and

(3) disclosures from Defendants to the Court and Plaintiffs' Lead Counsel of any

communications with putative class members.  (MDL No. 24-3108 (Doc. No. 285), Civil

No. 25-179 (Doc. No. 54) at 14-15.)  The Court grants this motion but modifies the breadth of the notices and disclosures.

### A.    Legal Standard

Defendants have a First Amendment right to communicate with the putative class members, including for purposes of settlement.  *See In re Target Corp. Customer Data Sec. Breach Litig.*, No. 14-md-2522, 2015 WL 2165432, at *1 (D. Minn. May 7, 2015) (citing *In re Baycol Prods. Litig.*, No. 01-md-1431, 2004 WL 1058105, at *3 (D. Minn. May 3, 2004) ("[S]ince no . . . class has yet been certified, Defendants have a right to negotiate settlements with prospective class members." (first alteration in original))). That said, a court has the discretion, and sometimes the duty, to govern such communications.  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981) ("Because of the potential for abuse, a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties."); *see also Manual for Complex Litigation (Fourth)* § 21.12 (2004) [hereinafter MCL 4th] ("Rule 23(d) authorizes the court to regulate communications with potential class members, even before certification.").

A court only has such authority over communications if there is "actual or threatened misconduct of a serious nature."  *Great Rivers Coop. of Se. Iowa v. Farmland Indus., Inc.*, 59 F.3d 764, 766 (8th Cir. 1995).  Serious misconduct includes providing false or misleading information, intimidating the prospective class, and attempting to influence a putative class member's decision to seek exclusion from the class.  *See* MCL 4th § 21.12; *see, e.g.*, *St. Barnabas Hosp., Inc. v. Ovation Pharms., Inc.*,

No. 09-cv-1375, 2010 WL 11574952, at *1 (D. Minn. June 24, 2010) (applying the *Manual for Complex Litigation*'s standard); *In re Target Corp.*, 2015 WL 2165432, at *1 (defining misconduct warranting intervention as that which is "misleading or coercive").

A court's use of authority over communications requires a clear record and specific findings of serious misconduct that reflect the need for a restraint on speech. *Gulf Oil*, 452 U.S. at 101; *Great Rivers*, 59 F.3d at 766. Additionally, the restraint must be narrowly tailored to limit speech only as much as is necessary. *Gulf Oil*, 452 U.S. at 102; *Great Rivers*, 59 F.3d at 766. When a class has not been certified, a defendant's right to communicate with the putative class is stronger, and the tailoring of a court's intervention must accommodate and respect that right. *See St. Barnabas Hosp.*, 2010 WL 11574952, at *2.

### B.    Analysis

#### 1.    Actual or Threatened Serious Misconduct

##### a.    Misleading

Provider Plaintiffs first argue that failure to mention the ongoing MDL, and, specifically, the dispute over the Defendants' right to collect under the TFAP loans, to the putative class before obtaining a release amounts to misleading communication sufficient to find serious misconduct. The Court agrees.

Obtaining releases from putative class members without informing them that a proposed class action has been filed is the textbook definition of abusive communications between defendants and putative class members. MCL 4th § 21.12 ("Direct communications with class members . . . can lead to abuse. For example, defendants

17

might attempt to obtain releases from class members without informing them that a proposed class action complaint has been filed." (footnote omitted)).  This sort of communication is a "half-truth," a "representation[] that state[s] the truth only so far as it goes, while omitting critical qualifying information."  *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 188-89 (2016).  The Supreme Court has held that half-truths can be actionable misrepresentations.  *Id.*

Defendants' communications present their right to collect loans immediately as a fact.  (*See* Dillman Decl. ¶ 11, Ex. B ("The obligation and expectation that the funds under [TFAP] would be repaid by participating providers upon the restoration of services has been consistently articulated in all program materials and communications.  Since we have restored the connectivity of our systems, the service disruption has ended for most clients, and we are requesting repayment."); Adiukwu Decl. ¶ 20, Ex. C (same).)[9]  It is true that Defendants have a right to collect on TFAP loans, but when that right is triggered is in dispute.  While the motion to dismiss the TFAP claim is still pending, the question of contract interpretation is unresolved.  By omitting the critical qualifying

---

[9]    The fact that Defendants secured releases from potential MDL claimants without mentioning the MDL is supported by a clear record.  Defendants' own submissions reflect that "[i]n unique and limited circumstances, certain Defendants have agreed to offset certain providers' claims for alleged damages against TFAP loan amounts that those providers received," and that, "[i]n these limited instances, the parties have agreed to a release of claims that the parties might possess."  (Sidwell Decl. ¶ 17.)  Further, instead of rebutting Provider Plaintiffs' contention that Defendants omit reference to the MDL, Defendants contend that communications regarding TFAP loan repayment are not related to litigation matters and that there is no obligation to reference ongoing civil actions.  (*Id.* ¶ 15; Opp'n Ct. Super. Mot. at 12).

information of the dispute over TFAP loan collection, Defendants tell a half-truth.  The Court finds that this is misleading.  *Cf. Friedman v. Intervet Inc.*, 730 F. Supp. 2d 758, 762-63 (N.D. Ohio Aug. 6, 2010) (collecting cases in which failure to mention litigation to a putative class member before obtaining a release was found to be intervenable misconduct).

Defendants respond that widespread media coverage of this MDL means that the putative class is already aware of the claims and, therefore, reference to the MDL in communications is unnecessary.  But media coverage does not guarantee that a provider has knowledge of the MDL, let alone the claims specific to TFAP loans.  And, even if all putative class members are aware of the litigation, that does not guarantee they have enough understanding of the claims contained in the 208-page consolidated complaint to fully understand how the release impacts them.  A notice serves to clarify any confusion to avoid the misleading nature of the communication.

### b.    Coercive and Intimidating

Provider Plaintiffs also argue that Defendants' communications are coercive and intimidating because Defendants are soliciting releases by threatening the providers with claim offsetting if loans are not repaid.  Provider Plaintiffs are especially concerned about this communication due to the ongoing business relationship between Defendants and providers.  While the Court acknowledges the pressure that putative class members may feel to settle their claims, the Court does not find the communications to be coercive or intimidating.  There is no evidence in front of the Court that demonstrates that Defendants are soliciting releases.  Defendants contend, and the Court has no reason to

believe otherwise, that settlement of loan balances in return for release of claims is only

mentioned after a putative class member reaches out to Defendants for a payment plan.

(Sidwell Decl. ¶ 17.)  Additionally, the putative class members are not signing away their

rights for nothing; they are benefitting from loan forgiveness or payment plans.

However, the Court warns Defendants that utilizing the potential of claim offsetting to

obtain releases toes the line of coercion and the Court may step in if Defendants cross

that line.

### 2.   Narrowly Tailored Solution

Having found the serious misconduct sufficient to exercise its authority over

Defendants' communications with the putative class, the Court now decides what

corrective conduct is necessary.  The Court is careful to limit its influence over

communications only to what is necessary to correct the misleading nature of Defendants'

communications, especially because this is a putative class.  The Court does not order

Defendants to stop communicating with the putative class—Defendants have a right to

continue communication with the putative class, subject to the following.

### a.   Future Notices

The Court orders Defendants to include the following message in all future

communications regarding a release of claims in exchange for TFAP loan forgiveness or a

delay on TFAP loan collection:

> Please be advised that the timing of payment collection on the Temporary Funding
> Assistance Program (TFAP) loans is currently being disputed in ongoing federal,
> multi-district litigation in the District of Minnesota.  Signing this release will
> prevent your involvement in that litigation.  You may wish to consult an attorney
> before signing.  That lawsuit is titled:  *In re:  Change Healthcare, Inc. Customer*

20

*Data Security Breach Litigation*, Case No. 24-md-3108.  You can find information, including contact information for Plaintiffs' counsel, on the District of Minnesota's website:  https://www.mnd.uscourts.gov/content/change-healthcare-inc-data-breach.

The Court emphasizes that this is a carefully drawn order, *see Gulf Oil*, 452 U.S. at 102, that only goes so far as to address the misleading aspect of the communication: the omission of the pending TFAP dispute in this MDL.  This notice need only be included when a release of claims is discussed in exchange for TFAP loan forgiveness or a delay on TFAP loan collection.  Defendants need not include this notice if they are negotiating a payment plan for a TFAP loan when that negotiation does not implicate a release of claims, nor in any other context.  Such tailoring is appropriate when, as here, a defendant has engaged in misleading but not coercive or intimidating behavior.  *Cf. Friedman*, 730 F. Supp. 2d at 766 (ordering defendants to notify all putative class members from whom defendants sought release from the putative class action).

The Court sees two main justifications for this compelled speech:  (1) it will fulfill the Court's obligation to the putative class and (2) it will legitimize any release obtained by ensuring that the release was entered into knowingly.  First, the Court has a duty to ensure that putative class members are aware of an ongoing class action.  *See* Fed. R. Civ. P. 23(d) (granting courts broad discretion "to protect class members and fairly conduct the action"); *see also, e.g.*, *Tillis v. Glob. Fixture Servs. Inc.*, No. 19-cv-1059, 2020 WL 1443490, at *7 (S.D. Tex. Mar. 23, 2020) (emphasizing the importance informing potential class members of a class action lawsuit); *Gutierrez v. Johnson & Johnson*, No. 01-cv-5302, 2003 WL 26477887, at *3 (D.N.J. Apr. 3, 2003) ("Common sense

dictates that in order to protect [putative class members'] rights, the putative members be informed of the existence of the [lawsuit] and the identity of the attorneys for the plaintiffs, as well as the fact that it is a class action, and that they may be a part of the class.").

Second, these notices will further the interests of justice by preventing litigation over the validity of releases. Releases signed without knowledge of ongoing litigation are at risk of being invalidated later. *See F.G. v. Coopersurgical, Inc.*, No. 24-cv-1261, 2024 WL 2274448, at *3 (N.D. Cal. May 20, 2024) (collecting cases in which the court invalidated the agreements for omitting information or otherwise misleading the putative class members). Inclusion of the above notice in communications about releases of claims ensures that releases are made knowingly.

Defendants' concern that such notices will harm any putative class members who "prefer to communicate directly with Defendants regarding their contracts" by delaying Defendants' ability to satisfy payment plan requests is unfounded. (*See* Opp'n Ct. Super. Mot. at 11-12.) The compelled notice will not prevent Defendants from communicating with a putative class member. The Court sees no reason why adding the paragraph above to communications is unduly burdensome. Similarly, Defendants' concern that the notice will harm their reputation and relationship with customers is mitigated by the narrow tailoring that mandates inclusion of the notice only when a release of claims is discussed in exchange for TFAP loan forgiveness or a delay on TFAP loan collection. And if, as Defendants say, putative class members are already aware of the MDL, then there is no harm in confirming that knowledge.

The Court finds that ordering Defendants to include the above notice in any communication with a putative class member regarding a release of claims in exchange for TFAP loan forgiveness or a delay on TFAP loan collection is the minimum necessary to protect the rights of the putative class and avoid misleading communication, while not unduly infringing on Defendants' right to communicate with the putative class.

### b.    Corrective Notices

The Court also orders Defendants to send the following notice to providers from whom they have already obtained a release of claims in exchange for TFAP loan forgiveness or a delay on TFAP loan collection:

> Please be advised that the release of claims you signed prevents you from participating in the ongoing federal, multi-district litigation in the District of Minnesota.  The release includes a release from claims in that litigation which concern the timing of payment collection on the Temporary Funding Assistance Program (TFAP) loans.  That lawsuit is titled: *In re: Change Healthcare, Inc. Customer Data Security Breach Litigation*, Case No. 24-md-3108.  You can find information, including contact information for Plaintiffs' counsel, on the District of Minnesota's website: https://www.mnd.uscourts.gov/content/change-healthcare-inc-data-breach.

Again, the Court emphasizes that this notice need only be sent to providers who have signed a release of claims in exchange for TFAP loan forgiveness or a delay on TFAP loan collection.  Defendants need not send this notice to any provider who did not sign a release, nor any provider with whom Defendants communicated in any other context.

The same justifications from above apply here.  First, corrective notices will ensure that all putative class members have knowledge of the ongoing litigation, fulfilling the Court's duty to the putative class.  Second, the interests of justice are served by

prompting any inquiry into the validity of the releases in a timely fashion.  If, as Defendants contend, all providers who signed releases were aware of the MDL, then sending this notice will not void any release signed previously.  These releases will instead serve to confirm that putative class members have knowledge of the MDL. However, if there are providers who signed these releases without knowledge of the ongoing MDL, this notice provides those putative class members with the opportunity to challenge any such release in a timely fashion.

The Court finds that ordering Defendants to send the above corrective notice to all putative class members from whom Defendants have obtained a release of claims in exchange for TFAP loan forgiveness or a delay on TFAP loan collection is the minimum necessary to protect the rights of the putative class, while not unduly infringing on Defendants' right to communicate with the putative class.

### c.    Disclosures

Finally, the Court orders Defendants to disclose to the Court and Plaintiffs' Lead Counsel[10]:  (1) a list of all putative class members from whom Defendants have obtained a release of claims to date; and (2) all future releases of claims obtained from a putative class member.

Notably, this disclosure is not limited to releases in exchange for TFAP loan forgiveness or a delay on TFAP loan collection.  The Court has a duty to putative class

---

[10]    For purposes of these disclosures, Plaintiffs' Lead Counsel includes the Overall Lead Counsel, Provider Track Co-Lead Counsel, and Provider Track Plaintiff Steering Committee.  (*See* MDL No. 24-3108 (Doc. No. 83).)

members and named plaintiffs to monitor the conduct of parties and ensure that the litigation progresses smoothly. *See* Fed. R. Civ. P. 23(d). Additionally, Plaintiffs' Lead Counsel has a fiduciary duty to the putative class. *See* Fed. R. Civ. P. 23(g) (discussing duty of class counsel); *see, e.g.*, *Jones v. Casey's Gen. Stores*, 517 F. Supp. 2d 1080, 1084 (S.D. Iowa 2007) ("[C]ounsel owes a fiduciary duty to putative class members even prior to class certification . . . ."). The Court believes that these broader disclosures will promote efficient management of the MDL and fulfill the duties of the Court and Plaintiffs' Lead Counsel to the putative class.

However, this Order is still carefully drawn. Defendants need not alert the Court or Plaintiffs' Lead Counsel of all communications regarding a release of claims, only those which actually result in a release. This is a narrower disclosure than that ordered in other cases. *Cf. F.G.*, 2024 WL 2274448, at *5 (ordering disclosure of all communications regarding settlement or release, even those which did not result in release).

In conclusion, the Court has a clear record with specific findings of serious misconduct in the communications between Defendants and the putative class. Defendants' right to communicate with putative class members, including for purposes of settlement, may therefore be regulated by the Court. Because the Court found the conduct to be misleading, but not coercive or intimidating, the Court's regulation of conduct is relatively minor. The Court has narrowly tailored compelled language to limit the infringement on Defendants' rights while protecting putative class members from misleading statements.

## CONCLUSION

The Court denies Plaintiffs Dillman Clinic and Odom's motion for preliminary injunction as moot because Defendants have voluntarily ceased TFAP loan collection efforts and have agreed to certain measures ensuring that collection will not restart until Defendants' right to collect has been adjudicated. The Court denies Provider Plaintiffs' motion for declaratory judgment because such a claim was not brought in the Providers' CAC and justice does not require the Court to adjudicate the issue now. Finally, the Court grants Provider Plaintiffs' motion for court supervision of communications between Defendants and the putative class because Defendants have engaged in misleading communications. However, the Court modifies Provider Plaintiffs' proposed notices and disclosures.

## ORDER

Based upon the foregoing and the record in this case, **IT IS HEREBY ORDERED** that:

1.    Plaintiffs Dillman Clinic and Lab, Inc. and Odom Sports Medicine P.A.'s motions for preliminary injunction (MDL No. 24-3108 (Doc. No. [276]), Civil No. 25-179 (Doc. No. [45]), Civil No. 25-949 (Doc. No. [6])) are **DENIED AS MOOT**.

2.    Provider Plaintiffs' motions for declaratory judgment (MDL No. 24-3108 (Doc. No. [289]), Civil No. 25-179 (Doc. No. [59])) are respectfully **DENIED**.

3.    Provider Plaintiffs' motions for court supervision of communications between Defendants and the putative class (MDL No. 24-3108 (Doc. No. [283]), Civil No. 25-179 (Doc. No. [52])) are **GRANTED** as follows:

a.      Defendants are ordered to include the future notice stated above in communications with all putative class members with whom Defendants communicate about a release of claims in exchange for TFAP loan forgiveness or a delay on TFAP loan collection.

b.      Defendants are ordered to send the corrective notice stated above to all putative class members from whom Defendants have obtained a release of claims in exchange for TFAP loan forgiveness or a delay on TFAP loan collection.

c.      Defendants are ordered to disclose to the Court and to Plaintiffs' Lead Counsel a list of all putative class members from whom Defendants have obtained a release of claims to date.

d.      Defendants are ordered to notify the Court and Plaintiffs' Lead Counsel of all future releases of claims obtained from a putative class member.

Dated:  May 21, 2025                          s/Donovan W. Frank
                                                          DONOVAN W. FRANK
                                                          United States District Judge