## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re:  CHANGE HEALTHCARE, INC. CUSTOMER DATA SECURITY BREACH LITIGATION | MDL No. 24-3108 (DWF/DJF) |
| This Document Relates to All Provider Actions | **MEMORANDUM OPINION AND ORDER** |

### INTRODUCTION

This matter is before the Court on Defendants'[1] motion to dismiss (Doc. No. 253)

the master complaint filed by Provider Plaintiffs[2] (Doc. No. 407 ("Compl.")).[3]  Provider

---

[1]    "Defendants" refers to:  UnitedHealth Group Incorporated ("UHG"); UnitedHealthCare Services, Inc. ("UHCS"); Optum Insight; Change Healthcare Inc. ("Change Healthcare"); Change Healthcare Operations, LLC ("CHO"); Change Healthcare Solutions, LLC ("CHS"); Change Healthcare Holdings, Inc. ("CHH"); Change Healthcare Technologies, LLC ("CHT"); Change Healthcare Pharmacy Solutions, Inc. ("CHPS"); Optum, Inc. ("Optum"); Optum Financial, Inc. ("Optum Financial"); Optum Bank; and Optum Pay.  (Compl. at 5-6.)

Change Healthcare, CHO, CHS, CHH, CHT, and CHPS are referred to collectively as "Change."  (*Id.* at 5.)  Change, with UHG, UHCS, and Optum Insight, are referred to collectively as "Change Health Defendants."  (*Id.*)  Optum, Optum Financial, Optum Bank, and Optum Pay are referred to collectively as "Optum Financial Defendants."  (*Id.* at 6.)

[2]    "Provider Plaintiffs" refers to:  Total Care Dental and Orthodontics ("Total Care"); Ridge Eye Care, Inc. ("Ridge"); H. Lee Moffitt Cancer Center and Research Institute Hospital, Inc. ("Moffitt"); Magnolia Medical Clinic, P.A. ("Magnolia"); K. Wade Foster, M.D., P.A. *d/b/a* Florida Dermatology and Skin Cancer Centers ("Florida Dermatology"); Pediatric Clinic, Ltd. ("Pediatric Clinic"); Revival Therapy, P.C. ("Revival"); Compounding Pharmacies of Louisiana, Inc. *d/b/a* Professional Arts Pharmacy ("Professional Arts"); York Hospital ("York"); Laura Cotton LICSW ("Cotton"); H & R Medical Practice, P.C. ("H & R"); Irwin Counseling Service, PLLC ("Irwin"); Beginnings and Beyond Counseling *d/b/a* Play Therapy Minnesota ("Play Therapy");

Plaintiffs oppose the motion.  (Doc. No. 328.)  For the reasons set forth below, the Court

grants in part and denies in part the motion.

## BACKGROUND

This MDL stems from a cyberattack on Change Healthcare's network and the

resulting data breach.  Individual patients and healthcare providers from across the

country sued Change Healthcare and various parent and partner organizations.  Those

cases were then consolidated in the District of Minnesota for pretrial purposes by the

Judicial Panel on Multidistrict Litigation.  (Doc. No. 1.)

## I.     The Change Platform

Change Healthcare is a healthcare data company.  (Compl. ¶¶ 1-2, 31.)  Change

Healthcare operates a platform through which healthcare providers and payers

communicate regarding healthcare service claims, and which facilitates data transfers

---

Dillman Clinic and Lab, Inc. ("Dillman"); Hackensack Meridian Health, Inc.
("Hackensack"); Advanced Cardiology of South Jersey, P.C. ("Advanced Cardiology");
AMB Medical Services *d/b/a* DocCare ("DocCare"); Western New York Retina
("Western"); Knox Community Hospital ("Knox"); Cultivating Mind LLC ("Cultivating
Mind"); Wiemer Family Podiatry LLC ("Wiemer"); Kaitlin Heckman LLC ("Heckman");
MedCare Pediatric Group, LP ("MedCare Group"); MedCare Pediatric Therapy, LP
("MedCare Therapy"); MedCare Pediatric Rehab Center, LP ("MedCare Rehab");
MedCare Pediatric Nursing, LP ("MedCare Nursing"); and the National Community
Pharmacists Association ("NCPA").  (Compl. at 5.)

Plaintiff Bay Area Therapy Group a Marriage and Family Counseling Corp.'s
claims were voluntarily dismissed.  (Doc. No. 226.)

[3]     The motion was originally filed to dismiss the consolidated class action complaint
filed in *Total Care Dental & Orthodontics et al. v. UnitedHealth Group Inc. et al.*,
No. 25-cv-179.  The Court directed Plaintiffs to file the complaint directly onto the
docket for this multi-district litigation ("MDL").  (*See* Doc. No. 403.)

between healthcare providers and insurers for purposes of both clinical decision-making and payment processing (the "Platform").  (*Id.* ¶¶ 1, 31, 50.)  That data exchange occurs through an Electronic Data Interchange ("EDI") clearinghouse.  (*Id.* ¶ 42.)

The Platform is the largest clearinghouse in the United States.  (*Id.* ¶ 1.)  The Platform processes approximately 15 billion healthcare transactions annually, representing over half of medical claims and totaling approximately $2 trillion[4] in claims. (*Id.* ¶¶ 1, 50.)  Additionally, Change Healthcare has exclusive payer arrangements with many large health plans, including some states, Aetna, BlueCross/Blue Shield, Kaiser, and Medicaid.  (*Id.* ¶ 49.)  These exclusive payer arrangements means that a provider must submit a claim through Change's Platform.  (*Id.*)  Providers can connect with Change Healthcare either directly or through a third-party intermediary.  (*Id.* ¶ 46.)

This work requires Change Healthcare to collect vast amounts of data, including personally identifiable information ("PII") and protected health information ("PHI"), collectively, "Private Information."  (*Id.* ¶¶ 2, 44-45.)  Change claims to have primary and secondary use rights over this data.  (*Id.* ¶ 52.)  In 2021, Optum Insight estimated that Change had the data rights of approximately 90 million Americans annually.  (*Id.*)

## II.    The Cyberattack

On February 12, 2024, cybercriminals breached Change Healthcare's network (the "Cyberattack").  (*Id.* ¶¶ 3, 57.)  The Cyberattack was orchestrated by a ransomware group

---

[4]    The Individual Plaintiffs' complaint states that the Platform processes approximately $1.5 trillion in medical claims.  (Doc. No. 406 ¶ 165.)  This discrepancy is not important to the resolution of the pending motion.

called ALPHV, a group notorious for targeting healthcare entities. (*Id.* ¶¶ 54-55, 153, 236-43.)

First, ALPHV used the user credentials of a low-level employee, found in a group chat that advertises the sale of stolen credentials to cybercriminals, to access a remote portal of Change Healthcare's network. (*Id.* ¶¶ 56-57.) Once in the network, the cybercriminals created privileged accounts with administrator capabilities. (*Id.* ¶ 60.) They then used those administrator accounts to install malware tools and "backdoors" to ensure continued access to the network if Change Healthcare discovered their activity and attempted to block access. (*Id.* ¶ 61.)

While in the network, ALPHV exfiltrated data (the "Data Breach"). (*Id.* ¶ 62.) The data stolen included the Private Information of over 190 million[5] patients. (*Id.*) This data included military personnel PII; medical records; dental records; payment information; claims information; patient PII such as phone numbers, emails, addresses, and Social Security numbers; source code files; and insurance records. (*Id.*) This constitutes the largest healthcare ransomware attack in the United States. (*Id.* ¶ 3.)

---

[5]    The complaint alleges that the data of "tens of millions of individuals" was exfiltrated. (Compl. ¶ 62; *see also id.* ¶ 86 (explaining impact and citing website where numbers are regularly updated).) Defendants' most recent estimate is that approximately 192.7 million individuals were impacted. *Change Healthcare Cybersecurity Incident Frequently Asked Questions*, U.S. Dep't of Health & Hum. Servs. (Mar. 14, 2025), https://www.hhs.gov/hipaa/for-professionals/special-topics/change-healthcare-cybersecurity-incident-frequently-asked-questions/index.html. The Court properly considers this update because it is embraced by the complaint. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

ALPHV then posted the exfiltrated data on the dark web, where it remained for approximately one week. (*Id.* ¶ 80.)

On February 21, 2024, nine days after the initial access, ALPHV deployed ransomware which blocked Defendants' access to Change Healthcare's networks. (*Id.* ¶¶ 63-64.) Defendants did not discover ALPHV's activity until this deployment. (*Id.* ¶ 63.)

To regain control of Change Healthcare's systems and decrypt the stolen data, ALPHV demanded a $22 million ransom from UHG, which UHG paid. (*Id.* ¶ 80.) Provider Plaintiffs allege that this ransom payment was ineffective because ALPHV did not destroy the data and ALPHV's affiliate retains the data. (*Id.* ¶¶ 81-85.) Indeed, a ransomware group has confirmed that it possesses four terabytes of the stolen data, posted screenshots of that data on the dark web, and attempted to extort more money from Defendants. (*Id.* ¶ 84.)

## III.    The Shutdown

Upon learning of the Cyberattack, UHG isolated the impacted systems and took Change Healthcare's systems, including the Platform, offline to prevent any further damage (the "Shutdown"). (*Id.* ¶¶ 4, 65-67.)

Change Health Defendants alerted providers to the Cyberattack and the need to take the Platform offline but did not make clear to providers how long the Shutdown would persist. (*Id.* ¶ 111.) They initially told providers that it would last "at least through the day," and later said medical claims would resume processing the week of March 18th. (*Id.* ¶¶ 112, 116.) However, the Platform was inoperable for weeks and still

not fully restored months later.  (*Id.* ¶¶ 68, 75, 87-88, 121-27.)  Indeed, Provider Plaintiffs

allege that the Change Healthcare systems are still not fully restored.  (*Id.* ¶¶ 7, 91.)

During the Shutdown, providers that utilized the Platform were unable to verify

insurance, determine copays, submit claims, or receive payment.  (*Id.* ¶¶ 5-6, 90, 96-107.)

Billions of dollars in reimbursement were delayed for months, leaving providers unable

to make payroll and rent or mortgage payments.  (*Id.* ¶¶ 5-6, 9, 73-74, 93.)  Problems

persist even now that the Platform is mostly operative because some claims from during

the Shutdown were denied as untimely.  (*Id.* ¶¶ 103-04.)

The Shutdown also impacted providers' ability to provide care.  (*Id.* ¶¶ 95,

105-06.)  For example, pharmacies were unable to confirm insurance and fill

prescriptions.  (*Id.* ¶ 5.)  Thus, patients went without essential care.  (*Id.* ¶¶ 69, 71-72,

93.)

## IV.  Security Measures

Provider Plaintiffs allege that the Cyberattack was the result of deficient security

measures on Change Healthcare's network.  (*Id.* ¶ 3.)

First, the portal to Change Healthcare's network did not use multi-factor

authentication ("MFA").  (*Id.* ¶¶ 8, 191.)  MFA is an identity verification method which

requires at least two pieces of information to gain access.  (*Id.* ¶¶ 187-88.)  MFA is an

effective way to prevent cyberattacks and widely recommended by experts.  (*Id.*

¶¶ 192-96.)  Further, the failure to implement MFA was a violation of Change Health

Defendants' own policies.  (*Id.* ¶ 199.)  Due to the lack of MFA, ALPHV was able to

more easily access the portal.  (*Id.* ¶¶ 58, 198.)  Indeed, ALPHV typically begins a hack

by "obtaining login credentials and exploiting systems that do not have MFA."  (*Id.* ¶ 250.)  UHG CEO Andrew Witty admitted that the lack of MFA allowed ALPHV to access the network.  (*Id.* ¶ 78.)

Second, the data stored by Change Healthcare was not encrypted.  (*Id.* ¶ 260.) Multiple federal agencies recommend encrypting Private Information to protect data even after a breach.  (*Id.* ¶¶ 256-58.)  The network's lack of encryption made it easier for ALPHV to view the data it exfiltrated.  (*See id.* ¶ 262.)

Third, the system did not implement sufficient internal monitoring.  (*Id.* ¶¶ 220, 228-30.)  Internal monitoring includes analyzing network usage to flag suspicious activity and identify system vulnerabilities.  (*Id.* ¶¶ 222-24.)  Cybersecurity experts and the Health Insurance Portability and Accountability Act ("HIPAA") encourage internal monitoring.  (*Id.* ¶¶ 225-27, 251.)  This lack of sufficient internal monitoring is allegedly the reason that ALPHV was in the system for nine days undetected.  (*Id.* ¶ 228.)  ALPHV installed software, ran administrator-only commands, and exfiltrated terabytes of data— all actions that should have been flagged by a monitoring system.  (*See id.* ¶ 229.)

Fourth, Change Healthcare did not segment its systems.  (*Id.* ¶¶ 209, 212.)  Data segmenting is the process of creating silos of data and software to prevent lateral movement within a system and protect the other silos if one silo is breached.  (*Id.* ¶ 210.) Cybersecurity guidance encourages such segmentation.  (*Id.* ¶ 211.)  Segmenting systems could have prevented ALPHV from accessing other areas of the network from the original access point and the Shutdown could have been avoided.  (*Id.* ¶¶ 212-14.)

Fifth, the network did not limit employees' access to the minimum necessary.  (*Id.* ¶ 207.)  Minimum necessary access means that a user is only granted access to data and systems which are necessary for their job and blocked from those which are not.  (*Id.* ¶ 200.)  Federal law and industry standards require application of this principle.  (*Id.* ¶¶ 201-03.)  Had minimum necessary access been implemented, ALPHV would not have been able to use the low-level employee's credentials to create an administrative profile. (*Id.* ¶¶ 204-06.)

Sixth, Change did not back up the data properly.  (*Id.* ¶¶ 216-18.)  A data backup is a duplication of data which protects data if the original version is impacted.  (*Id.* ¶ 215.) Backup is recommended for healthcare organizations.  (*Id.* ¶ 216.)  Change Healthcare did have a backup, but it was not separate from the main data, so ALPHV was able to access and disable both.  (*Id.* ¶ 218.)  Had Change Healthcare kept the backup separate, the Shutdown would not have been necessary.  (*Id.* ¶ 219.)

Provider Plaintiffs allege that Defendants knew about the risks of having deficient cybersecurity because healthcare companies are particularly at risk of cyberattacks.  (*Id.* ¶¶ 146-53, 185.)  For example, UHG experiences over 450,000 intrusion attempts each year.  (*Id.* ¶ 76.)  In acknowledgement of this risk, Change Health Defendants made statements about the security of their systems.  (*Id.* ¶¶ 151-52, 163.)  In contracts with providers, Change represented that it would protect Private Information and comply with federal data security law.  (*Id.* ¶ 165.)  Optum Insight and UHG made similar contractual commitments.  (*Id.* ¶¶ 167-68.)  Additionally, the respective companies' policies represented that they would protect data.  (*Id.* ¶¶ 170-74.)

## V.    The Temporary Funding Assistance Program

To mitigate the impact of the Shutdown, Defendants implemented the Temporary Funding Assistance Program ("TFAP").  (*Id.* ¶¶ 10, 136.)  The TFAP's stated purpose was to "provide [impacted providers] with temporary funding assistance to provide [them] with funds that [they] may have otherwise received but for the disruption in processing of electronic healthcare transactions, claims processing and administrative services and payments operations of Change Healthcare."  (Doc. No. 262, Ex. B ("TFAP Agreement") at 2.)[6]  Optum Financial Defendants disbursed nearly $9 billion in loans to providers through the TFAP.  (Compl. ¶ 145.)  Certain Provider Plaintiffs were among those who contracted with Defendants to receive these loans (the "Loan Plaintiffs").[7]  (*Id.* ¶¶ 270, 277, 303, 309, 345, 359, 370, 376, 395, 420, 426, 432.)

The terms of these loans were set out in an agreement provided to the loan recipients.  The Repayment section of the TFAP Agreement states:

> (a)    Repayment.  Recipient agrees to pay the total Funding Amount disbursed to Recipient in full within forty-five (45) business days of receiving notice that the Funding Amount is due ("Repayment Date").  CHC will send notice to the Recipient that the Funding Amount is due after claims processing and/or payment processing services have resumed and payments impacted during the service disruption period are being processed.  In the event of a failure to repay CHC the full Funding Amount due on the Repayment Date, CHC may seek repayment as outlined in Section 5(b).

---

[6]    The Court properly considers the TFAP Agreement because it is embraced by the complaint.  *See Porous Media Corp.*, 186 F.3d at 1079.

[7]    The Loan Plaintiffs are:  Total Care; Ridge; Florida Dermatology; Pediatric Clinic; Irwin; Dillman; Advanced Cardiology; DocCare; Cultivating Mind; MedCare Therapy; MedCare Rehab; and MedCare Nursing.  (Compl. ¶ 500.)

(b)  Rights upon Failure to Repay.  In the event Recipient fails to pay the total Funding Amount by the Repayment Date, the Recipient acknowledges and agrees that CHC and/or its parents or subsidiaries may:  (i) demand immediate repayment of the Funding Amount; (ii) offset the Funding Amount due from any claims or claims payments that are processed or otherwise owed to the Recipient through CHC, Optum Inc., its parent companies, affiliates, or its subsidiaries, and (iii) enforce any other rights and remedies available to it under this Agreement in equity or in law.  In the event that any amount remains unpaid following all attempts at collections, CHC reserves the right to treat any outstanding amount as a taxable payment to Recipient and to report such amount to the Internal Revenue Service and any State Department of Revenue or Taxation as applicable.

(TFAP Agreement ¶ 5.)  Witty interpreted this language to mean that UHG would not "ask[] for repayment until providers determined their business is back to normal." (Compl. ¶ 142.)  Defendants are now recollecting on these loans.  (*Id.* ¶ 11.)

## VI.    The Class Action

### A.    Claims

Provider Plaintiffs subsequently filed this consolidated class action complaint on behalf of themselves and all others similarly situated.  (*Id.* ¶ 263.)  Each Provider Plaintiff utilized the Platform for claims processing, either via a direct contract or through a third-party intermediary.  (*Id.* ¶¶ 267, 274, 281, 288, 293, 300, 306, 313, 319, 325, 331, 336, 342, 349, 356, 362, 367, 373, 380, 386, 392, 399, 405, 411, 417, 423, 429; *see also id.* ¶ 435 (alleging that NCPA members relied on Change Health Defendants' services).)  The putative class includes providers whose business operations were disrupted by the Shutdown.  (*Id.* ¶ 263)

They bring the following claims:  negligence (Count I); negligence per se (Count II); breach of contract (Count III); breach of TFAP contract (Count IV); unjust

enrichment (Count V); interference with prospective economic advantage, business

relationship, or expectancy (Count VI); negligent interference with economic advantage

(Count VII); negligent omission (Count VIII); negligent misrepresentation (Count IX);

fraudulent inducement (Count X); public nuisance (Count XI); violation of seven state

consumer protection laws (Counts XII-XVIII)[8]; and declaratory judgment (Count XIX).

(*Id.* ¶¶ 447-649.)

### B.    Defendants

These claims are brought against UHG, UHCS, Optum Insight, Change

Healthcare, CHO, CHS, CHH, CHT, CHPS, Optum, Optum Financial, Optum Bank, and

Optum Pay.  (Compl. at 5-6.)

UHG is a vertically integrated healthcare company comprised of United

Healthcare Insurance Co. ("UHIC"), Optum Health, Optum Insight, and Optum Rx.  (*Id.*

¶ 18; *see also id.*, Ex. A (UHG organizational chart).)  UHG is incorporated in Delaware

and has its principal place of business in Minnesota.  (*Id.* ¶ 17.)  UHG exercises control

over Change Healthcare's cybersecurity and was directly involved in the response to the

Cyberattack.  (*Id.* ¶¶ 17, 33.)

---

[8]    Violation of the Minnesota Protection of Consumer Fraud Act (Count XII); violation of the California Unfair Competition Law (Count XIII); violation of the Florida Deceptive and Unfair Trade Practices Act (Count XIV); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count XV); violation of the Massachusetts Regulation of Business Practice and Consumer Protection Act (Count XVI); violation of the New Jersey Consumer Fraud Act (Count XVII); and violation of the New York Deceptive Practices Act (Count XVIII).

UHCS is a direct subsidiary of UHG, which oversees UHIC and the Optum brand. (*Id.* ¶ 19.) UHCS's principal place of business and state of incorporation are both Minnesota. (*Id.*) Providers who participated in the TFAP were directed to send payment to UHCS. (*Id.*)

Optum Insight is a data analytics and technology company. (*Id.* ¶ 20.) Optum Insight is a direct subsidiary of UHCS and operates in conjunction with Change Healthcare. (*Id.* ¶¶ 20, 32.) Providers received correspondence from Optum Insight in response to messages they sent to Change Healthcare regarding the Shutdown. (*Id.* ¶ 20.) At the time of the merger with Change Healthcare, Optum Insight operated an EDI clearinghouse, processing 192 million claims annually. (*Id.* ¶ 34.) Optum Insight is incorporated in Delaware and its principal place of business is Minnesota. (*Id.* ¶ 20.)

Change Healthcare is a subsidiary of UHG that is operated as part of Optum Insight. (*Id.* ¶¶ 21, 31-33.) Change Healthcare maintained the Platform. (*Id.*) Change Healthcare is incorporated in Delaware and its principal place of business is Tennessee. (*Id.* ¶ 21.)

CHO is a subsidiary and contracting entity of Change Healthcare. (*Id.* ¶ 22.) To acquire a TFAP loan, providers were required to enter into an agreement with CHO. (*Id.*) CHO is incorporated in Delaware and its principal place of business is Tennessee. (*Id.*)

CHS is a subsidiary of CHO which provides software to health plans and providers. (*Id.* ¶ 23.) CHS is one of the contracting entities for providers to access the Platform. (*Id.*) CHS is incorporated in Delaware, has its principal place of business in Tennessee, and is registered to do business in Minnesota. (*Id.*)

CHH is another subsidiary of Change Healthcare. (*Id.* ¶ 24.) CHH is incorporated in Delaware and its principal place of business is Tennessee. (*Id.*) A subsidiary of CHH listed Optum's Minnesota address as CHH's address when registering for business in Minnesota. (*Id.*)

That subsidiary of CHH is CHT. (*Id.*) CHT is one of the contracting entities for providers to access the Platform. (*Id.* ¶ 25.) CHT is incorporated in Delaware and its principal place of business is Minnesota. (*Id.*)

CHPS is a subsidiary of Change Healthcare which handles pharmacy benefits. (*Id.* ¶ 26.) CHPS is one of the contracting entities for providers to access the Platform. (*Id.*) CHPS is incorporated in Maine, its principal place of business is Tennessee, and it is registered to do business in Minnesota. (*Id.*)

Optum is a subsidiary of UHCS and a holding company for the health services business. (*Id.* ¶ 27.) Optum is incorporated in Delaware and its principal place of business is in Minnesota. (*Id.*) TFAP repayment demands used Optum letterhead. (*Id.*)

Optum Financial is a subsidiary of Optum which offers healthcare finance solutions to people and organizations. (*Id.* ¶ 28.) Optum Financial is incorporated in Delaware and its principal place of business is Minnesota. (*Id.*)

Optum Bank is a subsidiary of Optum Financial which offers or administers health spending accounts. (*Id.* ¶ 29.) Optum Bank is incorporated and has its principal place of business in Utah. (*Id.*)

Optum Pay[9] is a platform that helps providers with claims payments.  (*Id.* ¶ 30.)
Providers accessed and managed TFAP loans through Optum Pay accounts.  (*Id.* ¶¶ 30,
138.)

## DISCUSSION

### I.     Choice of Law

As a preliminary issue, the parties dispute which substantive law applies to the
claims, so the Court addresses choice of law.[10]  Generally, federal courts analyze choice
of law under the forum state's laws.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487,
496 (1941).  However, for MDLs, the choice-of-law framework of the forum in which the
complaint was brought governs.  *See, e.g.*, *In re Bair Hugger Forced Air Warming
Devices Prods. Liab. Litig.*, 999 F.3d 534, 538 (8th Cir. 2021).  There are three relevant
transferor forums:  Minnesota,[11] Tennessee,[12] and Louisiana.[13]

---

[9]     Defendant Optum Pay is not a legal entity and therefore cannot be sued.  (*See* Doc.
No. 261 at 22 n.5.)  The Court therefore dismisses claims against Optum Pay and
terminates it as a party to the MDL.  *E.g.*, *Larson v. Dep't of Hums. Servs.*,
No. 23-cv-1832, 2024 WL 4485572, at *11 (D. Minn. May 16, 2024) ("The Court may
dismiss claims against a defendant if that defendant is not a legal entity with the capacity
to be sued.").  However, the allegations against Optum Pay are still relevant because it is
a platform used by Defendants Optum Financial and Optum Bank and Defendants
required providers to manage their TFAP loans through Optum Pay.

[10]     Provider Plaintiffs believe a choice-of-law analysis is premature, arguing that
discovery is insufficient to decide the issue.  (Doc. No. 331 at 3-4; Doc. No. 419 at 2-4.)
The Court finds it has sufficient information to decide this issue.  *See Pioneer Civ.
Constr., LLC v. Ingevity Ark., LLC*, 659 F. Supp. 3d 977, 986 (W.D. Ark. 2023).

[11]     Plaintiffs Total Care, Ridge, Magnolia, Florida Dermatology, Pediatric Clinic,
York, Cotton, H & R, Irwin, Play Therapy, Dillman, Hackensack, DocCare, Western,
Knox, Cultivating Mind, Wiemer, Heckman, MedCare Group, MedCare Therapy,

Provider Plaintiffs from each of the three transferor forums bring both tort and contract claims.[14]  For each, Provider Plaintiffs argue that Minnesota law applies, and Defendants argue that each Provider Plaintiff's home state's law applies.  (Doc. No. 255 at 2; Doc. No. 331 at 3; Doc. No. 419 at 1; Doc. No. 421 at 2.)

## A.    Minnesota Choice-of-Law Framework

Minnesota's choice-of-law framework is a three-step inquiry.  The Court (1) decides if there is a conflict between the laws of the two potential forums, (2) decides whether both laws can be constitutionally applied, and (3) weighs five factors to determine which law is more appropriately applied.  *Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co.*, 604 N.W.2d 91, 93-94, 94 n.2 (Minn. 2000).  This framework applies to both tort-law and contract-law claims.  *See Jepson v. Gen. Cas. Co. of Wis.*, 513 N.W.2d 467, 470 (Minn. 1994) (applying the framework to both contract and tort claims, and explaining the difference in application).

---

MedCare Rehab, MedCare Nursing, and NCPA originally filed in the District of Minnesota.

[12]    Plaintiffs Moffitt, Revival, and Advanced Cardiology originally filed in the Middle District of Tennessee.

[13]    Plaintiff Professional Arts originally filed in the Eastern District of Louisiana.

[14]    The following analysis applies only to contract-law claims in which a choice-of-law provision is not implicated.  For contract claims based on a contract with a choice-of-law provision, the Court will enforce that choice.  *See Combined Ins. Co. of Am. v. Bode*, 77 N.W.2d 533, 536 (Minn. 1956) (holding that contractual choice-of-law provisions are enforced in Minnesota); *Williams v. Smith*, 465 S.W.3d 150, 153 (Tenn. Ct. App. 2014) (listing the conditions necessary to uphold a contractual choice-of-law provision in Tennessee); La. Civ. Code Ann. art. 3540 (2025) (enforcing contractual choice-of-law provisions in Louisiana unless they contravene public policy).

### 1.    Conflict

"A conflict exists if the choice of one forum's law over the other will determine the outcome of the case." *Nodak*, 604 N.W.2d at 94. The parties agree there are material conflicts (Doc. No. 255 at 4; Doc. No. 331 at 5), so the Court moves to the next step in the framework. *See Am. Guarantee & Liab. Ins. Co. v. U.S. Fid. & Guar. Co.*, 668 F.3d 991, 996 n.3 (8th Cir. 2012) (accepting the parties' agreement on a conflict as sufficient to continue the analysis under Missouri's choice-of-law framework).

### 2.    Constitutionally Applied

Because an actual conflict exists, the Court must ensure the laws of each potential state can be constitutionally applied. *Jepson*, 513 N.W.2d at 469. That is, "that state must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Id.* (citation modified).

The Court finds that it can constitutionally apply the law of any state. Defendants did business with providers in every state, creating significant contacts and state interest in each. (*See* Compl. ¶¶ 49-50 (discussing the ubiquity of Change Healthcare in the American healthcare system).) Defendants could have expected litigation to occur in any location, so any substantive law can be constitutionally applied.

### 3.    Choice Influencing Factors

Third, the Court considers five "choice influencing factors" to determine which law should apply: "(1) predictability of result; (2) maintenance of interstate and international order; (3) simplification of the judicial task; (4) advancement of the forum's

governmental interest; and (5) application of the better rule of law." *Jepson*, 513 N.W.2d at 470.

"Predictability of results applies primarily to consensual transactions where the parties desire advance notice of which state law will govern in future disputes." *Myers v. Gov't Emps. Ins. Co.*, 225 N.W.2d 238, 242 (Minn. 1974). "The objective of the predictability factor is to fulfill the parties' justified expectations." *Lommen v. City of East Grand Forks*, 522 N.W.2d 148, 150 (Minn. Ct. App. 1994). Because Minnesota is the principal place of business of UHG, the entity which controlled Change's cybersecurity, it was predictable that Minnesota law would apply. *Cf. GreenState Credit Union v. Hy-Vee, Inc.*, 549 F. Supp. 3d 969, 978 (D. Minn. 2021) ("All of Hy-Vee's relevant information security employees and decision-making are located in Iowa. It is predictable that Iowa law would apply."). Similarly, because Change Healthcare processed data for providers nationwide, it was predictable that the home-state laws of potential plaintiffs would apply. *See In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 152 (S.D.N.Y. 2008) (emphasizing that parties who deliberately enter into transactions have "every reason to expect" that the law of the place in which the transactions occurred would apply). This factor is neutral.

The maintenance-of-interstate-order factor concerns whether the application of one state's law would manifest disrespect for another's sovereignty or "impede the interstate movement of people and goods." *Jepson*, 513 N.W.2d at 471. "[M]aintenance of interstate order is generally satisfied as long as the state whose laws are purportedly in conflict has sufficient contacts with and interest in the facts and issues being litigated."

*Myers*, 225 N.W.2d at 242. "The primary focus is on the contacts that each competing state has with the dispute." *Perry ex rel. Sherrell v. Beltrami County*, 520 F. Supp. 3d 1115, 1123 (D. Minn. 2021). By conducting business from and within Minnesota, Defendants had significant contacts with the state. *Cf. GreenState*, 549 F. Supp. 3d at 978 ("The actions and omissions by Hy-Vee giving rise to GreenState's claims—its data security decision-making and the actions of the information technology department—are based in Iowa."). But the Provider Plaintiffs' contact with their home states is stronger and by doing business with Plaintiffs, Defendants availed themselves of those laws. *Cf. Grand Theft Auto*, 251 F.R.D. at 152 ("[T]he application of Minnesota's law—or the law of any state other than the state of purchase—to transactions that took place throughout the nation would constitute an unwarranted infringement upon other states' sovereignty."). This factor weighs in favor of applying each Provider Plaintiff's home state's law.

The simplification-of-the-judicial-task "factor concerns the forum court's ability to discern and apply the law of another state as compared to its own law." *Lommen*, 522 N.W.2d at 152. This factor is neutral, as the Court is able to apply the law of any state. *See Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620 (8th Cir. 2001) ("A federal district court is faced almost daily with the task of applying some state's law other than that of the forum state, and it is equally capable of resolving [a] dispute under [any state's] law.").

The governmental-interest factor asks "which choice of law most advances a significant interest of the forum." *Nodak*, 604 N.W.2d at 95 (quoting *Jepson*, 513

18

N.W.2d at 472).  The Court considers the relative policy interests of the potential states. *GreenState*, 549 F. Supp. 3d at 978.  While all states have an interest in protecting nonresidents harmed in that state, that interest is outweighed by other states' interest in protecting their residents.  *See Hughes*, 250 F.3d at 621.  Therefore, this factor usually weighs in favor of the state where the injury occurred.  *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 207 (D. Minn. 2003).  Here, this factor weighs in favor of applying each Provider Plaintiff's home state's law because that is where the injury occurred and those states have an interest in protecting their residents.

The fifth factor, the "better rule of law," is given little weight and need not be considered when the choice-of-law question can be resolved using the other four factors. *Nesladek v. Ford Motor Co.*, 876 F. Supp. 1061, 1070 (D. Minn. 1994), *aff'd*, 46 F.3d 734 (8th Cir. 1995).  Because the other factors weigh in favor of applying each Provider Plaintiff's home state's law, the Court will not consider which is the "better" rule of law.

In tort-law cases, the second and fourth factors are given greater weight.  *See Perry*, 520 F. Supp. 3d at 1122-24; *Baycol*, 218 F.R.D. at 207.  However, because Provider Plaintiffs allege negligence in decision-making, this is not a typical "accidental" tort case, and the first factor is still relevant.  *GreenState*, 549 F. Supp. 3d at 977-78.  The first factor is neutral, but the second and fourth factors weigh in favor of applying each Provider Plaintiff's home state's law.  Further, for tort claims, the place of injury is especially relevant.  *See, e.g.*, *Perry*, 520 F. Supp. 3d at 1123; *Baycol*, 218 F.R.D. at 207. Provider Plaintiffs were allegedly injured in their home states.  The Court therefore holds

that the tort-law claims of each Provider Plaintiff who filed originally in Minnesota are governed by the law of the Provider Plaintiff's home state.

In contract-law cases, the first factor is given the greatest weight. *See Jepson*, 513 N.W.2d at 470. Because that factor is neutral, the Court looks to the other factors, which weigh in favor of applying each Provider Plaintiff's home state's law. The Court therefore holds that the contract-law claims of each Provider Plaintiff who filed originally in Minnesota are also governed by the law of the Provider Plaintiff's home state.

### B.    Tennessee Choice-of-Law Framework

#### 1.    Tort Claims

Tennessee follows the "most significant relationship" test from the Restatement (Second) of Conflict of Laws to decide choice of law for tort claims. *Hataway v. McKinley*, 830 S.W.2d 53, 59 (Tenn. 1992). The Restatement lists four contacts that are relevant to this analysis: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties is centered. Restatement (Second) of Conflict of Laws § 145 (A.L.I. 1971). These factors are "evaluated according to their relative importance with respect to the particular issue." *Id.*; *accord In re Numotion Data Incident Litig.*, No. 24-cv-545, 2025 WL 57712, at *6 (M.D. Tenn. Jan. 9, 2025). If a factor is irrelevant to the case, a court need not consider it. *See Radair, LLC v. Alaska Airlines, Inc.*, No. 20-cv-2286, 2022 WL 193736, at *3 (W.D. Tenn. Jan. 20, 2022).

Tennessee courts analyzing choice-of-law in data breach cases have heavily weighed a defendant's principal place of business because the defendant's conduct is the "common denominator." *Haney v. Charter Foods N., LLC*, 747 F. Supp. 3d 1093, 1107 (E.D. Tenn. 2024); *Mason v. Wright Bros. Constr. Co.*, No. 24-cv-384, 2025 WL 939709, at *4 (E.D. Tenn. Mar. 27, 2025); *Cahill v. Mem'l Heart Inst., LLC*, No. 23-cv-168, 2024 WL 4311648, at *5 (E.D. Tenn. Sep. 26, 2024). Here, Change Healthcare was based in Tennessee, but control of cybersecurity came from UHG, which was based in Minnesota. Thus, the conduct that allegedly caused injury, Defendants' cybersecurity measures and the Shutdown, occurred in Minnesota. The Court therefore holds that the tort-law claims of each Provider Plaintiff who filed originally in Tennessee are governed by Minnesota law.

### 2.    Contract Claims

Tennessee's contract choice-of-law framework is based on where the contract was executed. *E.g.*, *Williams*, 465 S.W.3d at 153. Without any contract to analyze, the Court infers that any business contract into which Provider Plaintiffs may have entered would be in Minnesota because control of the Platform came from Minnesota-based UHG and Optum. Additionally, to access the Platform, providers may contract with CHS, CHT or CHPS. Those Defendants operate in Tennessee or Minnesota and are all registered to do business in Minnesota. The Court therefore finds that Minnesota law is properly applied to the contract-law claims of each Provider Plaintiff who filed originally in Tennessee. However, if specific contracts are produced during discovery that show they were executed elsewhere, the Court reserves the right to apply that state's law.

21

For the implied-contract claims, Tennessee courts look to where the contractual duties were bestowed and where the alleged breach occurred.  *See Haney*, 747 F. Supp. 3d at 1107; *Cahill*, 2024 WL 4311648, at *5.  The implied-contract claims are also properly considered using Minnesota law because contractual duties were bestowed on Minnesota companies and the alleged actions were taken in Minnesota.

### C.    Louisiana Choice-of-Law Framework

Louisiana's choice-of-law analysis is mandated by statute.  *See* La. Civ. Code Ann. arts. 3537-41 (2025) (contracts); *id.* arts. 3542-48 (torts).  The general approach is comparative impairment, meaning that a court should apply the law of the state with policies that would be most seriously impaired if its law were not applied.  *Id.* arts. 3537, 3542.  Louisiana-based Plaintiff Professional Arts's claims center on Change Health Defendants' deficient data security measures and their decision to disconnect the Platform.  Because the cybersecurity measures were being controlled from Minnesota and the Shutdown decision was made by Minnesota-based UHG, the Court will compare Minnesota and Louisiana laws for the comparative impairment analysis.

### 1.    Tort Claims

Generally, the choice of law for torts claims is governed by article 3542 of the Louisiana Civil Code.  But there are more specific choice-of-law rules prescribed for "[i]ssues pertaining to standards of conduct and safety."  *Id.* art. 3543.  When applicable, a court applies the more specific rules.  *Id.* cmt. b ("[T]he rules contained in this Article prevail over Article 3542 because they are more specific.").  Here, Professional Arts's claims relate to Defendants' conduct, so article 3543 applies.  *See Kennedy v. Braskem*

*Am., Inc.*, No. 18-cv-12084, 2021 WL 1436498, at *11 (E.D. La. Mar. 31, 2021)

(applying article 3543 to negligence-based claims).

Under article 3543, if the state where the allegedly tortious conduct occurred has a

higher standard of conduct than the state where the injury occurred, the law of the state

where the conduct occurred applies.  La. Civ. Code Ann. art. 3543 (2025); *id.* cmt. f.  The

conduct occurred in Minnesota[15] and Minnesota has a higher standard of conduct for

negligence claims,[16] so Minnesota law applies to the tort-law claims.

### 2.   Contract Claims

Under the contract-law choice-of-law statute, comparative impairment is

determined by weighing:

> (1) the pertinent contacts of each state to the parties and the transaction,
> including the place of negotiation, formation, and performance of the
> contract, the location of the object of the contract, and the place of
> domicile, habitual residence, or business of the parties; (2) the nature, type,
> and purpose of the contract; and (3) the policies referred to in Article 3515,

---

[15]    Even if the Court were to determine that conduct occurred in more than one state,
the principal cause of injury occurred in Minnesota.  *See* La. Civ. Code Ann. art. 3543
cmt. h (explaining how to apply article 3543 when the conduct occurred in multiple
states).

[16]    Minnesota's negligence framework requires that:  (1) the defendant owed the
plaintiff a duty of care, (2) the defendant breached that duty, (3) plaintiff was injured, and
(4) plaintiff's injury was proximately caused by defendant's breach.  *Doe 169 v. Brandon*,
845 N.W.2d 174, 177 (Minn. 2014).  Louisiana's negligence framework requires those
elements plus that defendant's breach was the cause-in-fact of the plaintiff's injury.  *See
Farrell v. Circle K Stores, Inc.*, 359 So.3d 467, 473 (La. 2023).  Further, Minnesota
imposes liability for negligence per se, but Louisiana does not.  *Compare Perry v. Bay &
Bay Transp. Servs., Inc.*, 650 F. Supp. 3d 743, 755-56 (D. Minn. 2023) (discussing
Minnesota's negligence per se cause of action), *with Merrell v. 1st Lake Props., Inc.*,
No. 23-cv-1450, 2023 WL 6316257, at *5 (E.D. La. Sep. 28, 2023) ("Negligence *per se*
is not recognized under Louisiana law.").

> as well as the policies of facilitating the orderly planning of transactions, of promoting multistate commercial intercourse, and of protecting one party from undue imposition by the other.

*Id.* art. 3537.  Article 3515 weighs:

> (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.

*Id.* art. 3515.  The analysis is the same for quasi-contractual claims.  *Id.* art. 3541; *see*

*DeJohn v. Delta Faucet Co.*, No. 18-cv-13410, 2018 WL 6725393, at *2 n.14 (E.D. La.

Dec. 21, 2018).

The Court finds that these factors weigh in favor of applying Minnesota law.  As

there is no contract to look to, the Court infers that contracts were negotiated and

performed in Minnesota, where Defendants operated the Platform.  Further, the contracts

were for Minnesota-based Defendants to provide services to providers, so Minnesota has

the closest relationship to the contracts.  Because of Minnesota's close relationship, it

would impair Minnesota the most if its laws were not applied.

In conclusion, Provider Plaintiffs' home-state laws apply to the claims originally

filed in Minnesota, and Minnesota law applies to the claims originally filed in Tennessee

and Louisiana.  The Court cannot decide the merits based on the law of each home state

without complete briefing on the issues.  Currently, the parties have only fully briefed

Minnesota substantive law.[17]  The Court therefore continues the substantive analysis only

---

[17]    Defendants submitted appendices summarizing the relevant laws for each home state in support of their motion to dismiss.  (Doc. No. 262, Apps. A-H.)  In opposition

for the Minnesota-based Provider Plaintiffs who initially filed in this District and the

Provider Plaintiffs who filed originally in Tennessee and Louisiana:  Plaintiffs Moffitt,

Revival, Professional Arts, Play Therapy, Dillman, and Advanced Cardiology.[18]

## II.    Failure to State a Claim

To survive a motion to dismiss, a complaint must contain "enough facts to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  Although a complaint need not contain "detailed factual allegations," it must

---

briefing, Plaintiffs objected to Defendants' use of appendices.  (*See* Doc. No. 328 at 29
& n.3.)  At the June 12, 2025 Status Conference, the Court overruled Plaintiffs'
objections but noted that if the appendices were considered by the Court in its ruling,
Plaintiffs would have the opportunity to file response appendices and Defendants would
have the opportunity to reply.  (*See* Doc. No. 396 at 8-9.)

Accordingly, the Court now orders response and reply briefing on the home-state
laws for Provider Plaintiffs who filed in Minnesota but are not located in Minnesota.  The
parties are directed to comment on the substantive law of:  California for Plaintiffs Total
Care and Ridge; Florida for Plaintiffs Magnolia and Florida Dermatology; Illinois for
Plaintiff Pediatric Clinic; Maine for Plaintiff York; Massachusetts for Plaintiff Cotton;
Michigan for Plaintiffs H & R and Irwin; New Jersey for Plaintiff Hackensack; New York
for Plaintiffs DocCare and Western; Ohio for Plaintiffs Knox and Cultivating Mind;
Pennsylvania for Plaintiffs Wiemer and Heckman; Texas for Plaintiffs MedCare Group,
MedCare Therapy, MedCare Rehab, and MedCare Nursing; and Virginia for Plaintiff
NCPA.

[18]    These Plaintiffs collectively bring the following claims:  negligence (Count I);
negligence per se (Count II); breach of contract (Count III); breach of TFAP contract
(Count IV); unjust enrichment (Count V); interference with prospective economic
advantage, business relationship, or expectancy (Count VI); negligent omission
(Count VIII); negligent misrepresentation (Count IX); fraudulent inducement (Count X);
public nuisance (Count XI); violation of the Minnesota Protection of Consumer Fraud
Act (Count XII); violation of the Florida Deceptive and Unfair Trade Practices Act
(Count XIV); violation of the Illinois Consumer Fraud and Deceptive Business Practices
Act (Count XV); violation of the New Jersey Consumer Fraud Act (Count XVII); and
declaratory judgment (Count XIX).  The Court addresses only these counts as to these
Plaintiffs below.

contain facts with enough specificity "to raise a right to relief above the speculative

level." *Id.* at 555. "Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for

enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of

[the claim]." *Twombly*, 550 U.S. at 556.

### A.    Role of Defendants

As a final preliminary matter, the Court must consider whether each Defendant is

properly named in the complaint. Defendants argue that Provider Plaintiffs improperly

grouped Defendants together without clarifying each Defendant's role in the conduct.

(Doc. No. 261 at 22 n.5.)

A complaint must allege "sufficient personal involvement" of each defendant to

properly state a claim. *Beck v. LaFleur*, 257 F.3d 764, 766 (8th Cir. 2001). A plaintiff

must explain "who did what to whom" to provide fair notice to the defendant of the

grounds for a claim. *Tatone v. SunTrust Mortg., Inc.*, 857 F. Supp. 2d 821, 831 (D. Minn.

2012). "A complaint which lumps all defendants together," despite the ability to explain

each defendant's role, fails to state a claim. *Id.*; *see also City of Wyoming v. Proctor &

Gamble Co.*, 210 F. Supp. 3d 1137, 1153 (D. Minn. 2016) (differentiating between

complaints which lack specificity due to "laziness or frivolity" and those which lack

specificity due to a "practical difficulty" in identifying which defendant was responsible

for what outcome).

Provider Plaintiffs connect each Defendant to the litigation, with varying control over the Platform and the TFAP.  Defendants UHG, Optum Insight, Change Healthcare, CHS, CHH, CHT, and CHPS were allegedly involved in operational or cybersecurity decisions of either Change Healthcare or the Platform.  Defendants UHCS, CHO, Optum, Optum Financial, and Optum Bank were allegedly involved in the distribution of TFAP funding.  To the extent that any Defendant is not directly connected via the allegations, such failure is due to Defendants' complex corporate structure.  Provider Plaintiffs cannot be expected to define the contours of Defendants' corporate relationship when Defendants have blurred the lines by splitting tasks and transferring duties across entities. The Court finds that the complaint sufficiently alleges the involvement of each Defendant.

**B.    Count I:  Negligence**[19]

Minnesota follows the familiar negligence standard:  a plaintiff must prove that (1) the defendant owed them a duty of care, (2) the defendant breached that duty, (3) the plaintiff was injured, and (4) the plaintiff's injury was proximately caused by defendant's breach.  *Doe 169*, 845 N.W.2d at 177.

Provider Plaintiffs allege that Change Health Defendants owed "a duty to exercise reasonable care in setting up, providing, managing, maintaining, operating, supervising, and controlling the [network and Platform]" and "a duty to exercise reasonable care to

---

[19]    Defendants contend that certain negligence claims are barred by the economic loss rule.  (Doc. No. 261 at 21-22.)  The Court will not address that issue because Defendants do not contend that the economic loss rule bars the Minnesota-law negligence claims. (*See* Doc. No. 262, App. A at 3 (negligence); *id.*, App. B at 4 (negligence per se).)

avoid harm to Plaintiffs." (Compl. ¶¶ 449-50.) They allege that harms due to "the sudden and sustained lack of claims and payment processing" from the Shutdown were foreseeable, and that "Change Health Defendants knew or should have known of the vulnerabilities" of the network. (*Id.* ¶¶ 450-51.) Change Health Defendants then breached that duty by using insufficient cybersecurity, failing to have contingency plans in case of a shutdown, and failing to warn providers of the potential harms. (*Id.* ¶ 453.) And as a direct and proximate result of that negligence, Provider Plaintiffs were injured in the form of missed or delayed payments and the costs of remedying the Shutdown. (*Id.* ¶ 456.) Defendants contend that they did not owe Provider Plaintiffs any duty and that, if they did, the failure to safeguard Private Information was not causally connected to the Shutdown. (Doc. No. 261 at 22, 28 n.9.)

The existence of a duty of care is a question of law. *Doe 169*, 845 N.W.2d at 177. There is no general duty to safeguard data, but a duty to exercise reasonable care to protect that data arises if a defendant's own conduct creates a foreseeable risk of data exposure. *E.g.*, *In re Netgain Tech., LLC*, No. 21-cv-1210, 2022 WL 1810606, at *10-11 (D. Minn. June 2, 2022). Provider Plaintiffs plausibly allege that it was Change Health Defendants' own conduct—the deficient cybersecurity—that created the risk. *See In re Target Corp. Customer Data Sec. Breach Litig.*, 64 F. Supp. 3d 1304, 1309-10 (D. Minn. 2014) (finding that plaintiffs plausibly pled duty by alleging that defendant failed to implement cybersecurity); *Netgain*, 2022 WL 1810606, at *11 (same). And the harm of the Shutdown was a foreseeable risk of such conduct—operational disruptions from deficient cybersecurity are foreseeable. *Cf. Target*, 64 F. Supp. 3d at 1310 (finding that

defendant owed a duty when the harm was to financial institutions whose customers' data was stolen in a data breach). Indeed, Change Health Defendants themselves acknowledged that operational disruptions or shutdowns may be caused by cyberattacks. (Compl. ¶ 152.) Provider Plaintiffs sufficiently pled duty to exercise reasonable care based on foreseeable harm.[20]

Provider Plaintiffs allege that Change Health Defendants breached that duty to exercise reasonable care by using deficient cybersecurity, which was a direct and foreseeable result of the Cyberattack, and which then forced UHG to initiate the Shutdown, causing downstream harms to providers. The Court finds that this is sufficient to show breach, injury, and causation. Had Change Health Defendants implemented proper cybersecurity, ALPHV would not have been able to breach the network and UHG would not have needed to shut down the Platform. Had the Shutdown not occurred, providers would have been able to submit claims and receive payment, avoiding the harms associated with missed payments. Provider Plaintiffs plausibly allege all elements of negligence, and the Court denies Defendants' motion to dismiss the negligence claim.

## C.    Count II:  Negligence Per Se

Count II alleges that Change Health Defendants had a duty to provide adequate cybersecurity pursuant to the Federal Trade Commission Act ("FTC Act") and HIPAA, and that by breaching that duty, Defendants were negligent per se. (*Id.* ¶¶ 461, 464-65.)

---

[20]    The Court received an amicus curiae brief from the American Society of Anesthesiologists on a duty to safeguard arising from a bailment. (Doc. No. 408.) Because the Court finds that a duty arises through general principles of negligence, the Court need not address duty through a theory of bailment. *See* Fed. R. Civ. P. 8(d)(2).

The FTC Act prohibits unfair or deceptive trade practices.  15 U.S.C. § 45.  HIPAA requires the protection of protected health information.  45 C.F.R. § 164.306 (2025).

Neither the FTC Act nor HIPAA provide for a private right of action.  *FTC v. Johnson*, 800 F.3d 448, 452 (8th Cir. 2015); *Dodd v. Jones*, 623 F.3d 563, 569 (8th Cir. 2010).  Minnesota law is unclear on whether the lack of a private right of action warrants dismissal of the claim.  Some courts applying Minnesota law have dismissed for this reason.  *See, e.g.*, *Quaife v. Brady, Martz & Assocs., P.C.*, No. 23-cv-176, 2024 WL 2319619, at *3 (D.N.D. May 22, 2024); *Netgain*, 2022 WL 1810606, at *15-16.  Other courts have allowed claims to proceed under the general negligence per se framework.  *E.g.*, *Minnesota v. Fleet Farm LLC*, No. 22-cv-2694, 2024 WL 22102, at *6 (D. Minn. Jan. 2, 2024); *Wiley ex rel. Wiley v. Fleet Farm LLC*, No. 24-cv-4135, 2025 WL 2601952, at *25 (D. Minn. Sep. 9, 2025); *Bay & Bay*, 650 F. Supp. 3d at 754-55.  In light of this unclear law, the Court declines to dismiss the negligence per se claims for lack of a private right of action.  The Court now turns to the claims under the general negligence per se framework.

"In Minnesota, a violation of a statute or regulation gives rise to negligence per se if (1) the person harmed by that violation is among those the legislature sought to protect and (2) the harm suffered is of the type the statute or regulation was intended to prevent."  *Bay & Bay*, 650 F. Supp. 3d at 754.

### 1.    The FTC Act

The FTC Act is intended to protect consumers and competitors.  *See FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 (1972).  Provider Plaintiffs do not fall into either

category. *Cf. Clayton v. PruittHealth, Inc.*, No. 24-cv-2960, 2025 WL 1643485, at *5-6 (N.D. Ga. June 9, 2025) (finding that an employee of a healthcare organization was not in the class intended to be protected).

Provider Plaintiffs point to cases in which financial institutions were permitted to pursue negligence per se premised on violations of the FTC Act.  (Doc. No. 328 at 42-43.)  Those cases are inapposite because the financial institutions directly reimbursed consumers for the harms of the data breach.  *See, e.g.*, *In re Arby's Rest. Grp. Inc. Litig.*, No. 17-cv-514, 2018 WL 2128441, at *8 (N.D. Ga. Mar. 5, 2018); *First Choice Fed. Credit Union v. Wendy's Co.*, No. 16-cv-506, 2017 WL 9487086, at *4 (W.D. Pa. Feb. 13, 2017); *In re the Home Depot, Inc., Customer Data Sec. Breach Litig.*, No. 14-md-2583, 2016 WL 2897520, at *4 (N.D. Ga. May 18, 2016).  Here, Provider Plaintiffs are not alleging harms that connect back to consumers or patients, and providers are not responsible to patients for the alleged harms.  Indeed, the individuals impacted have their own litigation track.

Further, even if Provider Plaintiffs were in the class the statute was designed to protect, the complaint does not explain that.  *See Netgain*, 2022 WL 1810606, at *15 (dismissing negligence per se claim for failure to explain how plaintiffs were members of the protected group).  The complaint contains only the conclusory allegation that Provider Plaintiffs are within the class of persons the FTC Act was intended to protect.

### 2.    HIPAA

Provider Plaintiffs do not address whether they are in the class HIPAA intended to protect in their opposition briefing.  This failure to oppose a basis for dismissal warrants

dismissal of that claim.  *See Espey v. Nationstar Mortg., LLC*, No. 13-cv-2979, 2014 WL 2818657, at *11 (D. Minn. June 19, 2014) (collecting cases in which a plaintiff's failure to respond warranted dismissal).

But even if the Court considered the HIPAA claim, it would fail for the same reasons as the FTC Act claim.  HIPAA protects individual patients' privacy.  *See* 45 C.F.R. § 164.306 (2025) (protecting "protected health information"); *id.* § 160.103 (defining "protected health information" as "individually identifiable health information," and defining "[i]ndividually identifiable health information" as information collected from an individual).  Provider Plaintiffs are not patients and are therefore not in the class the legislature intended to protect.  And, again, Provider Plaintiffs fail to explain otherwise, only making the conclusory statement that they are in the class.

Provider Plaintiffs are not in the class of people either the FTC Act or HIPAA were intended to prevent, so they have failed to allege negligence per se.  Defendants' motion to dismiss Count II is granted.

### D.    Count III:  Breach of Contract

Provider Plaintiffs who contracted with Change (the "Direct Contract Plaintiffs"[21] and members of the "Change Healthcare Inc. Direct Contract Sub-Class,"[22] collectively,

---

[21]    The Direct Contract Plaintiffs are:  Moffitt, Pediatric Clinic, Professional Arts, York, H & R, Hackensack, DocCare, Western, and Knox.  (Compl. ¶ 473.)

The following analysis applies only to the Direct Contract Plaintiffs subject to Minnesota law, per the choice-of-law discussion:  Moffitt and Professional Arts.

[22]    The "Change Healthcare Inc. Direct Contract Sub-Class" is defined as:  "All Providers whose use of Change's Services pursuant to a contract with Change Healthcare

the "Contract Plaintiffs") allege that Change breached contractual promises by failing to safeguard Private Information and allowing the Cyberattack to occur, by not adequately protecting the network and Private Information, and by failing to give prompt notice of the Shutdown. (Compl. ¶¶ 489-91.)

Provider Plaintiffs identify multiple types of contracts into which Change allegedly entered: Complete Customer Agreements and General Terms and Conditions ("CCAs"), Business Association Agreements ("BAAs"), Master Relationship Agreements ("MRAs"), and Retail Participating Pharmacy Agreements ("RPPAs"). (*Id.* ¶¶ 477, 482, 485.) The CCAs, BAAs, MRAs, and RPPAs all required Change to protect patient information. (*Id.* ¶¶ 476, 478, 480, 483, 486.) The BAAs, MRAs, and RPPAs specifically required Change to comply with HIPAA. (*Id.* ¶¶ 481, 484, 486.) Additionally, the CCAs required Change to give prompt notice of changes to services which would adversely affect customers. (*Id.* ¶ 479.)

Each of these claims is analyzed using Minnesota's breach of contract framework. To state a claim, a plaintiff must show: "(1) formation of a contract, (2) performance by plaintiff of any conditions precedent to his right to demand performance by the defendant, and (3) breach of the contract by defendant." *Lyon Fin. Servs., Inc. v. Ill.*

---

Inc. or one of its predecessors or subsidiaries . . . was disrupted, or whose payments were delayed or denied because of the [Cyberattack and Shutdown]." (*Id.* ¶ 437.)

*Paper & Copier Co.*, 848 N.W.2d 539, 543 (Minn. 2014) (citation modified).[23]  The

parties dispute the first and third elements.

### 1.    Formation

Defendants argue that no enforceable contract exists because adherence to HIPAA

is not adequate consideration.  (Doc. No. 261 at 31.)  It is true that performance of an

existing legal obligation is not sufficient consideration.  *N. Pac. Ry. Co. v. Wis. Cent. Ry.

Co.*, 135 N.W. 984, 986 (Minn. 1912).  But Provider Plaintiffs allege that the contracts

contained more than just a promise to comply with HIPAA—the contracts were to

provide claims processing services.  This is sufficient to plead formation.  *Cf. Brush v.

Miami Beach Healthcare Grp. Ltd.*, 238 F. Supp. 3d 1359, 1367-68 (S.D. Fla. 2017)

(dismissing a claim based only on a privacy policy).

### 2.    Breach

#### a.    Duty to Exercise Reasonable Care

The CCAs and MRAs included a contractual duty to exercise reasonable care.

(Compl. ¶¶ 478, 483.)  The complaint alleges that Change breached those duties by

failing to safeguard information and not adequately protecting the network.  Defendants

contend that the mere existence of the Cyberattack is insufficient to show breach of those

duties.  (Doc. No. 261 at 31.)  While not every data breach is proof of failure to use

---

[23]    Notably, Minnesota does not require a plaintiff to plead actual damages to sustain a breach of contract claim at the motion to dismiss stage.  *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 833 n.5 (Minn. 2011); *see also Manderson ex rel. I.B.E.W. 292 Health Care Plan v. Fairview Health Servs.*, No. 21-cv-1797, 2022 WL 2442233, at *10 n.6 (D. Minn. July 5, 2022) (explaining the conflicting precedent on the issue and deciding that nominal damages are necessary).

reasonable care, Provider Plaintiffs have sufficiently pled failure here.  *Compare In re MOVEit Customer Data Sec. Breach Litig.*, No. 23-md-3038, 2025 WL 2179475, at *9 (D. Mass. July 31, 2025) (denying motion to dismiss similar allegations because specific cybersecurity failures plausibly pled breach of duty to take reasonable care), *with Crowe v. Managed Care of N. Am. Inc.*, No. 23-cv-61065, 2024 WL 6863341, at *6, *10 (S.D. Fla. Aug. 16, 2024) (dismissing claims because plaintiffs did not explain how the cybersecurity was deficient).  As discussed in the negligence section, Provider Plaintiffs detail how Defendants' deficient cybersecurity was unreasonable.

### b.    HIPAA Compliance

The complaint also alleges that the BAAs, MRAs, and RPPAs promised compliance with HIPAA, which was breached for the same reasons.  When a federal statute lacks a private right of action, a breach of contract claim cannot be premised on a violation of that statute unless the breach also violated state laws.  *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 118-19 (2011).  Put differently, if a breach of contract claim goes beyond the federal violation, plaintiffs may continue that claim.  *E.g.*, *In re Anthem, Inc. Data Breach Litig.*, 162 F. Supp. 3d 953, 1010 (N.D. Cal. 2016); *see also Dinerstein v. Google, LLC*, 484 F. Supp. 3d 561, 582-84 (N.D. Ill. 2020) (reviewing HIPAA preemption caselaw and concluding that state-law contract claims are not preempted).  As mentioned above, HIPAA does not have a private right of action.  *Dodd*, 623 F.3d at 569.

Therefore, Provider Plaintiffs' breach of contract claim fails to the extent it relies on HIPAA violations.  *See Harris v. Mercy Health Network, Inc.*, No. 23-cv-195, 2024

WL 5055556, at *10 (S.D. Iowa June 26, 2024) (collecting cases in which contractual claims based on HIPAA were dismissed).  But Provider Plaintiffs may continue their claims which go beyond HIPAA and require protection of information under state laws. *See Trone Health Servs., Inc. v. Express Scripts Holding Co.*, 974 F.3d 845, 851-52 (8th Cir. 2020) (concluding that the district court erred in dismissing breach of contract claim on the basis that HIPAA lacks a private right of action because the contract also required compliance with state laws).

The allegations regarding the BAAs and MRAs mention both federal and state laws.  (Compl. ¶¶ 480-81, 483-84.)  These allegations survive insofar as they allege state-law violations.  But the allegations regarding the RPPAs rely solely on HIPAA.  (*Id.* ¶ 486.)  The RPPA allegations are therefore dismissed.

### c.    Prompt Notice

Finally, the complaint alleges that Change breached the CCAs "by failing to give prompt notice that the Change Platform would be taken offline before the [Shutdown]." (*Id.* ¶ 491.)  Because they allege that the CCAs required "prompt, prior notice" of any service disruption (*id.* ¶ 479), it is plausible that it was a breach to not alert providers until after the Platform was down.

The motion to dismiss Count III is granted insofar as Provider Plaintiffs rely on HIPAA.  The motion as to the general breach of contract claim is otherwise denied. Allegations regarding breach of HIPAA requirements are dismissed.  Allegations regarding breach of contractual duty, state laws, and the notice requirement survive.

36

### 3.    Implied Covenant of Good Faith and Fair Dealing

Count III further alleges that Change breached the implied covenant of good faith and fair dealing by not implementing the security measures promised.  (*Id.* ¶¶ 494, 496-97.)  In Minnesota, "every contract includes an implied covenant of good faith and fair dealing requiring that one party not unjustifiably hinder the other party's performance of the contract."  *In re Hennepin Cnty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995) (citation modified).

A claim for breach of the implied covenant of good faith and fair dealing is duplicative of a breach of contract claim if the claims are based on the same conduct.  *E.g.*, *Turning Point Corp. v. One Diversified, LLC*, No. 24-cv-4566, 2025 WL 1435759, at *3 (D. Minn. May 19, 2025) (collecting cases).  Provider Plaintiffs rely on the same conduct for this claim and the general breach of contract claim—Change's deficient cybersecurity.  The claim is properly dismissed as duplicative.

Additionally, a plaintiff must allege facts plausibly showing bad faith.  *Fairview Health Servs. v. Armed Forces Off. of Royal Embassy of Saudi Arabia*, 705 F. Supp. 3d 898, 915 (D. Minn. 2023).  While Provider Plaintiffs allege intentional conduct elsewhere (*e.g.*, Compl. ¶ 525), Count III does not allege any conduct that would rise to the level of bad faith regarding the relevant contracts.  *See Cox v. Mortg. Elec. Registration Sys., Inc.*, 685 F.3d 663, 671 (8th Cir. 2012) (listing examples of what might be bad faith, such as intentional interference with the other party's ability to perform).  Provider Plaintiffs only allege that Change failed to implement contractually required security, but mere breach of contract is not enough to show bad faith.  *See Todd County v. Barlow Projects, Inc.*,

No. 04-cv-4218, 2005 WL 1115479, at *13 (D. Minn. May 11, 2005) ("Extending 'bad faith' to include instances where a party breaches its obligations under a contract would turn every breach into a violation of the implied covenant of good faith and fair dealing."). Moreover, when Defendants raised this issue, Provider Plaintiffs failed to respond. The claim is properly dismissed, in the alternative, for failure to state a claim.

Defendants' motion to dismiss Count III as to breach of the implied covenant of good faith and fair dealing is granted. The implied covenant claim is dismissed with prejudice. *See Mayo Found. for Med. Educ. & Rsch. v. Knowledge to Prac., Inc.*, No. 21-cv-1039, 2022 WL 409953, at *6-7 (D. Minn. Feb. 10, 2022) (dismissing with prejudice duplicative implied covenant claim); *Steady State Imaging, LLC v. Gen. Elec. Co.*, No. 17-cv-1048, 2018 WL 461136, at *4-5 (D. Minn. Jan. 17, 2018) (dismissing with prejudice implied covenant claim which failed to allege bad faith); *Espey*, 2014 WL 2818657, at *1, *11 (dismissing claim with prejudice for failure to oppose).

### E.    Count IV:  Breach of TFAP Contract

Count IV alleges that Defendants breached the TFAP Agreement's repayment clause "by demanding repayment of TFAP loans before payments impacted during the service disruption were processed, and by threatening to offset[] claims payments for temporary funding repayments." (Compl. ¶ 510.) The TFAP Agreements are governed by Minnesota law.[24] (TFAP Agreement ¶ 10.) The same elements of (1) formation, (2) performance, and (3) breach apply. *Lyon Fin. Servs.*, 848 N.W.2d at 543. Formation

---

[24]    Because all TFAP Agreements have a choice-of-law provision, this analysis applies to all Loan Plaintiffs.

and performance are not at issue; the parties dispute only whether Defendants have breached.

The plain language of the TFAP Agreement creates two conditions in order for Change to send a repayment notice. First, either claims or payment processing services, or both, must be operational. (TFAP Agreement ¶ 5.) The language does not require that all services be running, just that at least some processing ability has resumed. Now that the Shutdown is over and services are at least partially operational, this condition is met. (*See* Compl. ¶¶ 87-88, 119, 126.) Second, payments delayed or otherwise impacted during the Shutdown must be in process. (TFAP Agreement ¶ 5.) Payments need not be fully processed, but they must be in the processing flow. This reading is necessitated by the use of "are being processed"—the present tense dictates that the condition is satisfied while processing is occurring, not after processing is complete. This condition has not been met because Provider Plaintiffs allege there are impacted payments not yet in process. (*E.g.*, Compl. ¶¶ 121-25.)

Because Provider Plaintiffs have plausibly alleged that the repayment clause of the TFAP Agreement has yet to be triggered, it follows that they have plausibly alleged breach. Defendants are attempting to recollect on the loans despite the second condition not being met. Provider Plaintiffs have stated a claim for breach of the TFAP Agreement.

### F.    Count V: Unjust Enrichment

Count V alleges that Change Health Defendants were unjustly enriched by payments from Provider Plaintiffs for the Platform and from non-reimbursed services during the Shutdown. (*Id.* ¶¶ 517-18.) Specifically, Provider Plaintiffs paid, both directly

and indirectly, for use of the Platform. (*Id.* ¶ 517.) Providers Plaintiffs argue that Change Health Defendants should have used part of that money for cybersecurity functions of the Platform, and that by failing to implement proper cybersecurity, Change Health Defendants wrongfully retained the money. (*Id.* ¶ 518.) Further, they allege that UHG and UHCS were enriched by provision of healthcare services to patients insured by UHG, and that UHG and UHCS unjustly retained those benefits during the Shutdown when Provider Plaintiffs were not reimbursed for the provision of healthcare services. (*Id.* ¶¶ 517, 519.)

### 1.    Duplicity

Defendants argue that the unjust enrichment claim should be dismissed because it is duplicative of the breach of contract claim. (Doc. No. 261 at 40.) The Court rejects this argument.

Under Minnesota law, a plaintiff may plead an unjust enrichment claim in the alternative to a breach of contract claim. *Motley v. Homecomings Fin., LLC*, 557 F. Supp. 2d 1005, 1014 (D. Minn. 2008). Dismissal is warranted only if there is "no doubt" that a contract is applicable to the issue at hand. *HomeStar Prop. Sols., LLC v. Safeguard Props., LLC*, 370 F. Supp. 3d 1020, 1030 (D. Minn. 2019).

Count V is brought in the alternative to Count III. (Compl. ¶ 516.) While Provider Plaintiffs sufficiently pled the relevant terms of the contracts underlying Count III, they have not provided any such contract. The Court therefore cannot make a definitive finding about the scope or enforceability of the contracts at this point. *See*

*Barger v. BlueSky TelePysch, LLC*, No. 22-cv-2972, 2023 WL 3571939, at *6 (D. Minn. May 19, 2023). The Court will not dismiss Count V for duplicity.

### 2.    Legal Standard

"Unjust enrichment is an equitable doctrine that allows a plaintiff to recover a benefit conferred upon a defendant when retention of the benefit is not legally justifiable." *Herlache v. Rucks*, 990 N.W.2d 443, 450 (Minn. 2023) (citation modified). To state a claim, "the plaintiff must show that the defendant's enrichment is illegal, unlawful, or morally wrong." *Warren v. ACOVA, Inc.*, 21 N.W.3d 218, 242 (Minn. Ct. App. 2025). Additionally, the defendant must have benefited, but the benefit need not be conferred upon them directly by the plaintiff. *Id.* at 242-43; *see also Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1099 n.26 (D. Minn. 2017) (discussing case law on direct conferral and concluding that direct benefit is not required).

Payments for use of the Platform are clearly a benefit. *See, e.g.*, *Herlache*, 990 N.W.2d at 450 (money received is the "classic case" of unjust enrichment). But while Provider Plaintiffs allege that Change Health Defendants should have used some of that payment for cybersecurity, they do not allege that they did, in fact, pay a premium specifically for data protection. This is insufficient to establish a benefit conferred. *See Carlsen v. GameStop, Inc.*, 833 F.3d 903, 912 (8th Cir. 2016) (dismissing claim because plaintiff did not allege that a specific portion of his payment went toward data protection); *In re SuperValu, Inc.*, 925 F.3d 955, 966 (8th Cir. 2019) (dismissing claim under Illinois law for the same reason). This theory of unjust enrichment is dismissed.

Provider Plaintiffs' second theory—that UHG and UHCS benefitted from the provision of services to patients insured by UHG—survives, however. UHG and UHCS benefited because they continued to receive payments from their insureds. *Cf. Moline Mach., LLC v. City of Duluth*, 26 N.W.3d 875, 883 (Minn. Ct. App. 2025) (finding that the city was enriched by utility payments). Provider Plaintiffs plausibly allege that such enrichment was unjust because UHG and UHCS were not reimbursing providers for the healthcare services during the Shutdown. *Cf. Shaffer v. George Wash. Univ.*, 27 F.4th 754, 769-70 (D.C. Cir. 2022) (reversing dismissal of unjust enrichment claim from students alleging that the university unjustly retained their tuition during shutdowns resulting from the COVID-19 pandemic). This is sufficient to survive a motion to dismiss.

The motion to dismiss Count V is granted insofar as Provider Plaintiffs allege Change Health Defendants should have used payments for cybersecurity. Those allegations are dismissed. The motion is denied insofar as Provider Plaintiffs allege Change Health Defendants benefitted from provision of services to patients.

### G.     Count VI:  Interference with Prospective Economic Advantage, Business Relationship, or Expectancy[25]

Provider Plaintiffs allege that they relied on Change Health Defendants to process claims and exchange payments between themselves and third parties. (Compl.

---

[25]     In Minnesota, this claim is called "tortious interference with prospective economic advantage." *Gieske ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 216-17 (Minn. 2014) (discussing the different names and affirming a cause of action for tortious interference with prospective economic advantage).

¶¶ 522-23.)  Count VI alleges that Change Health Defendants intentionally interfered with those business relationships by failing to implement reasonable security, shutting down the Platform without an adequate substitute, and failing to have a disaster recovery plan.  (*Id.* ¶¶ 524, 526.)

### 1.    Duplicity

Defendants again challenge this claim as duplicitous of Count III as to the Direct Contract Plaintiffs.  (Doc. No. 261 at 45-46.)  The tortious-interference claim is based on the same actions as the breach of contract claim—both claim that Change Health Defendants failed to safeguard information and allowed the Cyberattack and Shutdown to occur.  However, the tortious-interference claim is based on duties outside the contracts.  (*See* Compl. ¶ 525 (alleging violations of HIPAA and the FTC Act).)  The claim is therefore not duplicative.  *Cf. Hawke Media, LLC v. Stable Grp. Holdings, LLC*, No. 23-cv-2496, 2025 WL 437483, at *3 (D. Minn. Feb. 7, 2025) (dismissing a tortious-interference claim because it was based entirely on duties arising from a contract).

### 2.    Legal Standard

To ultimately succeed on a claim for tortious interference with prospective economic advantage in Minnesota, a plaintiff must prove:  (1) the existence of a reasonable expectation of economic advantage; (2) that the defendant knew of that expectation; (3) that the defendant intentionally interfered with the plaintiff's expectation, and that intentional interference is either independently tortious or a violation of law; (4) that it is reasonably probable the plaintiff would have realized economic advantage or

benefit had the defendant not acted wrongfully; and (5) that the plaintiff was damaged.

*Gieske*, 844 N.W.2d at 219.

Provider Plaintiffs sufficiently allege each element. First, the complaint describes the relationships between providers and third-party payers and gives examples of payers with whom Change had exclusive relationships and therefore with whom providers would need to have relationships.[26] (*See* Compl. ¶¶ 49, 99, 522.) Second, Change Health Defendants allegedly knew of that expectation because the Platform facilitated the relationships. Third, tortious interference "is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts § 766B cmt. d (A.L.I. 1979). Change Health Defendants allegedly acted with intent because they knew interference was substantially certain to occur from the inadequate security and Shutdown.[27] Further,

---

[26] Examples of relationships is sufficient to survive a motion to dismiss; a plaintiff need not identify every single relationship potentially impacted. *See Paisley Park Enters., Inc. v. Boxill*, 361 F. Supp. 3d 869, 881 (D. Minn. 2019); *Toyota Motor Sales, U.S.A., Inc. v. Allen Interchange LLC*, No. 22-cv-1681, 2023 WL 5206884, at *11 (D. Minn. Aug. 14, 2023). The Court notes, however, that specific relationships must be identified to ultimately succeed. *Gieske*, 844 N.W.2d at 221-22.

[27] In opposition briefing, Provider Plaintiffs argued that specific intent is not required. (Doc. No. 328 at 64.) That is incorrect. A defendant must have intended the interference, not simply intended an action which then caused interference. *See, e.g.*, *Nitro Constr. Servs., Inc. v. Pilot Travel Ctrs., LLC*, No. 25-cv-26, 2025 WL 2487787, at *2 (S.D.W.V. Aug. 28, 2025) (applying West Virginia law); *Watson's Carpet & Floor Coverings, Inc. v. McCormick*, 247 S.W.3d 169, 176 (Tenn. Ct. App. 2007) (applying Tennessee law); *Petroleum Enhancer, LLC v. Woodward*, No. 07-cv-12425, 2013 WL 12233211, at *12 (E.D. Mich. Feb. 22, 2013) (applying Michigan law). *See generally Hyphy Music, Inc. v. Sena*, No. 21-cv-216, 2025 WL 842893, at *14 (E.D. Cal. Mar. 18, 2025) ("The only difference between an intentional interference claim and a negligent interference with prospective economic advantage claim relates to the defendant's intent;

44

that intentional conduct was independently an alleged violation of HIPAA and the FTC Act. Fourth, Provider Plaintiffs and payers had ongoing relationships and would have received payment for services. Finally, Provider Plaintiffs list numerous damages. The Court denies the motion to dismiss Count VI.

### H.    Counts VIII-IX:  Negligent Omission and Negligent Misrepresentation[28]

Provider Plaintiffs bring two theories of misrepresentation. First, Contract Plaintiffs allege that Change Health Defendants knowingly omitted material information and made false statements about their data privacy practices. (Compl. ¶¶ 539-40, 549-50.) Second, Provider Plaintiffs allege that Change Health Defendants knowingly omitted material information and made false statements about the length of the Shutdown. (*Id.*) Count VIII alleges that these omissions constitute negligent omission. (*See id.* ¶ 539.) Count IX alleges that these statements and omissions constitute negligent misrepresentation. (*See id.* ¶ 549.)

To state a claim for negligent misrepresentation, a plaintiff must allege: "(1) a duty of care owed by the defendant to the plaintiff; (2) the defendant supplied false information to the plaintiff; (3) justifiable reliance upon the information by the plaintiff;

---

rather than intentionally disrupting the relationship, the defendant must act negligently to disrupt the relationship."). Despite this error in briefing, the complaint is sufficient.

[28]    Provider Plaintiffs acknowledge that negligent omission is not a standalone cause of action, but rather a negligent omission can form the basis of a negligent misrepresentation claim. (Doc. No. 328 at 76-77; *see also, e.g.*, *Target*, 64 F. Supp. 3d at 1310-12 (discussing a "negligent-misrepresentation-by-omission" claim).) The Court therefore addresses these claims jointly, interpreting Count VIII as a claim for negligent misrepresentation by omission and Count IX as a claim for negligent misrepresentation by statement.

and (4) failure by the defendant to exercise reasonable care in communicating the information." *Nelson v. Am. Fam. Mut. Ins. Co.*, 899 F.3d 475, 481 (8th Cir. 2018) (citation modified). Additionally, a plaintiff must show that the "reliance on the misrepresentation was the proximate cause of [their] injury, and that [they] suffered damages as a result." *Minn. Pipe & Equip. Co. v. Ameron Int'l Corp.*, 938 F. Supp. 2d 862, 871 (D. Minn. 2013).

An allegation of negligent misrepresentation is considered an allegation of fraud and must be pled with particularity. *Trooien v. Mansour*, 608 F.3d 1020, 1028 (8th Cir. 2010). A plaintiff needs to identify "such matters as the time, place and contents of false representations." *Id.* (quoting *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir. 1982)). For negligent omission, a plaintiff needs to identify the information omitted and "how or when" the concealment occurred. *Target*, 64 F. Supp. 3d at 1311.

Duty of care is a question of law. *Minn. Pipe*, 938 F. Supp. 2d at 872. A duty of care arises in certain professional or fiduciary relationships, or in "special legal relationships in which one party has superior knowledge or expertise." *Williams v. Smith*, 820 N.W.2d 807, 816 (Minn. 2012); *see also Smith v. Questar Cap. Corp.*, No. 12-cv-2669, 2014 WL 2560607, at *14 (D. Minn. June 6, 2014) (adding that there is also a duty when "one party who chooses to speak omits information so as to make the information actually disclosed misleading").

### 1. Change's Cybersecurity

First, Contract Plaintiffs allege that Change Health Defendants failed to disclose material weaknesses in Change's cybersecurity. (Compl. ¶¶ 540-41.) Specifically,

Change Health Defendants represented in policies that they would comply with federal privacy regulations and secure data, but then failed to implement rudimentary cybersecurity measures and did not tell providers of these failures. As for the misrepresentations, Contract Plaintiffs allege that Change Health Defendants falsely stated that their network was secure, pointing to specific statements in their privacy policies. (*Id.* ¶¶ 164-74, 550.) This is sufficient particularity at this stage of the litigation. *See Target*, 64 F. Supp. 3d at 1311 (finding that failure to disclose security deficiencies, paired with allegations about specific issues and affirmative representations in privacy policies, was sufficient particularity).

Change Health Defendants plausibly owed a duty of care to Contract Plaintiffs. They had special knowledge of the cybersecurity of Change's network, notably that they were not operating in accordance with federal law. *See Liberty Mut. Fire Ins. Co. v. Acute Care Chiropractic Clinic P.A.*, 88 F. Supp. 3d 985, 1014 (D. Minn. Feb. 13, 2015) ("Defendants had a duty to disclose to Plaintiffs that they were not, in fact, legally owned and operating in accordance with state and federal law."). Further, by choosing to advertise their data security practices, Change Health Defendants created a duty to ensure such information was not misleading. *See id.* ("[A] party must say enough in order to prevent his words from misleading the other party.").

Contract Plaintiffs allege that they would not have contracted with Change had they known Change failed to use reasonable care or comply with federal regulations. (Compl. ¶¶ 543, 552.) It was plausibly justifiable for plaintiffs to rely on the statements about Change Health Defendants' cybersecurity when deciding to contract with them.

47

Lastly, Contract Plaintiffs identify damages that were plausibly caused by these statements. For example, if Contract Plaintiffs chose to not use the Change Platform, they would not have had missed or delayed payments due to the Shutdown.

Contract Plaintiffs have sufficiently pled negligent misrepresentation regarding Change Health Defendant's statements and omissions about their data security.

### 2. Shutdown Timeline

Second, Provider Plaintiffs allege that Change Health Defendants failed to disclose the true timeline for when the Platform would be back online and intentionally made false statements that the Shutdown duration would be shorter. (*Id.* ¶¶ 540-41, 550.) Specifically, Change Health Defendants were privy to facts that providers did not have, including the extent of the damage, the lack of business continuity planning, and the amount of labor necessary to reconnect the Platform. (*Id.* ¶ 109.) Provider Plaintiffs reason that Change Health Defendants knew it would take months to restore the Platform but led providers to believe the Shutdown would last merely days. (*See id.* ¶¶ 111-17.) Provider Plaintiffs allege that they relied on these statements and omissions when responding to the Shutdown and would have taken different mitigation measures had they known the true duration. (*Id.* ¶¶ 544, 553.)

This theory of negligent misrepresentation must fail because it relies on statements regarding predictions. *See, e.g.*, *Trooien*, 608 F.3d at 1031 (noting that mere predictions as to future events do not support a claim for misrepresentation). Change Health Defendants made clear that they could not estimate the length of the Shutdown and did not guarantee any specific timeline. (*See* Compl. ¶ 111.) Even the press release that

stated that claims processing would be restored the week of March 18, 2024, included language indicating that it was not a guarantee.  (*See id.* ¶ 116.)  There is no false information on which to base a claim of negligent misrepresentation, nor would any reliance be justifiable on such statements, so the claim must be dismissed.  *See Ferrara v. Ferrara*, No. 25-cv-2142, 2025 WL 3033939, at *5 (D. Minn. Oct. 30, 2025) (dismissing negligent misrepresentation claim based on a prediction of future price).

Provider Plaintiffs have not stated a claim for negligent misrepresentation regarding Change Health Defendants' statements and omissions about the Shutdown timeline.  The motion to dismiss is granted as to the Shutdown timeline theory of negligent misrepresentation.  However, the motion to dismiss Counts XIII and IX as to Contract Plaintiffs' claims is denied.

## I.    Count X:  Fraudulent Inducement

Similarly, Count X alleges that Change's statements about the security of their system and compliance with federal regulations constitute fraudulent inducement. (Compl. ¶ 560.)  This Count is brought by the Contract Plaintiffs against Change in regard to the service contracts into which Contract Plaintiffs and Change entered.  (*Id.* ¶ 561.)

To state a claim for fraudulent inducement in Minnesota, a plaintiff must show: (1) a false representation made by the defendant of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity, or asserted as the defendant's own knowledge when the defendant did not know whether it was true or false; (3) with the intention to induce the plaintiff to act in reliance; (4) that the

representation caused the plaintiff to act in reliance; and (5) that the plaintiff suffered pecuniary damage as a result of the reliance. *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 318 (Minn. 2007). Such allegations are subject to Rule 9(b)'s heightened pleading standard. *E.g.*, *Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1145 (D. Minn. 2016).

Contract Plaintiffs point to specific statements regarding Change's privacy that they allege were false because the system lacked adequate security and did not comply with HIPAA. Such statements were found in Change's policies and on their website. *See id.* at 1145-46 (accepting allegations based on defendant's website for purposes of Rule 9(b)). These statements were not promises to secure information in the future; rather, the statements were representations of the current cybersecurity measures Change had in place. *See InCompass IT, Inc. v. Dell, Inc.*, No. 11-cv-629, 2012 WL 383960, at *2 n.2 (D. Minn. Feb. 6, 2012) (differentiating between representations about future capabilities and current ability). Further, Contract Plaintiffs allege that Change knew the representations were false or made them with extreme disregard for the truth, that Change intended for Contract Plaintiffs to rely on those representations, that Contract Plaintiffs would not have contracted with Change had they known of the cybersecurity deficiencies, and that they suffered monetary damages. Contract Plaintiffs have sufficiently pled fraudulent inducement with particularity. Defendants' motion to dismiss is denied as to Count X.

J.    **Count XI:  Public Nuisance**

Count XI alleges that Change Health Defendants created a public nuisance by using insufficient cybersecurity and shutting down payment processing, which led to patients being unable to get care.  (Compl. ¶¶ 568, 575.)  Provider Plaintiffs allege that such conduct "substantially and unreasonably interfered with and endangered the public's rights to health, welfare, safety, peace, comfort, and ability to be free from disturbance and reasonable apprehension of danger to personal property."  (*Id.* ¶ 568.)  Specifically, patients' ability to receive healthcare was disrupted because (1) providers could not verify coverage, benefits, or prescriptions, (2) providers decreased staffing because they were not receiving payment, and (3) providers were forced to divert resources from patient care to administrative services.  (*Id.* ¶ 575.)  Further, Provider Plaintiffs were financially harmed in the form of missed or delayed payments and expenses related to responding to the Shutdown, among others.  (*Id.* ¶ 576.)

1.    **Legal Standard**

In Minnesota, it is a public nuisance to "act or fail[] to perform a legal duty" which "maintains or permits a condition which unreasonably annoys, injures or endangers the safety, health, morals, comfort, or repose of any considerable number of members of the public."  Minn. Stat. § 609.74 (2025).  The allegations sufficiently establish a claim for public nuisance.  First, as discussed previously, Provider Plaintiffs plausibly allege that Change Health Defendants failed to exercise reasonable care in the operation of Change's network, which was their legal duty, and intentionally shut down the Platform.  Second, the alleged harms to patient care plausibly injures the health of

members of the public because they faced barriers to getting care. Third, the complaint

explains the healthcare system's reliance on the Platform for claim processing and the

extensive impact of the Shutdown, plausibly showing that a considerable number of

people were impacted.

The Court acknowledges that this is the first time a claim for public nuisance has

been discussed in the context of a data breach. At this early stage, the Court has been

persuaded that patient harms arising from healthcare shutdowns are sufficiently similar to

patient harms from other public health crises to warrant application of the cause of action.

*E.g.*, *Minnesota v. Fleet Farm LLC*, No. 22-cv-2694, 2025 WL 2802243, at *13 (D.

Minn. Oct. 1, 2025) (discussing public nuisance in the context of firearms). *See*

*generally Leppink v. Water Gremlin Co.*, 944 N.W.2d 493, 499 (Minn. Ct. App. 2020)

(defining "public health nuisance" as "any activity or failure to act that adversely affects

the health of the community at large").

## 2. Specialized Injury

Generally, public nuisances are redressed by prosecution. *Hill v. Stokely-Van*

*Camp, Inc.*, 109 N.W.2d 749, 753 (Minn. 1961); *see also T.W. ex rel. McKenzie v.*

*Walmart Stores, Inc.*, No. 22-cv-1584, 2023 WL 3646685, at *3 (D. Minn. May 25, 2023)

(applying this rule to Minn. Stat. § 609.74). However, if a private entity "has suffered

some special or peculiar damage not common to the general public," it may bring a

claim. *Viebahn v. Bd. of Crow Wing Cnty. Comm'rs*, 104 N.W. 1089, 1091 (Minn. 1905);

*see also Gettysburg v. Teva Pharm. Indus., Ltd.*, No. 23-cv-3882, 2024 WL 2014212,

at *3 n.6 (D. Minn. May 7, 2024) (applying this rule to Minn. Stat. § 609.74).

The alleged harm to the public was disruption in patient care. The alleged harm to the Provider Plaintiffs was the cost of responding to the Shutdown. These are different, so the Provider Plaintiffs suffered specialized harm. *Cf. In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d 745, 774 (N.D. Ohio Apr. 3, 2020) (differentiating operational costs to hospitals as a result of the opioid crisis from negative health outcomes suffered by the public). *But see E. Me. Med. Ctr. v. Walgreen Co.*, 331 A.3d 380, 392-93 (Me. 2025) (finding that economic harms to hospitals was a subset of injuries of opioid misuse, not different harms). While both stem from the Shutdown, providers have a different relationship to the Shutdown than patients do—patient harms centered around access to care and provider harms centered around the economic impact. *See Clean Water & Air Legacy, LLC v. Tofte Wastewater Treatment Ass'n*, 649 F. Supp. 3d 764, 773-74 (D. Minn. 2023) (dismissing public nuisance claim because plaintiffs had the same relationship to the harms as the general public).

Provider Plaintiffs have sufficiently stated a claim for public nuisance and may bring the claim based on specialized injury. Defendants' motion to dismiss Count XI is denied.

K.    **State Statutory Claims**[29]

    1.    **Count XII:  Violation of the Minnesota Protection of Consumer Fraud Act ("MCFA")**

Provider Plaintiffs allege that Change Health Defendants violated the MCFA by making statements and omissions about Change's data security and the length of the Shutdown.  (Compl. ¶ 583.)  The MCFA prohibits "[t]he act, use, or employment by any person of any fraud, unfair or unconscionable practice, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise."  Minn. Stat. § 325F.69, subdiv. 1 (2025).  "Merchandise" includes services.  *Id.* § 325F.68, subdiv. 2.  A private person may enforce this statute if they are injured by the allegedly prohibited conduct and their cause of action benefits the public.  *Ly v. Nystrom*, 615 N.W.2d 302, 310, 314 (Minn. 2000).

Provider Plaintiffs' first theory, that Change misrepresented its cybersecurity, is plausibly a violation.  As discussed, Provider Plaintiffs sufficiently allege that Change Health Defendants made misrepresentations about their cybersecurity with the intent to

---

[29]    Provider Plaintiffs bring claims under various state consumer protection laws. (Compl. ¶¶ 580-644.)  The parties' briefing discussed these laws generally and did not dive into each relevant statute.  (*See* Doc. No. 261 at 52-64; Doc. No. 328 at 85-95.)  The Court finds the general briefing sufficient to decide the motion as to the claims applicable to the Minnesota-based Provider Plaintiffs who initially filed in this District and the Provider Plaintiffs who filed originally in Tennessee and Louisiana.  Those claims are Counts XII, XIV, XV, and XVII.  This decision does not apply to the remaining Provider Plaintiffs who bring those counts.  Further, the Court will wait to analyze Counts XIII, XVI, and XVIII until the claims of those states' respective Provider Plaintiffs are considered.

get providers to use the Platform. Coupled with the allegations that they were damaged by the conduct, Provider Plaintiffs have stated a claim under the MCFA. *See Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 12 (Minn. 2001) ("[T]he plaintiff need only plead that the defendant engaged in conduct prohibited by the statutes and that the plaintiff was damaged thereby. Allegations that the plaintiff relied on the defendant's conduct are not required to plead a violation."). Additionally, Provider Plaintiffs' allegations that Change Health Defendants omitted material information could support a MCFA violation. *See Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 951 & n.6 (D. Minn. 2020) (discussing the requirements for a MCFA violation based on omission).

This cause of action benefits the public because it would have impacts beyond the Provider Plaintiffs. *See Valera v. State Farm Mut. Auto. Ins. Co.*, 655 F. Supp. 3d 813, 824-25 (D. Minn. 2023). As evidenced by the Individual Track of this MDL, patients were impacted when their data was stolen from Change. Had Change Health Defendants not misrepresented their cybersecurity, providers would not have contracted with them, and patient data would not have been shared via the Platform. The public benefit requirement is satisfied. *See generally Cleveland v. Whirlpool Corp.*, 550 F. Supp. 3d 660, 676 (D. Minn. 2021) (noting that public benefit is a flexible inquiry).

However, the second theory, that Change Health Defendants misrepresented the length of the Shutdown, fails. The allegations only state that Change Health Defendants were attempting to deceive providers into believing that the Platform would return to functionality quickly. This is not a sale. Therefore, the MCFA does not apply. *See, e.g.,*

*Grady v. Progressive Direct Ins. Co.*, 643 F. Supp. 3d 929, 935 (D. Minn. 2022) ("If a claim asserts fraud that is not connected to the sale of merchandise, Section 325F.69, subdivision 1 does not apply."). This theory is dismissed.

Defendants' motion to dismiss Count XII is denied as to the cybersecurity representations and granted as to the Shutdown representations.

### 2.    Count XIV:  Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA")

Count XIV alleges that the misrepresentations regarding Change's cybersecurity and the length of the Shutdown constitute deceptive practices, and that Change Health Defendants' violations of the FTC Act and HIPAA constitute unfair practices, both of which violated the FDUTPA.  (Compl. ¶¶ 603-04.)

The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1) (2025).  To state a FDUTPA claim, a plaintiff must allege:  "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages."  *Dolphin LLC v. WCI Cmtys., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013).  The FDUTPA is to be construed liberally.  Fla. Stat. § 501.202 (2025).

A deceptive practice is one that is likely to mislead consumers to their detriment. *Yonan v. Walmart, Inc.*, 591 F. Supp. 3d 1291, 1299 (S.D. Fla. 2022).  It is plausible that misrepresentations about data security would mislead providers into thinking data was more secure than it was and that misleading statements about the length of the Shutdown would mislead providers mitigating damages from the Shutdown.  And Provider Plaintiffs

explain how such deception caused actual damages.  Provider Plaintiffs have sufficiently pled a claim under FDUTPA regarding misrepresentations.  *Cf. In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Prac. Litig.*, 955 F. Supp. 2d 1311, 1331-33 (S.D. Fla. 2013) (denying motion to dismiss FDUTPA claim based on false statements in milk products advertising).

As for violations of the FTC Act and HIPAA, the FDUTPA claim fails.  For the reasons discussed above, Provider Plaintiffs fail to establish violations of either the FTC Act or HIPAA.  Therefore, Provider Plaintiffs cannot establish an unfair act or practice to support the FDUTPA claim on these grounds.  Further, a FDUTPA claim cannot be predicated on a violation of federal law with no private right of action.  *See Eli Lilly & Co. v. RXCompoundStore.com, LLC*, No. 23-cv-23586, 2024 WL 1554339, at *4-6 (S.D. Fla. Apr. 9, 2024) (discussing preemption of FDUTPA).  This theory is dismissed with prejudice.

Defendants' motion to dismiss Count XIV is denied as to the misrepresentations theory but granted as to the statutory-violations theory.

### 3.    Count XV:  Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")

Similarly, Count XV alleges that the misrepresentations regarding Change's cybersecurity and the length of the Shutdown constitute deceptive practices, and that Change Health Defendants' violations of the FTC Act and HIPAA constitute unfair practices, both of which violated the ICFA.  (Compl. ¶¶ 611-12.)

The ICFA prohibits "any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact." 815 Ill. Comp. Stat. 505/2 (2025). A plaintiff must plead "that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019).

As with the FDUTPA, it is plausible that the misrepresentations were deceptive and unfair, and that Provider Plaintiffs were damaged. *See Sloan v. Anker Innovations Ltd.*, 711 F. Supp. 3d 946, 960 & n.5 (N.D. Ill. 2024) (analyzing consumer fraud claims under the ICFA and FDUTPA together). The Court therefore comes to the same conclusion: Provider Plaintiffs have stated a claim for violation of the ICFA as to the misrepresentations.

Unlike the FDUTPA, a plaintiff can predicate an ICFA claim on the violation of a law without a private right of action. *See Holmes v. Progressive Universal Ins. Co.*, No. 22-cv-894, 2023 WL 130477, at *6 (N.D. Ill. Jan. 9, 2023). But to do so, the plaintiff must adequately plead an underlying violation. *Id.* Because Provider Plaintiffs cannot establish a violation of either the FTC Act or HIPAA, they cannot base an ICFA claim on those violations. This theory is dismissed.

Defendants' motion to dismiss Count XV is denied as to the misrepresentations theory but granted as to the statutory-violations theory.

###### 4.  Count XVII:  Violation of the New Jersey Consumer Fraud Act ("NJCFA")

Count XVII mirrors the FDUTPA and ICFA claims, alleging that Change Health Defendants committed an unconscionable commercial act by violating the FTC Act and HIPAA, and committed deception by misrepresenting their cybersecurity and the length of the Shutdown, both of which violated the NJCFA.  (Compl. ¶¶ 629-30.)

The NJCFA prohibits "any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission."  N.J. Rev. Stat. § 56:8-2 (2025).  A plaintiff must plead (1) unlawful conduct, (2) an ascertainable loss, and (3) a causal connection between the conduct and loss.  *Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*, 929 A.2d 1076, 1086 (N.J. 2007).  A claim cannot be premised on a statutory violation with no private right of action.  *Slimm v. Bank of Am. Corp.*, No. 12-cv-5846, 2013 WL 1867035, at *13 (D.N.J. May 2, 2013).

Again, Provider Plaintiffs have adequately pled misrepresentations and omissions that cause loss, so they have adequately pled a NJCFA claim.  *See In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*, 288 F. Supp. 3d 1087, 1227-29 (D.N.M. 2017) (analyzing claims under the NJCFA, ICFA, and FDUTPA concurrently). However, the claims premised on violations of the FTC Act and HIPAA are dismissed with prejudice.  Defendants' motion to dismiss is denied as to the misrepresentations theory but granted as to the statutory-violations theory.

**L.    Count XIX:  Declaratory Judgment**

Provider Plaintiffs ask the Court to (1) declare that "Change Health Defendants' existing data security measures do not comply with their obligations and duties of care" and (2) order Change Health Defendants to implement various cybersecurity measures to meet their duty of care.  (Compl. ¶ 649.)  Provider Plaintiffs have not sufficiently alleged risk of future harm to support this request.

In order for the Court to issue such declaratory and injunctive relief, Provider Plaintiffs must establish that a future data breach is "certainly impending" or there is "a substantial risk" of a future breach.  *In re SuperValu, Inc.*, 870 F.3d 763, 769 (8th Cir. 2017) (citation modified).  Evidence of a prior data breach is not sufficient—there must be some indication that a future breach is imminent.  *See In re Pawn Am. Consumer Data Breach Litig.*, No. 21-cv-2554, 2022 WL 3159874, at *3 (D. Minn. Aug. 8, 2022).  Provider Plaintiffs clearly allege that Change's cybersecurity was deficient at the time of the Cyberattack, but they do not allege that such deficiencies remain.  Though the healthcare sector is particularly at risk of cyberattacks, there is no indication a future attack on Change would be successful.  Provider Plaintiffs have not established that a future breach is imminent so Count XIX is properly dismissed.

Alternatively, even if the allegations did address current deficiencies, the request is entirely duplicative of previous claims.  Count I discusses Defendants' alleged duty to exercise reasonable care.  Count XI similarly alleges that Change Health Defendants unreasonably operated the Platform and requests injunctive relief, including implementation of appropriate security.  Those claims survive this motion to dismiss.

*See, e.g.*, *Great Am. Ins. Co. v. Twin Cities Dance & Ent., LLC*, No. 23-cv-767, 2024 WL 6475956, at *6 (D. Minn. Jan. 16, 2024) (discussing redundant declaratory judgment claims).

The Court therefore grants Defendants' motion as to Count XIX. While a standing defect generally warrants dismissal without prejudice, the Court dismisses this claim with prejudice because it is also duplicative. *See County of Mille Lacs v. Benjamin*, 361 F.3d 460, 464-65 (8th Cir. 2004) (noting that a district court is barred from dismissing with prejudice solely on jurisdictional grounds); *see, e.g.*, *Sorensen v. BlueSky TelePsych, LLC*, No. 22-cv-2971, 2023 WL 3571937, at *3, *6 (D. Minn. May 19, 2023) (dismissing duplicative declaratory judgment claim with prejudice).

## CONCLUSION

At the motion to dismiss stage, the Court accepts the facts alleged in the complaint as true and views those allegations in the light most favorable to the plaintiff. Under that standard, Provider Plaintiffs have sufficiently alleged negligence, breach of contract, breach of the TFAP Agreement, unjust enrichment, tortious interference with prospective economic advantage, negligent misrepresentation by omission and by statement, fraudulent inducement, and public nuisance under Minnesota law. Additionally, they have sufficiently alleged violations of the MCFA, FDUTPA, ICFA, and NJCFA. However, Provider Plaintiffs' claims of negligence per se and breach of the implied covenant of good faith and fair dealing under Minnesota law and the declaratory judgment claim fall short. Those claims are dismissed.

**ORDER**

Based upon the foregoing and the record in this case, **IT IS HEREBY**

**ORDERED** that:

1.    Defendants' motion to dismiss Provider Plaintiffs' claims (Doc. No. [253])

is **GRANTED IN PART AND DENIED IN PART** as follows:

a.    The motion is granted as to Plaintiffs Moffitt, Revival, Professional

Arts, Play Therapy, Dillman, and Advanced Cardiology **ONLY** as to:  Counts II

and XIX in their entirety; Count III insofar as it relies on federal law and the

implied covenant of good faith and fair dealing; Count V insofar as it relies on

payments for cybersecurity; Counts VIII and IX insofar as they relate to the

Shutdown timeline; Count XII insofar as it relates to the Shutdown timeline; and

Counts XIV, XV, and XVII insofar as they rely on violations of federal law.

b.    The motion is respectfully denied as to Plaintiffs Moffitt, Revival,

Professional Arts, Play Therapy, Dillman, and Advanced Cardiology **ONLY** as to:

Counts I, VI, X, and XI in their entirety; Count III insofar as it relies on duties

outside of federal law; Count V insofar as it relates to provision of services;

Counts VIII and IX insofar as they relate to data security; Count XII insofar as it

relates to misrepresentations about cybersecurity; and Counts XIV, XV, and XVII

insofar as they rely on misrepresentations.

c.    The motion is respectfully denied as to Count IV in its entirety as to

**ALL** Provider Plaintiffs.

62

2.      Plaintiffs Moffitt, Revival, Professional Arts, Play Therapy, Dillman, and Advanced Cardiology's claims in Count II, Count III relating to violations of federal law, Count V relating to service payments, Counts VIII and IX relating to the Shutdown timeline, Count XII relating to the Shutdown timeline, and Count XV relating to statutory violations are **DISMISSED WITHOUT PREJUDICE**.

3.      Plaintiffs Moffitt, Revival, Professional Arts, Play Therapy, Dillman, and Advanced Cardiology's claims in Count III relating to the implied covenant of good faith and fair dealing, Counts XIV and XVII relating to statutory violations, and the entirety of Count XIX are **DISMISSED WITH PREJUDICE**.

4.      The parties shall submit response and reply briefing on the home-state laws for Provider Plaintiffs who filed in Minnesota but are not located in Minnesota.

  a.      The parties are directed to meet and confer on an appropriate timeline for this briefing and to file a stipulation on the matter by January 16, 2026.

  b.      The Court reserves ruling on the motion to dismiss as to the non-Minnesota-based Provider Plaintiffs until such briefing is received.

5.      Defendant Optum Pay is **TERMINATED** as a party in this MDL.


Dated:  December 19, 2025    s/Donovan W. Frank
            DONOVAN W. FRANK
            United States District Judge