# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

In re:

PRECISION TOXICOLOGY, LLC.                    MDL No. 24-3108 (DWF/DJF)
d/b/a PRECISION DIAGNOSTICS and
PRECISION TOXICOLOGY HOLDINGS, INC.,

       **COMPLAINT**

     Plaintiffs**,**

This Document Relates to All Actions

_____

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................... 5

JURISDICTION AND VENUE ................................................................. 8

FACTUAL ALLEGATIONS .................................................................... 9

  I.   DEFENDANTS ........................................................................ 9

  II.  UHG'S ACQUISITION OF CHANGE HEALTHCARE .................................... 12

  III.  THE CHANGE PLATFORM'S CRITICAL ROLE IN THE HEALTHCARE INDUSTRY ....... 13

  IV.  THE RANSOMWARE ATTACK AND SHUTDOWN OF THE CHANGE PLATFORM .......... 17

  V. THE AFTERMATH OF THE RANSOMWARE ATTACK FOR PROVIDERS ....................... 23

    a.   The Ransomware Attack and shutdown interfered with Providers' services.
        caused Providers to experience losses or delays of substantial Income ..........24

    b.   Change Health Defendants' misleading statements and omissions during
        the shutdown caused further damage……………………………………………28

    c.   UHG financially benefited from the Ransomware Attack and shutdown……....32

  VI.   CHANGE HEALTH DEFENDANTS ARE RESPONSIBLE FOR THE
        RANSOMWARE ATTACK AND SHUTDOWN……………………..……….34

    a.  Change Health Defendants knew of the acute risk of Ransomware Attacks
       for businesses in the healthcare industry…………………………………….34

    b.  Change Health Defendants had duties to protect Private Information…………38

    c.  Change Health Defendants represented that they adequately protected
       Private Information…………………………………………………………40

    d.  Change Health Defendants failed to comply with federal law and
       regulatory guidance to prevent the Data Breach and shutdown ………..............43

    e. Change Health Defendants failed to implement multi-factor authentication for
    remote access to its servers……………………………........................................46

VII.    CHANGE HEALTH DEFENDANTS FAILED TO APPLY THE PRINCIPLE
        OF LEAST PRIVILEGE TO ITS SYSTEMS…………………………………50

VIII.   CHANGE HEALTH DEFENDANTS DID NOT PROPERLY SEGMENT
        CHANGE'S SYSTEMS.……..………… ……………….….. …………….…....51

IX.        CHANGE HEALTH DEFENDANTS FAILED TO PROTECT THEIR
        BACKUP TECHNOLOGY AND DATA……….. …………………..……….…52

X.       CHANGE HEALTH DEFENDANTS FAILED TO IMPLEMENT CRITICAL
        INTERNAL CYBERSECURITY MONITORING AT CHANGE.………… …53

XI.        CHANGE HEALTH DEFENDANTS FAILED TO PROTECT AGAINST
        KNOWN THREATS FROM THE ALPHV CYBERCRIMINAL
        RANSOMWARE GROUP.…………………….….. ……………..……….…57

XII.   CHANGE HEALTH DEFENDANTS DID NOT PROPERLY ENCRYPT
        PRIVATE INFORMATION.………………….….. ……………..………61

    PLAINTIFFS.…………………………………………………………………..63
        a.  *Precision Toxicology, LLC d/b/a Precision Diagnostics  ("Precision")*…
            ………………………………………………………………………… 63
        b.  *Precision Toxicology Holdings, Inc.* ……………...…………………...…..63
**CLAIMS FOR RELIEF.…………….…………...…………………………………..63**
COUNT I: Negligence ..................................................................................... 63
COUNT II: Negligence Per Se ........................................................................ 68
COUNT III: Breach of Contract ..................................................................... 71
COUNT IV: Unjust Enrichment ..................................................................... 75
COUNT V: Interference With Prospective Economic Advantage, Business Relationship,
Or Expectancy ............................................................................................... 77
COUNT VI: Negligent Interference with Economic Advantage ................................. 80
COUNT VII: Negligent Omission ................................................................... 83
COUNT VIII: Negligent Misrepresentation ...................................................... 86
COUNT IX: Fraudulent Inducement ............................................................90
COUNT X: Public Nuisance ........................................................................92
COUNT XI: Violation of The California Protection of Consumer Fraud Act ................96

Mansfield, Bronstein & Stone, LLP
200 East Broward Boulevard  •  Suite 1250  •  Fort Lauderdale, Florida 33301
954.601.5600 (phone)  •  954.961.4756 (fax)
www.mblawpa.com

COUNT XII: Violation of The California Unfair Competition Law……………….………………………………………………………….…100.

COUNT XIII: Violation of The Minnesota Protection of Consumer Fraud Act …………………….…………………………………………………………….…....104

**REQUEST FOR RELIEF** ............................................................. **108**

**DEMAND FOR JURY TRIAL** ..................................................... **109**

Plaintiffs, Precision Toxicology, LLC d/b/a Precision Diagnostics (hereinafter referred to as "Precision") and Precision Toxicology Holdings, Inc. (hereinafter referred to as "Holdings"), (collectively, "Plaintiffs") bring this action against Defendants UnitedHealth Group Incorporated ("UHG"), United HealthCare Services, Inc. ("UHCS"), Optum Insight, Change Healthcare, Inc. ("Change Healthcare"), Change Healthcare Operations, LLC ("CHO"), Change Healthcare Solutions, LLC ("CHS"), Change Healthcare Holdings, Inc. ("CHH"), and, Change Healthcare Technologies, LLC ("CHT"), (Change Healthcare, CHO, CHS, CHH, and CHT, together, referred to as "Change") (Change, with UHG, UHCS, and Optum Insight, the "Change Health Defendants"), Change Healthcare Pharmacy Solutions, Inc., Optum, Inc., Optum Financial, Inc. ("Optum Financial"), Optum Bank, and Optum Pay, (collectively, the "Optum Financial Defendants") (Change Health Defendants and the Optum Financial Defendants, together, "Defendants"). Plaintiffs make the following allegations:

## PRELIMINARY STATEMENT

1.      The Change Health Defendants control the largest healthcare payment platform in the United States (the "Change Platform"), providing, among other things, a claims processing service that is used by healthcare providers, including Precision,  ("Providers") to submit claims to insurance companies and receive reimbursement for services performed (the "Services"). The Change Platform processes 15 billion transactions annually, "touching one in three U.S. patient records."[1] In dollar terms, the Change Platform processes approximately "$2 trillion in health care payments each year," meaning Change is "responsibl[e] for more than 44% of all the dollars flowing through the health care system."

2.      To operate the Change Platform, Change Health Defendants transact in and store huge volumes of confidential information including highly sensitive and confidential patient information including full names, phone numbers, addresses, Social Security numbers, emails, and payment information, referred to "Personally Identifying Information" or "PII." They also store patients' medical records, claims information, provider information, diagnoses, medicines, test results, images, care and treatment, and billing, claims and payment information including health insurance information (such as health plans and policies, insurance companies, member and group ID numbers, and Medicaid-Medicare-government payer ID numbers)—collectively known as "Private Health Information" or "PHI" (PII and PHI together are referred to as "Private Information").

3.      The Change Health Defendants provided some or all of these services to Precision.

4.      In February 2024, as a direct result of Change Health Defendants' failure to employ even rudimentary cybersecurity precautions to authenticate the identities of people logging in to their networks, Change Health Defendants' systems were compromised in the largest health care ransomware attack in history (the "Ransomware Attack"), which compromised millions of patients' Private Information, including private information attend by or on behalf of Precision's customer and or clients.

5.      In the aftermath of the Ransomware Attack, Change Health Defendants' systems were left in gross disrepair. Change Health Defendants had no viable backup plans or systems and in a largely futile effort to prevent further collapse of its systems, Change Health Defendants elected to take the remaining systems—including the Change Platform—offline completely, rendering it useless to Providers, including Precision.

6.      While the Change Platform was shut down, Providers, including Precision, were unable to verify insurance, determine copays, submit claims, or receive payment. As a result, Providers did not timely receive *billions* of dollars in earned reimbursements.  The impact on the U.S. health care system, and particularly Providers, was devastating. Hospitals, clinics, doctors, and therapists were left without a mechanism to be paid for their services for months.  The Change Platform shut down caused devastating financial, operational and managerial issues for Precision, which lost millions of dollars.

7.      During the shutdown, many Providers, including Precision, were unable to verify patient eligibility and coverage, file claims, appeal denials or partial denials of claims, receive electronic health remittances (ERAs), bill patients, or receive payments from insurers. With respect to Providers, and specifically to Precision, this continued for many months. Precision's reimbursements from its customers were severely curtailed during this time period. Without sufficient reimbursement, Providers, including Precision, had difficulty meeting employee payroll, paying rent, and other overhead expenses. Precision had to retrain existing staff, pay overtime and engage outside services in order to attempt manual claim submissions or use other workarounds to seek payment during the Change Platform shutdown.

8.      Exacerbating this crisis, Change Health Defendants did not provide adequate transparency and guidance to Providers, including Precision, during the shutdown. Specifically, Change Health Defendants knowingly and deliberately published misleading statements with significant omissions during the shutdown to lead Providers, including Precision, and the public to believe that the Change Platform would be offline only briefly. These statements were designed to pacify Providers, including Precision, to keep them from defecting to competitors and to hide

Change Health Defendants' gross negligence and incompetence from the public—all while Change Health Defendants knew that the outage would continue for much longer.

9.      Since the Ransomware Attack and shutdown, it has come to light that, despite the known risks of Ransomware Attacks to the healthcare industry, Change Health Defendants, in a grossly negligent manner, failed to implement reasonable security procedures and practices and failed to disclose material facts surrounding their deficient security protocols. Change Health Defendants have admitted that a well-known ransomware gang—ALPHV—was able to enter their externally facing server because it was not protected with even basic multifactor authentication ("MFA"). There were multiple other critical failures. As Senator Wyden exclaimed during the Senate hearing, "the attack could have been stopped with Cybersecurity 101."

10.      As a result of Defendants' conduct, Providers, including Precision, have suffered and will continue to suffer substantial harm. The event pushed many Providers, including Precision, to the brink of closure (and forced some Providers to close altogether). To survive, Providers, including Precision, necessarily incurred extra costs to make up for unpaid claims and in an attempt to submit claims without the Change Platform. Moreover, Providers, including Precision, will never see any compensation for claims that they were unable to submit during the shutdown.

## JURISDICTION AND VENUE

11.      On June 7, 2024, the Judicial Panel on Multidistrict Litigation issued an order centralizing litigation arising from the Ransomware Attack in this District. MDL Pretrial Order No. 1 (ECF 54) allows Plaintiffs to directly file this case in the MDL docket.

12.     The District of Minnesota may exercise jurisdiction over Defendants because they maintain their principal place of business in Minnesota, are registered to conduct business in Minnesota, have sufficient minimum contacts in Minnesota, have consented to jurisdiction in Minnesota; and/or, intentionally availed themselves of the markets within Minnesota through the promotion, sale, and marketing of the Services, thus rendering the exercise of jurisdiction by this Court proper and necessary.

13.     Venue is proper in the District of Minnesota under 28 U.S.C. § 1391 because Defendants UHG, UHCS, Optum, Inc., Optum Financial, Optum Insight, and CHT reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' and NCPA's claims occurred in this District.

## FACTUAL ALLEGATIONS

**I.**     **Defendants**

14.     Defendant UnitedHealth Group Incorporated is a Delaware corporation with its principal place of business in Minnetonka, Minnesota, and is registered to do business in the State. UHG exercises control over the management of the Change cybersecurity systems as evidenced by, inter alia, UHG's response to the Ransomware Attack as alleged herein.

15.     UHG "is a vertically integrated healthcare company" comprised of nondefendant United Healthcare Insurance Co. ("UHIC"), the largest commercial health insurer in America, and three Optum divisions: Optum Health, Optum Insight, and Optum Rx. UHG "is a health care leviathan" that, in 2023, "generated $324 billion in revenue, making it the fifth largest company in America."

Mansfield, Bronstein & Stone, LLP
200 East Broward Boulevard • Suite 1250 • Fort Lauderdale, Florida 33301
954.601.5600 (phone) • 954.961.4756 (fax)
www.mblawpa.com

16.     Defendant United HealthCare Services, Inc., is a direct subsidiary of UHG and maintains its principal place of business in Minnetonka, Minnesota, and is incorporated and registered to do business in Minnesota. UHCS is the parent to UHG's insurance business (UHIC), and healthcare services business operated under the Optum brand. UHG describes UHCS as providing "administrative services."

17.     Defendant Optum Insight, Inc. is a direct subsidiary of UHCS. It is incorporated in Delaware, and has its principal place of business in Eden Prairie, Minnesota. Optum Insight is registered to do business in Minnesota. Optum Insight is "a data and technology company and a technology-enabled services business" that offers a range of solutions including data, analytics, research, consulting, technology, and managed services to hospitals, physicians, health plans, governments, and life sciences companies. According to Change Healthcare Defendants, Optum Insight assists customers in lowering administrative expenses, complying with regulations, enhancing clinical performance, and reimagining operational processes. When some Providers attempted to contact Change Healthcare for help during the prolonged shutdown, they received responses from Optum Insight.

18.     Defendant Change Healthcare Inc. is a subsidiary of UHG, and is incorporated in Delaware, with its principal place of business in Nashville, Tennessee. Change Healthcare is now operated as part of Optum Insight and maintained the Change Platform at all relevant times.

19.     Defendant Change Healthcare Operations, LLC is a subsidiary of Change Healthcare. It is incorporated in Delaware, with its principal place of business in Nashville, Tennessee. CHO is a contracting entity for Change Healthcare.

20.      Defendant, Change Healthcare Solutions, LLC, is a subsidiary of or "managed" by CHO. It is incorporated in Delaware, has its principal place of business in Nashville, Tennessee, and is registered to do business in Minnesota. CHS provides "software & services for health plans & providers," and is one of the contracting entities for Providers, including Precision, to access the Change Platform.

21.      Defendant Change Healthcare Holdings, Inc. is a subsidiary of Change Healthcare. CHH is incorporated in Delaware, with its principal place of business in Nashville, Tennessee. In Defendant CHT's Minnesota Secretary of State Business registration, CHH's address is listed as Optum's headquarters in Eden Prairie, Minnesota.

22.      Defendant Change Healthcare Technologies, LLC is a subsidiary of, or "managed" by, CHH. It is incorporated in Delaware, and is registered to do business in Minnesota, and on such registration lists a principal place of business in Eden Prairie, Minnesota. CHT is a contracting entity for Change Healthcare and is one of the contracting entities for Providers to access the Change Platform.

23.      Defendant Change Healthcare Pharmacy Solutions, Inc. is a subsidiary of Change Healthcare. It is incorporated in Miane, with a principle place of business in Nashville, Tennessee. CHPS is registered to do business in Minnesota. It describes itself as providing "Pharmacy Benefits Administration" and is one of the contracting entities for Providers to access the Change Platform.

24.      Defendant Optum, Inc. is a subsidiary of UHCS. It is incorporated in Delaware, Optum, Inc. has its principal place of business in Eden Prairie, Minnesota and it's registered to do business in Minnesota. It functions as a holding company for the health services business."

Mansfield, Bronstein & Stone, LLP
200 East Broward Boulevard • Suite 1250 • Fort Lauderdale, Florida 33301
954.601.5600 (phone) • 954.961.4756 (fax)
www.mblawpa.com

25.     Defendant Optum Financial, Inc. is a subsidiary of Optum, Inc. It is incorporated in Delaware, with a principal place of business in Eden Prairie, Minnesota. Optum Financial is registered to do business in Minnesota. It describes itself as providing solutions for "people and organizations [to] save, spend, invest, and pay for health care."

26.     Defendant Optum Bank is a subsidiary of Optum Financial. It is incorporated, and has its principal place of business, in Utah. It is a member of the FDIC, and "offer[s] or administer[s]" HSAs, FSAs, HRAs, MSAs, and other health accounts, for Optum Financial.

27.     Defendant Optum Pay is a "financial solution" "platform that helps expedite payments," "optimize claims reconciliation," and allows "[P]roviders [to] choose how to receive payments from a network of payers." Optum Pay is "made possible by Optum Financial, Inc. and its subsidiaries" and related "[b]anking services are provided by OptumBank."

**II. UHG's Acquisition of Change Healthcare**

28.     Change Healthcare was founded in 1996 and provides data solutions to health insurers and providers to facilitate clinical decision making and payment processing across the healthcare industry. In 2017, Change Healthcare entered into a joint venture with McKesson Corporation's Technologies Solutions Division. In January 2021, UHG agreed to purchase Change Healthcare for approximately $13 billion.

29.     In October 2022, following a Department of Justice antitrust investigation into the merger and a trial ultimately approving the merger, UHG finalized its acquisition of Change Healthcare and integrated it operationally with Optum Insight.

30. As part of the merger, UHG "acquired all of the outstanding common shares of Change Healthcare" and, thus, wholly owns Change Healthcare and is responsible for supervising the cybersecurity practices and protocols of Change Healthcare.

31. At the time of its merger with Change Healthcare in 2022, Optum Insight processed approximately 192 million medical claims annually via its Electronic Data Interchange ("EDI") clearinghouse on behalf of approximately 220 of the approximately 230 health insurance companies in the United States. Via its own EDI clearinghouse network, Optum Insight had the largest collection of claims and electronic medical records in the healthcare industry, covering approximately 270 million American lives. The claims data "sent to Optum Insight [] is not de-identified or masked in any way."

32. In support of the merger, UHG and Change Healthcare claimed that the merger would result in significant benefits to the healthcare system, including simplifying and accelerating physician billing and patient payment processes, accelerating cash flow to providers, lowering financial burdens, decreasing the frequency of denied claims, and "minimiz[ing] the amount of friction between payers and providers." The DOJ and the AHA presciently cast doubts on those claims, highlighting the dangers of concentrating essential healthcare services and processes in UHG and Change Healthcare.

### III. The Change Platform's Critical Role in the Healthcare Industry

33. Generally, payments for healthcare services in the United States proceed in the following fashion: health insurers like UHIC, also known as "payers," pay medical claims submitted by Precision and other providers.

34.     The process begins with a patient or customer seeking care from a Provider, who confirms insurance coverage. The Provider provides services for the patient or customer.

35.     The Provider then submits a claim to a payer so that the Provider can be compensated for the provision of its services.

36.     Prior to paying the Provider, the payer evaluates the submitted claim to determine how much, if any, it should pay the Provider for the services rendered.

37.     The payer then sends the Provider an electronic remittance advice, or ERA, which outlines the claim, and the allowable amounts paid or denied, and pays the Provider the determined amount.

38.     The Provider then uses the ERA to bill the patient for any outstanding amounts owed, if any. Alternatively, the Provider may appeal the determination of the payer.

39.     The exchanges of information described above occur through EDI clearinghouses, which serve as the "pipes" through which electronic transmission of claims, ERAs, payment remittances, and other information are exchanged between payers and Providers. EDI clearinghouses are used by 95% of Providers and by 99% of insurers.

40.     EDI clearinghouse transactions are submitted in standardized transaction formats, which include a substantial amount of highly sensitive patient information in order to effectuate revenue management, clinical decision making, and patient support.

41.     In the regular course of business, the Change Health Defendants store massive volumes of highly sensitive and confidential Private Information, including full names, phone numbers, addresses, Social Security numbers, emails, and payment information.

42.     The Change Health Defendants also store massive volumes of information protected by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") such as medical records, medical record numbers, dental records, claims information, providers, diagnoses, medicines, test results, images, care and treatment, and billing, claims and payment information (such as claim numbers, account numbers, billing codes, payment cards, financial and banking information, payments made, and balance due). The Change Health Defendants also store massive volumes of health insurance information (such as primary, secondary or other health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payer ID numbers).

43.     In theory, the standardized format of information in EDI clearinghouse transactions should enable clearinghouses, Providers, and health insurers to be interoperable across the healthcare industry. In practice, as evidenced by the immense disruption to claims processing following the Ransomware Attack and shutdown, that is not the case. This is partly a function of the fact that Providers connect with the Change Platform either directly or indirectly via a third-party vendor or intermediary. While some Providers contract directly with Change to access the Change Platform, many Providers, including Precision, use electronic health records ("EHR") or revenue cycle management ("RCM") vendors to establish an indirect connection to the Change Platform, typically for a monthly flat fee.

44.     A further hindrance to Providers simply switching to new EDI clearinghouses is the fact that some payers require the use of a single EDI clearinghouse. Providers and payers are able to transmit claims to clearinghouses for which they do not have a direct or indirect connection via

"hops" because EDI clearinghouses have agreements to transmit claims they receive from other EDI clearinghouses on behalf of each EDI's clearinghouse.

45.     It is rare for Providers, including Precision, to switch EDI clearinghouses because it is costly and time-intensive to do so. For example, sometimes switching EDI clearinghouses entails switching the entire back-end RCM system into which the EDI clearinghouse integrates. Even when a full back-end system switch is not necessary, it can take between 60 and 90 days or longer to switch EDI clearinghouses. Indeed, during the 2022 DOJ antitrust trial, evidence from multiple witnesses was presented discussing the profound costs in both time and money to switching EDI clearinghouses and UHG acknowledged that "switching costs are too high" and "[c]auses too much disruption for providers." Two witnesses' testimonies revealed that it could take twelve to eighteen months and over $1 million for a provider to switch from the Change Platform.

46.     The ubiquity of the Change Platform is largely a function of its vast network of relationships with payers and Providers. Indeed, as of March 6, 2024, Change had an exclusive payer arrangement with over 1,000 payers in the United States, including in several states, Aetna, BlueCross/Blue Shield, Kaiser, and Medicaid. Such payers only accepted electronic claims through the Change Platform. Including exclusive payers, Change's pervasive network connectivity includes a network of approximately 900,000 physicians, 118,000 dentists, 33,000 pharmacies, 5,500 hospitals, 600 laboratories, and 2,400 government and commercial health insurers.

47.     At the time of its merger with Optum Insight, Change operated the country's largest EDI clearinghouse with over half of all commercial medical claims data flowing through the

Change Platform. Using its EDI clearinghouse network, Change's Network Solutions business facilitates "'financial, administrative, and clinical transactions, electronic business-to-business and consumer-to-business payments,' as well as aggregation and analytical data services," and generally the transmission of electronic claims. Specifically, the Change Platform processes medical claims relating to 15 billion health care transactions annually, encompassing a third of the patient records in the United States.

48.     Change stores and maintains historical claims data flowing through the Change Platform as far back as 2012.

49.     Change claims to have "primary" and "secondary" use rights over the data transmitted through its clearinghouse "for purposes beyond providing clearinghouse services" and licenses de-identified data to third parties. In January 2021, Optum Insight estimated that Change had data rights for approximately 90 million Americans annually.

## IV. The Ransomware Attack and Shutdown of the Change Platform

50.     "Ransomware" is a form of malicious software—or malware—designed to encrypt files on computer devices, rendering any files and the systems that rely on them unusable. After deploying their malware to cripple vulnerable computer systems, malicious actors then demand ransom in exchange for encryption.

51.     ALPHV (pronounced "ALF-V") is a well-known Russian-speaking cybercriminal ransomware group that emerged in 2021. ALPHV is also commonly known as BlackCat due to the image of a black cat on its ransomware dark web site.

52.     Healthcare Providers and their affiliates like the Change Health Defendants are prime targets for Ransomware Attacks for two primary reasons. First, they have significant

resources to pay ransoms in order to remove encryption and regain control over their networks and systems. Second, the Private Information they collect and store is valuable on black markets.

53. On February 12, 2024, the username and password for a low-level, customer support employee's access to Change's Citrix portal were posted in a Telegram group chat that advertises the sale of stolen credentials. The account was a basic, user-level account: it only had access to specific applications and did not itself have administrator access or credentials. However, the compromised account had the authority to create accounts with administrative privileges.

54. On February 12, 2024, ALPHV and its affiliates used the compromised credentials to remotely access Change's portal, thus gaining entry to the basic, user-level account.

55. Since "the [Citrix Remote PC Access] portal did not have multi-factor authentication," ALPHV experienced limited roadblocks in gaining access to Change's networks with the compromised credentials.

56. From that limited account, the cybercriminals were able to break into the server that hosted Change's medication management application, SelectRX. This action was undetected by the Change Health Defendants.

57. From there, the cybercriminals created privileged accounts with administrator capabilities that permitted access to and deletion of any and all files, changes to system configurations, and similar administrator-level activities. These actions went to the heart of the integrity of Change's most critical IT infrastructure but still went undetected by Change Health Defendants.

58. ALPHV navigated through Change's systems and servers at will, installing multiple malware tools and applications, as well as multiple "backdoors" that would allow the

cybercriminals to return to those environments in the event Change detected the suspicious activity and tried to block access.

59.    ALPHV also copied and exfiltrated terabytes of Private Information for tens of millions of individuals. ALPHV has disclosed that the data exfiltrated in the Ransomware Attack includes millions of "active U.S. military/navy personnel PII," "medical records," "dental records," "payments information," "claims information," "patients' PII data (i.e., phone numbers, addresses, social security numbers, email addresses, and more," "3000+ source code files for Change Health solutions…," "insurance records," and "more."

60.    This access to systems critical to Change's operations went undetected by Change Health Defendants for nine days until the ALPHV chose to reveal itself when it began to encrypt Change's systems on February 21, 2024.

61.    On that date, ALPHV ransomware was deployed on Change's networks, "encrypting Change Healthcare's systems" so they could not be accessed without ALPHV's cooperation.  ALPHV warned Change Health Defendants that they were "walking on a very thin line be careful you just might fall over."

62.    Upon learning of the Ransomware Attack, and "[n]ot knowing the entry point of the attack at the time," UHG "immediately severed connectivity with Change's data centers to eliminate the potential for further infection" to "the broader health system."

63.    In other words, Change Health Defendants intentionally made the Change Platform inoperable after discovering the Ransomware Attack, severing the connection between Providers, including Precision, and payers.

64.    On February 21, 2024, in an SEC filing, UHG announced that "a suspected nation-state associated cyber security threat actor had gained access to some of the Change Healthcare information technology systems." UHG falsely claimed to have "proactively isolated the impacted systems from other connecting systems . . . ." UHG also said it was "working with law enforcement" and allegedly "notified customers, clients and certain government agencies" of the Ransomware Attack. UHG disclosed that the "network interruption [was] specific to Change Healthcare . . . ." UHG explained it was working to restore Change's information technology systems and resume normal operations as soon as possible but informed the SEC that UHG could not estimate the duration or extent of the disruption at that time.

65.    Weeks later, the Change Platform remained largely inoperable.

66.    In light of the ongoing shutdown of the Change Platform, on March 13, 2024, the Health and Human Services' Office for Civil Rights ("OCR") sounded the alarm via a Dear Colleague Letter issued to Change wherein OCR emphasized that the Ransomware Attack continued to "pose[] a direct threat to critically needed patient care and essential operations of the health care industry."

67.    On April 22, 2024, UHG CEO Andrew Witty reported that files containing Private Information for a substantial proportion of America's population were among the files exfiltrated. Witty further reported that it would take several months of continued analysis before UHG believed it had enough information to begin notifying impacted customers and individuals.

68.    On April 27, 2024, the AHA provided Congress a letter containing significant information regarding patients' access to care and the financial instability of Providers across the country resulting from the Ransomware Attack. AHA identified "Change Healthcare [as] the

predominant source of more than 100 critical functions that keep the health care system operating." According to AHA, Change "processes $2 trillion in health care payments each year," meaning Change is "responsibl[e] for more than 44% of all the dollars flowing through the health care system."

69.    As the AHA explained in its letter to Congress, the Ransomware Attack resulted in "patients struggl[ing] to get timely access to care and billions of dollars stopped flowing to providers, thereby threatening the solvency of our nation's provider network." Part of the reason for this was because "[d]uring the early days and weeks of the event, it was very difficult to obtain clear information from UnitedHealth Group. Initially, there was little communication and a minimization from UnitedHealth Group about the impact this event was having on the ability to process medical claims."

70.    A third of the hospitals surveyed by AHA reported that the Ransomware Attack "disrupted more than half of their revenue." This figure does not tell the full story of the toll on Providers' finances and operations as, post-restoration, Providers still had to "work through the backlog of claims, reprocess denials…, reconcile payments to accounts, and bill patients." Much of this work remains incomplete, even today.

71.    On May 1, 2024, Witty testified before both the House Energy and Commerce Committee and the Senate Finance Committee concerning the Ransomware Attack. Witty acknowledged the Ransomware Attack and shutdown "caused incredible disruption across the health care system," resulting in everything from "pharmacists having to manually submit claims to the rural family medicine practice struggling to make payroll." Witty "pledge[d] to do everything in our power to fix [Providers'] system[s] or underwrite their cashflow."

72.    Witty also testified about the continued shutdown, acknowledging that UHG was still "mak[ing] substantial progress in restoring Change Healthcare's impacted services" and that a "number of providers [ ] continue to be adversely impacted."

73.    Witty confirmed UHG's understanding that "Cyberattacks continue to increase in frequency and significance" and explained that UHG understood the pervasiveness of these attacks, given UHG's own experiences with over 450,000 intrusion attempts annually.

74.    Witty claimed that since Change recently became part of UHG, they "were in the process of upgrading and modernizing their technology" when the Ransomware Attack happened and that "the attack itself had the effect of locking up the various backup systems which had been developed inside Change before it was acquired."

75.    Witty also admitted that ALPHV gained access to the Change network because of a lack of multi-factor authentication on a Change server. More specifically, ALPHV used compromised credentials to infiltrate the network through the externally facing Change server, without multi-factor authentication restrictions.

76.    Witty further estimated one-third of Americans were impacted by the Ransomware Attack. He confirmed that "it is likely to take several months … to identify and notify impacted customers and individuals."

77.    Witty confirmed that Private Information from the exfiltrated files had been posted for approximately a week on the dark web and that UHG paid the demanded $22 million ransom in bitcoin.

78.    However, after ALPHV received UHG's ransom payment, it chose not to share the ransom with its affiliate who executed the attack, known as "Notchy," and instead, "published a

fake law enforcement takedown notice on their leak site before disappearing with the full $22 million."

79.     Notchy confirmed that, because it was not paid its share of the ransom by ALPHV, it would retain the stolen data, stating: "Sadly for Change Healthcare, their data [is] still with us."

80.     Notchy and other former ALPHV affiliated groups have since joined the ransomware group RansomHub.

81.     RansomHub has since confirmed that it possesses 4 terabytes of the Change Health Defendants' stolen data by posting screenshots on its dark web ransomware site and has attempted to extort Change Health Defendants out of additional ransom payments.

82.     In response to ALPHV refusing to pay Notchy, Dmitry Smilyanets, a researcher for the security firm Recorded Future, said, "[t]he affiliates still have this data, and they're mad they didn't receive this money. . . . It's a good lesson for everyone. You cannot trust criminals; their word is worth nothing."

83.     The number of individuals in the United States that have been affected by the Ransomware Attack is astounding. On October 22, 2024, Change notified OCR that it had already sent individual notices to approximately 100 million Americans.

84.     However, it was not until November 21, 2024, nine months after the initial shutdown, that Change reported that it had purportedly "complete[d] restoration of its clearinghouse services." Even then, Change was only offering "partial service" for some Services.

**V. The Aftermath of the Ransomware Attack for Providers**

85.     The Change Health Defendants' decision to shutdown the Change Platform without warning to the Providers, including Precision, and insurers that were dependent on the Platform

and without offering an adequate substitute wreaked chaos throughout the healthcare system which, as a result of Defendants' mergers and expansion throughout the industry, was dependent on the Change Platform as essential infrastructure for the provision of patient care.

86.     The Change Health Defendants' decision acutely impacted Providers, including Precision, by cutting off their ability to submit insurance claims and receive payment. Other Services that Precision relied on were also cut off, such as its ability to receive ERAs and conduct patient eligibility checks.

87.     Change Health Defendants were unable to fully restore these Services for months after the Ransomware Attack.

88.     By cutting off Providers, including Precision, from necessary healthcare system infrastructure and substantial cash inflows for months, the Ransomware Attack and resulting shutdown decimated healthcare practices nationwide, including Precision.

89.     Change Health Defendants' decision to shut down the Change Platform caused Providers, including Precision, to experience loss or delay of months' worth of income, and forced Providers, including Precision, to divert resources from their ordinary operations, including patient care.

90.     Change Health Defendants' decision to publish incomplete and misleading information regarding the duration and extent of the shutdown exacerbated these injuries.

**a. The Ransomware Attack and shutdown interfered with Providers' services caused Providers, including Precision, to experience losses or delays of substantial income.**

91.     The Change Platform outage impacted Providers', including Precision, to obtain compensation for the services they were able to provide to patients and or customers, in numerous ways.

92.    When Change Health Defendants disconnected the Change Platform, many Providers, including Precision, lost their primary (and, in some cases, their only) method for processing insurance claims for their services, including both private insurance and government provided healthcare plans such as Medicare. Because these Providers, including Precision, could not submit and/or have their claims processed for months, they did not receive payment from insurance companies or the government for months. For example, a survey conducted by the American Medical Association (AMA) two months after the Ransomware Attack revealed that 80% of responding physician practices were still losing revenue from the inability to submit claims.

93.    Some Providers, including Precision, resorted to submitting paper claims through the mail, a laborious process that required enormous human resources on the part of Providers. Providers, including Precision, either had to marshal additional human resources to undertake paper claims submissions, or were simply unable to submit claims. Two months after the Ransomware Attack, the AMA survey revealed that 91% of surveyed physician practices still had to commit additional staff time and resources to complete revenue cycle tasks. Many insurers became so overrun by paper claims during the outage that they encouraged Providers to stop submitting paper claims due to long delays processing paper claims. These delays further delayed payment to Providers, including Precision, or prevented payment altogether.

94.    Providers, including Precision, also exerted resources by trying to switch clearinghouses so they could submit claims through those alternative services. However, attempting to switch clearinghouses on an expedited timeline created costs associated with

switching, increases in rejected claims, interoperability issues with some insurers, and lost employee time implementing and learning a new system.

95.    Switching clearinghouses was also not a panacea. Many insurers accepted electronic claims exclusively through the Change Platform. When Change Health Defendants shut down the Change Platform, Providers, including Precision,—regardless of whether they exclusively used the Change Platform—could only submit claims to those insurers by paper and mail. Fully switching to another clearinghouse was simply not an option because these payers did not work with any clearinghouses other than Change.

96.    As a result of Change Health Defendants' decision to take the Change Platform offline, Providers, including Precision, were (and some still are) unable to receive ERAs for claims that were (i) submitted via the Change Platform shortly before the shutdown, and (ii) claims that were submitted via alternate routes (such as by paper or through an alternative clearinghouse) during the shutdown. Without ERAs, Providers, including Precision, have no way of knowing which claims insurers have accepted, partially accepted, or rejected, and are unable to go through the normal process of addressing these issues to ensure that they receive full payment before insurers' Timely Filing Deadlines.

97.    Providers, including Precision, were unable to engage in payment reconciliations and decide which denials to appeal without ERAs. As a result, Providers, including Precision, missed out on payments, entirely or partially, on claims for which they never received ERAs or for which they received delayed ERAs.

98.     Two months after the Ransomware Attack and shutdown, 79% of surveyed physician practices were still unable to receive ERAs. Some Providers, including Precision, remain unable to receive or access historical ERAs.

99.     In addition to being unable to perform reconciliations by using the ERAs, due to the length of the shutdown, there are some claims for which Providers, including Precision, were unable to make any submission by the Timely Filing Deadlines. With no or limited ability to submit claims, the Ransomware Attack and subsequent Change Platform shutdown caused many Providers, including Precision, to have claims denied by insurers for not complying with the Timely Filing Deadlines. Providers, including Precision, will never be paid for these claims because of Change Health Defendants' shutdown.

100.     Just two months after the Ransomware Attack and shutdown, 27% of surveyed physician practices reported that they had already had claims denied for failing to meet Timely Filing Deadlines because of the Ransomware Attack and shutdown.

101.     Moreover, as a result of Change Health Defendants' shutdown of the Change Platform, Providers, including Precision, were unable to check patient coverage or eligibility for services. In some cases, Providers had to delay services or turn patients away, including for new patients whose insurance coverage Providers could not verify due to the shutdown.

102.     Providers, including Precision, had to absorb these costs and losses in real time, impacting their financial stability.  The administrative and financial challenges created by the Change shutdown forced Precision to divert staff time and resources to administrative tasks.

**b. Change Health Defendants' misleading statements and omissions during the shutdown caused further damage.**

103.    To make matters worse, throughout the shutdown Change Health Defendants published misleading statements and omitted key facts regarding the impact of the Ransomware Attack. These statements were intended to (and did) deceive Providers, including Precision, into believing that the Change Platform would be back online quickly and to hide Change Health Defendants' ineptitude from the public.

104.    In reality, Change Health Defendants had exclusive knowledge of facts that clearly indicated it would be months before the Change Platform was up and running at its previous capacity. These facts, which only Change Health Defendants were privy to, included (i) the extensive damage caused by the cybercriminals, (ii) Change Health Defendants' lack of disaster recovery or business continuity plans and preparations to provide an adequate substitute for the Services offered on the Change Platform, and (iii) the labor required to reconnect the massive volume of entities to the Change Platform, all of which are required for the Platform to function at full capacity.

105.    Despite this knowledge, Change Health Defendants persisted in making several misleading statements and omitting key facts that would have allowed Providers to mitigate their damages.

106.    For example, when Change Health Defendants disclosed the Change Platform was the subject of the Ransomware Attack on February 21, 2024, they optimistically stated that they were "working diligently to restore those systems and resume normal operations as soon as possible, but cannot estimate the duration or extent of the disruption at this time." In reality, Change

Health Defendants knew it would take months—not days or weeks—to restore the Change Platform.

107.    On each day between February 21 and February 28, 2024, Optum, Inc. provided an update regarding the shutdown, again emphasizing that the Change Health Defendants were working to restore Services:

> We are working on multiple approaches to restore the impacted environment and will not take any shortcuts or take any additional risk as we bring our systems back online. We will continue to be proactive and aggressive with all our systems and if we suspect any issue with the system, we will immediately take action and disconnect. ***The disruption is expected to last at least through the day.***

108.    Discovery will show that sometime between February 21 and February 28, 2024, Change Health Defendants came to understand the shutdown would last much longer than a day, or even weeks. Despite this knowledge, Change Health Defendants failed to remove the misleading statement on the Optum website stating the "disruption is expected to last at least through the day," and omitted a truthful assessment of how long the shutdown would last.

109.    On March 7, 2024, UHG published a press release addressing the "Timeline to Restore Change Healthcare Systems." The press release stated that "[a]ssuming we continue at our current rate of progress, we expect our key system functionality to be restored and available on the following timelines: . . . Medical claims: We expect to begin testing and reestablish connectivity to our claims network and software ***on March 18, restoring service through that week.***" UHG claimed that all major pharmacy claims and payment systems were back up and functioning and that UHG had taken action to make sure patients could access their medicines.

110.    Discovery will show that as of March 7, Change Health Defendants knew that many users of the Change Platform, including both insurers and providers, including Precision, would not have "key system functionality" restored by the week of March 18. Despite this knowledge, Change Health Defendants misleadingly stated the Change Platform would be restored on March 18 and the following week, omitted that it would take much longer to get all users of the platform reconnected, and omitted that even when the Change Platform came back online, it would not be fully operational and several Services would not be available at all. Change Health Defendants further failed to later update and correct these misleading statements regarding medical claims functionality despite having a duty to do so after choosing to make statements on the topic.

111.    Also on April 22, 2024, two months after the Ransomware Attack, Change Health Defendants stated in a press release that "[m]edical claims across the U.S. health system are now flowing at near-normal levels as systems come back online *or providers switch to other methods of submission*. Change Healthcare knew that number of providers, including Precision, would continue to be adversely impacted." Change Health Defendants further admitted payment processing was still only at "86% of pre-incident levels," and other Services, such as eligibility software, were still in the process of "being restored on a rolling basis."

112.    Change Health Defendants' April 22, 2024, statements were false and misleading, and omitted critical facts, as to the true state of the Change Platform.

113.    For example, on April 29, 2024, the AMA released the results of a survey of physician practices on the continuing impacts of the Ransomware Attack and shutdown taken between April 19 and April 24, 2024. The survey revealed that 60% continued to face challenges

in verifying patient eligibility; 75% still faced barriers with claim submission; 79% still could not receive ERAs; and 85% continued to experience disruptions in claim payments.

114.    The AMA survey responses indicated the additional harm Change Health Defendants' misleading statements and omission had on Providers, with one survey respondent stating:

> We are still not able to send electronic claims, yet Medicare and other insurances are saying to bill electronically because Change is back online, when the platform we use will not be online for months.

This statement indicates that insures and government payers relied on Change Health Defendants' false and misleading statements and omissions regarding the restoration of the Change Platform to Providers' detriment.

115.    The AMA survey responses also revealed that 84% of surveyed physician practices "indicated that they are not receiving information, or are receiving inaccurate information, regarding service restoration from [Change Health Defendants]."

116.    The continued adverse impact is reflected in online forums created by Providers to try to help and support each other following the Ransomware Attack. For example, in a June 6, 2024, Reddit post titled "Change/Optum healthcare claims processing STILL down" various Providers discussed the reality that claims processing continued "to be down for three plus months for multiple practices throughout the country. No end in sight."

117.    Publicly available facts show the restoration was still not complete nearly six months after the Ransomware Attack and shutdown. For example, on August 8, 2024, Blue Cross Blue Shield of Massachusetts stated that it reconnected to Change Platform for some, but not all,

functionality. Specifically, it reported it had restored connectivity to the Change clearinghouse but was still working to process ERAs that had been held during the shutdown.

118.    Moreover, on or around November 21, 2024, nine months after the Ransomware Attack and shutdown, Change reported it had purportedly "complete[d] restoration of its clearinghouse services. Even then, Change was only offering "partial service" for some Services.

119.    Even today, Providers, including Precision, who changed to new clearinghouses are unable to access ERAs from Change.

120.    Change Health Defendants' misleading statements and omissions, which were widely covered in the media and reported to and relied on by Providers, including Precision, prevented Providers, including Precision, insurers, and EHR vendors from making informed decisions during the shutdown. For example, had Change Health Defendants disseminated accurate and complete information about how long it would take to restore the functionality of the Change Platform, Providers, including Precision, could have made informed decisions about obtaining financing, investing the resources to switch to alternative clearinghouses, obtaining resources to submit paper claims, negotiating Timely Filing Deadlines.

121.    The full impact of the Ransomware Attack on Providers is enormous and not yet fully known, and its effects are currently being felt by Providers, including Precision, nationwide.

**c.    UHG financially benefitted from the Ransomware Attack and shutdown.**

122.    Amidst all the harm Change Health Defendants' conduct inflicted upon the healthcare system and Providers specifically, UHG acknowledged that it experienced certain *positive* financial impacts resulting from the Ransomware Attack.

123.    For example, on April 16, 2024, UHG reported that the business disruptions caused by the Ransomware Attack had a positive $48 million tax effect, with an estimated benefit of $70 to $90 million in year-end impact. UHG estimated the total tax effect of the Ransomware Attack was $189 million for the first quarter with a $305 million to $375 million total tax effect by year end.

124.    On July 16, 2024, UHG reported the total estimated tax effect of the Ransomware Attack was $252 million for the second quarter with an estimated $515 million to $560 million total tax effect by year end. UHG estimated the total tax effect of the direct response as a result of the Data Breach was $182 million for the second quarter and $323 million for the first two quarters combined.

125.    These positive tax benefits comport with UHG's representations to the SEC that "the Company has not determined the incident is reasonably likely to materially impact the Company's financial condition…."

126.    Much of the positive financial impact of the Ransomware Attack and shutdown for UHG is attributable to UHIC, UHG's health insurance company. During the shutdown, UHIC, like many other insurers, did not experience a dip in income because members were still paying premiums. UHIC and other insurers, however, were not paying

Providers for the medical services members received during the shutdown because Providers were unable to submit claims. Instead of paying out that money owed to Providers, UHIC and other insurers held those millions (if not billions) of dollars in their cash reserves, earning interest at a time when interest rates were at recent highs.

127.    Moreover, UHIC has aggressively enforced Timely Filing Deadlines for claims that could not be submitted because of the shutdown, permanently denying payment to struggling Providers while enriching UHG.

## VI. Change Health Defendants Are Responsible for the Ransomware Attack and Shutdown

### a. Change Health Defendants knew of the acute risk of ransomware attacks for businesses in the healthcare industry.

128.    Change Health Defendants' data security obligations were particularly important given the substantial increase in Ransomware Attacks targeting healthcare entities that collect and store Private Information preceding the date of the Attack.

129.    The increased risk to healthcare entities was known and obvious to Change Health Defendants as they observed frequent public announcements of ransomware attacks affecting healthcare providers and knew that information of the type they collect, maintain, and store is highly coveted and a frequent target of cybercriminals.

130.    There have been recent high profile cybersecurity incidents at other healthcare partner and provider companies, including ESO Solutions, Inc. (2.7 million patients, September 2023), HCA Healthcare (11 million patients, July 2023), HealthEC LLC (4 million patients, July 2023), Prospect Medical Holdings, Inc. (1.3 million patients, July-August 2023), Managed Care of North America (8 million patients, March 2023), PharMerica Corporation (5 million patients, March 2023), Florida Orthopedic Institute (640,000 patients, July 2020), Elite Emergency Physicians (550,000 patients, June 2020),

131.    Magellan Health (365,000 patients, April 2020), BJC Health System (286,876 patients, March 2020), American Medical Collection Agency (25 million patients, March 2019),

Oregon Department of Human Services (645,000 patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), and Wolverine Solutions Group (600,000 patients, September 2018).

132. According to the HIPAA Journal's 2023 Healthcare Ransomware Attack Report, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services (HHS) Office for Civil Rights (OCR), beating the record of 720 healthcare security breaches set the previous year."

133. In addition, the Identity Theft Resource Center ("ITRC") set a new record for the number of data compromises tracked in a year, up 72% from the previous all-time high in 2021 (1,860).

134. Further, in Change Healthcare's 2022 Form 10-K disclosures, it acknowledged the broad range of risks that are attributed to its field of business and its own company specifically. Change Healthcare claimed that:

a. Its Services "involve the use and disclosure of personal and business information that could be used to impersonate third parties or otherwise gain access to their data or funds. If any of our employees or vendors or other bad actors takes, converts, or misuses such funds, documents or information, or we experience a data breach creating a risk of identity theft, we could be liable for damages, and our reputation could be damaged or destroyed;"

b. It could "be perceived to have facilitated or participated in illegal misappropriation of funds, documents or data and, therefore, be subject to civil or criminal liability.

Federal and state regulators may take the position that a data breach or misdirection of data constitutes an unfair or deceptive act or trade practice;"

c. "Despite [its] security management efforts […] [its] infrastructure, data or other operation centers and systems used in connection with [its] business operations, including the internet and related systems of [its] vendors . . . are vulnerable to, and may experience, unauthorized access to data and/or breaches of confidential information due to criminal conduct;" and

d. "[Its] products and services involve processing personal information. Like many organizations, [the UHG companies] have been and expect to routinely be the target of attempted cyber and other security threats by outside third parties, including technologically sophisticated and well-resourced bad actors attempting to access or steal the data [they] store."

135.     In UHG's SEC Form 10-K disclosures for the fiscal year ended December 31, 2023, which also analyzed and disclosed risks associated with Optum Insight, UHG and Optum Insight recognized that:

e. "If we or third parties we rely on sustain cyber-attacks or other privacy or data security incidents resulting in disruption to our operations or the disclosure of protected personal information or proprietary or confidential information, we could suffer a loss of revenue and increased costs, negative operational affects, exposure to significant liability, reputational harm and other serious negative consequences."

f. "We are regularly the target of attempted cyber-attacks and other security threats and have previously been, and may in the future be, subject to compromises of the

information technology systems we use, information we hold, or information held on our behalf by third parties."

g.  "Threat actors and hackers have previously been, and may in the future be, able to negatively affect our operations by penetrating our security controls and causing system and operational disruptions or shutdowns, accessing, misappropriating or otherwise compromising protected personal information or proprietary or confidential information or that of third parties, and developing and deploying viruses, ransomware and other malware that can attack our systems, exploit any security vulnerabilities, and disrupt or shutdown our systems and operations."

h.  "There have previously been and may be in the future heightened vulnerabilities due to the lack of physical supervision and on-site infrastructure for remote workforce operations and for recently-acquired or non-integrated businesses. We rely in some circumstances on third-party vendors to process, store and transmit large amounts of data for our business whose operations are subject to similar risks."

i.  "[C]ompromises of our security measures or the unauthorized dissemination of sensitive personal information, proprietary information or confidential information about us, our customers or other third parties, previously and in the future, could expose us or them to the risk of financial or medical identity theft, negative operational affects, expose us or them to a risk of loss or misuse of this information, result in litigation and liability, including regulatory penalties, for us, damage our brand and reputation, or otherwise harm our business."

136.    Moreover, prior to the Ransomware Attack, government agencies and cybersecurity researchers provided repeated warnings to healthcare entities of the threat posed by ALPHV.

**b. Change Health Defendants had duties to protect Private Information.**

137.    Change Health Defendants are covered by HIPAA (*see* 45 C.F.R. § 160.102) and, as such, are required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

138.    These rules establish national standards for the protection of patient information, defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider. 45 C.F.R. § 160.103.

139.    HIPAA limits the permissible uses of "protected health information" and prohibits unauthorized disclosures of "protected health information."

140.    HIPAA requires that Change Health Defendants implement appropriate safeguards for this information.

141.    HIPAA requires that covered entities provide notice of a breach of "unsecured" protected health information. "Unsecured" protected health information means protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons— i.e., non-encrypted data.

142.    In addition to HIPAA, federal agencies have issued recommendations and guidelines to help minimize the risks of a ransomware attack for businesses holding Private

Information. For example, the Federal Trade Commission (FTC) has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.

143.    The FTC's publication Protecting Personal Information: A Guide for Business sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data. Among other things, the guidelines state that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.

144.    Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures. This is consistent with guidance provided by the FBI, HHS, and the principles set forth in the Cybersecurity and Infrastructure Security Agency ("CISA") 2020 guidance.

145.    The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders

resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

146.    Given the amount and sensitive nature of Private Information they store, Change Health Defendants recognize and have previously acknowledged their duty to comply with the legal requirements set forth in HIPAA and other regulations to protect health information received and/or collected via their clearinghouse networks.

**c. Change Health Defendants represented that they adequately protected Private Information.**

147.    Change Health Defendants promise patients, Providers, including Precision, and payers that they will keep sensitive patient data secure.

148.    In its contract with Precision, Change broadly represented that it would retain in confidence and not disclose any and all confidential or proprietary information and materials of Precision. With respect to PHI governed by HIPAA, Change specifically promised Precision that Change would protect confidential information, including HIPAA information, "in a manner which shall be no less than the standard of care, which shall be reasonably adequate to protect confidential information."

149.    On its websites, Change also assures Providers that it has various processes and policies in place to protect their clients' and patients' sensitive information: "Keeping our customers' information secure is a top priority for Change Healthcare. We dedicate extensive resources to make sure personal medical and financial information is secure and we strive to build a company culture that reinforces trust at every opportunity."

150.    Optum Insight's contracts with health insurers further require the company to protect customers' data, including PHI, and to "use all 'reasonable commercial means'" to do so.

151.    As part of the merger with Change, UHG made "binding commitments" to customers to apply and maintain data security policies to protect customers' data "and to uphold all contractual rights of Change's customers to audit the protection and security of their data."

152.    Given the extensive amount and sensitive nature of the data they handle, Change Health Defendants maintain privacy policies outlining the usage and disclosure of confidential and personal information.

153.    Change's Global Privacy Notice represented that "Privacy matters to Change Healthcare, so we follow a privacy framework that helps us to manage and protect your personal information." Change further represented that it implemented and maintained "security measures designed to safeguard the data we process against unauthorized access" such that "Your Personal Information is only accessible to personnel who need to access it."

154.    Likewise, Change represents in its Code of Conduct that:

    a.    "We exercise care and discretion when handling [restricted and confidential] information."

    b.    "We collect, store, access, use, share, transfer, and dispose of [personally identifiable information] responsibly."

    c.    "We also respect and protect the sensitive nature of [protected health information] and carefully maintain its confidentiality."

    d.    "We earn the trust of our team members and the companies with which we do business by following our privacy, security, and data and information protection policies."

e. "We also regularly monitor our systems to be sure that information is accessed and used for appropriate, authorized activities, to discover any new threats, and to look for ways to improve."

f. "We monitor and control all electronic and computing devices used … to interact with our internal networks and systems."

155.    Hence, Change recognizes that its customers (i.e., Providers including Precision) and those they service have placed their trust in Change to protect the confidentiality and privacy of their data and "the consequences of betraying the trust of its customers…would be catastrophic." Change is responsible to all those who place their trust in it to maintain data security, including the patients and consumers who are ultimately served by its Change Platform and Services.

156.    UHG and Optum Insight adhere to the same "Privacy Policy," which assures the public—including patients and providers—that they have implemented organizational, technical, and administrative security measures" to safeguard patients' information. Their "Social Security Number Protection Policy" explicitly states their commitment to preserving the confidentiality of Social Security numbers received or collected during business operations. UHG and Optum Insight also pledge to limit access to Social Security numbers to lawful purposes and to prohibit unlawful disclosure. Change similarly assures that it implements and maintains security measures— organizational, technical, and administrative—to protect processed data from unauthorized access, destruction, loss, alteration, or misuse. These measures aim to uphold the integrity and confidentiality of data, including personal information.

157.    Change Health Defendants represent to the public that these are not mere words or policies. Optum Insight's Chief Operating Officer has testified that the company's

culture is to "treat customers' data as they would treat their data themselves." Change Health Defendants represented, under oath, that they had built a top down "culture of trust and integrity around protecting customers' sensitive information."

158. Given their representations and experience handling highly sensitive Private Information, Change Health Defendants understood the need and requirements to protect patients' Private Information and prioritize data security.

> **d. Change Health Defendants failed to comply with federal law and regulatory guidance to prevent the Data Breach and shutdown.**

159. During a Senate hearing regarding the Ransomware Attack, Senator Wyden said, "the attack could have been stopped with 'Cybersecurity 101.'" Senator Thom Tillis further confirmed the preventability of this Ransomware Attack. Waiving a paperback copy of "Hacking for Dummies," Senator Tillis emphasized that "[t]his is some basic stuff that was missed, so shame on internal audit, external audit and your systems folks tasked with redundancy, they're not doing their job."



160.    Despite the foreseeability of the Ransomware Attack, this cyber disaster occurred because, as CEO Witty highlighted, Change employed outdated technology and UHG, UHCS, and Optum Insight failed to promptly fix Change's problems when UHG acquired Change Healthcare in October 2022.

161.    Change Health Defendants' cybersecurity practices and policies were inadequate and fell short of the industry-standard measures that should have been implemented long before the Ransomware Attack occurred.

162.    By marketing and advertising the Change Platform as a reliable, HIPAA compliant solution for Providers and insurers handling highly sensitive Private Information, the Change Health Defendants assumed legal and equitable duties. The Change Health Defendants knew or should have known they were responsible for:

a.    adequately designing, maintaining, and updating their software and networks;

b.    promptly detecting, remediating, and notifying Providers and those they serve of any critical vulnerabilities in their software and networks;

c.    ensuring compliance with industry standards related to data security;

d.    ensuring compliance with regulatory requirements related to data security;

e.    protecting and securing the Private Information stored on their networks from unauthorized disclosure; and

f.    providing adequate notice to Providers and patients if patient Private Information is disclosed without authorization.

Mansfield, Bronstein & Stone, LLP
200 East Broward Boulevard • Suite 1250 • Fort Lauderdale, Florida 33301
954.601.5600 (phone) • 954.961.4756 (fax)
www.mblawpa.com

163.    Change Health Defendants failed to use the requisite degree of care that a reasonably prudent company would use in designing, developing, and maintaining networks that perform a critical function in the healthcare system and store highly sensitive Private Information.

164.    Despite their representations that the Change Platform complied with the requirements under HIPAA for data security, Change Health Defendants failed to:

a.    Implement adequate procedures to verify that a person or entity seeking access to electronic PHI is the one claimed, in violation of 45 C.F.R. § 164(c).

b.    Train all members of their workforces effectively on the policies and procedures with respect to protected health information as necessary and appropriate for the members of their workforces to carry out their functions and to maintain security of Private Information, in violation of 45 C.F.R. § 164.530(b).

c.    Implement a data security system that complied with the minimum necessary standard or principle of least privilege, thereby adequately limiting access to Private Information, in violation of 45 CFR §§ 164.502(b), 164.514(d).

d.    Implement technical policies and procedures for electronic information systems that separate or segment data so that their systems allow access to Private Information only by those persons or software programs that have been granted access rights to, in violation of 45 C.F.R. § 164.312(a)(1).

e.    Implement data security practices and procedures that adequately monitor network activity, such as reviewing records of information system activity regularly, including audit logs, access reports, and security incident tracking reports (45

C.F.R. § 164.308(a)(1)(ii)(D)), thereby preventing, detecting, containing, and correcting security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i).

f.  Ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1).

g.  Protect against reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3).

h.  Ensure compliance with the electronically protected health information security standard rules by their workforces, in violation of 45 C.F.R. § 164.306(a)(4).

165.    Change Health Defendants failed to implement each of the industry standard security protocols outlined below.

**e. Change Health Defendants failed to implement multi-factor authentication for remote access to its servers.**

166.    Use of stolen credentials has long been the most popular and effective method of gaining authorized access to a company's internal networks. As a result, it is well-established that companies should take precautions to prevent attacks using stolen user credentials.

167.    According to the FBI, phishing schemes designed to induce individuals to reveal personal information, such as network passwords, were the most common type of cybercrime in 2020, with such incidents nearly doubling in frequency between 2019 and 2020. According to Verizon's 2021 Ransomware Attack Investigations Report, 43% of breaches stemmed from phishing and/or pretexting schemes.

168.    The risk is so prevalent for healthcare Providers that on October 28, 2020, the FBI and two federal agencies issued a "Joint Cybersecurity Advisory" warning that they have "credible information of an increased and imminent cybercrime threat to U.S. hospitals and healthcare providers."

169.    Despite the apparent risk that a user's credentials could be compromised, Change Health Defendants failed to take reasonable steps to authenticate Change users.

170.    In this context, "authentication" refers to steps a company can take which go beyond requiring the user to merely provide login name and password, namely steps which ensure that the person using the login and password is the person to whom the name and password were assigned. These steps can take the form of requiring the user to respond to a message on their phone, to physically toggle a device attached to their computer, to provide a fingerprint or other biometric information, to answer a phone call to their cell phone, or to take any other number of steps to confirm that the person using the login and password is authorized to do so.

171.    Requiring more than just a login and password is referred to as Multifactor Authentication, or multi-factor authentication. Multi-factor authentication is "an identity verification method in which a user must supply at least 2 pieces of evidence, such as their password and a temporary passcode, to prove their identity." "For example, to log into an email account, a user might need to enter both their account password and a single-use passcode the email provider sends to their mobile phone via text message." "multi-factor authentication systems add an extra layer of security by requiring more than one piece of evidence to confirm a user's identity. Even if hackers steal a password, it won't be enough to gain unauthorized access to a system."

172.    At the time of the Ransomware Attack, Change employees could access Change's internal networks remotely through third-party Citrix Remote PC Access software.

173.    Citrix's "Remote PC Access is a feature of Citrix Virtual Apps and Desktops that enables organizations to easily allow their employees to access corporate resources remotely in a secure manner. The Citrix platform makes this secure access possible by giving users access to their physical office PCs. If users can access their office PCs, they can access all the applications, data, and resources they need to do their work."

174.    At the time of the Ransomware Attack, Change Health Defendants' implementation of Citrix Remote PC Access was not equipped with MFA.

175.    MFA has existed since the 1980s and has been widely in use since the late 2000s. MFA using biometrics has been widely in use since the early 2010s. MFA "has become an increasingly important piece of corporate identity and access management (IAM) strategies. Standard single-factor authentication methods, which rely on usernames and passwords, are easy to break. In fact, compromised credentials are one of the most common causes of data breaches, according to IBM's *Cost of a Ransomware Attack report.*"

176.    In 2019, both Microsoft and Google publicly reported that using MFA blocks more than 99% of automated hacks, including most ransomware attacks that occur because of unauthorized account access. Likewise, the reputable SANS Software Security Institute issued a paper stating: "[t]ime to implement multi-factor authentication!"

177.    Citrix states on its website that "[i]t's critical . . . to also implement multifactor authentication as a backup in case passwords do become compromised."

178.   HIPAA further requires covered entities to "[i]mplement procedures to verify that a person or entity seeking access to electronic protected health information is the one claimed." 45 C.F.R. § 164(c). MFA is widely recommended to meet this requirement for all healthcare applications. The book *HIPAA Privacy and Security Compliance – Simplified: Practical Guide for Healthcare Providers and Managers states* "Multi-factor authentications (MFA) shall be used for remote access, for system administration activities and for access to critical systems."

179.   MFA is also required by a number of other industry standards:

   a.   PCI-DSS The Payment Card Industry Data Security Standard requires multi-factor authentication per requirement 8.2.

   b.   Service Organization Control 2 (SOC 2), a widely used cybersecurity auditing standard used for a wide range of businesses, requires multifactor authentication.

   c.   ISO 27002 is an international standard that provides guidance for organizations on how to establish, implement, and improve an Information Security Management System. ISO 27002 requires one to either use MFA, digital certificates, smart cards, or biometric login.

   d.   The Cybersecurity and Infrastructure Security Agency has strongly encouraged all businesses to use MFA for many years.

   e.   NIST 800-53 strongly recommends multi-factor authentication beginning on page 132 is a cybersecurity framework and compliance standard that can be used by any organization.

180.    At the time of the Ransomware Attack, Change's internal networks were accessible through Citrix Remote PC Access without MFA, meaning that any third party that obtained a Change employee's login credentials could access Change's internal networks remotely.

181.    Had Change Health Defendants had an MFA system in place, the Ransomware Attack and shutdown would have been prevented.

182.    The failure to have MFA was an explicit violation of Change Health Defendants' own policies requiring MFA on all external-facing applications, HIPAA, and the industry standards described above.

**VII. Change Health Defendants failed to apply the principle of least privilege to its systems.**

183.    The principle of least privilege is a cybersecurity concept that states a user or entity should only be granted the minimum access level needed to perform their required tasks, meaning they should only have access to the specific data, resources, and applications necessary to complete their job functions, and nothing more; essentially, providing the lowest level of privilege possible while still allowing them to do their work.

184.    CISA and HIPAA require that the principle of least privilege be applied to all systems.

185.    HIPAA refers to this as the Minimum Necessary Rule., The Minimum Necessary Rule standard is based on the practice that PHI should not be used or disclosed when it is not necessary to satisfy a particular purpose or carry out a function. The Minimum Necessary Rule requires covered entities to evaluate their practices and enhance safeguards as needed to limit unnecessary or inappropriate access to and disclosure of PHI.

186.    Other applicable standards also require least privileges. For example, both *PCI-DSS requirement 7*, and NIST 800-53 require least privileges.

187.    During the Ransomware Attack, the cybercriminals were able to use a low-level employee account to ultimately conduct administrator actions and move laterally throughout Change's networks and backup systems.

188.    This low-level employee account should not have been configured in such a way as to allow it to create accounts with administrative privileges that could in turn be used to access and exfiltrate Private Information.

189.    This low-level employee account should not have been configured in such a way as to allow it to create accounts with administrative privileges that could in turn be used to encrypt the Change Platform.

190.    Change Health Defendants did not adequately follow the principle of least privilege or the Minimum Necessary Rule.

191.    Had Change Health Defendants adequately implemented policies and procedures applying the principle of least privilege or the Minimum Necessary Rule, the Ransomware Attack and shutdown could have been prevented.

**VIII. Change Health Defendants did not properly segment Change's systems.**

192.    Change Health Defendants should have also properly siloed the systems so that a bad actor would be unable to escalate privileges and move laterally through Change's systems.

193.    This data security procedure is called segmentation. Data silos are created when an organization manages different types of data and software separately, without maintaining a centralized system to share and access information. Each data silo or segment should have its own

security defense mechanisms so that breaching one segment does not give an attacker access to other segments.

194.    CISA guidance recommends that using a comprehensive network, in addition to network segregation, will help contain the impact of an intrusion and prevent or limit lateral movement on the part of malicious actors.

195.    During the Ransomware Attack, the cybercriminals were able to access patients' Private Information, Change software, Change's backup systems, and more. The breadth of access the attackers had demonstrates that Change Health Defendants did not properly implement network segmentation.

196.    The lack of segmented systems allowed the hacker to travel among Change's systems freely, compromising multiple systems which Change Health Defendants were unable to recover, and ultimately resulting in the complete shutdown of Change's operations.

197.    Had Change Health Defendants adequately implemented data segmentation, the Ransomware Attack and shutdown would have been prevented, or would have been much smaller in scope.

## IX. Change Health Defendants failed to protect their backup technology and data.

198.    IT Redundancy helps companies mitigate the effects of a ransomware attack. IT Redundancy means "[p]rovision of duplicate, backup equipment or links that immediately take over the function of equipment or transmission lines that fail." So for example, if a primary server fails, a backup server can take over, ensuring that patient data is still accessible and that critical healthcare services can continue.

199.    Organizations like the AHA recommend companies in the healthcare industry use "backup technology which renders the backups 'immutable' – unable to be deleted, altered or encrypted."

200.    Unfortunately, like their data security, Change Health Defendants' IT Redundancy was also subpar. As Senator Wyden emphasized, "[m]ultifactor authentication is vital for prevention, but redundancies . . . help the company get back on its feet . . . [Change Health Defendants] flunked both."

201.    Once Change's system was infiltrated, ALPHV was allowed to disable both the primary and backup systems for the Change Platform because the backup systems were not immutable nor isolated from the primary systems, and few elements were stored on the cloud. These are all elementary security features that Change Health Defendants should have employed to prevent the disastrous effects of the Ransomware Attack.

202.    Had Change Health Defendants adequately protected Change's backup technology and data, the shutdown would have been prevented.

**X. Change Health Defendants failed to implement critical internal cybersecurity monitoring at Change.**

203.    At the time of the Ransomware Attack, Change Health Defendants did not have adequate cybersecurity monitoring systems in place to prevent and detect unauthorized access to the Change networks.

204.    Change, like any entity in the healthcare industry storing valuable data, should have had robust protections in place to detect and terminate a successful intrusion long before access and exfiltration could expand to millions of patient files. Change Health Defendants' below-

industry-standard procedures and policies are inexcusable given their knowledge that they were a prime target for cyberattacks.

205.    "Cybersecurity or process monitoring is continuously observing and analyzing your computer network or systems to prevent cyberattacks. The primary objective of monitoring in cybersecurity is quickly identifying signs of vulnerability and responding to potential security threats in real-time."

206.    A key component of cybersecurity monitoring is an intrusion detection system (IDS), which "analyzes an organization's network traffic, activities, and devices, looking for known malicious activities or policy violations. If an IDS detects suspicious activities or patterns, it alerts the system administrators or security team of the potential threat."

207.    Another "[o]ne of the simplest yet effective methods of safeguarding systems is through IP whitelisting. It is particularly beneficial for businesses that rely on remote access or have distributed teams but want to maintain strict security protocols. . . . IP whitelisting is a security practice that involves creating a list of trusted IP addresses granted access to a specific server, application, or network. By using IP whitelisting, only preapproved IP addresses can interact with your system. By restricting access to a select group of devices based on their IP addresses, you can limit exposure to potential attacks and unauthorized access. The method effectively controls access to critical business systems, cloud infrastructure, and online services."

208.    NIST Special Publication 800-167: *Guide to Application Whitelisting* provides specific guidance to companies on how to implement whitelisting.

209.    The CISA guidance also encourages organizations to prevent unauthorized access by:

a.    Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

b.    Regularly patching and updating software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

c.    Ensuring devices are properly configured and that security features are enabled;

d.    Employing best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

e.    Disabling operating system network file sharing protocol known as Server Message Block (SMB), which is used by threat actors to travel through a network to spread malware or access sensitive data.

210.    The CISA guidance further recommends implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.

211.    Change's systems lacked internal monitoring to such a degree that the attackers were not detected until they chose to reveal themselves—nine days after gaining access.

212.    ALPHV's activity involved several steps that should have been noticed by Change Health Defendants through proper endpoint and network monitoring and scanning. This includes:

a.    Installing software such as nmap, an obvious and 'noisy' network discovery scanner. Only administrators should be able to install any software, and then

such installations should still be monitored. Had Change Health Defendants properly monitored Change's systems, they would not have allowed nmap to be installed in the first instance. A properly monitored network would have also detected nmap being installed. Application whitelisting, which means even administrators can only install software that has been pre-approved would have also prevented the installation of nmap because nmap would not have been on the whitelist.

b. The attackers also ran several administrator-only commands. These commands should only be possible for those with the highest security privileges, and even then, the execution of these privileges should be logged and monitored. Had Change Health Defendants had proper monitoring on the networks, the administrator-only commands would have alerted Change Health Defendants' IT personnel.

c. The attackers exfiltrated terabytes of Private Information. Such actions should have only been possible by Change Health Defendants' network administrators and should have required even administrators to pass additional security features. Such exfiltration activity should have been detected and raised numerous red flags within the system.

213. Had Change Health Defendants implemented adequate internal cybersecurity monitoring, the Ransomware Attack and shutdown would have been prevented or much smaller in scope.

**XI. Change Health Defendants failed to protect against known threats from the ALPHV cybercriminal ransomware group.**

214.    Not only would proper endpoint and network monitoring have detected and alerted Change Health Defendants to software installation, privilege escalation, and exfiltration, Change Health Defendants also should have properly configured Change's networks to detect and block this specific ALPHV/BlackCat ransomware attack. The attackers were well-known to target participants in the healthcare industry, and employed certain signature technologies and methods that Change Health Defendants could have configured Change's systems to detect and stop.

215.    "ALPHV operates as a Ransomware-as-a-Service (RaaS), which means fellow threat actors can become affiliates by purchasing access to ALPHV ransomware, infrastructure, and other resources. ALPHV affiliates conduct attacks, while ALPHV focuses on affiliate support, ransomware development, and business expansion."

216.    ALPHV is notably sophisticated in its use of the Rust programming language, "which improve[s] attack performance."

217.    ALPHV cybersecurity attacks often use the "double extortion" method, whereby a victim's data is both ransomed—i.e., stolen with the threat of publication if a ransom is not paid— and encrypted—i.e., turned into an unreadable format on the victim's network, so that the victim cannot continue using the data without ALPHV's decryption key.

218.    ALPHV also sometimes use "triple extortion" which additionally adds the threat of distributed denial of service (DDoS) attack, which can shut down a victim's networks.

219.    By 2023, ALPHV had collected nearly $300 million in ransom and gained notoriety for high-profile attacks targeting healthcare entities specifically.

220.    At the time of the Ransomware Attack, the U.S. Department of State was "offering a reward of up to $10,000,000 for information leading to the identification or location of any individual(s) who hold a key leadership position in the Transnational Organized Crime group behind the ALPHV/BlackCat ransomware variant."

221.    The U.S. Department of Health and Human Services has recognized ALPHV ransomware as a sophisticated threat to the health sector since at least 2023.

222.    In January 2023, Nextgen Health, a "multibillion-dollar healthcare giant [that] produces electronic health record (EHR) software and practice management systems for hundreds of the biggest hospitals and clinics in the U.S.," was attacked by ALPHV ransomware.

223.    In February 2023, ALPHV successfully penetrated the Lehigh Valley Health Network systems and exfiltrated and published sensitive patient data including clinical images of breast cancer patients that the group notoriously teased as "nude photos."

224.    In July 2023, ALPHV attacked Barts Health NHS Trust in the UK and exfiltrated seven terabytes of information.

225.    In October 2023, ALPHV took credit for a July 2023 attack on McLaren Health Care, where they successfully exfiltrated the Private Information of over 2.2 million McLaren patients.

226.    According to John Riggi, the AHA's national advisor for cybersecurity and risk, as of December 20, 2023 "[ALPHV] has attacked numerous hospitals, publicly exposed sensitive patient data and placed patient care and lives at risk."

227.    On December 19, 2023 the FBI and CISA co-authored a Joint Cybersecurity Advisory titled "#StopRansomware: ALPHV BlackCat" warning that ALPHV was targeting critical infrastructure with ransomware.

228.    The Advisory identified certain Indicators of Compromise ("IoCs") associated with the ransomware group.

229.    Typical IoCs are virus signatures and IP addresses, MD5 hashes of malware files, or URLs or domain names of botnet command and control servers. After IoCs have been identified they can be used for early detection of future attack attempts using intrusion detection systems and antivirus software.

230.    The FBI and CISA Advisory specifically noted that "[s]ince previous reporting, ALPHV BlackCat actors released a new version of the malware, and the FBI identified over 1000 victims worldwide [nearly 75 percent of which are in the United States] targeted via ransomware and/or data extortion."

231.    The Advisory further recommended that potential targets implement specific precautions to "to improve your organization's cybersecurity posture based on threat actor activity and to reduce the risk of compromise by ALPHV BlackCat threat actors."

232.    As far back as 2022 and continuing to 2023, independent security researchers also published guides detailing ALPHV's IoCs, and specific prophylactic measures organizations could implement to detect, prevent, or mitigate the group's Ransomware Attacks. Moreover, ALPHV was infecting systems that did not use multi-factor authentication at least as early as 2022.

233.    As described, the steps of an ALPHV attack are well-documented, as are the defenses that can be employed at each step to foil an attack. An overview of a standard process is given here:

a.    Initial access often begins with obtaining login credentials and exploiting systems that do not have MFA.

b.    After access is achieved, the network is scanned for other machines. A network scan, particularly using such a widely known tool as nmap, should be detected by any properly configured system monitoring.

c.    They next use a tool named PsExec to deploy additional malware to other systems on the network. This tool is a free tool but must be downloaded and installed on the machine. If the victim systems are using the very fundamental cybersecurity principle of least privilege, then only a select few accounts would even be able to install software. This would mean that if the attackers gained access through an account that was not part of the group that had privileges to install software, their attack would be stopped.

d.    The tool the attackers deploy is ExMatter. It is a tool written in .Net specifically to exfiltrate data. Specifically, ExMatter will steal user files, compressed files, and databases, then upload them to a Secure File Transfer Protocol server (SFTP). Properly managed systems should notice any system initiating an SFTP transfer to outside the network.

e.    ALPHV will also run a number of commands, all of which should require administrative privileges in a properly configured network:

1. Get device UUID

2. Stop IIS service

3. Clean Shadow Copies

4. List Windows Event logs and try to clear them (this in particular should trigger some monitoring system).

    f.   Only then does ALPHV encrypt the files.

234.    HIPAA security standards require organizations to "[p]rotect against any reasonably anticipated threats or hazards to the security or integrity of such information." Automatically tracking IoCs is a standard method for companies to comply with these requirements.

235.    At the time of the Ransomware Attack, ALPHV was a reasonably anticipated threat or hazard to the Change Health Defendants.

236.    Change Health Defendants knew or should have known of their obligation to implement and use reasonable measures to protect against ALPHV attacks.

237.    As evidenced by the Ransomware Attack, Change Health Defendants did not track IoCs regarding ALPHV or implement other reasonable measures to prevent an ALPHV attack.

238.    Had Change Health Defendants tracked ALPHV IoCs and implemented measures to detect and ALPHV attack, the Ransomware Attack could have been prevented.

**XII. Change Health Defendants did not properly encrypt Private Information.**

239.    HIPAA recommends appropriately encrypting data using a robust encryption algorithm, whether at rest or in transition.

240.    For organizations like Change, with abundant technology resources, HIPAA regulations require encryption of PHI and dictate that all encryption protocols follow the NIST standards.

241.    For example, NIST 800-53 recommends removing, masking, encrypting, or hashing PII contained in company datasets. "There are many possible processes for removing direct identifiers from a dataset. Columns in a dataset that contain a direct identifier can be removed. In masking, the direct identifier is transformed into a repeating character, such as XXXXXX or 999999. Identifiers can be encrypted or hashed so that the linked records remain linked. In the case of encryption or hashing, algorithms are employed that require the use of a key, including the Advanced Encryption Standard or a Hash-based Message Authentication Code. Implementations may use the same key for all identifiers or use a different key for each identifier. Using a different key for each identifier provides a higher degree of security and privacy. Identifiers can alternatively be replaced with a keyword, including transforming 'George Washington' to 'PATIENT' or replacing it with a surrogate value, such as transforming 'George Washington' to 'Abraham Polk.'"

242.    Change Health Defendants were fully aware of their obligations to implement and use reasonable measures such as encryption to protect patients' Private Information.

243.    Given the attackers were able to access Private Information, Change Health Defendants failed to comply with these basic recommendations and guidelines and did not protect Private Information with sufficient masking, encrypting, or hashing.

244.    Change Health Defendants' failure to employ reasonable measures to protect against unauthorized access to patient information violated HIPAA and constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

245.    Had Change Health Defendants adequately encrypted or hashed Private Information, the Ransomware Attack and shutdown would have been prevented.

## PLAINTIFFS

a.    Precision Toxicology, LLC d/b/a Precision Diagnostics and Precision Toxicology Holdings, Inc. ("Precision").  Precision is a provider of high-specificity, clinically-relevant urine and oral fluid testing solutions designed to monitor patients on chronic opioid therapy to improve patient compliance and outcomes with treatment plans. The Company generates patient service revenue from laboratory testing services primarily at the direction of physicians. The Company receives payment for services from governmental payors, such as Medicaid and Medicare, commercial payors,facilities, and from patients.

b.    Precision Toxicology Holdings ("Holdings") is a company that owns Precision Toxicology and suffered the losses described herein.

## CLAIMS FOR RELIEF

## COUNT I: NEGLIGENCE
### (On Behalf of Plaintiffs Against Defendants)

246.    Plaintiffs repeat and reallege every allegation set forth above.

247.    At relevant times, Defendants set up, provided, managed, maintained, operated, supervised, controlled, and commercially benefited from a network, equipment, and systems ("System") used to operate the Change Platform.  Precision paid for and used the Change Platform

for claims processing, eligibility confirmation and the ability to submit claims for services to, and get paid by, insurance companies, government and other payors for services Precision provided.

248.    Because of Defendants' grossly negligent data security measures, Change experienced the Ransomware Attack. In response, Defendants chose to disconnect the Change Platform. As a result of Defendants' decision to disconnect the Change Platform, Precision was unable to submit claims, receive ERAs, and receive payment for its services.  Precision's business was thereby disrupted and still has not recovered to pre-Ransomware Attack conditions.  As a result of the Defendants' decision to disconnect the Change Platform, Precision was unable to perform insurance eligibility checks, submit claims, receive ERAs and receive payment for its services.

249.    As a result of Defendants' actions, Precision did not receive the services it paid for from Change. In addition, this business disruption has caused Precision to suffer monetary losses, such as rejected and/or delayed payments for services, thus depriving Precision of the time value of money and loss of interest. Furthermore, Precision spent significant time and resources, including but not limited to investigating the network outage and alternative methods to receive payment for medical care, which increased manual labor costs.

250.    If Precision knew about Defendants' inadequate data security practices, it would have attempted to use an alternative to the Change Platform.

251.    Each of the Defendants owed Plaintiffs a duty to exercise reasonable care in setting up, providing, managing, maintaining, operating, supervising, and controlling the System, including a duty to secure the System against reasonably foreseeable breaches of the System, to have adequate training and policies to secure the System against reasonably foreseeable Ransomware Attacks, to warn Plaintiffs (directly or through their vendors) of gaps or deficiencies

in the System, to monitor the System for attacks, to timely notify Plaintiffs, (directly or through their vendors) of attacks, and to ensure that the Services would be properly functioning, timely, and accurate, including by having redundancies and contingency plans in the event of an attack on the System.

252.    Defendants also owed Plaintiffs a duty to exercise reasonable care to avoid harm because Precision was a reasonably foreseeable and probable victim of substandard cybersecurity practices, such as a lack of MFA, given that Defendants' System houses the Services. Accordingly, it was reasonably foreseeable that if an attack on the System caused the System to be disconnected (as happened here), Precision would be damaged by the sudden and sustained lack of claims and payment processing by the Change Platform.

253.    Defendants knew or should have known of the vulnerabilities of their System and of the significance of their inadequate security measures, including the reasonably foreseeable harm to Plaintiffs from a System breach and disconnection. Change Health Defendants knew or should have known about the prevalence of Ransomware Attacks and data breaches in the healthcare sector and Change Health Defendants knew or should have known that their network security did not adequately safeguard the Services.

254.    Defendants' duty to use reasonable care in securing and operating the System so as to protect against disconnection of the Change Platform also arises from the parties' relationship, as well as common law and federal law, and Defendants' own policies and promises regarding privacy and data security.

255.    Defendants breached their duties to Plaintiffs in numerous ways through their affirmative misfeasance, including by:

a.  Creating, using, and implementing security systems, protocols, and practices that were insufficient to protect the System against reasonably foreseeable Ransomware Attacks;

b.  Creating, using, and implementing systems, protocols, and practices that lacked redundancies and contingency protocols and were otherwise insufficient to ensure the continuity of the Change Platform and avoid sudden and sustained lack of claims and payment processing in the event of a breach of the System;

c.  Creating, using, and implementing security systems, protocols, and practices that violated regulatory requirements and industry standard data security measures for the healthcare industry leading up to the Ransomware Attack;

d.  Failing to comply with their own privacy and data security policies;

e.  Failing to adequately monitor, evaluate, and ensure the security of the System;

f.  Failing to have reasonably adequate contingency plans and backup systems to avoid sudden and sustained lack of claims and payment processing by the Change Platform; and

g.  Failing to warn Plaintiffs (directly or through their vendors) that the System was not adequately secured and/or that a reasonably foreseeable breach of the System could require disconnection and sudden and sustained loss of Services through the Change Platform.

256.  Precision would have been able to timely submit claims and receive timely payment for their healthcare services but for Defendants' wrongful and negligent breaches of their duties.

257.    It was reasonably foreseeable to Defendants that a breach of the System could injure healthcare providers like Precision, whose claims and payments for healthcare services are routinely processed through the Change Platform and who reasonably rely on the timely and accurate processing of such claims and payments.

258.    As a direct and proximate result of Defendants' negligence, Precision and Holdings suffered multi-million-dollar damages, a specific amount to be proven at trial. Precision and Holdings damages include one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages, loss of enterprise value due to reduced earnings.

259.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived

primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

260.    Defendants' breaches of one or more of their duties was a substantial factor in causing harms, injuries, and damages to Precision and Holdings.

261.    Defendants' conduct, as described above, was willful, wanton, reckless, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct and warrants an award of punitive damages in an amount sufficient to punish the Defendants and deter others from like conduct.

WHEREFORE, Precision and Holdings demand judgment against the Defendants, including costs and fees, and such other relief that the Court may grant.

## COUNT II: NEGLIGENCE PER SE
### (On Behalf of Plaintiffs Against CHS and the Defendants)

262.    Precision and Holdings repeat and reallege every allegation set forth above.

263.    At all relevant times, CHS and the Defendants had an obligation to comply with applicable statutes and regulations, including Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1) and HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

264.    Section 5 of the FTC prohibits "unfair . . . practices in or affecting commerce." The FTC has interpreted Section 5 to include as an unfair act or practice the failure by a business to

employ reasonable security measures to secure access to their paid for systems, despite representing otherwise.

265.    The HIPAA Privacy and Security Rules require, *inter alia*, that Change Health Defendants maintain adequate data security systems to reduce the risk of data breaches and cyberattacks, adequately protect the PHI of patients, and ensure the confidentiality and integrity of electronically protected health information created, received, maintained, or transmitted. *See*, e.g., 45 C.F.R. § 164.306(a)(1).

266.    CHS and the Defendants violated Section 5 of the FTCA and HIPAA Privacy and Security Rules by failing to use reasonable security measures to secure access to their paid-for Change Platform, despite representing otherwise, including not complying with applicable industry standards. CHS and the Defendants' conduct was particularly unreasonable given the nature and amount of sensitive information they collect, maintain, and/or transfer as well as the nature of the Change Platform's business. CHS and the Defendants' conduct was also unreasonable given the foreseeable consequences of a System breach to the continuity of the Services (given CHS and the Defendants' lack of redundancies and contingency plans) and the resulting impact on Precision and Holdings.

267.    CHS and the Defendants' violation of Section 5 of the FTCA and the HIPAA Privacy and Security Rules constitutes negligence per se.

268.    Precision and Holdings are within the class of persons that Section 5 of the FTCA and HIPAA Privacy and Security Rules were intended to protect.

269.    The harm suffered by Precision and Holdings as a result of the Ransomware Attack is the type of harm that Section 5 of the FTCA and HIPAA Privacy and Security Rules were intended to guard against.

270.    It was reasonably foreseeable to CHS and the Defendants that their failure to exercise reasonable care in securing the System would result in harm to Precision and Holdings due to not being able to timely submit claims for and not receiving timely payments for their healthcare services.  Plaintiffs lost millions of dollars in revenue, as a result of the CHS and the Defendants' failure to secure the system.

271.    The injury and harm that Plaintiffs suffered was the direct and proximate result of CHS and the Defendants' violation of Section 5 of FTCA and HIPAA Privacy and Security Rules. Precision and Holdings have been injured and are entitled to damages in an amount to be proven at trial. Plaintiffs' damages include one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments, if any; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

272.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

273.    CHS and the Defendants' conduct, as described above, was willful, wanton, reckless, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of their conduct and warrants an award of punitive damages in an amount sufficient to punish CHS and the Defendants and deter others from like conduct.

WHEREFORE, Plaintiffs demand judgment against the CHS and the Defendants, including costs and fees, and such other relief that the Court may grant.

### COUNT III: BREACH OF CONTRACT
#### (On Behalf of Plaintiffs Against CHS and the Defendants)

274.    Precision repeats and realleges every allegation set forth above.

275.    Acting in the ordinary course of business, CHS contracted with Precision on or about February 28, 2022, to provide a host of services, including but not limited to, claims processing, eligibility confirmation, and the ability to submit claims to insurance companies, government and other payers for service provided by Precision.

276.     Through the regular, ordinary course of their business in providing the Services, CHS obtained patients' Private Information directly from Providers, including Precision.

277.     The contract between CHS and Precision contained provisions requiring CHS and the Defendants to protect patient Private Information.

278.     Under the agreement, CHS was required to hold the Confidential Information of the other contracting party in confidence and protect the same with at least the same degree of care with which it protects its own most sensitive confidential information, but in any event, no less than reasonable care.

279.     Under the agreement, CHS agreed that changes to Services should not adversely affect Precision. Specifically, CHS was obligated to give prompt, prior notice of any revisions, modifications, updates or replacements to Services and no changes could be made if they would "adversely affect" Precision in any material manner.

280.     Under the agreement, CHS was obligated to protect patient health information .

281.     CHS was also required to comply with federal and state laws regarding the protection of PHI as defined by HIPAA.

282.     Under the agreement, CHS promised that each party will protect and safeguard the other party's Confidential Information with at least the same care used for its own Confidential Information of a similar nature, but no less than reasonable care.

283.     Under the agreement, CHS committed to implement and maintain appropriate administrative, physical, and technical safeguards to comply with the [HIPAA] Security Rule with respect to Electronic PHI, to prevent Use or Disclosure of such information. The agreement also

stated that the parties are required to comply with federal and state laws regarding the protection of PHI as defined by HIPAA.

284.    Under the agreement, CHS promised to use appropriate administrative, physical, and technical safeguards to comply with the [HIPAA] Security Rule with respect to Electronic PHI, to prevent use or disclosure of such information. Change also agreed to comply with all applicable federal privacy and security laws governing PHI.

285.    The agreement included an integration clause indicating that the terms of the contract contain the complete and final agreement between the parties.

286.    CHS and the Defendants breached the above agreement by failing to safeguard Private Information entrusted to it and allowing the Ransomware Attack and shutdown to occur.

287.    CHS and the Defendants breached the contract while acting in the ordinary course of business by not adequately protecting the System and the Private Information of Precision, as alleged in this Complaint.

288.    CHS and the Defendants also breached the contract with Precision by failing to give prompt notice that the Change Platform would be taken offline before the Platform was taken offline, which adversely affected Precision, who was no longer able to receive the Services it paid for.

289.    As a direct and proximate result of CHS's and the Defendants breaches, Precision and Holdings have been injured and are entitled to damages in an amount to be proven at trial. Precision and Holdings' damages include one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred, if any; additional labor

costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.  As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

290.    Precision and Holdings alternatively seek an award of nominal damages.

291.    Further, the contract between the parties was subject to implied covenants of good faith and fair dealing that the parties would act in good faith and with reasonable efforts to perform their contractual obligations (both explicit and fairly implied) and not to impair the rights of the other parties to receive the rights, benefits, and reasonable expectations under the contracts. These included the implied covenants that CHS and the Defendants would act fairly and in good faith in

carrying out their contractual obligations to take reasonable measures to protect the continuity of the System by implementing measure to prevent, detect, and stop Ransomware Attacks, to avoid service disruptions, to comply with industry standards and federal regulations, and to protect the confidentiality of patient Private Information.

292.   Precision performed all conditions, covenants, obligations, and promises owed to CHS and the Defendants.

293.   CHS's and the Defendants failure to act in good faith in implementing the security measures required by the contract denied Precision the full benefit of their bargain, and instead IT received services that were less valuable than what IT paid for and less valuable than their reasonable expectations under the contract. Precision was damaged in an amount at least equal to this overpayment.

294.   CHS's and the Defendants failure to act in good faith in implementing the security measures required by the Precision contract caused Precision and Holdings to suffer actual damages including a loss or delay of substantial income resulting from the shutdown of the Change Platform.

WHEREFORE, Precision and Holdings demand judgment against CHS and the Defendants, including costs and fees, and such other relief as the Court may grant.

### COUNT IV: UNJUST ENRICHMENT
### (On Behalf of Plaintiffs Against CHS
### and the Defendants)

295.   Precision and Holdings repeat and reallege every allegation set forth above.

296.   This Count is pleaded on behalf of Precision and Holdings in the alternative to the breach of express and implied contract claim above.

297.    Precision and Holdings conferred benefits on CHS and the Defendants, both directly and indirectly, in the form of payments for the Services. Precision and Holdings further conferred benefits on UHG and UHCS through the provision of patient services to insureds covered by a UHG subsidiary health insurers prior to payment. CHS and the Defendants had knowledge of the benefits conferred by Precision and Holdings, and appreciated, and retained, such benefits.

298.    In accepting payments from Precision, CHS and the Defendants should have used, in part, the monies Precision paid to them, directly and indirectly, to pay the costs of industry standard cybersecurity, threat detection, and incident response measures, including a business continuity plan. In accepting payments from Precision, CHS and the Defendants should have used the monies Precision paid to them, directly and indirectly, to maintain a functioning Change Platform and Services. In failing to provide such cybersecurity and incident response measures, including maintaining a functioning Change Platform and Services, Defendants have been unjustly enriched at Precision's expense. Defendants had no justification for failing to provide adequate data security protections and failing to maintain a functioning Change Platform and Services, and retention of benefits would be unjust and morally wrong.

299.    Because of CHS and the Defendants' wrongful and inequitable conduct, including Defendants' shutdown of the Change Platform and Services, UHG and UHCS unjustly benefitted from and retained the value of Plaintiffs' provision of patient services to insureds covered by a UHG subsidiary health insurer before payment. UHG and UHCS thus unjustly retained and had use of, either temporarily or permanently, money and interest or other investment income earned thereon that should have been timely paid to Plaintiffs for their provision of patient services. UHG

and UHCS had no justification for this conduct, and retention of benefits would be unjust and morally wrong.

300.    The Defendants are vicariously liable for CHS's and the Defendants' breaches of the agreement as set forth above.

301.    Plaintiffs have suffered damages and harm because of CHS and the Defendants' negligent, and unlawful, conduct, inactions, and omissions. Defendants should be required to disgorge all unlawful or inequitable benefits received from Plaintiffs.

302.    Accordingly, Precision and Holdings have been injured as a result of CHS and the Defendants breach of the covenant of good faith and fair dealing and are entitled to damages and/or restitution in an amount to be proven at trial.

WHEREFORE, Precision and Holdings demand judgment against CHS and the Defendants, including costs and fees, and such other relief as the Court may grant.

### COUNT V: INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE, BUSINESS RELATIONSHIP, OR EXPECTANCY
### (On Behalf of Plaintiffs Against CHS and the Defendants)

303.    Plaintiffs repeat and reallege every allegation set forth above.

304.    At the time of the Ransomware Attack and outage, Plaintiffs had ongoing business relationships or business expectancies with third parties. Precision submitted claims through the Change Platform to these third parties with the expectation and understanding that their claims would be processed and they would be reimbursed in a timely fashion or worked with the third parties to submit claims through the Change Platform.

305.    CHS and the Defendants knew or should have known about these relationships or expectancies due to the intentional integration of the Change Platform and the Services and processes with the third parties and their data systems. Indeed, the Change Platform is an indispensable link in the healthcare reimbursement process, enabling Plaintiffs and these third-party businesses to conduct business transactions, process claims, and exchange payments. Plaintiffs relied on CHS and the Defendants to ensure they could run and grow successful businesses.

306.    Despite CHS and the Defendants positioning the Change Platform as a linchpin of the nation's healthcare system and crucial to Plaintiffs' healthcare business operations, CHS and the Defendants (1) failed to implement reasonable and adequate security controls to prevent the Ransomware Attack; (2) shut down the Change Platform without an adequate substitute in place to ensure that Plaintiffs could be paid for the vital health services they performed; and (3) failed to have adequate business continuity or disaster recovery plans and capabilities to quickly recover the Systems.

307.    CHS and the Defendants failed to act with reasonable care and intentionally engaged in wrongful conduct, including by violating Section 5 of FTCA and HIPAA Privacy and Security Rules. Change Health Defendants had ample knowledge of the requirements to implement reasonable data security under the FTCA and HIPAA, and knew of the increased risk to healthcare entities, as well as many recent high profile cybersecurity incidents at other healthcare partner and Provider companies.

308.    As a result of CHS and the Defendants' intentional and wrongful conduct, CHS and the Defendants interfered with and disrupted the business relationships or expectancies between Plaintiffs and the third-party businesses.

309.    CHS and the Defendants knew interference with Plaintiffs' business relationships and expectancies was substantially certain to occur as a result of the Ransomware Attack and shutdown.

310.    CHS and the Defendants did not have any privilege or justification for their actions, and they were strangers to the business relationships between Plaintiffs and the third parties with which they interfered.

311.    As a direct and proximate cause of CHS and the Defendants' wrongful conduct, Plaintiffs have suffered damages as discussed herein, including loss of the ability to obtain prospective economic advantages from existing business relationships. Plaintiffs were unable to obtain payment for services rendered as a result of the CHS and the Defendants' interference. Further, Plaintiffs' damages include one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the

Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

312.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

WHEREFORE, Plaintiffs demand judgment against CHS and the Defendants, including costs and fees, and such other relief that the Court may grant.

## COUNT VI: NEGLIGENT INTERFERENCE
## WITH ECONOMIC ADVANTAGE
### (On Behalf of the Plaintiffs Against CHS and the Defendants)

313.    Plaintiffs repeat and reallege every allegation set forth above.

314.    Plaintiffs had ongoing business relationships or reasonable business expectancies with third parties. Plaintiffs submitted claims through the Change Platform to these third parties with the expectation and understanding that their claims would be processed and they would be reimbursed in a timely fashion or worked with the third parties to submit claims through the Change Platform.

315.    CHS and the Defendants knew or should have known about these relationships or expectancies due to the intentional integration of the Change Platform and Services and processes

Mansfield, Bronstein & Stone, LLP
200 East Broward Boulevard • Suite 1250 • Fort Lauderdale, Florida 33301
954.601.5600 (phone) • 954.961.4756 (fax)
www.mblawpa.com

with the third parties and their data systems. Indeed, the Change Platform is an indispensable link in the healthcare reimbursement process, enabling Plaintiffs and these third-party businesses to conduct business transactions, process claims, and exchange payments. Plaintiffs relied on CHS and the Defendants to ensure they could run and grow successful businesses.

316.    CHS and the Defendants owed a duty of care to Plaintiffs. The services CHS and the Defendants rendered for third parties were intended to facilitate their relationships with, and thus affect, Providers like Plaintiffs; it was foreseeable that Plaintiffs would be harmed by Change Health Defendants' negligence; there was a high degree of certainty that Plaintiffs would be injured; CHS and the Defendants' conduct directly and immediately caused Plaintiffs' injuries; and Change Health Defendants' conduct was inexcusable and immoral. Accordingly, CHS and the Defendants owed a duty of care to Plaintiffs.

317.    CHS and the Defendants acted negligently when they (1) failed to implement reasonable and adequate security controls to prevent the Ransomware Attack; (2) shut down the Change Platform without an adequate substitute in place to ensure that California Plaintiffs could be paid for the vital health services they performed; and (3) failed to have adequate business continuity or disaster recovery plans and capabilities to avoid the shutdown.

318.    CHS and the Defendants also engaged in wrongful conduct, including violating Section 5 of FTCA and HIPAA Privacy and Security Rules. CHS and the Defendants had ample knowledge of the requirements to implement reasonable data security under the FTCA and HIPAA, and knew of the increased risk to healthcare entities, as well as many recent high profile cybersecurity incidents at other healthcare partner and provider companies.

319.    As a direct and proximate cause of CHS and the Defendants' wrongful conduct, Plaintiffs have suffered damages as discussed herein, including the ability to obtain prospective economic advantages from existing business relationships. Plaintiffs were unable to obtain payment for services rendered as a result of the CHS and the Defendants' interference. Further, Plaintiffs' damages include one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

320.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to

those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of Plaintiffs.

321.    The harms Plaintiffs suffered as alleged herein were not part of Plaintiffs' ordinary business risk.

WHEREFORE, Plaintiffs demand judgment against the CHS and the Defendants, including costs and fees, and such other relief that the Court may grant.

### COUNT VII: NEGLIGENT OMISSION
### (On Behalf of Plaintiffs Against CHS and the Defendants)

322.    Plaintiffs repeat and reallege every allegation set forth above.

323.    Plaintiffs bring this claim as to CHS and the Defendants' statements and omissions before and during their contractual relationships. Plaintiffs bring this claim as to CHS and the Defendants' statements and omissions after the Ransomware Attack and shutdown.

324.    As alleged in greater detail above, CHS and the Defendants omitted material information: (1) regarding the unsecure nature of their services; and (2) following the Ransomware Attack, regarding the impact of the Ransomware Attack on the Change Platform and the timeline for when it would be back online. Specifically, CHS and the Defendants omitted or otherwise failed to disclose that they: (1) lacked adequate data privacy practices, which rendered the Services unsecure and led to the Ransomware Attack; and (2) facts that clearly indicated that it would be months before the Change Platform was up and running at its previous capacity.

325.    CHS and the Defendants knowingly and deliberately failed to disclose (1) material weaknesses in Change's System, and (2) the true timeline for when the Change Platform would be back online, both of which good faith and common decency required them to disclose to Plaintiffs.

326.    Such omissions were material (1) when Plaintiffs initially executed and maintained its contract with Change for the Services, based on their omissions that the Services were secure and complied with federal regulations; and/or (2) following the Ransomware Attack, when Plaintiffs attempted to mitigate the harm imposed by CHS and the Defendants' shutdown of the Change Platform.

327.    Plaintiffs would not have contracted with Change to use the Services had they known they were not as secure as represented (or secure by any reasonable standard) and failed to comply with federal regulations.

328.    Plaintiffs would have taken different measures to mitigate their harm had Change Health Defendants provided truthful and accurate information about the duration of their intentional shutdown of the Change Platform.

329.    CHS and the Defendants knew that their data security obligations were particularly important given the substantial increase in cyber-attacks and/or Ransomware Attacks targeting healthcare entities that collect and store Private Information, preceding the date of the Ransomware Attack. CHS and the Defendants were further aware in their industry that Providers and their affiliates are prime targets because of the sensitive information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees and patients—all extremely valuable on underground markets. Additionally, CHS and the Defendants knew or should have known that they were at risk of experiencing the Ransomware Attack based on the substantial number of recent high profile cybersecurity incidents at other healthcare partner and provider companies. Indeed, in their SEC filings, Change Healthcare, Optum Insight, and UHG explicitly acknowledged the broad

Mansfield, Bronstein & Stone, LLP
200 East Broward Boulevard • Suite 1250 • Fort Lauderdale, Florida 33301
954.601.5600 (phone) • 954.961.4756 (fax)
www.mblawpa.com

range of cybersecurity risks that they face. This knowledge is imputed to remaining CHS and the Defendants as mutually owned and controlled corporate parent/subsidiaries.

330.    CHS and the Defendants knew that conveying accurate information about the impact of the Ransomware Attack on the Change Platform and the timeline for when it would be back online was particularly important to Plaintiffs so they could make informed decisions and mitigate the harm they experienced as a direct result of the Change Platform shutdown. Indeed, CHS and the Defendants knew how critical the Change Platform is to Plaintiffs—whether they use the Change Platform directly or through third-party intermediaries—in the everyday course of their businesses, to (among many other vital services) submit and receive payment for healthcare services through the Change Platform. CHS and the Defendants had exclusive knowledge of facts that clearly indicated that it would be months before the Change Platform was up and running at its capacity prior to the Ransomware Attack but omitted or otherwise failed to convey that information to Plaintiffs. This knowledge is imputed to all CHS and the Defendants as mutually owned and controlled corporate parent/subsidiaries.

331.    As a direct and proximate result of CHS and the Defendants' wrongful conduct, Plaintiffs have suffered damages including one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and

obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

332.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

WHEREFORE, Plaintiffs demand judgment against the CHS and the Defendants, including costs and fees, and such other relief that the Court may grant.

### COUNT VIII: NEGLIGENT MISREPRESENTATION
### (On Behalf of Plaintiffs Against CHS and the Defendants)

333.    Plaintiffs repeat and reallege every allegation set forth above.

334.    Plaintiffs bring this claim as to CHS and the Defendants' statements and omissions before and during their contractual relationships. Plaintiffs bring this claim as to CHS and the Defendants' statements and omissions after the Ransomware Attack and shutdown.

335.    As alleged in greater detail above, CHS and the Defendants made numerous representations: (1) regarding the supposed secure nature of the Services; and (2) following the Ransomware Attack, regarding the impact of the Ransomware Attack on the Change Platform and

Mansfield, Bronstein & Stone, LLP
200 East Broward Boulevard • Suite 1250 • Fort Lauderdale, Florida 33301
954.601.5600 (phone) • 954.961.4756 (fax)
www.mblawpa.com

the timeline for when it would be back online. Such representations were false because CHS and the Defendants (1) lacked adequate data privacy practices, which rendered their services unsecure and led to the Ransomware Attack; and (2) had exclusive knowledge of facts that clearly indicated that it would be months before the Change Platform was up and running at its previous capacity.

336.    Such representations were material to Plaintiffs, who reasonably relied on Change Health Defendants' representations (1) when Plaintiffs executed and maintained its contract with Change for the Services, based on their false representations that their services were secure and complied with federal regulations; and/or (2) following the Ransomware Attack, when Plaintiffs attempted to mitigate the harm imposed by CHS and the Defendants' shutdown of the Change Platform.

337.    Plaintiffs would not have contracted with Change to use the Services had they known they were not as secure as represented (or secure by any reasonable standard) and failed to comply with federal regulations.

338.    Plaintiffs would have taken different measures to mitigate their harm had CHS and the Defendants provided truthful and accurate information about the duration of their intentional shutdown of the Change Platform.

339.    CHS and the Defendants intended for Plaintiffs to rely on their representations both before and after the Ransomware Attack. In reliance on CHS and the Defendants' representations, Precision executed a contract with Change for the Services, based on their false representations that the Services were secure, and/or—following the Ransomware Attack—Plaintiffs relied on CHS and the Defendants' representations when making crucial decisions/actions to mitigate the harm imposed by CHS and the Defendants' shutdown of the Change Platform.

340.    CHS and the Defendants' representations were made with knowledge of their falsity, or at least with extreme disregard for their truth.

341.    CHS and the Defendants knew that their data security obligations were particularly important given the substantial increase in cyber-attacks and/or Ransomware Attacks targeting healthcare entities that collect and store Private Information, preceding the date of the Ransomware Attack. CHS and the Defendants were further aware in their industry that Providers and their affiliates are prime targets because of the information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees and patients—all extremely valuable on underground markets. Additionally, CHS and the Defendants knew or should have known that they were at risk of experiencing the Ransomware Attack based on the substantial number of recent high profile cybersecurity incidents at other healthcare partner and provider companies. Indeed, in their SEC filings, CHS, Optum Insight, and UHG explicitly acknowledged the broad range of cybersecurity risks that they face. This knowledge is imputed to all CHS and the Defendants as mutually owned and controlled corporate parent/subsidiaries.

342.    CHS and the Defendants knew that conveying accurate information about the impact of the Ransomware Attack on the Change Platform and the timeline for when it would be back online was particularly important to Plaintiffs so they could make informed decisions and mitigate the harm they experienced as a direct result of the Change Platform shutdown. Indeed, CHS and the Defendants knew how critical the Change Platform is to Providers like Precision— whether they use the Change Platform directly or through third-party intermediaries—in the everyday course of their businesses, to (among many other vital services) submit and receive

payment for healthcare services provided by Plaintiffs. Despite their statements to the contrary, CHS and the Defendants had exclusive knowledge of facts that clearly indicated that it would be months before the Change Platform was up and running at its capacity prior to the Ransomware Attack. This knowledge is imputed to all CHS and the Defendants as mutually owned and controlled corporate parent/subsidiaries.

343.    As a direct and proximate result of CHS and the Defendants' wrongful conduct, Plaintiffs have suffered damages including one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

344.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived

primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

WHEREFORE, Plaintiffs demand judgment against CHS and the Defendants, including costs and fees, and such other relief that the Court may grant.

### COUNT IX: FRAUDULENT INDUCEMENT
### (On Behalf of Plaintiffs Against CHS and the Defendants)

345.    Plaintiffs repeat and reallege every allegation set forth above.

346.    As alleged in greater detail above, CHS and the Defendant's made numerous representations regarding the supposed secure nature of the Services and that they complied with federal regulations, including HIPAA. Such representations were false because the System lacked adequate data privacy practices, which rendered the Services unsecure and led to the Ransomware Attack.

347.    Such representations were material to Plaintiffs, who reasonably relied on CHS and the Defendant's representations (1) when initially executing and maintaining contracts with CHS for the Services based on CHS and the Defendant's false representations that the Services were secure and complied with federal regulations.

348.    Plaintiffs would not have contracted to use the Services had they known they were not as secure as represented (or secure by any reasonable standard) and failed to comply with federal regulations.

349.    CHS and the Defendant's intended for Plaintiffs to rely on their representations before the Ransomware Attack.

350. CHS and the Defendant' representations were made with knowledge of their falsity, or at least with extreme disregard for their truth.

351. CHS and the Defendant's knew that their data security obligations were particularly important given the substantial increase in cyber-attacks and/or Ransomware Attacks targeting healthcare entities that collect and store Private Information. CHS and the Defendants were further aware in their industry that Providers and their affiliates are prime targets because of the sensitive information they collect and store, including financial information of patients, login credentials, insurance information, medical records and diagnoses, and personal information of employees and patients—all extremely valuable on underground markets. CHS and the Defendant's knew or should have known that they were at risk of experiencing the Ransomware Attack based on the substantial number of recent high profile cybersecurity incidents at other healthcare partner and provider companies. Indeed, in its SEC filings, CHC explicitly acknowledged the broad range of cybersecurity risks that they face. This knowledge is imputed to CHS and the Defendant's as mutually owned and controlled corporate subsidiaries.

352. As a direct and proximate result of CHS and the Defendant's wrongful conduct, Plaintiffs have suffered damages including one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and

obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

353.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

WHEREFORE, Plaintiffs demand judgment against CHS and the Defendants, including costs and fees, and such other relief that the Court may grant.

## COUNT X: PUBLIC NUISANCE
### (On Behalf of Plaintiffs Against CHS and the Defendants)

354.    Plaintiffs repeat and reallege every allegation set forth above.

355.    CHS and the Defendants have substantially and unreasonably interfered with and endangered the public's rights to health, welfare, safety, peace, comfort, and ability to be free from disturbance and reasonable apprehension of danger to personal property by setting up, providing, managing, maintaining, operating, supervising, monitoring, securing, and controlling the Change Platform in a manner that made the platform unreasonably vulnerable to foreseeable attack and

intrusion and to a sudden and sustained lack of timely and accurate claims and payment processing Services for Providers, including Plaintiffs

356.    CHS and the Defendants' conduct was unreasonable in light of the known and foreseeable risks of a Ransomware Attack and industry standards for cybersecurity (including, e.g., the use of MFA). Further, CHS and the Defendants' conduct also violated standards set forth under federal law and regulations, rendering the conduct a per se nuisance.

357.    As set forth above, at the time of the Ransomware Attack, the Change Platform was a critical linchpin in the country's healthcare services infrastructure. Huge swathes of the healthcare sector—e.g., 94% of hospitals, 100 million patients, and approximately 1/3 of all healthcare claims and payments—were dependent (knowingly or unknowingly) on the reliable operation of the Change Platform to timely and accurately process multiple types of transactions needed to provide healthcare to patients throughout the U.S., including verification of insurance for new patients, verification of patient eligibility and coverage, prior authorizations, processing of insurance claims and appeals from denials of claims, electronic remittance advice, and payments from insurers.

358.    Having actively worked to make their platform the backbone of healthcare operations across the country—both through direct contracts with Providers and by contracting with innumerable vendors that provide electronic services to Providers, including Plaintiffs—CHS and the Defendants' unreasonably inadequate security systems and contingency planning is all the more egregious.

359.    At all relevant times, the CHS and the Defendants had control over the instrumentality that has caused the public nuisance at issue, namely the Change Platform and the

System, as well as control over their own conduct that caused the public nuisance, namely the unreasonably insecure and lax manner in which they set up, provide, manage, maintain, operate supervise, monitor, secure, and control the Change Platform and System, including the multiple failures described in this Complaint.

360.    The CHS and the Defendants knew or reasonably should have known that the harm caused by their conduct outweighed any potential benefit of the use of the Change Platform in its inadequately secured state.

361.    The public nuisance, and the economic and other harms to Plaintiffs, was reasonably foreseeable to the Change Health Defendants.

362.    CHS and the Defendants' conduct caused, created, or was a substantial factor in causing the public nuisance at issue, namely a significant and substantial interference with the public's common rights to health, welfare, safety, peace, comfort, and ability to be free from disturbance and reasonable apprehension of danger to personal property. As set forth above, following the Ransomware Attack and the sudden and sustained loss of services from the Change Platform, the ability of patients to receive healthcare was substantially disrupted, compromised, and endangered throughout the country, including (a) when Providers, including Plaintiffs, were unable to verify coverage, benefits, or prescriptions for patients, resulting in healthcare being delayed, denied, or inaccessible to patients, (b) when Providers, including Plaintiffs, were forced to cut back on hours, staff, and supplies that otherwise would have been available for patient care due to lack of timely and reliable processing of claims and payments, and (c) when Providers, including Plaintiffs,  were forced to divert staff and resources from patient care to instead address

the lack of Services from the Change Platform (e.g., trying to process claims and verifications off-platform, trying to secure other sources of cash, and trying to switch to another platform).

363.    As Providers, Plaintiffs, suffered special economic injuries distinct from the general harm to healthcare suffered by the public at large (and also distinct from the privacy harms suffered by patients whose Private Information was compromised).  As set forth above, as a direct and proximate result of Change Health Defendants' conduct, Plaintiffs and are entitled to damages in an amount to be proven at trial. Plaintiffs' damages include one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

364.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived

primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

365.    Plaintiffs are entitled to appropriate relief to abate the public nuisance, including injunctive relief requiring CHS and the Defendants to implement appropriate security measures and contingency plans to protect critical infrastructure technology and Private Information and to avoid further sudden and sustained service outages, injunctive relief requiring CHS and the Defendants to create and robustly fund and staff a system to promptly resolve claim and payment backlogs and assist Providers with information and financial support needed to respond to ongoing questions and/or "late" claim penalties.

366.    Plaintiffs request all the relief to which they are entitled in their own right with respect to the distinct special damages they have suffered, including actual and compensatory damages in an amount to be determined at trial. Plaintiffs further request declaratory and injunctive relief providing for the abatement of the public nuisance CHS and the Defendants have created, payment to Plaintiffs to abate the public nuisance, and an order enjoining Defendants from future conduct contributing to the public nuisance described above.

WHEREFORE, Plaintiff demand judgment against CHS and the Defendants, including costs and fees, and such other relief that the Court may grant.

### COUNT XI: VIOLATION OF THE CALIFORNIA PROTECTION OF CONSUMER FRAUD ACT CA. Stat. §§ 325F.68-325F.70 (On Behalf of Plaintiffs, Against CHS and the Defendants)

367.    Plaintiffs repeat and reallege every allegation set forth above.

368.    Plaintiff, Precision, is located in, and domesticated in California.  The subject agreement was entered into in California.

369.    Under the California Protection of Consumer Fraud Act ("CACFA"), and enforced through § 8.31, it is unlawful for any person to commit a fraud, false pretense, false promise, misrepresentation, misleading statement, or deceptive practice with the intent that others rely thereon in connection with the sale of any merchandise.

370.    Precision is considered a "person" for the purpose of the MPCFA and § 8.31.

371.    CHA and the Defendants committed frauds, false pretenses, false promises, misrepresentations, misleading statements, or deceptive practices, including but not limited to the following:

a.  Prior to the shutdown, CHS and the Defendants knowingly and willingly misrepresented, through statements and omissions, that their network maintained adequate protections and maintained data in a HIPAA-compliant manner to induce Precision to use and rely on CHS and the Defendants' services. Precision's decision to trust CHS and the Defendants with their processing needs was based on CHS and the Defendants' statements that CHS and the Defendants would take adequate security precautions and maintain industry standard cybersecurity measures, and omissions that CHS and the Defendants maintained weak data security that failed to comply with the law.

b.  During the shutdown, CHS and the Defendants knowingly and willingly misrepresented, through statements and omissions, the extent and impact of the

shutdown. CHS and the Defendants did so with the intent to deceive Plaintiffs into believing that the Change Platform would return to functionality quickly.

372.    CHS and the Defendants did so with the intent that others rely thereon, whether or not any person was in fact misled.

373.    CHS and the Defendants did so in connection with the sale of merchandise.

374.    Precision was injured by CHS and the Defendants' conduct:

375.    As a direct and proximate result of CHS and the Defendants' wrongful conduct, Precision has suffered damages including one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

376.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened

financial performance during the relevant period. Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

    a.   Moreover, as a direct and proximate result of CHS and the Defendants' misleading statements and omissions during the shutdown, Precision incurred additional financial damages, the extent of which is not yet fully known and continues to impact Plaintiffs.

    377.   There is a causal relationship between Plaintiffs' loss and CHS and the Defendants' actions:

    a.   But for CHS and the Defendants' failure to employ reasonable security measures, in violation of the law, and despite representing otherwise, the

    b.   Change Platform would not have been shut down, and Plaintiffs would not have suffered injuries and incurred damages.

    c.   But for CHS and the Defendants' misleading statements and omissions regarding the efficacy of Defendants' security measures, Precision would not have relied on Change Health Defendants for their clearinghouse services and would not have suffered injuries and incurred damages.

    d.   But for CHS and the Defendants' misleading statements and omissions regarding the duration and extent of the shutdown, Precision would not have incurred additional costs associated with mitigating the damage caused by CHS and the Defendants.

    e.   Thus, Precision relied on CHS and the Defendants' actions.

378.    There is a public benefit in holding CHS and the Defendants liable for their fraudulent, misleading, and deceptive actions. CHS and the Defendants directed their numerous misleading statements and omissions at the consuming public and the marketplace. CHS and the Defendants' misleading statements and omissions were widely covered in the media and relied on by providers. This prevented providers, insurers, and EHR vendors from making informed decisions during the shutdown, thereby impacting the consumer decision-making process. There is a public benefit in holding CHS and the Defendants liable for their misleading statements and omissions.

379.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

WHEREFORE, Plaintiffs demand judgment against the CHS and the Defendants, including costs and fees, and such other relief that the Court may grant.

### COUNT XII: VIOLATION OF THE CALIFORNIA
### UNFAIR COMPETITION LAW
### Cal. Bus. & Prof. Code §§ 17200, et seq.
### (On Behalf of Plaintiff Against CHS and the Defendants)

380.    Plaintiff repeats and realleges every allegation set forth above.

381.    Under the California Unfair Competition Law ("CUCL"), it is unlawful for any person to engage in unfair competition. Unfair competition is any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising.

382.    Precision is  considered a "persons" for the purpose of the CUCL.

383.    CHS and the Defendants engaged in unlawful business acts, including violating the common law violations pleaded in this Complaint.

384.    CHS and the Defendants' acts or practices, including soliciting Private Information from Providers without adequate data security measures in place to protect that Private Information, collecting fees from users of the Change Platform without adequately investing in cybersecurity, inducing reliance by Providers on the Services, which are critical to the healthcare system and Providers' livelihoods without disaster recovery plans or a reasonable substitute in place, among other acts by the Change Health Defendants, are unfair.

385.    Such conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and have caused harm to Plaintiffs.

386.    CHS and the Defendants profited from their unfair conduct without incurring the costs associated with maintaining a System with adequate data security.

387.    CHS and the Defendants engaged in fraudulent business acts or practices and deceptive, untrue or misleading advertising, including but not limited to the following:

a. Prior to the shutdown, CHS and the Defendants knowingly and willingly misrepresented, through statements and omissions, that their network maintained adequate protections and maintained data in a HIPAA-compliant manner to induce Precision to use and rely on CHS and the Defendants' services. Precision trusted CHS

and the Defendants with its processing needs.  That trust was based on CHS and the Defendants' statements that CHS and the Defendants would take adequate security precautions and maintain industry standard cybersecurity measures, and omissions that CHS and the Defendants maintained weak data security that failed to comply with the law.

b. During the shutdown, CHS and the Defendants knowingly and willingly misrepresented, through statements and omissions, the extent and impact of the shutdown.

388.    CHS and the Defendants did so with the intent to deceive Precision into believing that the Change Platform would return to functionality quickly.

389.    Plaintiffs have suffered an injury in fact, and lost money and/or property:

390.    As a direct and proximate result of CHS and the Defendants' wrongful conduct, Plaintiffs have suffered damages including one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the

Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

391.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period. Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

a.    Moreover, as a direct and proximate result of CHS and the Defendants' misleading statements and omissions during the shutdown, Plaintiffs incurred additional financial damages, the extent of which is not yet fully known and continues to impact Plaintiffs.

392.    Plaintiffs' injury was caused by CHS and the Defendants' actions:

b.    But for CHS and the Defendants' failure to employ reasonable security measures, in violation of the law, and despite representing otherwise, CHS and the Defendants would not have been shut down, and Plaintiffs would not have suffered injuries and incurred damages.

c.    But for CHS and the Defendants' misleading statements and omissions regarding the efficacy of CHS and the Defendants' security measures, Plaintiffs would not have relied on CHS and the Defendants for their Services and would not have suffered injuries and incurred damages.

d. But for CHS and the Defendants' misleading statements and omissions regarding the duration and extent of the shutdown, Plaintiffs would not have incurred additional costs associated with mitigating the damage caused by CHS and the Defendants.

393. At all relevant times, CHS and the Defendants were willfully and knowingly engaged in the use of an unfair and deceptive practice declared to be unlawful.

WHEREFORE, Plaintiffs move for the relief requested above as well as fees and costs and request further relief as the court may grant.

### COUNT XIII: VIOLATION OF THE MINNESOTA PROTECTION OF CONSUMER FRAUD ACT
### Minn. Stat. §§ 325F.68-325.70
### (On Behalf of Plaintiff Against CHS and the Defendants)

394. Plaintiff repeats and realleges every allegation set forth above.

395. Under the Minnesota Protection of Consumer Fraud Act ("MPCFA"), , and enforced through **§ 8.31**, it is unlawful for any person to commit a fraud, false pretense, false promise, misrepresentation, misleading statement, or deceptive practice with the intent that other rely thereon in connection with the intent that other rely thereon in connection with the sale of any merchandise.

396. Precision is considered "a person" for the purpose of the MPCFA and **§ 8.31.**

397. CHS and the Defendants engaged in unlawful business acts, including violating the common law violations pleaded in this Complaint.

398. CHS and the Defendants' acts or practices, including soliciting Private Information from Providers without adequate data security measures in place to protect that Private Information, collecting fees from users of the Change Platform without adequately investing in

cybersecurity, inducing reliance by Providers on the Services, which are critical to the healthcare system and Providers' livelihoods without disaster recovery plans or a reasonable substitute in place, among other acts by the CHS and the Defendants, are unfair.

399.    Such conduct is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers, and have caused harm to Plaintiffs.

400.    CHS and the Defendants profited from their unfair conduct without incurring the costs associated with maintaining a System with adequate data security.

401.    CHS and the Defendants engaged in fraudulent business acts or practices and deceptive, untrue or misleading advertising, including but not limited to the following:

a.  Prior to the shutdown, CHS and the Defendants knowingly and willingly misrepresented, through statements and omissions, that their network maintained adequate protections and maintained data in a HIPAA-compliant manner to induce Precision to use and rely on CHS and the Defendants' services. Precision trusted CHS and the Defendants with its processing needs.  That trust was based on CHS and the Defendants' statements that CHS and the Defendants would take adequate security precautions and maintain industry standard cybersecurity measures, and omissions that CHS and the Defendants maintained weak data security that failed to comply with the law.

b.  During the shutdown, CHS and the Defendants knowingly and willingly misrepresented, through statements and omissions, the extent and impact of the shutdown. CHS and the Defendants did so with the intent to deceive Precision into believing that the Change Platform would return to functionality quickly.

402.    CHS and the Defendants did so with the intent that others rely thereon, whether or not any person was in fact misled.

403.    CHS and the Defendants did so in connection with the sale of merchandise and/or services.

404.    Plaintiffs have suffered an injury in fact, and lost money and/or property.

405.    As a direct and proximate result of CHS and the Defendants' wrongful conduct, Plaintiffs have suffered damages including one or more of the following: missed payments for their healthcare services; delayed payments for their healthcare services; the costs of securing financing alternative to those missed or delayed payments; interest charges incurred; additional labor costs; expenses associated with and time spent hiring staff or vendors to troubleshoot the business disruption caused by CHS and the Defendants' shutdown of the Change Platform; expenses associated with and time spent researching and implementing new healthcare payment software and systems; expenses associated with and time spent attempting to manually submit claims and obtain payments that otherwise were to be processed through the Change Platform; late penalties assessed for untimely submission of claims; lost benefit of their bargains and overcharges for the Services; loss of the time-value of money, including but not limited to interest or other income, associated with the preceding injuries and damages.

   a.    As a direct and proximate result of the wrongful acts and omissions of CHS and the Defendants, Precision's profitability was materially reduced, including through the loss of revenue, erosion of margins, increased operating costs, disruption of customer relationships, and impairment of anticipated growth opportunities, all of which diminished EBITDA and weakened financial performance during the relevant period.

Because Precision's enterprise value is derived primarily from its historical and projected earnings and the application of valuation multiples to those earnings, the reduction in profitability directly and foreseeably resulted in a corresponding reduction in enterprise value, to the detriment of both Precision and Holdings.

b. Moreover, as a direct and proximate result of CHS and the Defendants' misleading statements and omissions during the shutdown, Plaintiffs incurred additional financial damages, the extent of which is not yet fully known and continues to impact Plaintiffs.

406.     Plaintiffs' injury was caused by CHS and the Defendants' actions:

407.     But for CHS and the Defendants' failure to employ reasonable security measures, in violation of the law, and despite representing otherwise, CHS and the Change Platform would not have been shut down, and Plaintiffs would not have suffered injuries and incurred damages.

408.     But for CHS and the Defendants' misleading statements and omissions regarding the efficacy of Defendants' security measures, Plaintiffs would not have relied on CHS and the Defendants for their Services and would not have suffered injuries and incurred damages.

409.     But for CHS and the Defendants' misleading statements and omissions regarding the duration and extent of the shutdown, Plaintiffs would not have incurred additional costs associated with mitigating the damage caused by CHS and the Defendants.

410.     Plaintiffs relied on CHS and the Defendants' actions.

411.     At all relevant times, CHS and the Defendants were willfully and knowingly engaged in the use of an unfair and deceptive practice declared to be unlawful.

412.     There is a public benefit in holding CHS and the Defendants liable for their fraudulent, misleading, and deceptive actions.  CHS and the Defendants directed their numerous

misleading statements and omissions at the consuming public and the marketplace. CHS and the Defendants' misleading statements and omissions were widely covered int e4h media and relied on by providers. This prevented providers, insurers, and HER vendors from making informed decisions during the shutdown, thereby impacting the consumer decision-making process. There is a public benefit in holding CHS and the Defendants liable for their misleading statements and omissions.

WHEREFORE, Plaintiffs respectfully request the following relief:

1) That the Court grant permanent injunctive relief to prohibit and prevent CHS and the Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

2) That the Court award Plaintiffs compensatory, consequential, and general damages, including nominal damages as appropriate, for each count as allowed by law in an amount to be determined

3) at trial;

4) That the Court award statutory damages, trebled, and/or punitive or exemplary damages, to the extent permitted by law;

5) That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by CHS and the Defendants as a result of their unlawful acts, omissions, and practices;

6) That Plaintiffs be granted the declaratory and injunctive relief sought herein;

7) That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses; and

8) That the Court award pre-and post-judgment interest at the maximum legal rate and all such other relief as it deems just and proper.

WHEREFORE, Plaintiffs move for the requested relief.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial in the instant action.

**DATED** this 23rd day of February 2026.


Respectfully submitted,

By:  /s/ Gary Mansfield, Esq.
**GARY N. MANSFIELD, ESQ.**
**FBN: 061913**
**RONNIE BRONSTEIN, ESQ.**
**FBN: 84052**
**DAVID STONE, ESQ.**
**FBN: 400432**
**ROBERT MANSEN, ESQ.**
**FBN: 102737**
MANSFIELD, BRONSTEIN & STONE, LLP
200 East Boulevard, Suite 1250
Fort Lauderdale, Florida 33301
Phone 954.601.5600
Fax 954.961.4756
Service Email Designation:
litigation@mblawpa.com